EXHibit (A)

RECEIVED

MAY 05 2008
MAY - 5 2008
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
District of California

CASE # CV - 08 - 1982

Final ExHibit that will

be Filed.

until Asked to Rebuddle

I will Remine silent.

THE coRam Nobis is Filed to
SF. co. superior court. WAiting on
CASe #. and File date.

CERTIFICATE OF SERVICE

Case Name: _George Martha_ v. _THE People oF THE STATE oF California, In For city and canty oF San Francisco._

Case No.: _157784_

IMPORTANT: 2 copies of this brief and any attachments must be sent to ALL parties in this case. Please list below the names and addresses of the parties who were sent a copy of your brief and the dates on which they were served. Be sure to sign the statement below.

I certify that a copy of this brief and any attachments was served, either in person or by mail, on the persons listed below.

Signature

Notary NOT required

| Name | Address | Date Served |
|---|---|---|
| #1 Lead District Attorney. 850 Bryant Street | San Francisco California 94103 | 5-1-08 |
| #2 Hall of Justice of SF, city and county 850 Bryant street | San Francisco California 94103 | Original |

ONE copy was sent to the U.S.A President. George.W. Bush.

ONE to US Congresswoman Office. San Francisco.

ONE to U.S. District Court in For Northern District.
450 Golden Gate Ave
SF. CA. 94102

THE PEOPLE, Plaintiff and Respondent, v. George Martha, Defendant and Appellant

CRIM. NO. 157784

PRIOR HISTORY SUPERIOR COURT of the City and County of SAN, Francisco, NO. 157784 LENARD, D. Louie, Judge

oulisium

CRIMINAL LAW and Procedure → Postconviction Proceedings → Coram Nobis.

[HN8] A writ of error coram nobis is granted when three requirements are met:

(1) the petitioner has shown that some fact existed which, without fault of his own, was not presented to the court at the trial on the merits, and which if presented would have prevented the rendition of Judgment;

(2) the petitioner has shown that the newly discovered evidence does not go to the merits of the issues tried; and (3) the petitioner has shown that the facts upon which he relies were not known to him and could not in the exercise of due diligence have been discovered by him at any time substantially earlier than the time of his motion for the writ.   All Exhibits are newly discovered evidence. I would of went to trial 'for sure. My life is in danger and detention doesn't end. I can't take much more will go with (1) simple none beatable argument.

#1   EXHIBIT (A) PROOF defendant is and was mentaly sick, life long. Evidences left out during court. By 5 Attorneys on one case

#2   I charge EACH Attorney on this case but MR CONROY with Ineffective Assistence of counsle. For not seeking Propere Mental Evaluation. LAW  LAND MARK Case LAW    STRIKlANd V. WASHington. (1984)

Also Pointer V. Texas  380 U.S 400  a Right to Present Witnesses on one's defense. "which I was diprive of."

Also WASHington V. Texas  388 U.S. 14  a Right to Remain Silent. "which I was diprive." "of"

Also Malloy V. Hogan  378 U.S and a Right to be convicted by proof beyond all Reasonable doubt IN RE: winship  397 U.S 358. "which I was diprive of"

After Reading Exhibit (A) Page #1 States clearly in criminal Law and Procedure [HN8] (1) (2) (3)

A writ of ERROR coRam nobis is granted when three Requirements are met:

Exhibit (A) Kills 3 birds with one Stone.

#1 Fact existed without Fault of his own.

#2 Newly discovered Evidence does not go to the merits of issues Tried

#3 due diligence have been discovered by me at Any time substantially earlier than the time of my motion For the writ of ERROR coRam nobis.

6th amendment violation if the paid counslor Rebecca young would have order a 90 obsinuation the court would have Found a mental disorder exsisting. and would have issued medication to stop suffering defendant. 8th amendment violation cruel to Not help a sick Person. In Jail at 850 Bryant SF ca. 94103 defendant was beaten up and Forced to live in "D" Block For safety concerns. which violates 14th Amendmint due process when Rebecca young did Not motion the court For the evaluation.

It's clear in pointer V. Texas 380 U.S. 400 a Right to Present witnesses on one's defense.

It's clear in Rebecca young, violated a Right to Present witnesses After Reading Exhibit (A) criminal Law [HN8] (1) Fact existed without Fault of defendant.

Motion For Reapiontment of counsle MR conRoy and if denied motion FOR a consitution Attorney For this case Needs one iti a matter of life oR death. MR MARtha is Not a Lawyer.

page #2

It's clear In WASHington v. Texas 388 U.S. 14 to Remain silent is a Right. and when a Lawyer Remains silent on one's defense violates defendant's 1st Amendment a Right to speak Freely in defense and it violates Cruel and unusual punishment 8th Amendment mental Tortour to be silent because Incompident to the Issues of Law and Not able to speak Properly in defending himself to explain the Mental problem defendant had. It Violates World Laws As well Read Exhibit (A) The Attorney did not bring up in court Immigration and if (INS) sucessfully deports defendant he Maybe Killed and tortures. iF Removed. Which violates due Process, 5th and 14th and 8th and 1st Amendment. According to Ma v. Reno 2000 9th cvrcvit case Illegal detention Kicked in because Futher more IF you Read Exhibit (B) None of the Above and Even Each Arrest Between 1994 til Present 2008 Jan-25-08 would have happend to defendant iF Brad Davis with Adult Probation would have did his job and Followed the court order "To Transfer Probation to Chicago. Judge Louie clearly Kicked me out of California. Violation of Plea Bargin, Breaching Agreements is Illegal in the united States of America.

SupReme court of THE united states
404 U.S. 257; 92 S. Ct. 495 30 L. Ed
2d 427; 1971
SANToBello v. New yoRK

All the case's Presidented and Briefs Filed by Attorney's will be Motioned into this case submitted by George Martha No. 157784. Summary; 35 App Div 2d 1084, 316 NyS2d 194 counsel; IRving Anolik ARgued the cause and Filed a brief For Petitioner to which I motioned Above to use his brief in ARguments in my Plea being violated. By Brad Davis and

Page #3

CRIMINAL LAW. [HNI] CAL Penal code § 1016.5 requires the trial court before accepting a plea of guilty or Nolo Contendere, to advise a defendant in an appropriate case that the plea may have Immigration consequences CAL Penal code § 1016.5 Provides that if the court Fails to give the advisement and if the defendant shows that his conviction May result in deportation, exclusion, or denial Naturalization, then the court, on defendants motion, shall vacate the Judgement and Permit the defendant to withdraw the plea of guilty or nolo Contendere, and enter a plea of Not guilty.

Exhibit (A)

Human Rights. THE Protection Against Torture Read opinion by PH.D Jess H. GHANNAM. People with mental disorders in 3Rd world country are housed with out proper Treatment and medication. They see it as the act of a devil. It goes Back to the days Jesus casted out demons, From People. Not to disRespect Jesus because he is My Lord, but the PuPle he was dealing with were mentaly sick People with out medication in my opinion.

Back to the merits

Aside From personal opinion to where LAW does not Rule on. CAL P.C. § 1016.5 Requires the court to accept a plea of guilty or Nolo contendere to advise defendant in an appropriate case that a Plea may have (INS) slash Now (ICE) consequences. Attorney was Ineffective to Allow defendant to plea to a possible torture or death case if Removed. This was Not Advised to defendant During Any Plea or we would have went to trial. Original

No Attorney Pleas with cases like torture or death if Attorney is effective Glasher v. U.S.

IF the court carefully Recorded defendants behavior in custody you will Find an uncontrolable person with thought disorders and mood swings left untreated. And housed in the "D" Block hole, For safety concerns,

IF you Read transcript questioning Judge Lovie about deportation was not the Job of client but Attorney conRoy pointer v. Texas 380 U.S. 400. a Right to exspert witnesses to Advise An Incopident Trial Attorney of (INS) LAWS. and world (LAWS). Read declaration by MR CONRoy. Exhibit (c) Also WASHINGTON v. TEXAS 388 U.S. 14. a Right to Remain silent. on transcript questions Asked by defendant to Judge Lovie conRoy should have objected to Me Tonting the Judge. and even to Allow it on Recorded TRANSCRIPT. a Mentaly sick Person with out Properc medication left undiognosed at that time is Innocent of Verbal Abuse or Any verbel Action As long As an Act is not Commited. But convicted For a Threat commited from a distance of 3000 miles over a Phone during a Bipolar episode held on Bond 1 million dollars because of OJ simson v. THE People of the State of california. That is what the DIA told the court in Bond Reduction hearing she Also mention Palistinian Race people Act on Threats to there wives.

Important Foot Note
SAN QUENTIN PRISON 2008

Even up until JAN 2008 and Feb 2008 PhD Brenner and PhD Lippton just Found the Micical drug. Tryliptal it Ables me to think slower and iF they would have diognosed me during trial and gave me Propere medication ~~the~~ ~~pro~~ ~~pro~~ I would not have suffered many more years After. Also IF I would have had been diognosed 10 years before I would not have became a convicted Felon.

CAL PC. § 1016.5 requires the court to advise defendant OF (INS) consequences.

Failed to do so because #1 legal exsperts where not Appointed to help defendant understand mentaly what was going to happen in the Near Future. #2 Backed up by Exhibit (A) PH.D letters. Although DR levy evaluated defendant it was to clear defendant of possible Threats carried out if Released. It was not a disorder evaluation to which I charge Attorneys For Ineffectivness STRIKLAND v. WASHINGTON (1984)
      LANDMARK CASE LAW

#3 IF counslors where Effective and legal exsperts where hired to help explain (INS) consequences will be in the Near Future. And PHD' where there to medicate defendant to make him compident to his surroundings He would of went to Trial.

A Right to Effective Assistance of Counsle
      Glasher v. United States

CAL PC § 1016.5 provides that if the court Fails to give the advisement and if the defendant shows that his conviction may result in deportation, exclusion, or denial of Naturalization, then the court on defendant's motion, shall vacate the judgment and permit the defendant to withdRAw the Plea of guilty or Nolo contendere, and enter a plea of not guilty. which defendant proved above in motion in writ of ERROR CORAM Nobis. This case is half beaten 2001 st cyr V. INS 2001 212-c waver was granted on the part of defendant.

After a long Illegal detention Battle with (INS) To which I have little Regret. Everything happens For a Reason. Public Officeals Needed my Assistence.

#1  1998  I was used to collect Information to convict a man that made death Threats to the US congresswoman of San Francisco to which a copy of this writ of Error will be sent to her office in Washington D.C. Also one to The President of the United States George W. Bush Asking to support my Pardon.

#2  Nov 2001 Before Honorable Donna Little I Stopped a Mad man From Entering Department #12 in SF california Hall of Justice with a 5" Knif. Deputy Oliver and Deputy Washington witnessed my Brave duties. He made threats to him the D/A present that day iF O.R. was not granted.

#3  2002 Testified on the behalf of LT. Lopez Redwood city. To a man who shot a E.P.R Police man.

#4  2003 Saved the life of Correction officer Crocker At mule creek State Prison.

#5  422.PC does not carry death and if I am Removed to a 3Rd world country a death sentence is now Issued. and iF I die in custody a death sentence is now Issued. how much more can # 41 year old man take with history of Tumors RE: 10-11-06 UC. Davis hospital. Surgery on George Martha In custody.

#6  Proof of Abuse By Brad Davis, 2 months before discharging Probation he Revoked my probation and sent me off to Hell. My life is meaningless and Illegal detention is never ending and this is not Justice or the land of the Free to punish someone over and over. I have over over 9 years credit time served. Robbed of my liberty. My Grandmother who Rasied me Refused to die til she saw me. Pour lady die while I was in custody on 9-11-06 10:30 AM in San Diego. Merry Kawash. My moms mom call my mom 925-349-9562

Page #7

To prove uncontrollable Thought disorder Please ask

US. District Judge SUSAN ILLSTON Northern district

court 450 Golden Gate Ave SF. Ca. 94103

I Filed 62 Motions or more in defense in

case No. SC051811 SAN MATEO county Judgment

To which was used to Strik a Strik to which

would have Never happened if BRAD Davis with

Adult Probation would have TRANSFered Probation to

CHicago As ordered by Honorable Judge Louie.

Violation of Plea
BARgin,
SANTo Bello v. New York
404 U.S. 257, 92 S.ct
495 30 L.Ed 2d 427;
1971
(Not CoNRoy) DAve Wise ARANsed Prison deal.

Followed by INEFFective Assistance of counsles part For not
securing Plea Agreement. STRIKland v. WASHington.

I was made to buy a One way Plan ticket back
to CHicago. on TRANscript. ("DAVE WISE". I told him Plea was
BREach. And I should be IN CHicago)

ORder your Record Probation Never was TRANSFered.
I HAVE living witnesses Ready to testifie
I Recieved a Rude Call by Davis in chicago

He stated IF you do NoT come back you will be
Re-ARRested. That Judge Louie unconsitional sentenced
Me and SF county was unwilling to TRANSFer Probation.
Making the whole Family Move Back to CALIFornia and
they are Ready to Testifie on my behalf. IF called
on to do so. I called Brendan conRoy to Advise him
of Brad Davis' deeds. conRoy and I spoke and I was told
I better listen to his order            Page #8

To which EVERY ARRest BETWEEN 1999 - 01, JAN 2008
defendant is Innocent.

After the WRit is granted case No. 157784 will hold
Judgment on San Mateo case No. SCO51811 to which
case No. 157784 made San Mateo case No. SCO51811 an
Aggravated sentence which Again made defendant deport
Able. Motion to vacate the Judgment should be and Needs
to be granted because defendant killed ③ Birds with one
Stone. [HN8] three Requirements are met to grant coram
Nobis have been met;

[HN2] CAL P.C. § 1018   A person may withdraw Plea before
Judgment showing good cause.

Although CAL P.C § 1018 is limited on its Face
to period before Judgment
the courts have long permitted defendants to
move to set A-side the Judgment as a means
of allowing the defendant to withdraw the guilty
Plea after Judgment.

[HN4] under Cal. P.C § 1018.

Mistake, Ignorance or Any other Factor overcoming
the exercise of Free Judgment is - good cause
For withdraw of the Plea, but good cause - -
must be shown by clear and convincing evidence.
The decision to grant the motion to withdraw
the plea lies within the discretion of the trial
court. After Reading Trial Transcripts and
Exhibits this court will be committing Breaking Humanitary
(LAWS) Against defendants Living Rights, IF denied
this writ.

ORiginal

PAge # 9

and PARTISIPATING IN ILLEGAL detention AGAINST MR MARTHA.
The CASE IN → Ma v. Reno (2000) 9th CURCUIT. Never ENding
detention. → OR LOCK them Up and throw AWAy the Keys
LiFers in (INS) detention
NOW (ICe) detention - -

Criminal LAW Procedures
[HN5]  PReliminary Proceedings Enter of Plea → changes and withdrawals.

Where on Account of duress, Fraud, or other Fact overreaching
the Free will and Judgment of a deFendant hE is deprived of
the Right of a trial on the Merits. the court in which he
WAS SentenCed MAy aFter Judgment and aFter the time for Appeal
hAs passed, if a properly Supported Motion is SeasonAbly Made,
grant him the privilege of withdRawing his Plea of guilty.
It Should be Noted however, that this exceptional remedy
Applies onLy UpON a StRoNg and CoNviNciNg ShowiNg
OF the deprivation legal Rights by extRiNsic CAuses
AS IN MR MARtha's CAse No. 157784  SF County
CONViCtioN.

EXHibit (C)

contAiNs  Event sHeet (INS)
1-26-00  letter From Jordan Hat citizen
212-c waver granted
STATus To Employment CArd.
Never Could be AN AmericAN.
unLess Judgment is VACAted.
order oF Supervision. 212-c waver.
JRAD Motion granted by SF County Judge  DAvid GARciA Judge
CRies in the wilderness, unpleasant conditions at Jordan's
Mental institute.
EXHibit (D)
INS TRIAl Attor Attorneys
Pleaing For My life.

ORiginAl

New hold is ISRAEL. But as soon as ISRAEL denys citizenship the U.S Goverment will try Jordan again As they did in the past.

ASK Rebecca. J. Hooley 925-335-1800

EX- Attorney For (INS)
For defendant in this
CASE

EXHibit (C)

Middle EAST and North AFRICA
By BARBABA WALTERS

[HN6]

A Postjudgment motion to change a plea must be seasonably made Thus, the trial court may properly consider the defendant's delay in making his Application, and if considerable time" has elapsed between the guilty Plea and the motion to withdraw the Plea, the burden is on the defendant to explain and justify the delay.

INEFFective counsle
STRIKland V. WASHington.
Effective counsle
Glasher V. United States.

Next Page

explain and Justify the delay lies on burden of counsel

Plus Fairness in securing agreement between an accused and

a prosecutor. It is now clear for example that the accused

Pleading guilty must be counseled absent a waver moore v. Michigan,

355 U.S. 155 (1957) Brad Davis Broke the seal of Plea Bargin.

Fed Rule crim Proc 11. [HN3] Lynch v. overholser. 369 U.S. 705.

719. (1962) Fed Rule crim Proc 11. MR JUSTICE Douglas

Agreed New York did Not Keep it's Plea Bargin, as the

Court will Agree in this writ of ERROR coram nobis San

Francisco case No. 157784 did Not Keeps its Plea Bargin.

[HN 7] Relief From Judgment → Coram Nobis.

A motion to vacate the Judgment is recognized

as equivalent to a petition For the common law Remedy

of a writ of ERROR. CONTRACT LAWS are Firm in

the U.S.A. Headnote [9] LAW § 59

Brady v. United states
397 U.S. 742, 752
[1970]

SEE Cal P.C § 1016.5 (d). Motion to VACATE Judgment

The omission of the advisement under Cal PC 1016.5 will

Provide a ground to vacate Judgment, only Upon a

Showing that a defendant was not aware of the

Possible immigration consequences of his Plea and

would not have entered his guilty or nolo contendere

plea had he been properly Admonished. Defendant Mr.

MARtha has proved his case. Case No. 157784 Change Plea

date Jan. 3. 1995. line 18. 19. 20. Judge Lovie said I could

take back my Plea and go to TRIAL. Motion to do so After

your Read the Transcript. Those where Judge Lovies last

living words to me God Rest his Soul For he Pasted Away

And is in Heaven According to my Prays.

Page # 12

THE People, Plaintiff and Respondent

v.

STEFAN WiEDERSPERG, defendant

CRIM NO. 12967

Court of Appeal of California, First Appellate District Div. THREE

44 Cal. App. 3d 550; 118 Cal. Rptr. 755; 1975

Cal. App

[HN3]

Disposition    The order is Reversed

(2a)    Did the petition State possible grounds For Relief.
(1) (2) (3) Requirements met.

Petitioner has shown that Facts upon which he relies on were not known to him and could not in the exercise of due diligence have been discovered by him at any time substantially earlier than the time on his motion For the writ. ( People v. Shipman (1965) 62 Cal 2d 226, 230 [42 Cal Rptr 1. 397 P. 2d 993].) (2b) The Record [** 758] contains declarations under penalty of purjury which satisfy these Requirements.

omission/

Case 3:08-cv-01982-SI    Document 1    Filed 05/05/2008    Page 16 of 49

Did not go with death. Who is MRS VIVIAN BARBARY For me to ~~SF~~ suffer death
and over and over. Read her declaration and put her in Jail. For my Jeshic

We conclude that the trial court has Jurisdiction

and that the petition Stated Facts upon which the court

in it's discretion and if the proof is sufficient, could

grant the relief sought. (see People V. Superior court (Giron)

(1974) 11 Cal. 3d 793 [114 Cal. Rptr. 596, 523 P. 2d 636].)

I will not live a Normal life until this 422.PC is corrected.
I may Never be Released by Immigration Again iF Judgment Remines.
For the Forgoing Reason THE WRIT of ERROR CORAM Nobis must

be granted in the city and country of SAN Francisco superior

court leavel.

I declare under the Penalty of Perjury that the
Forgoing is true and correct.

ORIGINAL

GM

To: Honorable Judge in for the city and county of SAN Francisco.

MOTION to Subpoena Officer who took the Police Report
He is a Lawyer now. He also picked me up For Chicago Jail.

#1  Look at Transcripts how hard Judge Louie Made it to

Release me to go back to chicago.

a one way NON Stop ticket was Mandatory.

#2  God Rest his Soul if he Know my Plea was Violated
he would Vacate Judgment.

#3  Someone would need to carry his wishes.
With merit of Corose

#4  Read a Signed Declaration by So called Victum.

#5  She only Recorded what she wanted you all to hear.

#6  She prepared my Anger to SNAP then Recorded
My Voice. Intrapment. She only wanted my Body
in SF County For our Son. She went by it the wrong way.

#7  Important.

The officer who took the Report, he Picked me up at the
Cook county Jail. Chicago on a One Million dollar warrant.

↑        $ $

(CC) Added, who picked me up
Officer Saw her in the lobby
And told me He Regreted
taking Report And to Subpeam     Next Page
him in Appeals

#8    I Forgot his Name it was him and a Female officer

#9    when I ARRived to the Jail someone Breach security
      she was there in the lobby to visit me.

#10   Her cousin who is behind this whole OR deal
      is behind All this. SHireff Deputy MAZEN BABARY
      BAdge # 1326 SAN Francisco county. He was Also behind
      Me going to PRison. Having Probation violated 2 Months before
      discharging a 3 year term. " Sounds" Fishie to me.

#11   How Then would she Know EXACT time and date I would
      be IN your Jail. Point is I won this Argument.

#12   No oNe oN earth but Deputy BARBARY could have Found
      out EXACT time and date.

#13   Breaching   security        Motion to Sobepenn that officer
      Breaching   Plea.           who took the Report. and Picked
      Illegal sentence.           Me up From Cook county Jail.
      ─────────────               He is a Lawyer Now And I
                                  Need him on PART of defense
                                  IN writ oF ERRoR CoRam Nobis.

      All Behind a BAd officer. This officer and his Cousin
      and Brad Davis messed up my whole life.

      This Story is the truth the whole truth so
      help me God.

OF SAN Francisco Calif

ORIGINAL

THE PEOPLE OF the STATE
OF CaliforNiA
V.

George MArtha

CASE No. 157784
Appiortment oF Counslt
For possible death
Sentence case.

THE writ of ERROR CORAm Nobis.

IN the MAttER under the 422. PC it does not cARRy a death penalty sentence. But in this MAtter it does. THere For I Am ILLegAly charged. and ILLegAliy sentenced.

APPiontment oF caunsle is most MANditory in possible death penalty cases.

IN the WRit oF ERROR CORAm Nobis ERRORs are CRyisAl cleur in this MAtter. CASE No. 157784

#1  Exsiting FActs leFt out oF court. All ExHibits AFter the FAct came out AFter Immigration proceeding.

#2  ~~Count~~ Counslors 100 %. INeFFective and INcopedert to CRimiNAl LAW, and Mental Health LAWs world LAWs Most oF All (INS) slash (Ice) LAWs that changed EVERydAy. IN this writ a Law will change. Because Immigration Law changes EVERy year and criminal Attorneys No Nothing About it or can keep up with it.

ORIGINAL

There Fore  EACH  County  needs  experts  in  Court
to explain penaltys. IN special case that could lead to death
By not explaining  to  me  I  Face possible death.
due to mental Issues, this  VACtion of  Judgment Should
Stand.

#3.  Breaching  Plea  and  not  securing  Plea Bargin.

These meet  Requirments  For  VACAting  Judgement
in  Coram nobis  Rules.

And  Require  Appiortment  of  Cansle.


I declare under the Penalty  of  purjury that
the Forgins is true and  correct

To vacate a conviction on the grounds that the court did not explain or obtain a waiver of Rights from the defendant at the time of a guilty plea, the non-citizen must show: (1) that s/he was not properly advised of his or her rights; (2) that s/he would not have entered the plea if properly advised of his/her Rights; and (3) that s/he used "due diligence" in Raising this issue see People v. Castaneda (1995) 37 Cal. App. 4th 1612, 44 Cal. Rptr. 2d 666, 670. Actual ignorance of the Immigration Consequences must be shown. SEE Exhibits left out of court Before plea. "In Addition, the Immigration consequences not explained must take effect. To meet the due diligence Requirement, the defendant must show that s/he diligently presented the motion and the underlying Facts supporting the motion.

## Ineffective Assistance of Counsel.

THE 6th Amendment to the U.S Constitution and Article I, Section 13 of the California Constitution give the Right to effective Assistance of counsel. A criminal defendant is deprived of effective counsel when his or her defense Attorney Fails to act in a manner expected of a Reasonably competent Attorney acting as a diligent Advocate, and it is Reasonably probable that a determination More Favorable to the defendant would have resulted if counsel had been effective see Strickland v. Washington, 466 U.S 104 S.ct 2052 (1984). People v. Fusselman (1983) 33 Cal. 3d 572, 584; People v. Pope (1979). 23 Cal. 3d 412. To qualify as Ineffective Assistance of counsel, the omissions of defense counsel must involve a critical Issue and not be justified by a Knowledgeable choice of tactics. People v. Farley (1979) 90 Cal. App. 3d 851, 153 Cal. Rptr. 695, 698 See People v. Perez (1978) 83 Cal. App. 3d 718.

### Important Footnote

After the Fact defendant was told by experts torture or death could happen if Removed. Attorney was 100'l. INEFFective. We would have went to trial and had a seperate trial to see if the punishment Fit the crime Vacation of Judgment is the only Relief. and a complet wip out of criminal History Betwean the time 1994 til 2008. THe years.

California courts have found that counsel is required to investigate the immigration consequences of a plea and advise the client of those consequences before entering a plea. See People v. Soriano (1987) 194 Cal. App. 3d 1470, 240 Cal. Rptr. 328 (Also finding that counsel cannot merely advise client that deportation, exclusion, and denial of naturalization may result). THE Ninth Circuit is beginning to recognize the validity of this argument see United States v Gonzalez, 58 F.3d 459 (9th Cir. 1995) other federal courts, however, have generally found that immigration consequences are collateral to a defendant's case, and a defendant need not be advised of them prior to taking a plea. See United States v. Del Rosario (D.C. Cir. 1990) 902 F.2d 55, 59.

THE following elements must be established in order to make a claim for ineffective assistance of counsel: (1) defense counsel did not investigate the exact immigration consequences that would flow from conviction; (2) counsel did not advise client of those consequences, (3) Client did not enter the plea knowingly and intelligently, and (4) there is a reasonable probability that D would have chosen to go to trial rather than accept the plea See Lockhart v. Fretwell. 506 U.S. 364 (1993); Hill v. Lockhart, U.S. 52, 59 (1985); Strickland v Washington 466 U.S. 668 (1984);

IN CRIMINAL LAW CONCERNING Immigration special cases like File No# A17796939 ONce a Plea OR Judgment is ENtered Either by Plea or Judgment by Jury or by Judge one's consitutional Rights and Human Rights are in violation. Dve proces. is in violation becavse Attorney's become ineFFective. THey become this why From incompidency. THey Also violate the 1st Amendment oF the United States. Not Speaking in deFense For a client violates Freedom oF speach. A Right to deFend and speak in deFense. once a case is done and a capital Punishment is later Issued with out a Separate Jury Trial First is Illegal. Second Illegaly charged. A crime must Fit the Punishment. And it has Nothing to do with Immigration LAW. It has to do with ~~Incop~~ Incompedent Attorneys. IF I where the lawyer in a case that had to do with (INS) Removeal Now (Ice) I would think First beFore accepting Any Judgment. Which Attorney would accept torture or death in plea,? I would say an INcompident one. #1 condistions oF mental health would Run in my Attorney mind. #2 PHyical. #3 condistions in his or her cavntry and so on.

THe only way to sort out this Evidence is properly and careFully. Exspert witnesses. It's back words in case's like mine. It would oF been Easyer and soFter iF Immigration conducted proceedings First so I covld have presented Exspert witnesses to the Plea Bargin caurt or Jury Trial. No Jury would convict some one oF torture or death out side it's penalty For the crime.

### Pointer v. Texas 380 U.S. 400

A Right to Present witneses in one's deFense "very clearly said". Evidence leFt out oF supiorer Courts For one second is to long specialy when it's Right under our noses and could eFFect Judgment 100%. IN Favour oF one's liFe.

### STrickland v. WAsHington
INeFFective caunsle

Also Glasher v. United States. A Right to EFFective Assistence oF counsle.

Motion this court to order (M) file # A1/176957 Just see how much evidence was left out of my case. For purpose of Exhausting State Remidies, should be granted.

WASHINGTON V. TEXAS 388 U.S 14. a Right to Remain silent. For an Ineffective Trial Attorney To Allow a Plea Bargin to be entered that the punishment is out side the penalty OF the crime will later be Issued into Torture or death Acording to legal exsperts say will happen to me violates a Right to Remine silent. Violates Plea Bargain. Violates the 5th 6th 14th 8th and 1st Amendment of the united states. Malloy v Hogan 378 U.S Right to be convicted by proof beyond All Reasonable doubt IN RE: winship. 397 U.S. 358 To which all people Facing torture or death have a Right to. Blakely v. Either United States or California a separate Jury Trial must be conducted For punishment out side the normal Range. To Violate Plea Santobell v. New york. contract Laws are Firm in the united states Brady v. United States 397 U.S. 742 752 (1970)

Anyone In any kind of case like mine inside Immigration or out side Immigration should have Judgment vacated if they where deprived of the Full Protection of our consitutional Laws set out by our Four Fathers. Though I was Able to walk on the tight Rope and survive how many Innocent Blood did Ineffective Assistance of counsle Shed, by Removing someone's Body to a 3rd world country that placed an Innocent person in harms way. Also effecting American Families he or she left behind. We have to protect Hardship in our American Families.

Also

It's very clear in my case I am Innocent For each Arrest between 1994 until 2008. Brad Davis and city and county of San Francisco in case No 157284 Broke the seal of Plea not once but twice. #1 Incompident to world Law & Follows the Illegal possibility of capital punishment out side the penalty of the Crime defendent committed. and second seal Broke by Staff For Never Transfering Probation to Chicago As ordered by Judge Louie. Read Transcripts they don't lie.

Page#2

I am very sure a Rebuddle brief will be Filed to Attack the Merits of the case.

To Allow the superior court to see Abuse of Authority commited by U.S. Attorney General in 1960's. F.B.I. Files, Please Read the case John Lennon v. United States Attorney General. F.B.I Files Found U.S. Attorney Notes stated clearly let's set John Lennon up By Placing drug's on him. THen Read File NO A 17796939 denial of Protection of torture by a very heartless U.S. Attorney. in George Martha's case.

Cases are some times unfair because Evidance is Not Brought Forth by lazy Attorneys.

(1990's)
SF. County. Louie Martha v. THe People of the State of California Did 120 MPH on slop Blvd by the SF Zoo. He hit a Pole he killed Johnny Salamma. He tried to put Johnny's Body in the drivers set to Say he was driving witnesses said. He did not call Johnny's ~~parnts~~ mom or dad. Johnny was dead 1 1/2 dies with out his mom and dad Knowing About it. Louie got 38 Hours Commuity service, Acording to his Driving Record should of got Life Without Parole.

                    OR

Sean Moloney v. THe People, SF County D.U.I. Murdered a Friend in the (1980's) 6 Months county Jail, Sean is a Big time drug Lord and walks the Street Still.

                    OR

Prison Board Abuse California State sight All old lifers Motion to Sight All old lifer case's Needs to be granted to Exhaust State Remidies. well Have Exsamples

   D. Rick Stevens B-79550    Jose Velasquez B-06047
   Both at Mule creek in Ione.

   Even medical in California State Prison RE: UC Davis
                                          saved my life

And in the years I suffered over case no. 157784 steamed out of
San Francisco County, to which contract was not fulfilled on
the part of staff of the city and county of San Francisco
is Now a poor in humain contract placing one's life in harm
Mental Anguish or physical harm. because of Probation officer
Brad Davis and incompident Attorneys.

Special case's like mine, and cases like Anyone who
suffer Any Illegal plea to which can be proven
beyond a Reasonable dout that it was Broken should
Vacate his or her Judgment in writ of ERROR coram
Nobis. like my transcript will prove. And the whole Martha Family
is Ready to testifie as soon as live Witnesses Are call to do so.
EVEN Victums of Californias 3.S.L Three strike
Law. Since that Law is Abused and Many Inmates
Already Killed themselves and it's a political Law
Maybe it's a loop whole to File Political Asylum Against
California Political Law with in the United States to
seek Relief From Bondage custody and to flood
the Federal court with case's with merit and giving
loop whole to grant VACATION of Judgment. by the
court should be filed today by All 3.S.L defendants.

<u>Important Note</u>

3.S.L was steamed into hell. Mental & medical & living
Torture. Even After the Federal Goverment took over medical.
3.S.L was written out of Revange by a weeping Grand Father
who lost his grandchild behind A Freak. Now the weeping is said
And done and the Freak is in death Row where he Belongs convicted
beyond the Reasonable dout within season. the writter wants to Change this
Law.

Also how many people do we know of that died AFter a Removeal?
And with out a proper Evidence hearing to seek ~~tree~~ truth if ones
life could be taken or placed in Harms way if deport.

Appointment counsle is 100%. Nessesary in This writ in the
Superior court leavel to Exhaust this Remidy for higher leavel
of care in Appeal if Nessesary or if denied.

Motion to Appoint world Law exspert Attorneys to Answer this ?

This motion must be granted before a Render of descion in this case
Again.

"THE ones who Already died," "or have been or still are being toetured
we can't bring back." we maybe able to bring back the living through Family
ties if one survived torture, "on Appeal". or Emergency Transport which will
generate more (ICE) Employment to which is good.

In the dead it's to late goes back to the story of King David. While
he Fasted and weeped his sons Illness until he died. Servants said
why where you weeping while he is Alive. But once he died you stopped
weeping? King David said I can't bring him back but I could go to him.
when I die. God Rest Both of there souls. This is why it is so Important
to have exspert witnesses Before the time of Plea to secure the Plea
100%. To prevent a seal From being Broken, Because once someone
claims torture or death to an Immigration court the Plea becomes
Vacatable. And to save time and extra detention Immigration ought to
conducte special cases. specialy For them to have a Hearing before
criminal proceeding start to which will generate more Jobs and
sort out Bogus deportable People From ones who Are not Removeable
At all. It will save money and give more Jobs to young Bright People.
Concerning case no. 157784  File # A 17796939  the penalty to the
offense is unjust and over due For Relief to start and detention to end.

Back to the point this case will steam into a Law
For the good of All. It will Finally Sort out or Filter
out who Should Face Removeal Before conviction and
~~Seam~~ Save lot's of money and time on Bogus case's.
and Generate more Job's within Immigration Law to
Which is slowly dieing out. and to educate Trial
Courts and Attorneys & O/A's of Human Rights. It
Will teach them to be more compassionate to These
deserving Compassion.

Important case

One second is to long to leave Evidence out of One's deFense
Pete Rose v. California. (2006) 11 years credit time served. Innocent
Project in Santa Clara county California Found him Innocent. TAlk About
Abuse of Staff within California inside Goverment within the State.
of California. Same Abuse happened to George Martha V. The People
of the State of California in For city and county of San Francisco. Case
No. 157784 Evidence left out of court during the time it was Avaible but
left out due to Incompident Attorney's. seal was Broken Also.

Important case

Important Argument

It goes back to the days of Jesus he said to the Fisherman be Fisher
men of men. your an Attorney you have to Fish For All Possible Evidence.
Everything happens For a Reason I lived to make history so the
Transcripts will be Fulfilled Amen. And it wasn't until Ph.D --at
San Quentin in ~~2008~~ 2008 of this year Ph.D Brenner Ph.D Lippton
Issued (Trylieptal) which Abled me to think in many years properly
Even After diagnosed. I've been taken the wrong medication til this
year. I miss my son dame it!

People who where deported in the past ore Facing deportation After the Fact of this ERROR who Face torture or death. Had a Right to present witnesses Before Plea or Pretrial or Trial by Judge OR Jury About exsiting torture on death iF Removeal is successful had a Right to be tried First by Immigrantion before criminal proceedings to Exhaust Federal Remedies First to present to Trial State OR Federal courts to show the Judge OR Jury possible death or torture could Acore. to weigh out if the crime Fits the punishment. To Issue death or torture one person world have to commit the crime to punish Him or her under that penalty. "All clear" IN other words the Evidence is Brought out to late. IN order to Save lives Immigration proceeding should come before State of Federal court Plea or trial, then After. you can't bring back a dead Body. But you can Save one. where at war with dictators to help save INNocent lives. IF so how can we kill INNocent people who do not deserve death or torture as part of the punishment For a crime they commited that does not carry that penalty.

Punishment Laws require a separate Jury trial to weigh out punishment properly for one's crime.

and to leave out the evidence deprives People in such case's of a fair and just Judgment.

And on the part of State and Federal courts before the fact need to Sobpena exsperts to help Sort out the problems in the merit of these case's.

Violating due Process by not having Exsperts tell a Jury torture or death could happen in certain case's like mine Accore and 100% Vacation of Judgment Should be granted. And any crime after that was used to Repunish steamed by a Prior Shald Automately be Vacated As well For the first crime was an Illegal Plea or conviction As Law Stands with Merit.

Noone deserves Consitutional Error Noone at All.

(1) second or (20) years is to long to laps

Evidence in any case. To defend one's personal Rights to Equal Protection to our Consitution in the U.S.A.

<u>Pete Rose v California</u>  2006
Innocent Project Santa Clara California

Jurisdiction Laws are Also violated, many change's need to be made to secure Safety upon Removel in State court and Federal court leavel in Immigrant case's. By First having the Immigration proceeding to Render Evidence to a separate Jury trial to weigh out the punishment to see if it Fits the crime, Before conviction. "Because if torture or death or Both or more time Added to A sentence does include to punishment it's a Jury who deside's to weigh the Judgment, A Jury can order munity Against deportation As part of punishment to a sentence if one's lives could be taken or tortured. To have a Biased Attorney General lie or Frame to Remove a body to EARN A name like the A.G. in John Lennons case violates protection Against torture. Which gives the trial court the power over deportation in EVERY legal way. Like In my First Removel Proceeding it was left out of Plea or separe trial. To which I would have won After the Jury heard how Vicious the young U.S. Attorney denied Protection Against torture After Exhibits where Placed in Front of his Face. And young Attorneys shouldn't have munity of Any crime. Sending Someone to die is murder. whAt's the diffFerence between a Soilder who Kills out of the line of duty. and get's convicted during the time of war. over the young U.S. Attorney who commits the Same act Intentionally or Not. A liFe is a life.

Seperate Jury trial For Punishment    BLAKLY v. United States supreme court,

THis brief is For All Immigrants who Face death or torture beyond the penalty of the crime they commited who can not speak For themseleves, who have Lawyers who violate there 1st Amendment Right on up to the very last Amendment.

Motion this court to Appoint
Effective Assistence of exspert
Attorreys in such cass's be
granted

Motion to Protect defendant
By Staff members in SF.
county Jail if moved to
your Jail to hear this
writ of ERROR with MERIT.

Motion Futhere more to
have U.S. officers escort
me to and From court and
horsed in the Federal Prison
in Pleasenton California.
Fear of Retaliation For making
treve statements of Abuse
From SF county staff.

To have a legal exspert Add up All the extra time of Illegal detention Steamed on the Part of the seal Broken by Brad Davis and SF county Hall of Justice STAFF. To pay $110⁰⁰ a day to George MARTHA. To wipe out Any and All Arrest and convictions between 1994 til 2008 Steamed by this contract being Broken by the Aboved Persons INTENTIONNAlly. IS the only Relief JUSTIFICAble to George MARTHA.

And to have each Person who Runs under the same cases seek the same Relief. Munity From deportation And $110⁰⁰ Per day For extra detention.

I declare under the PeNAlTy oF PuRjury that the Forgoing is true and correct.

BRieF Submitted

UNIVERSITY OF CALIFORNIA, DAVIS
HEALTH SYSTEM

182 43 47 7    10-010787595
MARTHA ,GEORGE
AKA
M   06/01/1967 ADM 10/11/06

**TERMS AND CONDITIONS OF SERVICE**

University policy, California and federal law and regulations authorize the maintenance of this information. Furnishing all information requested is mandatory unless otherwise noted. Failure to provide such information may affect your medical care and/or insurance benefits and coverage. The information you provide may be disclosed to others, however, you have the right to review your medical information and the right to request restriction of access to your medical information, as described in the Notice of Privacy Practices. If you would like your agent under a durable power of attorney for health care or your next of kin to receive a copy of your rights and responsibilities as a patient of UCDHS (Notice of Privacy Practices & Patient Rights and Responsibilities Notice), please contact the Health Information Management Department at (916) 734-5205.

8. **FINANCIAL AGREEMENT:** I agree to pay The Regents of the University of California for professional, hospital and clinic services, including UCDHS physician services, in accordance with the regular rates and terms of UCDHS. I also agree to pay for other professional services provided by other physicians at UCDHS. Should the account be referred to an attorney or collection agency for collection, I agree to be responsible for all collection fees (attorney's fees, costs and collection expenses) in addition to any other amounts due. Unpaid accounts referred to outside agencies for collection also bear interest at the then current legal rate.

9. **ASSIGNMENT OF BENEFITS (INCLUDING MEDICARE BENEFITS):** I authorize and direct the payment to UCDHS of any insurance benefits including hospital insurance and unemployment compensation disability benefits otherwise payable to or on my behalf for UCDHS services, including emergency services, at a rate not to exceed UCDHS' actual charges. I understand that I am financially responsible for charges not paid pursuant to this agreement. I further agree that any credit balance resulting from payment of insurance or other sources may be applied to any other account owed to UCDHS by me.

**I have read, agreed to and received a copy of this Terms and Conditions of Service.**

| | | |
|---|---|---|
| Signature of Patient | or | Signature of Patient's Representative |

| | |
|---|---|
| Relationship of Representative to Patient | Signature of Interpreter |

Signature of Witness
(required if patient unable to sign)

10·11·06

Date of Signing

---

**For office use only:**
EXCEPTIONAL SIGNATURE REQUIREMENTS ARE REFERENCED BELOW. Please check the appropriate box(es).
❏ **PATIENT IS LEGALLY INCOMPETENT TO SIGN:** The court approved guardian or conservator, the agent under an Advance Directive, or family member or other appropriate surrogate must sign as "Patient's Representative."
❏ **PATIENT IS PHYSICALLY INCAPABLE OF SIGNING:** The patient should give verbal consent, witnessed by a UCDHS employee. The Patient's Representative should sign in witness of the patient having given verbal consent. The UCDHS employee witness shall also sign.

To. E.N.T. Dept. 4th Floor                    10-31-06

NAME: George Martha                Please send to me
D.O.B. 06-01-1967                  legal mail.
ADM. date 10-11-06.
# 182 43 47 7    10-010787595



RECEIVED
NOV 27 2006
HEALTH INFO. MGTMT. DEPT.
U.C.D. MED CENTER
SACRAMENTO CA 95817

Please grant my Request.

#1   Need copies of All medical Records.
#2   Need a letter from the doctors opinion
     stipulated if this Adenoid tumor would have Remined in
the location it was in, that it would have turned deadly.
   ok cancerous.
Please Repond soon.
this Information is for a legal civil case Against prison medical
staff.
Thank you

copy Made.

Mail to ---> : George Martha  T-69137
Thank you.   P.o Box 409040 B-6-115-up
             Ione ca. 95640
             Mule creek State prison

# UNIVERSITY OF CALIFORNIA, DAVIS



BERKELEY ● DAVIS ● IRVINE ● LOS ANGELES ● MERCED ● RIVERSIDE ● SAN DIEGO ● SAN FRANCISCO        SANTA BARBARA ● SANTA CRUZ

UC DAVIS MEDICAL CENTER
2315 STOCKTON BOULEVARD
**UCDHS is Unable to Fulfill Your Request**ENTO, CALIFORNIA 95817

11/27/06
George Mattha    T-69137
George Martha
Po Box 409099
B-6-115-Up
Ione, CA 95640

RE:    George Martha / 1824347

The Health Information Management Department at University of California Davis Medical Center
has received a request for medical information regarding the above-mentioned patient.

We are unable to comply with your request due to one or more of the following reasons:
The enclosed authorization/subpoena has been found invalid for the following reason(s):

- ✗ **Invalid authorization form: please see standard UCDHS authorization form
  approved by the UCD Compliance Officer, enclosed for your convenience. You
  may download this form from
  www.ucdmc.ucdavis.edu/compliance/guidance/privacy.**
- ☉ The authorization must be signed by the patient; or if the patient is a minor, signed by the
  parent or legal guardian; if the patient is mentally or physically incompetent or deceased,
  signed by the legal representative.
- ☉ If signed by other than the patient, proof of next of kin, executor of estate, Durable Power
  of Attorney for Heath Care, conservatorship papers or legal guardianship papers must be
  provided.
- ☉ The authorization must be dated.
- ☉ Authorization must be complete. Please see where indicated on form.

We are returning the correspondence in its entirety. Please resubmit everything including the
requested documents / information, monies or as otherwise stated. Your request will be
processed promptly upon receipt of the requested information.

Sincerely,

Karl Moertz
Release of Information Unit
Health Information Management Department
UC, Davis Health Systems
Phone 916-734-5205
Fax 916-734-2126

TO THE Imigration Judge:

I VIVIAN BarBary declares as follows :

1. I have personnel Knowledge of these facts and coud testify com Peterrtly and truthfully to them If called as a witness.

2. I have Known George Martha for 14 years. We are distanT cousins

3. In all the years I have known George Martha he has never hit me or pHysically abused me.

4. In 1994 I complained to the Police about a threatening Phone call, that George Martha had made to me. However at No time did I actually believe that he woud carry out his threats. He was convicted based on that Phone call.

I Declare under Penalty of Perjury that the foregoing is true and correct And that this declaration was executed On Febuary 11, 1999 In San FRancisco California

_Vivian Barbary_
Vivian BarBary

To Whom it may concern,

5/11/00

I am writing  you this letter in reference to Mr. George Martha he is my ex-husband
I don't feel afraid of him nor is our 9 year old son Anthony. Mr Martha has been locked up for a very
Long time. I am sure if you release him that he would really turn his life around. It is time for him and
His son to finally get to know one another. He is a good person and deserves a second chance in life. I
I have also gone to court on his behalf and told the judge that I am not afraid of him. So please
give him a chance and let him come and live with his mother and father so he can really be a part of his
sons life.  Please take this to heart and let our son start having a father around. Mr Martha only wants to
be in his sons life he writes to him everyday. Now I feel he should be able to do more in person instead.

Thank You,

Vivian Barbary

EXHIBIT $(A)$



ATTORNEYS AT LAW

October 18, 1999

Dr. Jess Ghanim

**VIA FACSIMILE ONLY**

Re:    <u>George Martha</u>

Dear Dr. Ghanim:

I am writing to follow up our telephone conversation regarding George Martha's mental condition. As I mentioned over the telephone, in order for Mr. Martha to have a chance of avoiding deportation to Jordan, he needs a letter from you containing:

- your qualifications;

- your confirmation that you read the letter from Mr. Martha's psychiatrist and that you are therefore familiar with Mr. Martha's condition;

- a description of the projects you have done in connection with Jordan, to establish your knowledge about conditions for mental patients there; and

- your conclusion that, in your professional opinion, should Mr. Martha be deported to Jordan, he would likely be confined to an insane asylum due to his mental condition, be denied treatment, or be subject to some other horrible fate.

Thank you for assistance in this matter.

Sincerely,

Dana Mendelson

211 Gough Street, Suite 112 ◆ San Francisco, California 94102
Telephone: (415) 255-9922 ◆ Facsimile: (415) 255-9919

## Informed Medication Consent

**Valproic Acid and Derivatives**

☐ Valporic Acid (Depakene)          ☐ Divalproax Sodium (Depakote)

Route of Administration: Oral    Frequency: Up to four times a day.
Total Daily Dose: _100_ to _3,600_          *NEURONTIN*
Other:

This medication is being prescribed to treat the symptoms of your mental, emotional, or behavioral problems, the nature of which is as follows:_____*BIPOLAR DISORDER*_____.

### ADVANTAGES
Although this medication is used primarily to treat convulsions, it is also effective in treating certain psychiatric conditions such as bipolar disorder (manic phase) or acute agitated states associated with other affective disorders. It may be effective when other treatments have failed.

**PSYCHOTHERAPY WITHOUT THIS MEDICATION**
☐ Your condition is likely to worsen
☐ Your condition is unlikely to improve
☒ Your condition may improve but with significant delay
☐ Other_____

**EXPECTED DURATION OF TAKING MEDICATION**
☐ During hospitalization
☒ During hospitalization and after discharge
☐ Other_____

**ALTERNATIVES TO THE USE OF THIS MEDICATION**
☐ Discharge ☒ Other Medications_____          ☐ Other_____

### SIDE EFFECTS
Any medication may produce unwanted side effects along with the desired results. Some side effects may appear even before benefit from the medication is experienced. If side effects do appear, they may fade during continued treatment. Examples of side effects which may occur are:

**More Common:** Nausea, vomiting, cramps, diarrhea, constipation.

**Less Common:** Sedation; hair loss; bone marrow suppression; elevation in liver enzymes; liver toxicity, primarily in children; rash; reduction in the number of blood platelets (thrombocytopenia).

**Rare:** Tremor, poor muscular coordination (ataxia), headache, "spots before the eyes", worsening of psychiatric disorders.

> **All side effects should be reported and discussed with the doctor, nurse, or pharmacist.**

**CAUTION:** Avoid the use of alcoholic beverages while taking this medication. This medication should not be used in patients who have liver disease.

### PATIENT'S CONSENT
I hereby authorize and consent to the administration of the medication within the daily dose and frequency ranges specified above. I have discussed all of the above information with my (my child's) physician, and have received all of the information I presently desire concerning such medication and treatment. I understand I may seek further information at any time. I also understand that I have the right to refuse the administration of this medication, and that I may withdraw my consent to the administration of this medication at any time by stating my intention to any member of the treatment team.

Signature _____    Date _10/4/99_  Time _4:15/PM_
Patient/Parent/Guardian/Conservator

☒ The information above has been discussed with the patient, who reports having read and understood it.

☐ The patient appears to understand the nature and effects of the medication and consents to the administration, but does not wish to sign this consent form.

_____ Date _10/4/99_ Time _4:15/PM_
Physician

_____ Date _____ Time _____
Witness (When Required)

**Patient Identification**

*Martha, George*

*Fischer*

CPC Belmedco 8-10-92



**ATTORNEYS AT LAW**

## FACSIMILE TRANSMISSION COVER SHEET

Date:     **November 17, 1999**                    Time:  **6:49 PM**

From:    **Dana Mendelson, Esq.**

To:        **George N. Martha**
              **Walnut Creek Hospital**

Number of pages (including cover sheet):        **14**

Comments:

**Send any corrections within 2 hours.**

*IMPORTANT NOTICE:*   **This facsimile transmission contains confidential
attorney-client communications and is intended to be viewed only by the
recipient indicated above. If you have received this transmission in error,
please contact Mendelson & Associates immediately at (415) 255-9922. You
may contact this facsimile machine at (415) 255-9919.**

211 Gough Street, Suite 112 ● San Francisco, California 94102
Telephone: (415) 255-9922 ● Facsimile: (415) 255-9919

## Craig Fischer, M.D.

*177 LA CASA VIA, SUITE 1 • WALNUT CREEK, CA 94598 • 925-280-8787 • FAX 925-280-8783*

October 11, 1999

Dana Mendelson
211 Gough Street, Suite 112
San Francisco, California 94102
VIA Fax 415-255-9919

Re:    George Martha

Dear Ms. Mendelson,

At your request, I am reporting on my evaluation and treatment of George Martha. As you are aware, Mr. Martha was admitted to Walnut Creek Hospital under my care on September 23, 1999. He remains hospitalized at this time. I have reviewed information sent with him, have interviewed him approximately ten times, and have reviewed his current hospital record.

Mr. Martha was referred to Walnut Creek Hospital by the Immigration and Naturalization Service because his behavior while in custody indicated that he was mentally ill. He reportedly had been diagnosed previously, while in INS custody, as having a bipolar disorder. He had been on medications to treat this disorder, but the medications had been discontinued. He was again demonstrating irritability, poor judgment, and poor impulse control, to the extent that he was placing himself at risk of harm by other inmates.

Based on my evaluation of Mr. Martha, I concur with the diagnosis of Bipolar Disorder, Currently Hypomanic. It is manifest by hyperactivity, increased internal energy, irritability, poor impulse control, impaired judgment, and insomnia. In addition, he is suffering from Psychotic Disorder, Not Otherwise Specified. This latter disorder is most likely the residual of prior amphetamine use, and consists of mild paranoid ideation and infrequent hallucinations.

Mr. Martha's psychiatric disorders are treatable, although he will likely need lifelong treatment, including medication. He currently is in need on ongoing psychiatric hospital treatment, for approximately two to four more weeks. He is taking psychiatric medication to control the symptoms of both of his disorders, currently consisting of Depakote and Neurontin, two mood stabilizing drugs, and Seroquel, an antipsychotic drug. Although still symptomatic, he is responding to treatment.

With treatment, Mr. Martha's prognosis is good. If he continues on medication, he should have minimal or no symptoms. I would anticipate that he would be able to return to be a productive member of society. He should be able to work if he stays in treatment.

Re: George Martha
October 11, 1999
Page 2

Without ongoing treatment, including medication, his prognosis is very poor. He is very likely at least periodically to have significant symptoms of his illness. He is likely to again have poor impulse control, poor judgment, and irritability. I believe he would again quickly get himself in trouble, most likely by provoking others. While in custody, he apparently has often provoked others, thus setting himself up to be victimized. Without medication, he will no doubt continue this pattern. In my opinion, if he is deported to a country where he is unlikely to be continued on medication, and where psychiatric illness is not tolerated or appropriately recognized, his safety would be at significant risk.

You have asked if his psychiatric illness could have been a factor in the incident that led to his arrest, i. e., making threatening remarks to his wife during a phone conservation. Although I obviously have no information as to his mental state at that time, his actions were typical of acutely manic patients. Such patients frequently become hostile and threatening, and often act without any recognition of the consequences of their actions. Impulse control and judgment are usually impaired.

I hope I have provided the information you need. Please let me know if I can be of further assistance.

Very truly yours,

Craig Fischer, M.D.
Diplomate, American Board of Psychiatry
and Neurology

CF:cw
Martha 101199.wpd

**JESS H. GHANNAM, PhD**
1939 DIVISADERO, SUITE 3
SAN FRANCISCO, CALIFORNIA 94115

TEL 415 921 8096 / FAX 415 921 8095

27 October 1999

Dana Mendelson
Attorney at Law
211 Gough Street, Suite 112
San Francisco, CA 94102                    Re: George Martha

Dear Ms. Mendelson:

Per your request I have reviewed the letter from Mr. Martha's psychiatrist, Dr. Craig
Fischer, and I am in a position to render an opinion regarding the implications of Mr.
Martha's psychiatric condition should he be deported to Jordan.

    Let me begin by stating my qualifications. I have a PhD from the University of
California at Berkeley and am currently the Chief of Medical Psychology and the
Director of Training in the Department of Psychiatry at UCSF-Stanford, Mount Zion.
I am a licensed psychologist in the state of California (PSY 9261) and have a private
practice in San Francisco. I have been practicing for about 14 years and have worked
in the Middle East as a consultant for the past 6 years. My main area of work in
Middle East, specifically, in Palestine, Jordan, and Egypt, has been to help establish
mental health clinics and training programs to help local professionals improve the
quality of care in this region. Mental illness in this part of the world is seen as the
"work of the devil" and most people with mental disorders do not have access to
modern treatments. Typically they go without treatment or are housed in
unregulated locked facilities or simply put in jail and tortured. These conditions
frequently make these individual decompensate very quickly and often they do not
live very long.

    Given that Mr. Martha have a very severe and chronic form of mental illness
requiring ongoing treatment for the rest of his life, should he be deported to Jordan it
is my professional opinion that his condition would worsen and he would not receive
the care that he so badly needs. He would run the risk of decompensating to a
condition that could precipitate his early and painful demise. Please feel free to
contact me should you have any additional questions or concerns.

Very truly yours,

Jess H. Ghannam, PhD

State Of California

Creekside Adult School

# Certificate of Completion

awarded to

## GEORGE NAVEIRA

who has successfully completed the following instruction

V08.03.01 THRU V08.03.06
VOCATIONAL WELDING PROGRAM

and is hereby honored and congratulated for achieving this commendable goal.



WESTERN ASSOCIATION OF
SCHOOLS AND COLLEGES
Accreditation #
0395000869

March 14, 2007
Date

VOC0148/#T-69137

Log#



Instructor

Supervisor of Academic Vocational Instruction

# Certificate of Achievement



is hereby granted to

*George Martha*

for completion of the course on

## *Thought Disorders*

*Granted: 04/14/2000*

Laurie M. Fortier, LMSW

# Columbia Care Center



*George Martha,* CCC187

is awarded this certificate in recognition of faithful participation in weekly worship services and special events sponsored by the Chaplain's Department on this *24th* day of *April* in the year of our Lord *2000.*

Chaplain - Columbia Care Center
Rock of Ages Prison Ministry, Inc.

*So then faith cometh by hearing, and hearing by the word of God. Romans 10:17*



| 6-Feb-99 | Income | Martha, G. | $ | (960.00) |
|---|---|---|---|---|
| 31-Mar-99 | Income | Martha, G. | $ | (40.00) |
| 31-Mar-99 | Income | Martha, G. | $ | (500.00) |
| 30-Apr-99 | Income | Martha, G. | $ | (1,000.00) |
| 4-Jun-99 | Income | Martha, G. | $ | (500.00) |

EXHibit $\left( B \right)$

Declarations
call Rebecca . J. Hurley
415 - 335 1800

She got them From Conroy.

* * * Transmission Result Report ( Nov. 29. 2000  3:27PM )  * * *

T T I   MCCUTCHEN ETAL SF242

| File | Mode | Option | Address (Group) | Result | Page |
|------|------|--------|-----------------|--------|------|
| 4030 | SAF_TX | | 9-99001-880-495-4429 | OK | P. 19/19 |



Reason for Error
1) Hang up or line fail          2) Busy
3) No answer                     4) No facsimile connection



MCCUTCHEN, DOYLE, BROWN & ENERSEN, LLP

Three Embarcadero Center      San Francisco    Palo Alto
San Francisco, California 94111-4067   Los Angeles    Taipei
Tel. (415) 393-2000 Fax (415) 393-2286   Walnut Creek
www.mccutchen.com

ATTORNEYS AT LAW

## Fax Cover Page

**Date:**    November 29, 2000

**To:**    **Brandon Conroy**
           fax: 415-495-4429          voice:

**From:**   Sejal A. Mistry
           fax: (415) 393-2286    voice: (415) 393-2278  smistry@mdbe.com

**Number of pages (including this page):** 17
For fax transmission problems, please call (415) 393-2174.

**Message:**



Document 82-2 Filed 05/05/2008    Page 2 of 51

0060811



# M°CUTCHEN

**M°CUTCHEN, DOYLE, BROWN & ENERSEN, LLP**

Three Embarcadero Center    San Francisco    Palo Alto
San Francisco, California 94111-4067    Los Angeles    Tainei
Tel. (415) 393-2000 Fax (415) 393-2286    Walnut Creek
www.mccutchen.com

## ATTORNEYS AT LAW

# Fax Cover Page

**Date:**      November 29, 2000

**To:**       **Brandon Conroy**
          fax: 415-495-4429          voice:

**From:**     **Sejal A. Mistry**
          fax: (415) 393-2286          voice: (415) 393-2278  smistry@mdbe.com

**Number of pages (including this page): 17**
For fax transmission problems, please call (415) 393-2174.

**Message:**

2000 NOV 29 PM 3: 12

RECEIVED
MDBE LLP
SF FAX DEPT

**WARNING:**
*This fax is intended only for the recipient(s) named above. If you receive this fax by mistake, please telephone us (collect) at the above voice number to let us know of the error. If this fax contains privileged or otherwise legally protected information, disclosure of the information to anyone other than the named recipient(s) is not authorized, and you may not lawfully read, copy, or otherwise use this fax unless you are a named recipient or a named recipient's authorized representative.*



Document 7-2 Filed 05/05/2008 Page 4 of 51

**MCCUTCHEN, DOYLE, BROWN & ENERSEN, LLP**

Three Embarcadero Center
San Francisco, California 94111-4067
Tel. (415) 393-2000 Fax (415) 393-2286
www.mccutchen.com

San Francisco   Palo Alto
Los Angeles     Tainei
Walnut Creek

0060811

## ATTORNEYS AT LAW

# Fax Cover Page

**Date:** November 29, 2000

**To:** **Brandon Conroy**
fax: 415-495-4429          voice:

**From:** **Sejal A. Mistry**
fax: (415) 393-2286          voice: (415) 393-2278   smistry@mdbe.com

**Number of pages (including this page): 17**
For fax transmission problems, please call (415) 393-2174.

**Message:**

RECEIVED
MDBE:
SF FAX DEPT
2000 NOV 29 PM 3: 12

**WARNING:**
*This fax is intended only for the recipient(s) named above. If you receive this fax by mistake, please telephone us (collect) at the above voice number to let us know of the error. If this fax contains privileged or otherwise legally protected information, disclosure of the information to anyone other than the named recipient(s) is not authorized, and you may not lawfully read, copy, or otherwise use this fax unless you are a named recipient or a named recipient's authorized representative.*

SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO • PROBATION ORDER
SAN FRANCISCO ADULT PROBATION DEPARTMENT • 880 BRYANT ST. ROOM 200 • SAN FRANCISCO CA 94103 (415) 553-1704

Case 3:08-cv-01902-SI    Document 1-2    Filed 05/23/2008    Page 3 of 51

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SC # | | MC# | COURT DATE | DEPT. NO. |
|---|---|---|---|---|---|---|---|
| Martha | George | Nimer | 157784 | 1533143 | | 01/17/95 | 25 |

| CA | | | APO NO. | FILE NO. | SFPD NO. | JUDGE |
|---|---|---|---|---|---|---|
| | | | 345511 | | 422949 | Louie |

| ADDRESS | OFFENSE |
|---|---|
| 4409 North Kedzie | 422 PC |

| | SOCIAL SECURITY NO. | CONVICTED BY | CII NO. |
|---|---|---|---|
| Chicago, Illinois 60625 | 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 | | A08310586 |

| INTERPRETER NEEDED/SPECIFY LANGUAGE | RECEIVED DATE | COMMUNITY SERVICES SUPERVISOR |
|---|---|---|
| | | |

| D.O.B. | P.O.B. | SEX | PHONE NO. | CASELOAD NO. | C/S PROBATION OFFICER | PHONE |
|---|---|---|---|---|---|---|
| 06/01/67 | Palestine, IS. | M | 312-588-5539 | | | |

| INVESTIGATING PO, EXTENSION | DA | DEFENSE ATTORNEY |
|---|---|---|
| Diane Bekk | Susan Breall | E. Contoy |

---

COURT ACTION

THE ABOVE NAMED DEFENDANT, BEING PRESENT IN COURT AND HAVING BEEN CONVICTED OF VIOLATION(S) OF SECTION(S) _____

IT IS HEREBY ORDERED THAT:

☐ A: IMPOSITION OF SENTENCE SUSPENDED.   ☐ _____ YEARS STATE PRISON SUSPENDED   ☐ BWI

☐ B: PROBATION BE DENIED AND THE DEFENDANT SENTENCED TO: ☐ STATE PRISON ☐ CALIFORNIA YOUTH AUTHORITY.

☒ PROBATION GRANTED FOR 3 YEARS COMMENCING ON 1-17-95

---

TERMS AND CONDITIONS

1. ☒ SERVE _____ DAYS/MONTHS/ONE YEAR IN THE COUNTY JAIL ___ DAYS
   ☐ THRU SWAP: SURRENDER DATE _____ (AND PAY SWAP FEES AS DETERMINED)

1A. ☐ NO WORK FURLOUGH / ☐ NO COUNTY PAROLE / ☐ NO EARLY RELEASE.
B. ☐ WORK FURLOUGH PERMITTED / SOX
C. ☐ MAY BE SERVED IN LIVE-IN DRUG TREATMENT PROGRAM.

2. ☐ WARRANTLESS SEARCH CONDITION: AS TO DEFENDANT'S PERSON, PREMISES OR VEHICLE ANY TIME DAY OR NIGHT, WITH OR WITHOUT PROBABLE CAUSE, BY ANY PEACE, PAROLE, OR PROBATION OFFICER.

3. ☐ WEAPONS: DO NOT POSSESS ANY FIREARM OR ANY OTHER DANGEROUS OR DEADLY WEAPON.

4. ☐ ALCOHOL: DO NOT DRINK ALCOHOLIC BEVERAGES.

5. ☒ SUBMIT TO: DRUG/CHEMICAL TESTING AS DIRECTED BY THE PROBATION OFFICER.

6. ☐ DRIVING: DO NOT DRIVE WITHOUT A VALID DRIVER'S LICENSE AND INSURANCE.

7. ☐ NOT TO DRIVE WITH ANY MEASURABLE ALCOHOL IN BLOOD.

8. ☐ DRIVER'S LICENSE: _____ SURRENDER LICENSE TO CLERK OF THE COURT HERE SENT TO D.M.V. DRIVING PRIVILEGE AND LICENSE IS SUSPENDED BY THE COURT FOR _____ MONTHS. ☐ DRIVING PRIVILEGE IS RESTRICTED BY THE COURT, EXCEPT THAT DEFENDANT IS AUTHORIZED TO DRIVE TO AND FROM, OR, IN THE COURSE OF EMPLOYMENT AND _____

9. ☐ OBTAIN/CONTINUE PSYCHIATRIC IN/OUT-PATIENT DRUG/ALCOHOL/PSYCHIATRIC TREATMENT _____

10. ☒ DO NOT THREATEN, MOLEST, HAVE NO WRITTEN, TELEPHONE, PERSONAL OR THIRD PARTY CONTACT WITH _____

☒ NOTIFY THE PROBATION OFFICER IMMEDIATELY WHEN YOU CHANGE YOUR RESIDENCE OR EMPLOYMENT.

☒ OBEY ALL LAWS. FEDERAL LAW PROHIBITS ANY CONVICTED FELON FROM POSSESSING A FIREARM.

• ☒ REPORT TO THE PROBATION OFFICER MONTHLY, OR AS DIRECTED. FAILURE TO REPORT IS A VIOLATION OF THE TERMS OF YOUR PROBATION.

11. ☐ REGISTER PURSUANT TO PROVISIONS OF: [ ] 290PC   [ ] 457.1PC [ ] 11590 H&S

12. ☐ PAY RESTITUTION TO THE VICTIM IN THE AMOUNT OF $ _____ OR IN AN AMOUNT AND MANNER TO BE DETERMINED BY THE COURT, OR THE PROBATION OFFICER, PLUS 10% ADMINISTRATIVE FEE.

13. ☐ RESTITUTION TO INCLUDE OUT OF POCKET EXPENSES ONLY.

14. ☐ PAY RESTITUTION TO THE RESTITUTION FUND PURSUANT TO SECTION 1203.04P.C. IN AN AMOUNT OF: _____

15. ☐ PAY A RESTITUTION FINE TO THE RESTITUTION FUND IN THE AMOUNT OF $ _____ PURSUANT TO SECTION 13967 OF THE GOVERNMENT CODE, PLUS 10% ADMINISTRATIVE FEES.

☐ SAID RESTITUTION FINE TO BE STAYED PENDING PAYMENT OF RESTITUTION, STAY TO BECOME PERMANENT UPON SUCCESSFUL COMPLETION OF PROBATION.

16. ☐ PERFORM _____ HOURS OF COMMUNITY SERVICE.

17. ☐ PAY PROBATION COSTS AT THE RATE OF $ _____ /MO. IN A MANNER DETERMINED BY THE PROBATION OFFICER.

18. ☐ PAY $ _____ FINE PLUS PENALTY ASSESSMENT TO THE CASHIER'S OFFICE OF THE ADULT PROBATION DEPT. IN SUCH MONTHLY INSTALLMENTS AS DIRECTED BY THE PROBATION OFFICER.

19. ☐ PAY A $ _____ CRIMINAL ANALYSIS FEE PURSUANT TO SECTION 11372.5 HEALTH AND SAFETY CODE ON EACH COUNT.

20. ☐ PAY ATTORNEY FEE RECOUPMENT PURSUANT TO 987.8PC IN AN AMOUNT OF:

21. ☐ PAY $ _____ AIDS EDUCATION FINE PURSUANT TO P.C. 1463.23

22. ☐ PAY THE COST OF INCARCERATION IN THE AMOUNT OF $ _____

23. ☐ OTHER CONDITIONS: _____

24. ☐ POSSESS NO DRUGS WITHOUT PRESCRIPTION.

25. ☐ PROGRESS REPORT ORDERED FOR _____ DATE IN DEPT# _____

☒ NOTIFY THE PROBATION OFFICER OF ANY ARRESTS NO MORE THAN 24 HOURS AFTER THEY OCCUR. (EXCLUDING WEEKENDS AND HOLIDAYS)

---

I ACKNOWLEDGE THAT PROBATION OFFICER HAS EXPLAINED ABOVE CONDITIONS     DEF INIT _____ DATE _____

X _____
SIGNATURE OF DEFENDANT                                    DATE

_____
SIGNATURE OF COURT CLERK/COURT OFFICER     DATE

_____
SIGNATURE OF PROBATION OFFICER                 DATE

THE ANNEXED INSTRUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE. ATTEST:
NOV 30
Clerk of the Superior Court
San Francisco

## ABSTRACT OF JUDGMENT – PRISON COMMITMENT
### SINGLE OR CONCURRENT COUNT FORM
(Not to be used for Multiple Count Convictions nor Consecutive Sentences)

FORM DSL 290.1

☑ SUPERIOR
☐ MUNICIPAL     COURT OF CALIFORNIA, COUNTY OF     SAN FRANCISCO
☐ JUSTICE

| COURT (I.D.) | BRANCH OR JUDICIAL DISTRICT: |
| S 38 | |

**FILED**
San Francisco County Superior Court

**APR 1 1 1997**

ALAN CARLSON, Clerk

BY: _Esther Berick_
Deputy Clerk

**PEOPLE OF THE STATE OF CALIFORNIA** versus
**DEFENDANT:** George N. Martha          ☒ PRESENT     SC# 157784
**AKA:**          ☐ NOT PRESENT

**COMMITMENT TO STATE PRISON**          **AMENDED**
**ABSTRACT OF JUDGMENT**          **ABSTRACT** ☐

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO | JUDGE | CLERK |
| 04 08 97 | 25 | Lee D. Baxter | Esther Berick |
| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
| LaVena Ward Page | Barge, G. | Wise, D. | 345511 |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONY (OR ALTERNATE FELONY/MISDEMEANOR):

| | | | | YEAR CRIME COMMITTED | DATE OF CONVICTION | | | CONVICTED BY | | | | TIME IMPOSED | |
| COUNT | CODE | SECTION NUMBER | CRIME | | MO | DAY | YEAR | JURY TRIAL | COURT TRIAL | PLEA | TERM (L.M.U) | YEARS | MONTHS |
| 1 | PC | 422 p | Terrorist Threats | 94 | 01 | 03 | 95 | | | X | L | 1 | 4 |

2. **ENHANCEMENTS** charged and found true **TIED TO SPECIFIC COUNTS** (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.: For each count list enhancements horizontally. Enter time imposed for each "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add up time for enhancements on each line and enter line total in right-hand column.

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
| | | | | | | | | | | | |

3. **ENHANCEMENTS** charged and found true **FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS** (mainly § 667-series) and **OTHER.** List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 non-violent prior prison terms under § 667.5(b) list § 667.5(b) 2 times). Enter time imposed for each "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add time for these enhancements and enter total in right-hand column. Also enter here any other enhancement not provided for in space 2.

| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
| | | | | | | | | | | |

4. OTHER ORDERS:

THE ANNEXED INSTRUMENT IS A
CORRECT COPY OF THE ORIGINAL
ON FILE IN MY OFFICE.
ATTEST: CERTIFIED

NOV 3 0 2000

GORDON PARK-LI, Clerk
San Francisco County Superior Court
BY _____ DEPUTY CLERK

5. TIME STAYED § 1170.1(a) (DOUBLE BASE LIMIT):

| 6. TOTAL TERM IMPOSED: | 1 | 4 |

7. ☐ THIS SENTENCE IS TO RUN CONCURRENT WITH ANY PRIOR UNCOMPLETED SENTENCE(S):

8. **EXECUTION OF SENTENCE IMPOSED:**

A. ☐ AT INITIAL SENTENCING HEARING     B. ☐ AT RESENTENCING PURSUANT TO DECISION ON APPEAL     C. ☒ AFTER REVOCATION OF PROBATION     D. ☐ AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC § 1170(d)     E. ☐ OTHER

9. DATE OF SENTENCE PRONOUNCED (MO) (DAY) (YR)     04 08 97

| CREDIT FOR TIME SPENT IN CUSTODY | TOTAL DAYS 384 | INCLUDING: | ACTUAL TIME 256 | LOCAL CONDUCT CREDITS 128 | STATE INSTITUTIONS ☐ DMH | ☐ CDC |

10. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:

☒ FORTHWITH     ☐ INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:     ☐ CALIF. INSTITUTION FOR WOMEN – FRONTERA     ☐ CALIF. MEDICAL FACILITY – VACAVILLE     ☒ CALIF. INSTITUTION FOR MEN – CHINO     ☒ DEUEL VOC. INST.

☒ AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS     ☐ SAN QUENTIN

☒ OTHER (SPECIFY): Stay of surrender to 04-21-97.

### CLERK OF THE COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE _Esther Berick_ | DATE 04-11-97 |

This form is prescribed under Penal Code § 1213.5 to satisfy the requirements of § 1213 for determinate sentences under Penal Code § 1170. Attachments may be used but must be referred to in this document.

**ABSTRACT OF JUDGMENT – COMMITMENT**
**SINGLE OR CONCURRENT COUNT FORM**
(Not to be used for Multiple Count Convictions nor Consecutive Sentences)
**FORM DSL 290.1**

Form Adopted by the
Judicial Council of California
Effective April 1, 1992

DISTRIBUTION:          PINK COPY – COURT FILE          YELLOW COPY – DEPARTMENT OF CORRECTIONS

## DECLARATION OF BRENDAN P. CONROY

I, Brendan Patrick Conroy, do hereby declare:

1.    I am an attorney admitted to practice law in California.

2.    I represented George N. Martha as his criminal defense counsel, concerning terrorist threats charges which ultimately resulted in a conviction in 1995.

3.    I was advised that Mr. Martha was a Lawful Permanent Resident of the United States at the time I was representing him.

4.    I was aware that a conviction for terrorist threats under Penal Code 422, the charge that Mr. Martha was facing at the time I represented him, might result in his deportation.

5.    I am aware that Mr. Martha indicates that he and I talked about a possible INA § 212(c) waiver. Although I do not have a specific recollection, it is my usual practice to discuss that with my clients. I understand that Mr. Martha ultimately decided to enter a guilty plea in part based on the availability of this waiver.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, information and belief. Executed this/5 day of _June_ 2001 at San Francisco, California.

Brendan P. Conroy

## DECLARATION OF GEORGE N. MARTHA

I, George N. Martha, hereby declare:

1.    I am a lawful permanent resident of the United States and have been living in the
United States since I was four months old. I am a national of Jordan where I was born on June 1,
1967. My entire family, including my mother, father, two sisters, brother, and Anthony, live in
the United States and are United States citizens.

2.    In the thirty-three years since his initial entry, I have never left the U.S. I have no
family or friends in Jordan and I only speak fluent in English.

3.    On January 3, 1995, I pled no contest to a violation of Penal Code §422 terrorist
threats charges. In making my plea, I relied upon the availability of a discretionary immigration
waiver, known as Immigration and Nationality Act ("INA") §212(c). I understood that because
of my long-term residency in the U.S. and the fact that my sentence was significantly shorter
than five-years, I would be eligible for the waiver of deportation.

4.    I entered my plea in reliance on the understanding that I would still be eligible to
apply for a waiver of deportation before the immigration judge if I was later placed in
deportation proceedings.

5.    If I had known in 1995 that I would not be eligible to apply for a waiver of
deportation before an immigration judge as a result of my plea, I would not have agreed to the
plea and would have gone to trial. The ability to remain in the United States was of paramount
importance to me and I would not have done anything to jeopardize my residency status.

I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct to the best of my knowledge, information and belief. Executed this
16 day of June 2001 at Redwood City, California.

George N. Martha

THE ANNEXED INSTRUMENT IS A
CORRECT COPY OF THE ORIGINAL
ON FILE IN MY OFFICE.
ATTEST: CERTIFIED

NOV 3 0 2000

Superior Court

PEOPLE ... Superior Court CLERK

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**CITY AND COUNTY OF SAN FRANCISCO**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | SUSAN M. BREALL |
| | ) | NO. 157784 |
| Plaintiff, | ) | **ENDORSED** |
| | ) | **F I L E D** |
| vs. | ) | San Francisco County Superior Court |
| | ) | |
| GEORGE NIMER MARTHA, | ) | <u>INFORMATION</u> NOV 02 1994 |
| | ) | |
| Defendant(s). | ) | **ALAN CARLSON, Clerk** |
| | ) | BY: __AIDA M. CALIXTON__ |
| | ) | Deputy Clerk |

<u>COUNT I:</u>

### GEORGE NIMER MARTHA

is accused by the District Attorney of the City and County of San Francisco, State of California, by this Information, of the crime of felony, to wit:  VIOLATION OF SECTION 422 OF THE CALIFORNIA PENAL CODE,

committed as follows:  The said defendant(s) on and between the 7th day of August 1994 through the 16th day of August 1994, both dates inclusive, at the City and County of San Francisco, State of California, did willfully and unlawfully threaten to commit a crime which would result in death and great bodily injury to another person, to wit:  VIVIAN BARBARY made so unequivocally, unconditionally, immediately and specifically as to convey to the person threatened a gravity of purpose and an immediate prospect of execution.

<u>COUNT II:</u>

The said defendant(s), GEORGE NIMER MARTHA, is further accused by the District Attorney of the City and County of San Francisco, State of California, by this Information, of the crime of felony, to wit: VIOLATION OF SECTION 646.9(a) OF THE CALIFORNIA PENAL CODE,

committed as follows:  The said defendant(s) on and between the 7th day of August 1994 through the 16th day of August 1994, both dates inclusive, at the City and County of San Francisco, State of California, did willfully, maliciously and repeatedly follow and harass VIVIAN BARBARY, and make a credible threat against him/her immediate family with the intent to place him/her in reasonable fear of his/her safety.

/ / /

/ / /

. . .

People vs.  George Nimer Martha        S. C. NO.  157784

#### COUNT III:

The said defendant(s), GEORGE NIMER MARTHA, is further accused by
the District Attorney of the City and County of San Francisco, State
of California, by this Information, of the crime of felony, to wit:
VIOLATION OF SECTION 646.9(b) OF THE CALIFORNIA PENAL CODE,

committed as follows:  The said defendant(s) on and between the 7th
day of August 1994 through the 16th day of August 1994, both dates
inclusive, at the City and County of San Francisco, State of
California, did  willfully, malicously, and repeatedly follow and
harass VIVIAN BARBARY, and make a credible threat against him/her
immediate family with the intent to place him/her in reasonable fear
for his/her safety, when there was in effect Temporary Restraining
Order prohibiting said behavior.

#### COUNT IV:

The said defendant(s), GEORGE NIMER MARTHA, is further accused by
the District Attorney of the City and County of San Francisco, State
of California, by this Information, of the crime of felony, to wit:
VIOLATION OF SECTION 422 OF THE CALIFORNIA PENAL CODE,

committed as follows:  The said defendant(s) on and between the 10th
day of August 1994, at the City and County of San Francisco, State
of California, did willfully and unlawfully threaten to commit a
crime which would result in death and great bodily injury to another
person, to wit:  VIVIAN BARBARY made so unequivocally,
unconditionally, immediately and specifically as to convey to the
person threatened a gravity of purpose and an immediate prospect of
execution.

#### COUNT V:

The said defendant(s), GEORGE NIMER MARTHA, is further accused by
the District Attorney of the City and County of San Francisco, State
of California, by this Information, of the crime of felony, to wit:
VIOLATION OF SECTION 422 OF THE CALIFORNIA PENAL CODE, committed as
follows:  The said defendant(s) on and between the 12th day of
August 1994, at the City and County of San Francisco, State of
California, did willfully and unlawfully threaten to commit a crime
which would result in death and great bodily injury to another
person, to wit:  VIVIAN BARBARY made so unequivocally,
unconditionally, immediately and specifically as to convey to the
person threatened a gravity of purpose and an immediate prospect of
execution.

People vs.  **George Nimer Martha**              S. C. NO.  **157784**

COUNT VI:

The said defendant(s), GEORGE NIMER MARTHA, is further accused by
the District Attorney of the City and County of San Francisco, State
of California, by this Information, of the crime of felony, to wit:
VIOLATION OF SECTION 422 OF THE CALIFORNIA PENAL CODE,

committed as follows:  The said defendant(s) on and between the 16th
day of August 1994, at the City and County of San Francisco, State
of California, did willfully and unlawfully threaten to commit a
crime which would result in death and great bodily injury to another
person, to wit:  VIVIAN BARBARY made so unequivocally,
unconditionally, immediately and specifically as to convey to the
person threatened a gravity of purpose and an immediate prospect of
execution.

ARLO SMITH
District Attorney

P. E. PRINCIPE

Assistant District Attorney

0375Y/cde

SF. County CASE No. 157784   Plea WAS FulFilled.

Probation ExHibit

correct Address. CHicago

Never transfered.

Violation of FulFilling
Plea BARgin.

Seal Broken by SF county

Staff and courts and Attorney.
Because seal was Broken my life
turned into Hell. Between 1994
til 2008 Not Guilty of Any
Crime or convictions.

# SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO • PROBATION ORDER

SAN FRANCISCO ADULT PROBATION DEPARTMENT • 880 BRYANT ST. ROOM 200 • SAN FRANCISCO, CA 94103 (415) 553-1704

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SC # | | MC# | COURT DATE | DEPT. NO. |
|---|---|---|---|---|---|---|---|
| Martha | George | Mimer | 157784 | 1533143 | | 01/17/95 | 25 |

| AKA | | | | APD NO. 345511 | FILE NO. | SPD NO. 422949 | JUDGE Louie |
|---|---|---|---|---|---|---|---|

| ADDRESS 4409 North Kedzie | OFFENSE 422 PC | | |
|---|---|---|---|

| Chicago, Illinois 60625 | SOCIAL SECURITY NO. 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 | CONVICTED BY | CII NO. A08310586 |
|---|---|---|---|

| INTERPRETER NEEDED/SPECIFY LANGUAGE | RECEIVED DATE | COMMUNITY SERVICES SUPERVISOR |
|---|---|---|

| D.O.B. 06/01/67 | P.O.B. PAlestine, IS. | SEX M | PHONE NO. 312-588-5539 | CASELOAD NO. | C/S PROBATION OFFICER | PHONE |
|---|---|---|---|---|---|---|

| INVESTIGATING PO, EXTENSION Diane Bekk | DA Susan Breall | DEFENSE ATTORNEY E. Contoy |
|---|---|---|

## COURT ACTION

THE ABOVE NAMED DEFENDANT, BEING PRESENT IN COURT AND HAVING BEEN CONVICTED OF VIOLATION(S) OF SECTION(S)

PC 1 - 422 P/F

### IT IS HEREBY ORDERED THAT:

☐ A: IMPOSITION OF SENTENCE SUSPENDED. ☐ _____ YEARS STATE PRISON SUSPENDED ☐ BWI

☐ B: PROBATION BE DENIED AND THE DEFENDANT SENTENCED TO: ☐ STATE PRISON ☐ CALIFORNIA YOUTH AUTHORITY.

☑ PROBATION GRANTED FOR __3__ YEARS COMMENCING ON __1-17-95__

## TERMS AND CONDITIONS

1. ☑ SERVE ____ DAYS/MONTHS/ONE-YEAR IN THE COUNTY JAIL __/__ CTS
   ☐ THRU SWAP: SURRENDER DATE ____ (AND PAY SWAP FEES AS DETERMINED)

1A. ☐ NO WORK FURLOUGH / ☐ NO COUNTY PAROLE / ☐ NO EARLY RELEASE.
B. ☐ WORK FURLOUGH PERMITTED / SOX.
C. ☐ MAY BE SERVED IN LIVE-IN DRUG TREATMENT PROGRAM.

2. ☐ WARRANTLESS SEARCH CONDITION AS TO DEFENDANT'S PERSON, PREMISES OR VEHICLE, ANY TIME DAY OR NIGHT, WITH OR WITHOUT PROBABLE CAUSE, BY ANY PEACE, PAROLE, OR PROBATION OFFICER.

3. ☐ WEAPONS: DO NOT POSSESS ANY FIREARM OR ANY OTHER DANGEROUS OR DEADLY WEAPON.

4. ☐ ALCOHOL: DO NOT DRINK ALCOHOLIC BEVERAGES.

5. ☑ SUBMIT TO: DRUG/CHEMICAL TESTING AS DIRECTED BY THE PROBATION OFFICER.

6. ☐ DRIVING: DO NOT DRIVE WITHOUT A VALID DRIVER'S LICENSE AND INSURANCE.

7. ☐ NOT TO DRIVE WITH ANY MEASURABLE ALCOHOL IN BLOOD.

8. ☐ DRIVER'S LICENSE: ____ ORDER LICENSE TO CLERK OF THE COURT TO BE SENT TO D.M.V. ____ DRIVING PRIVILEGE AND LICENSE IS SUSPENDED BY THE COURT FOR ____ MONTHS. ____ DRIVING PRIVILEGE IS RESTRICTED BY THE COURT, EXCEPT THAT DEFENDANT IS AUTHORIZED TO DRIVE TO AND FROM, OR, IN THE COURSE OF EMPLOYMENT AND ____

9. ☐ OBTAIN/CONTINUE IN-PATIENT/OUT-PATIENT DRUG/ALCOHOL/PSYCHIATRIC TREATMENT COUNSELING ____

10. ☐ DO NOT THREATEN, MOLEST, HAVE NO WRITTEN, TELEPHONE, PERSONAL OR THIRD PARTY CONTACT WITH ____

☑ NOTIFY THE PROBATION OFFICER IMMEDIATELY WHEN YOU CHANGE YOUR RESIDENCE OR EMPLOYMENT.

☑ OBEY ALL LAWS. FEDERAL LAW PROHIBITS ANY CONVICTED FELON FROM POSSESSING A FIREARM.

• ☑ REPORT TO THE PROBATION OFFICER MONTHLY, OR AS DIRECTED. FAILURE TO REPORT IS A VIOLATION OF THE TERMS OF YOUR PROBATION.

11. ☐ REGISTER PURSUANT TO PROVISIONS OF: [ ] 290PC [ ] 457.1PC [ ] 11590 H&S

12. ☐ PAY RESTITUTION TO THE VICTIM IN THE AMOUNT OF $ ____ OR IN AN AMOUNT AND MANNER TO BE DETERMINED BY THE COURT, OR THE PROBATION OFFICER, PLUS 10% ADMINISTRATIVE FEE.

13. ☐ RESTITUTION TO INCLUDE OUT OF POCKET EXPENSES ONLY.

14. ☐ PAY RESTITUTION TO THE RESTITUTION FUND PURSUANT TO SECTION 1203.04P.C. IN AN AMOUNT OF:

15. ☐ PAY A RESTITUTION FINE TO THE RESTITUTION FUND IN THE AMOUNT OF $ ____ PURSUANT TO SECTION 13967 OF THE GOVERNMENT CODE, PLUS 10% ADMINISTRATIVE FEES.

   ☐ SAID RESTITUTION FINE TO BE STAYED PENDING PAYMENT OF RESTITUTION, STAY TO BECOME PERMANENT UPON SUCCESSFUL COMPLETION OF PROBATION.

16. ☐ PERFORM ____ HOURS OF COMMUNITY SERVICE.

17. ☐ PAY PROBATION COSTS AT THE RATE OF $ ____ /MO. IN A MANNER DETERMINED BY THE PROBATION OFFICER.

18. ☐ PAY A $ ____ FINE PLUS PENALTY ASSESSMENT TO THE CASHIER'S OFFICE OF THE ADULT PROBATION DEPT. IN SUCH MONTHLY INSTALLMENTS AS DIRECTED BY THE PROBATION OFFICER.

19. ☐ PAY A $ ____ CRIMINAL ANALYSIS FEE PURSUANT TO SECTION 11372.5 HEALTH AND SAFETY CODE ON EACH COUNT.

20. ☐ PAY ATTORNEY FEE RECOUPMENT PURSUANT TO 987.8PC IN AN AMOUNT OF:

21. ☐ PAY $ ____ AIDS EDUCATION FINE PURSUANT TO P.C. 1463.23

22. ☐ PAY THE COST OF INCARCERATION IN THE AMOUNT OF $ ____

23. ☐ OTHER CONDITIONS ____

24. ☐ POSSESS NO DRUGS WITHOUT PRESCRIPTION.

25. ☐ PROGRESS REPORT ORDERED FOR ____ DATE IN DEPT# ____

☑ NOTIFY THE PROBATION OFFICER OF ANY ARRESTS NO MORE THAN 24 HOURS AFTER THEY OCCUR. (EXCLUDING WEEKENDS AND HOLIDAYS)

I ACKNOWLEDGE THAT PROBATION OFFICER HAS EXPLAINED ABOVE CONDITIONS

X _____

| SIGNATURE OF DEFENDANT | DATE |
|---|---|

| SIGNATURE OF COURT CLERK/COURT OFFICER | DATE | SIGNATURE OF PROBATION OFFICER | DATE |
|---|---|---|---|

# ABSTRACT OF JUDGMENT – PRISON COMMITMENT
## SINGLE OR CONCURRENT COUNT FORM

(Not to be used for Multiple Count Convictions nor Consecutive Sentences)

FORM DSL 290.1

☒ SUPERIOR
☐ MUNICIPAL
☐ JUSTICE
COURT OF CALIFORNIA, COUNTY OF _____ SAN FRANCISCO

COURT (I.D.)
S 38

BRANCH OR JUDICIAL DISTRICT:

**F I L E D**
San Francisco County Superior Court

APR 1 1 1997

ALAN CARLSON, Clerk
BY: _Esther Berick_
Deputy Clerk

PEOPLE OF THE STATE OF CALIFORNIA versus
DEFENDANT: George N. Martha
AKA:
☒ PRESENT
☐ NOT PRESENT
SC# 157784

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT
AMENDED
ABSTRACT ☐

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO | JUDGE | CLERK |
|---|---|---|---|
| 04 08 97 | 25 | Lee D. Baxter | Esther Berick |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| LaVena Ward Page | Barge, G. | Wise, D. | 345511 |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONY (OR ALTERNATE FELONY/MISDEMEANOR):

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO | DAY | YEAR | CONVICTED BY JURY TRIAL | COURT TRIAL | PLEA | TERM (L.W.U) | TIME IMPOSED YEARS | MONTHS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 422 p | Terrorist Threats | 94 | 01 | 03 | 95 | | | X | L | 1 | 4 |

2. ENHANCEMENTS charged and found true TIED TO SPECIFIC COUNTS (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.: For each count list enhancements horizontally. Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add up time for enhancements on each line and enter line total in right-hand column.

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

3. ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER. List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 non-violent prior prison terms under § 667.5(b) list § 667.5(b) 2 times). Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add time for these enhancements and enter total in right-hand column. Also enter here any other enhancement not provided for in space 2.

| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

4. OTHER ORDERS:

THE ANNEXED INSTRUMENT IS A
CORRECT COPY OF THE ORIGINAL
ON FILE IN MY OFFICE.
ATTEST: CERTIFIED

NOV 3 0 2000

GORDON PARK-LI, Clerk
By County Superior Court
San Francisco
DEPUTY CLERK

5. TIME STAYED § 1170.1(g) (DOUBLE BASE LIMIT):

6. TOTAL TERM IMPOSED: | 1 | 4 |

7. ☐ THIS SENTENCE IS TO RUN CONCURRENT WITH ANY PRIOR UNCOMPLETED SENTENCE(S): BY ___

8. EXECUTION OF SENTENCE IMPOSED:
A. ☐ AT INITIAL SENTENCING HEARING
B. ☐ AT RESENTENCING PURSUANT TO DECISION ON APPEAL
C. ☒ AFTER REVOCATION OF PROBATION
D. ☐ AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC § 1170(d))
E. ☐ OTHER ___

9. DATE OF SENTENCE PRONOUNCED (MO) (DAY) (YR): 04 08 97
CREDIT FOR TIME SPENT IN CUSTODY: 384
TOTAL DAYS INCLUDING:
ACTUAL LOCAL TIME: 256
LOCAL CONDUCT CREDITS: 128
STATE INSTITUTIONS ☐ DMH ☐ CDC

10. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:
☒ FORTHWITH
☐ AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS
☐ INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:
☐ CALIF. INSTITUTION FOR WOMEN – FRONTERA
☒ CALIF. MEDICAL FACILITY VACAVILLE
☐ SAN QUENTIN
☐ CALIF. INSTITUTION FOR MEN – CHINO
☐ DEUEL VOC. INST.
☒ OTHER (SPECIFY): Stay of surrender to 04-21-97.

**CLERK OF THE COURT**

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE: _Esther Berick_
DATE: 04-11-97

This form is prescribed under Penal Code § 1213.5 to satisfy the requirements of § 1213 for determinate sentences under Penal Code § 1170. Attachments may be used but must be referred to in this document.

ABSTRACT OF JUDGMENT – COMMITMENT
SINGLE OR CONCURRENT COUNT FORM
(Not to be used for Multiple Count Convictions or Consecutive Sentences)
FORM DSL 290.1

Form Adopted by the Judicial Council of California Effective April 1, 1992

DISTRIBUTION:    PINK COPY – COURT FILE    YELLOW COPY – DEPARTMENT OF CORRECTIONS

| S22 | 08/28/96 | HR | CONT'D PROGRESS REPORT/PROG:09-26-96/<br>/CO:PROOF OF MANALIVE PROGRAM ENROLLMENT/<br>/H1:960926/0900/S22 |
| S22 | 09/26/96 | HR | CONT'D PROGRESS REPORT/PROG:10-28-96/CONT/<br>/H1:961028/0900/S22 |
| S22 | 10/28/96 | HR | /CAL:PROGRESS REPORT/CONT PROB/PROB MOD/PGM6:WALDEN HOUSE/<br>PGM12:MANALIVE/ |
| S22 | 01/15/97 | HR | /MOTION TO REVOKE PROBATION-APD - GRANTED /FTA/BWI/NB/OC/ |
| S22 | 01/28/97 | HR | CONT'D HRG WHET PROB SHD REM REV APD/APD-MTR/SUPP:02-27-97/<br>SHER/S25/<br>/H1:970303/0900/S25 |
| S22 | 02/24/97 | HR | /CAL:MOTION TO RELEASE ON O,R, OR BAIL//MO DENIED/BAIL:$5,000/<br>/H1:970303/0900/S25 |
| S22 | 02/28/97 | HR | /MO TO CONT:BY DEFENSE//MO GRTD/<br>/H1:970311/0900/S25 |
| S25 | 03/03/97 | HR | /DAW/CONT'D TS WHET PROB SHD REM REV APD/<br>/H2:970311/0900/S25 |
| S25 | 03/11/97 | HR | CONT'D TS WHET PROB SHD REM REV APD/<br>/H1:970408/0900/S25 |
| S25 | 04/08/97 | | 0900 HEARING TS WHET PROB SHD REM REV AP |

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE LENARD D. LOUIE, JUDGE

DEPARTMENT NO. 25

**FILED**

San Francisco County Superior Court

JAN 20 1995

ALAN CARLSON, Clerk
Superior Court of the City & County of San Francisco
BY _____
DEPUTY CLERK

---oOo---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>        PLAINTIFF,<br><br>  VS.<br><br>GEORGE NIMER MARTHA,<br><br>        DEFENDANT. | NO. 157784<br><br>CHANGE OF PLEA |

---oOo---

REPORTER'S TRANSCRIPT
JANUARY 3, 1995

A P P E A R A N C E S:

FOR THE PEOPLE:                    HON. ARLO E. SMITH
                                   DISTRICT ATTORNEY
                                   BY:  S. BREALL
                                   ASST. DISTRICT ATTORNEY

FOR THE DEFENDANT:                 HON. GEOFFREY BROWN
                                   PUBLIC DEFENDER
                                   BY:  B. CONROY
                                   DEPUTY PUBLIC DEFENDER

REPORTED BY:    CONNIE MIHOS, CSR 7391
                OFFICIAL COURT REPORTER

ORIGINAL

1

| | |
|---|---|
| 1 | JANUARY 3, 1995                              P.M. SESSION |
| 2 | P R O C E E D I N G S |
| 3 | THE COURT:  GEORGE MARTHA. · |
| 4 | LET THE RECORD SHOW WE'RE HERE WITH MR. MARTHA; |
| 5 | MR. CONROY, THE ATTORNEY; MS. BREALL, THE DISTRICT ATTORNEY; |
| 6 | AND THE ALLEGED VICTIM VIVIAN BARBARY. |
| 7 | MS. BREALL, WOULD YOU STATE THE TERMS OF THE |
| 8 | AGREED-UPON DISPOSITION. |
| 9 | AND MS. BARBARY, I WANT YOU TO LISTEN TO THE AGREED- |
| 10 | UPON DISPOSITION AND SEE IF WHAT SHE SAYS AGREES WITH YOU. |
| 11 | MS. BREALL:  THE PROPOSED DISPOSITION, YOUR HONOR, IS |
| 12 | IMPOSITION OF SENTENCE SUSPENDED.  THE DEFENDANT IS TO BE |
| 13 | PLACED ON THREE YEARS PROBATION WITH THE ADULT PROBATION |
| 14 | DEPARTMENT ON INTENSIVE SUPERVISION. |
| 15 | HE'S GOING TO RECEIVE CREDIT FOR TIME SERVED AT THE |
| 16 | TIME OF SENTENCING, WHICH IS APPROXIMATELY ONE YEAR. |
| 17 | HE'S TO HAVE A 1035 SEARCH CONDITION, WHICH MEANS HIS |
| 18 | PERSON, HIS RESIDENCE, HIS VEHICLE MAY BE SEARCHED WITH OR |
| 19 | WITHOUT A WARRANT, WITH OR WITHOUT REASONABLE OR PROBABLE |
| 20 | CAUSE, BY ANY PEACE OR PROBATION OFFICER, ANY TIME OF THE |
| 21 | DAY OR NIGHT. |
| 22 | HE'S TO HAVE NO WEAPONS ON HIM DURING THE TERM OF HIS |
| 23 | PROBATION. |
| 24 | HE IS TO STAY AWAY FROM THE VICTIM IN THIS CASE, VIVIAN |
| 25 | BARBARY, B-A-R-B-A-R-Y.  HE'S TO HAVE NO CONTACT WITH HER, |
| 26 | NO WRITTEN CONTACT, NO PHONE CONTACT, NO CONTACT OF ANY |
| 27 | KIND. |
| 28 | HE IS TO ON THE DAY OF SENTENCING WHEN HE IS RELEASED |

2

1  HAVE IN HIS HAND PLANE TICKETS TO CHICAGO --

2       THE COURT:  DIRECT FLIGHT.

3       MS. BREALL:  -- THAT DAY, DIRECT FLIGHT FROM SAN

4  FRANCISCO TO CHICAGO.  AND HE WILL BE ABLE TO TRANSFER HIS

5  PROBATION TO CHICAGO.

6       HE'S TO UNDERGO DOMESTIC VIOLENCE COUNSELING IN

7  CHICAGO.

8       AND ALL THIS IS CONDITIONED UPON A PSYCHIATRIC

9  EXAMINATION THAT TELLS US THAT THE DEFENDANT DOES NOT PLAN

10  TO CARRY OUT HIS THREATS AND IS NOT A DANGER TO THE VICTIM.

11       THE COURT:  THE COURT IS GOING TO APPOINT DR. LEVY TO

12  EXAMINE THIS DEFENDANT PURSUANT TO A 730/1017 FOR AN

13  ADVISEMENT AS TO WHETHER OR NOT MR. MARTHA POSES A DANGER TO

14  OTHERS, INCLUDING THE ALLEGED VICTIM, MS. BARBARY.

15       MS. BARBARY, THAT IS THE TENTATIVE AGREEMENT WE HAVE

16  ARRIVED AT.  DOES THAT DISPOSITION SATISFY YOU?

17       MS. BARBARY:  YES, IT DOES, YOUR HONOR.

18       THE COURT:  OKAY.  MR. CONROY, IS YOUR CLIENT PREPARED

19  TO ACCEPT THAT DISPOSITION?

20       MR. CONROY:  YES, HE IS, YOUR HONOR.

21       THE COURT:  PLEASE ADVISE YOUR CLIENT OF HIS RIGHTS.

22       MR. CONROY:  OKAY.

23       MR. MARTHA, I'M GOING TO MAKE A STATEMENT TO THE COURT

24  ABOUT YOUR CASE; IT'S VERY IMPORTANT THAT YOU LISTEN TO IT

25  CAREFULLY.

26       YOUR HONOR, GEORGE MARTHA WANTS TO ENTER A PLEA OF

27  GUILTY TO THE CHARGE OF A VIOLATION OF CALIFORNIA PENAL CODE

28  SECTION 422, MAKING THREATS INVOLVING BODILY INJURY TO

1 | VIVIAN BARBARY, WHICH IS A FELONY.

2 | I HAVE TOLD HIM THAT SEVERAL CONSTITUTIONAL RIGHTS WILL
3 | BE GIVEN UP IF THE COURT ACCEPTS THIS PLEA INCLUDING, FIRST,
4 | HIS PRIVILEGE AGAINST SELF-INCRIMINATION; THAT IS, HE IS
5 | UNDER NO OBLIGATION TO SAY ANYTHING THAT MAY TEND TO
6 | INCRIMINATE HIM.  AND I HAVE TOLD HIM THAT BY PLEADING
7 | GUILTY HE IS, IN FACT, INCRIMINATING HIMSELF.

8 | SECOND, HIS RIGHT TO BE TRIED BY A JURY.  IN THIS
9 | REGARD, I HAVE ADVISED HIM THAT HE CANNOT BE CONVICTED
10 | UNLESS ALL 12 JURORS AGREE THAT THE PROSECUTION HAS PROVED
11 | HIS GUILT BEYOND A REASONABLE DOUBT.

12 | THIRD, HIS RIGHT TO SEE AND HEAR HIS ACCUSERS TESTIFY
13 | IN OPEN COURT IN HIS PRESENCE AND TO HAVE HIS ATTORNEY
14 | CROSS-EXAMINE THEM.

15 | WE HAVE DISCUSSED THE ELEMENTS OF THE CHARGE AGAINST
16 | HIM AND THE POSSIBLE DEFENSES TO THE CHARGE, AND I HAVE
17 | ADVISED HIM OF THE LAW AS IT RELATES TO THE FACTS OF HIS
18 | CASE.  I HAVE ADVISED HIM OF THE LEGAL CONSEQUENCES OF A
19 | GUILTY PLEA TO THE CHARGE AND THAT THE PUNISHMENT FOR THE
20 | OFFENSE IS 16 MONTHS, TWO YEARS OR THREE YEARS IN STATE
21 | PRISON.

22 | UPON HIS RELEASE FROM CUSTODY, HE MAY BE PLACED ON
23 | PAROLE FOR A PERIOD OF FOUR YEARS FROM THE DATE OF HIS
24 | INITIAL PAROLE.  HOWEVER, IF PAROLE IS REVOKED, CONFINEMENT
25 | PURSUANT TO A REVOCATION OF PAROLE IN THE ABSENCE OF A NEW
26 | CONVICTION AND COMMITMENT TO PRISON UNDER OTHER PROVISIONS
27 | OF LAW SHALL NOT EXCEED 12 MONTHS EXCEPT AS PROVIDED BY
28 | PENAL CODE SECTION 3057(C), SUBSEQUENT ACTS OF MISCONDUCT

4

1   COMMITTED BY A PAROLEE WHILE CONFINED PURSUANT TO THAT

2   PAROLE REVOCATION.

3       THE PLEA IS OFFERED AS A RESULT OF DISCUSSIONS WITH THE

4   COURT AND ASSISTANT DISTRICT ATTORNEY SUSAN BREALL.

5       WE PREVIOUSLY STATED IN OPEN COURT WHAT THE TERMS ARE,

6   AND THOSE ARE THE TERMS MR. MARTHA UNDERSTANDS.

7       THE COURT:  BEFORE I TAKE THE PLEA, MS. BREALL, PLEASE

8   VOIR DIRE THE VICTIM.

9                           EXAMINATION

10      MS. BREALL:  Q.  VIVIAN, DO YOU UNDERSTAND THE TERMS

11  AND CONDITIONS OF THIS DISPOSITION AS I'VE STATED THEM?

12      A.  YES, I HAVE.

13      Q.  DO YOU UNDERSTAND IT'S POSSIBLE WITHIN TWO WEEKS

14  THE DEFENDANT WILL BE RELEASED FROM JAIL?

15      A.  YES, I DO.

16      Q.  IS THIS WITH YOUR APPROVAL?

17      A.  YES.

18      Q.  DID YOU, IN FACT, ASK ME TO TRY TO SETTLE THIS CASE

19  IN THIS FASHION?

20      A.  YES.

21      Q.  WILL YOU BE AFRAID OF THE DEFENDANT IF HE IS

22  RELEASED FROM JAIL WITH AN APPROPRIATE PSYCHIATRIC

23  EXAMINATION?

24      A.  NO, I WON'T BE.

25      Q.  DID YOU WANT TO GO TO JURY TRIAL ON THIS MATTER?

26      A.  NO, I DIDN'T.

27      Q.  DID YOU WANT TO SEE THE DEFENDANT IN JAIL OR STATE

28  PRISON?

5

1     A.  NO, I DON'T.

2         THE COURT:  OKAY.  MR. MARTHA, SIR, YOU'VE HEARD THE

3     STATEMENTS MADE TO THE COURT BY YOUR ATTORNEY, MR. CONROY,

4     AND THOSE MADE BY MS. BREALL.  ARE THEY TRUE IN ALL

5     RESPECTS?

6         THE DEFENDANT:  YES, YOUR HONOR.

7         THE COURT:  YOU HAVE A RIGHT TO BE TRIED BY A JURY.  DO

8     YOU WAIVE THAT RIGHT?

9         (THE DEFENDANT CONFERRED WITH COUNSEL.)

10        MR. CONROY:  IF YOU WANT TO HAVE THIS DISPOSITION,

11    WHAT WE JUST SAID, YOU HAVE TO WAIVE THESE RIGHTS.

12        THE DEFENDANT:  I WAIVE THE RIGHTS.

13        THE COURT:  SIR, YOU HAVE A RIGHT TO BE TRIED BY A

14    JURY.  DO YOU WAIVE THAT RIGHT?

15        THE DEFENDANT:  YES, SIR.

16        THE COURT:  YOU HAVE A RIGHT TO SEE, TO QUESTION AND

17    TO EXAMINE ALL THE WITNESSES WHO WOULD TESTIFY AGAINST YOU.

18    DO YOU WAIVE THAT RIGHT?

19        THE DEFENDANT:  YES, SIR.

20        THE COURT:  YOU HAVE A RIGHT TO REMAIN SILENT AND NOT

21    TO SAY ANYTHING WHICH MIGHT TEND TO INCRIMINATE YOU.  DO YOU

22    WAIVE THAT RIGHT?

23        THE DEFENDANT:  YES, SIR.

24        THE COURT:  GEORGE MARTHA, YOU ARE FURTHER ADVISED THAT

25    IF YOU ARE NOT A CITIZEN OF THE UNITED STATES, A GUILTY PLEA

26    TO THE CHARGE MENTIONED BY YOUR ATTORNEY COULD SUBJECT YOU

27    TO DEPORTATION, EXCLUSION FROM ADMISSION AND OF DENIAL OF

28    NATURALIZATION.  OBVIOUSLY, IF YOU'RE A CITIZEN, IT DOESN'T

1    APPLY.  IS THAT CLEAR, SIR?

2        THE DEFENDANT:  CAN I FILE FOR CITIZENSHIP WHILE I'M

3    ON PROBATION?

4        THE COURT:  SIR, I'M ADVISING YOU WHAT THE LAW IS.  I'M

5    NOT AN IMMIGRATION EXPERT; I CAN'T ADVISE YOU ON THAT, BUT

6    DO YOU UNDERSTAND THAT PART?

7        THE DEFENDANT:  YES, SIR.

8        MR. CONROY:  LET ME JUST TAKE ONE MINUTE HERE.

9        (THE DEFENDANT CONFERRED WITH COUNSEL.)

10        THE COURT:  YOU UNDERSTAND THAT, SIR?

11        THE DEFENDANT:  YES, SIR.

12        THE COURT:  MR. MARTHA, YOU'LL BE PLACED ON PROBATION

13    FOR THREE YEARS.  IF YOU VIOLATE ANY OF THE TERMS OF THAT

14    PROBATION, YOU MAY BE SENTENCED TO THE STATE PRISON UP TO

15    THREE YEARS WITHOUT A TRIAL.  IS THAT CLEAR?

16        THE DEFENDANT:  YES, SIR.

17        THE COURT:  LASTLY, MR. MARTHA, YOU ARE ADVISED THAT MY

18    TAKING THE PLEA AT THIS TIME DOESN'T BIND ME.  IF I CAN'T

19    GIVE YOU THIS AGREEMENT THAT WE HAVE, YOU CAN TAKE BACK YOUR

20    GUILTY PLEA AND GO TO TRIAL.  IS THAT CLEAR?

21        THE DEFENDANT:  I UNDERSTAND.

22        THE COURT:  GEORGE MARTHA, WHAT'S YOUR PLEA TO A

23    VIOLATION OF 422 OF THE PENAL CODE AS A FELONY AS IT APPEARS

24    IN COUNT 1 OF THE INFORMATION?

25        THE DEFENDANT:  GUILTY.

26        THE COURT:  MR. CONROY, BASED ON THE EVIDENCE RECEIVED

27    BY YOU PURSUANT TO DISCOVERY, IS THERE A FACTUAL BASIS FOR

28    THE PLEA?

1       MR. CONROY:  SO STIPULATED.

2       THE COURT:  MS. BREALL?

3       MS. BREALL:  YES, SO STIPULATED.

4       THE COURT:  THE COURT ACCEPTS THE GUILTY PLEA.  THE

5   COURT FINDS THAT THIS DEFENDANT IS GUILTY OF THE CHARGE,

6   OBVIOUSLY.

7       THE COURT FINDS THE DEFENDANT WAS FULLY ADVISED OF HIS

8   RIGHTS, THAT HE UNDERSTOOD HIS RIGHTS, THAT HE FREELY AND

9   VOLUNTARILY WAIVED HIS RIGHTS AND THAT HE ENTERED INTO THE

10  GUILTY PLEA WELL KNOWING THE CONSEQUENCES OF THAT PLEA.

11      WHAT DATE DO YOU RECOMMEND, MR. CONROY?

12      MR. CONROY:  YOUR HONOR, MAY WE HAVE THE 17TH OF

13  JANUARY?

14      THE COURT:  SURE.  I'M NOT SURE WE CAN MAKE IT ON THE

15  17TH.  I KNOW FOR SURE WE CAN MAKE IT ON THE 20TH.  I THINK

16  THE 17TH MAY BE --

17      MR. CONROY:  COULD WE TRY FOR THE 17TH, AND I WILL

18  TRY --

19      THE COURT:  JANUARY 17TH.

20      MR. CONROY:  THANK YOU VERY MUCH.

21      THE COURT:  WE'LL NEED TWO DOCUMENTS BEFORE THE PLEA

22  CAN GO THROUGH:  ONE IS THE REPORT FROM DR. LEVY ADVISING US

23  THAT MR. MARTHA IN HIS OPINION DOESN'T POSE A DANGER TO

24  OTHERS AND TO HIMSELF; AND, SECONDLY, WE MUST HAVE A ONE-WAY

25  PLANE TICKET ON A DIRECT FLIGHT FROM SAN FRANCISCO TO

26  CHICAGO ON THAT DAY.

27      AND MR. CONROY, ASSUME FOR THE SAKE OF ARGUMENT WE CAN

28  SETTLE THIS CASE AND SENTENCE THIS DEFENDANT BY 9:00

1   O'CLOCK.  I BELIEVE THAT THE FLIGHT IN QUESTION SHOULD BE

2   ABOUT 11:00 O'CLOCK IN THE MORNING.

3       MR. CONROY:  WELL, ACTUALLY, JUDGE, WHAT I WOULD

4   PROPOSE IS THIS, YOUR HONOR. I WOULD GET A FLIGHT THAT LEFT

5   6:00 P.M. OR LATER ON THE 17TH.  THE REALITY IS HE MIGHT BE

6   HERE ALL DAY UPSTAIRS.

7       THE BAILIFF:  I WOULD REQUEST THEY EXPEDITE IT.

8       THE COURT:  I DON'T WANT HIM HERE IN THE CITY;

9   OTHERWISE, HE'S GOT TOO MUCH FREE TIME.  ANYTHING CAN

10  HAPPEN, MR. CONROY.

11      MR. CONROY:  WE APPRECIATE THAT.  ALSO, IF EVERYONE

12  DOES THEIR BEST AND HE MISSES THE PLANE -- MY SUGGESTION IS

13  WHAT ABOUT 3:00 O'CLOCK IN THE AFTERNOON?

14      THE COURT:  IS THERE A FLIGHT GOING BACK TO CHICAGO AT

15  3:00 O'CLOCK?

16      THE DEFENDANT:  THERE'S FLIGHTS THAT LEAVE SAN

17  FRANCISCO INTERNATIONAL ABOUT FOUR OR FIVE TIMES A DAY FROM

18  SOUTHWEST AIRLINES, IF NOT THERE, OAKLAND.

19      THE COURT:  ISN'T SOUTHWEST OVER IN OAKLAND?

20      THE DEFENDANT:  SOUTHWEST IS IN OAKLAND AND IN SAN

21  FRANCISCO.

22      THE CLERK:  BOTH PLACES, YOUR HONOR.

23      THE COURT:  YOU'VE BEEN TO CHICAGO FROM HERE?

24      THE CLERK:  YES, YOUR HONOR, THAT'S HOW I HAVE TO GO

25  HOME.

26      THE DEFENDANT:  YOUR HONOR, AM I KICKED OUT OF SAN

27  FRANCISCO OR SOMETHING?

28      THE COURT:  SIR.

1      THE DEFENDANT:  THAT'S WHAT I NEED TO ASK YOU.

2      THE COURT:  YES, YOU ARE.

3      THE DEFENDANT:  I CANNOT --

4      THE COURT:  I'M GLAD YOU ASKED ME THAT.  THE ANSWER IS

5  YES, A COMPLETE YES, BECAUSE WE'RE CONCERNED THAT IF YOU

6  STAY IN SAN FRANCISCO, YOU MIGHT HURT SOMEBODY, NAMELY

7  MS. BARBARY.  YOU ASKED ME.  THAT'S MY OPINION.  THE ANSWER

8  IS YES.

9      THE DEFENDANT:  THIS IS NOW IF I WANTED TO COME BACK

10  TO VISIT IN SAN FRANCISCO OR LIVE IN SAN FRANCISCO, I CAN

11  JUST HAVE MY PROBATION MOVED BACK, RIGHT?

12      THE COURT:  I DON'T KNOW ABOUT THAT.  I DON'T KNOW

13  ABOUT THAT.

14      THE DEFENDANT:  WHAT I'M ASKING YOU IS:  AM I KICKED

15  OUT OF SAN FRANCISCO FOR THREE YEARS?

16      THE COURT:  LET'S PUT IT THIS WAY.  I CAN'T KICK YOU

17  OUT FOR THREE YEARS.

18      THE DEFENDANT:  THAT'S WHAT I'M ASKING.

19      THE COURT:  I'M ONLY SAYING YOU CAN'T HAVE ANY CONTACT

20  WITH MS. BARBARY, EITHER DIRECT OR INDIRECT, DURING THE

21  THREE-YEAR PERIOD OF PROBATION.

22      THE DEFENDANT:  THAT'S FINE.

23      THE COURT:  IF YOU DO VIOLATE PROBATION, YOU'LL BE IN

24  STATE PRISON.

25      THE DEFENDANT:  I UNDERSTAND THOSE RIGHTS.  THANK YOU.

26      THE COURT:  IS THERE A MOTION?

27      THE CLERK:  JUST TO COUNT ONE?

28      MR. CONROY:  RIGHT.

1        THE COURT:   MR. VALENZUELA, HE'S NOT BEING O.R.'ED AT

2    ALL.

3        THE BAILIFF:   NO, YOUR HONOR.

4        THE COURT:   AND WE NEED TO CONTACT DR. LEVY TO HAVE HIM

5    EXAMINED.

6        (DISCUSSION OFF THE RECORD.)

7        THE COURT:   WE'RE ON FOR THE 17TH OF JANUARY.   IF THE

8    PLANE TICKET IS NOT AVAILABLE OR IF LEVY'S REPORT IS NOT

9    AVAILABLE, NOTHING GOES THROUGH; THAT'S ALL THERE IS TO IT.

10       MR. CONROY:   I UNDERSTAND.

11       THE COURT:   YOUR MOTION TO HAVE THE CHARGES DISMISSED

12   IS TAKEN UNDER SUBMISSION AND THE COURT WILL RENDER A

13   DECISION ON JANUARY 17TH.

14       MS. BREALL:   THANK YOU.

15       (WHEREUPON, THE PROCEEDINGS CONCLUDED.)

16

17

18

19

20

21

22

23

24

25

26

27

28

STATE OF CALIFORNIA            )
                              )  SS
CITY AND COUNTY OF SAN FRANCISCO  )


I, CONNIE MIHOS, OFFICIAL COURT REPORTER OF THE SUPERIOR
COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, STATE OF
CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING IS A FULL, TRUE AND CORRECT
STATEMENT OF THE TESTIMONY AND PROCEEDINGS HAD IN THE
ABOVE-ENTITLED MATTER AND THAT THE SAME IS A FULL, TRUE AND
CORRECT TRANSCRIPTION OF THE STENOTYPE NOTES AS TAKEN BY ME
IN SAID MATTER.

DATED: 1/20/95

SAN FRANCISCO, CALIFORNIA


_____
CONNIE MIHOS, CSR NO. 7391

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE LENARD D. LOUIE, JUDGE

DEPARTMENT NO. 25

---oOo---

**FILED**

San Francisco County Superior Court

JAN 2 0 1995

ALAN CARLSON, Clerk

BY: _____
Deputy Clerk

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) |
| PLAINTIFF, | ) ) |
| VS. | ) ) |
| GEORGE NIMER MARTHA, | ) ) |
| DEFENDANT. | ) ) ) |

NO. 157784

JUDGMENT & SENTENCE

RECEIVED
DEPARTMENT OF JUSTICE

JAN 2 1 1999

EXECUTIVE OFFICE
IMMIGRATION REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA

---oOo---

REPORTER'S TRANSCRIPT
JANUARY 17, 1995

A P P E A R A N C E S:

FOR THE PEOPLE:                    HON. ARLO E. SMITH
                                   DISTRICT ATTORNEY
                                   BY:  R. RING
                                   ASST. DISTRICT ATTORNEY

FOR THE DEFENDANT:                 B. CONROY, ESQ.

REPORTED BY:    CONNIE MIHOS, CSR 7391
                OFFICIAL COURT REPORTER

3

1   CHICAGO?

2   MR. CONROY:  I THINK THE SHERIFF'S DEPARTMENT IS GOING

3   TO TAKE CARE OF IT.

4   THE BAILIFF:  I WILL LEAVE IT WITH THE DEPUTY AT THE

5   DISCHARGE AREA, YOUR HONOR.

6   THE COURT:  MR. CONROY, AS AN OFFICER OF THE COURT,

7   YOU'RE ADVISING THE COURT THAT THE PLANE TICKET IS A DIRECT

8   FLIGHT FROM HERE TO CHICAGO?

9   MR. CONROY:  I AM, YOUR HONOR.  YOU CAN TAKE A LOOK FOR

10  YOURSELF IN CASE I'M MISSTATING IT.

11  THE BAILIFF:  IT'S BEEN SEALED, YOUR HONOR, SO THERE'S

12  NO TAMPERING WITH THE CASH.

13  THE COURT:  LASTLY, THERE ARE TWO CIVIL PENALTIES:

14  $150 FOR THE COST OF THE PREPARATION OF THIS REPORT AND UP

15  TO $40 A MONTH FOR PROBATION COSTS.

16  MR. MARTHA, DO YOU ACCEPT THE TERMS AND CONDITIONS OF

17  PROBATION?

18  THE DEFENDANT:  YES.

19  THE COURT:  LET THE RECORD SHOW THE COURT HAD

20  CONSIDERED THE REPORT AND ALSO DR. LEVY'S REPORT IN

21  PRONOUNCING THE SENTENCE.

22  MR. CONROY:  THANK YOUR HONOR.

23  THE COURT:  THANK YOU.

24  MR. RING:  IT SAID SOMETHING ABOUT A DEPORTATION

25  CLAUSE.

26  THE COURT:  HE'S A CITIZEN.

27  MR. CONROY:  I THINK THE OTHER COUNT HAS TO BE

28  DISMISSED.

4

1          THE COURT:  RIGHT.  AND THE MOTION BY THE PEOPLE TO

2   DISMISS THE OTHER COUNT WHICH THE COURT TOOK UNDER

3   SUBMISSION IS HEREBY GRANTED.

4          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE LENARD D. LOUIE, JUDGE

DEPARTMENT NO. 25

---oOo---

**FILED**

San Francisco County Superior Court

JAN 2 0 1995

ALAN CARLSON, Clerk

BY: _____ Deputy Clerk

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>PLAINTIFF,<br><br>VS.<br><br>GEORGE NIMER MARTHA,<br><br>DEFENDANT. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

NO. 157784

JUDGMENT & SENTENCE

THE ANNEXED INSTRUMENT IS A CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE ATTEST:

NOV 3 0 2000

GORDON PARK-LI, Clerk
San Francisco County Superior Court
BY _____ DEPUTY CLERK

---oOo---

REPORTER'S TRANSCRIPT
JANUARY 17, 1995

A P P E A R A N C E S:

FOR THE PEOPLE:

HON. ARLO E. SMITH
DISTRICT ATTORNEY
BY:  R. RING
ASST. DISTRICT ATTORNEY

FOR THE DEFENDANT:

B. CONROY, ESQ.

REPORTED BY:    CONNIE MIHOS, CSR 7391
OFFICIAL COURT REPORTER

ORIGINAL

1

1    JANUARY 17, 1995                          A.M. SESSION

2                    P R O C E E D I N G S

3        THE COURT:  GEORGE MARTHA.

4        THIS IS MR. MARTHA ON LINE 5.

5        MR. CONROY, REFRESH MY MEMORY AS TO THE DISPOSITION.  I

6    DO REMEMBER THAT THE WIFE WAS IN COURT AND WE ALL AGREED HE

7    WOULD RECEIVE C.T.S. IF HE WERE TO LEAVE SAN FRANCISCO

8    TODAY.

9        MR. CONROY:  YES.

10       THE COURT:  IF YOU COULD SHOW TO THE COURT HE HAS A

11   ONE-WAY PLANE TICKET ON A DIRECT FLIGHT TO CHICAGO, NO

12   STAY-OVER IN DENVER.

13       MR. CONROY:  I'VE GIVEN THAT TO YOUR BAILIFF.  I GAVE

14   HIM $45.00 CASH AND A PLANE TICKET ONE-WAY FROM SAN

15   FRANCISCO TO CHICAGO LEAVING AT 1:30 THIS AFTERNOON.

16       THE BAILIFF:  THAT'S CORRECT, YOUR HONOR.

17       THE COURT:  SUBMITTED BY BOTH SIDES?

18       MR. CONROY:  IT IS, YOUR HONOR.  DR. LEVY'S REPORT IS

19   WITH THE COURT.  HE SAYS THE DEFENDANT IS NOT A DANGER.  AND

20   I'D SUBMIT THE MATTER EXCEPT FOR SOME COMMENTS ON THE

21   PROBATION REPORT.

22       THE COURT:  OKAY, SURE.

23       MR. CONROY:  JUDGE, ON THE PROBATION REPORT, AT LINE 8,

24   IT INDICATES THE DEFENDANT -- WE DISCUSSED INTENSIVE

25   SUPERVISION AS WE UNDERSTAND IT IN SAN FRANCISCO.  HOWEVER,

26   WHAT THEY CALL INTENSIVE SUPERVISION IN CHICAGO MEANS FIVE

27   MEETINGS A WEEK WITH THE PROBATION OFFICER, A CURFEW FROM

28   7:00 AT NIGHT TO 7:00 IN THE MORNING, AND THAT'S NOT WHAT'S

1    ANTICIPATED.

2        SO I DON'T THINK WE SHOULD SAY INTENSIVE SUPERVISION.

3    I THINK ENHANCED SUPERVISION IS THE WAY THE PROBATION

4    OFFICER TALKS ABOUT IT IN PAGE 8, AND I THINK THAT'S WHAT'S

5    CONTEMPLATED BY THE COURT.

6        THE COURT:  SUBMITTED?

7        MR. CONROY:  YES.

8        MR. RING:  SUBMITTED.

9        THE COURT:  THIS IS A NEGOTIATED DISPOSITION.

10    SUBMITTED, MR. RING?

11        MR. RING:  YES, IT IS.

12        THE COURT:  IT WAS -- IN FACT, WE HAD THE VICTIM IN

13    COURT AND SHE TESTIFIED UNDER OATH, NOW, THAT SUCH A

14    DISPOSITION IS ACCEPTABLE TO HER.

15        OKAY.  MR. MARTHA, YOUR SENTENCE IS IMPOSITION OF

16    SENTENCE SUSPENDED, THREE YEARS PROBATION -- THREE YEARS OF

17    ENHANCED PROBATION TO THE ADULT PROBATION DEPARTMENT.

18        AS CONDITIONS OF PROBATION, YOU'LL RECEIVE CREDIT FOR

19    TIME SERVED OF 159 DAYS.

20        YOU'LL STAY AWAY FROM VIVIAN BARBARY, B-A-R-B-A-R-Y.

21    BY STAY AWAY, YOU'RE TO HAVE NO CONTACT WITH THAT PERSON

22    EITHER DIRECTLY OR INDIRECTLY.

23        YOU MUST UNDERGO PSYCHIATRIC, PSYCHOLOGICAL AND ANY

24    OTHER TYPE OF COUNSELING AND TREATMENT AND TESTING AS DEEMED

25    REQUIRED BY THE ADULT PROBATION DEPARTMENT.

26        YOU'LL PAY A FINE OF $200 TO THE VICTIM'S INDEMNITY

27    FUND.

28        MR. MARTHA, DO YOU HAVE THE PLANE TICKET WITH YOU TO

1    CHICAGO?

2        MR. CONROY:  I THINK THE SHERIFF'S DEPARTMENT IS GOING

3    TO TAKE CARE OF IT.

4        THE BAILIFF:  I WILL LEAVE IT WITH THE DEPUTY AT THE

5    DISCHARGE AREA, YOUR HONOR.

6        THE COURT:  MR. CONROY, AS AN OFFICER OF THE COURT,

7    YOU'RE ADVISING THE COURT THAT THE PLANE TICKET IS A DIRECT

8    FLIGHT FROM HERE TO CHICAGO?

9        MR. CONROY:  I AM, YOUR HONOR.  YOU CAN TAKE A LOOK FOR

10   YOURSELF IN CASE I'M MISSTATING IT.

11       THE BAILIFF:  IT'S BEEN SEALED, YOUR HONOR, SO THERE'S

12   NO TAMPERING WITH THE CASH.

13       THE COURT:  LASTLY, THERE ARE TWO CIVIL PENALTIES:

14   $150 FOR THE COST OF THE PREPARATION OF THIS REPORT AND UP

15   TO $40 A MONTH FOR PROBATION COSTS.

16       MR. MARTHA, DO YOU ACCEPT THE TERMS AND CONDITIONS OF

17   PROBATION?

18       THE DEFENDANT:  YES.

19       THE COURT:  LET THE RECORD SHOW THE COURT HAD

20   CONSIDERED THE REPORT AND ALSO DR. LEVY'S REPORT IN

21   PRONOUNCING THE SENTENCE.

22       MR. CONROY:  THANK YOUR HONOR.

23       THE COURT:  THANK YOU.

24       MR. RING:  IT SAID SOMETHING ABOUT A DEPORTATION

25   CLAUSE.

26       THE COURT:  HE'S A CITIZEN.

27       MR. CONROY:  I THINK THE OTHER COUNT HAS TO BE

28   DISMISSED.

4

1          THE COURT:   RIGHT.   AND THE MOTION BY THE PEOPLE TO

2   DISMISS THE OTHER COUNT WHICH THE COURT TOOK UNDER

3   SUBMISSION IS HEREBY GRANTED.

4          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATE OF CALIFORNIA                    )
                                       )  SS
CITY AND COUNTY OF SAN FRANCISCO       )


     I, CONNIE MIHOS, OFFICIAL COURT REPORTER OF THE SUPERIOR

COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, STATE OF

CALIFORNIA, DO HEREBY CERTIFY:

     THAT THE FOREGOING IS A FULL, TRUE AND CORRECT

STATEMENT OF THE TESTIMONY AND PROCEEDINGS HAD IN THE

ABOVE-ENTITLED MATTER AND THAT THE SAME IS A FULL, TRUE AND

CORRECT TRANSCRIPTION OF THE STENOTYPE NOTES AS TAKEN BY ME

IN SAID MATTER.


        DATED:  1/20/95

        SAN FRANCISCO, CALIFORNIA




                              CONNIE MIHOS, CSR NO. 7391

```
OPAL STATUS SUMMARY  TYPE-   D     ZONE                              08/09/2006 21:39
----------------------------------------------------------------------------------
  CDC NUMBER  :  NAME                               :ETHNIC:     BIRTHDATE
   T69137     :  MARTHA,GEORGE                       : OTH  :   06/01/1967
----------------------------------------------------------------------------------
 TERM STARTS :  MAX REL DATE    MIN REL DATE  MAX ADJ REL DT :  MIN ADJ REL DT
 10/11/2002 :  05/01/2008     06/21/2007    05/01/2008  :    06/21/2007
----------------------------------------------------------------------------------
                                                          :  PAROLE PERIOD
 USE TERM  4/00 + ENHCMNTS   2/04 = TOT TERM   6/04       :  3 YRS
----------------------------------------------------------------------------------

 RE-PRISON + POST SENTENCE CREDITS
 CASE     P2900-5 P1203-3 P2900-1 CRC-CRED MH-CRED P4019   P2931 POST-SENT   TOT
----------------------------------------------------------------------------------
 SC051811   190                              95                       1    286

 CASE  DNA COMPLETED


 ----------------------------------------------------------------------------------
 RECV DT/ COUNTY/     CASE    SENTENCE DATE                 CREDIT    OFFENSE
   CNT       OFF-CODE  DESCRIPTION                          CODE       DATE
 ----------------------------------------------------------------------------------

 --CONTROLLING PRINCIPAL & CONSECUTIVE   (INCLUDES ENHANCEMENTS/OFFENSES):

 --CONTROLLING CASE --
 10/11/2002  SM    SC051811    10/09/2002   NO STRIKES: 2
                    01 F667.5(B) PPT-NV                            3
  01 V2800.2    DISREGARD FOR SAFETY                          3   04/03/2002
  02 V10851(A)  VEHICLE THEFT                          CS     3   04/03/2002


 ----------------------------------------------------------------------------------
 TRAN                             RULE     _____D A Y S_____
 TYPE    DATE     END DATE LOG NUMBER   NUMBER  ASSESS LOST REST DEAD
 ----------------------------------------------------------------------------------
 BEG 10/11/2002            ******BEG BAL*******
 ADD 10/11/2002            SC051811
 ADD 10/11/2002            SC051811
 ADD 10/11/2002            SC051811
 SCL 07/01/2006            B0706001 3005C        90   90
 ADD 10/11/2002            SC051811
    CURRENT PC BALANCE:    0           CURRENT BC BALANCE:   315
 ----------------------------------------------------------------------------------
```

# MCCUTCHEN

**MCCUTCHEN, DOYLE, BROWN & ENERSEN, LLP**

Three Embarcadero Center
San Francisco, California 94111-4067
Tel. (415) 393-2000 Fax (415) 393-2286
www.mccutchen.com

San Francisco
Los Angeles
Walnut Creek

Palo Alto
Tainei

## ATTORNEYS AT LAW

0060811

# Fax Cover Page

**Date:**  November 29, 2000

**To:**  **Brandon Conroy**
fax: 415-495-4429          voice:

**From:**  **Sejal A. Mistry**
fax: (415) 393-2286          voice: (415) 393-2278  smistry@mdbe.com

**Number of pages (including this page): 17**
For fax transmission problems, please call (415) 393-2174.

**Message:**

2000 NOV 29  PM 3: 12
RECEIVED
MDBE-LLP
SF FAX DEPT

**WARNING:**
*This fax is intended only for the recipient(s) named above. If you receive this fax by mistake, please telephone us (collect) at the above voice number to let us know of the error. If this fax contains privileged or otherwise legally protected information, disclosure of the information to anyone other than the named recipient(s) is not authorized, and you may not lawfully read, copy, or otherwise use this fax unless you are a named recipient or a named recipient's authorized representative.*

P. 1

```
* * *  Transmission Result Report ( Nov. 29. 2000  3:27PM )  * * *

                                                    T T I    MCCUTCHEN ETAL SF242

File   Mode    Option                    Address (Group)              Result           Page
-------------------------------------------------------------------------------------------
4030   SAF_TX                       9-9900 1-880-495-4429               OK           P. 19/19
```



```
----------------------------------------------------------------------------------------
        Reason for Error
          1) Hang up or line fail            2) Busy
          3) No answer                       4) No facsimile connection
```



MCCUTCHEN, DOYLE, BROWN & ENERSEN, LLP

**ATTORNEYS AT LAW**

Three Embarcadero Center          San Francisco    Palo Alto
San Francisco, California 94111-4067   Los Angeles   Taipei
Tel. (415) 393-2000 Fax. (415) 393-2286   Walnut Creek
www.mccutchen.com

## Fax Cover Page

**Date:** November 29, 2000

**To:** Brandon Conroy
fax: 415-495-4429       voice:

**From:** Sejal A. Mistry
fax: (415) 393-2286      voice: (415) 393-2278  smistry@mdbe.com

**Number of pages (including this page):** 17
For fax transmission problems, please call (415) 393-2174.

**Message:**

1-17-85

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE LENARD D. LOUIE, JUDGE

DEPARTMENT NO. 25

# FILED

San Francisco County Superior Court

---oOo---

JAN 20 1995

ALAN CARLSON, Clerk
Superior Court of the City & County of San Francisco
BY _Carolyn A. Tanaka_
DEPUTY CLERK

THE PEOPLE OF THE )
STATE OF CALIFORNIA, )
)
PLAINTIFF, )
)
VS. )
)
GEORGE NIMER MARTHA, )      NO. 157784
)
DEFENDANT. )      CHANGE OF PLEA
)
_____)

---oOo---

REPORTER'S TRANSCRIPT
JANUARY 3, 1995

A P P E A R A N C E S:

FOR THE PEOPLE:                HON. ARLO E. SMITH
                              DISTRICT ATTORNEY
                              BY:  S. BREALL
                              ASST. DISTRICT ATTORNEY

FOR THE DEFENDANT:            HON. GEOFFREY BROWN
                              PUBLIC DEFENDER
                              BY:  B. CONROY
                              DEPUTY PUBLIC DEFENDER

REPORTED BY:    CONNIE MIHOS, CSR 7391
                OFFICIAL COURT REPORTER

ORIGINAL

1

1    JANUARY 3, 1995                        P.M. SESSION

2                P R O C E E D I N G S

3        THE COURT:  GEORGE MARTHA. ·

4        LET THE RECORD SHOW WE'RE HERE WITH MR. MARTHA;

5    MR. CONROY, THE ATTORNEY; MS. BREALL, THE DISTRICT ATTORNEY;

6    AND THE ALLEGED VICTIM VIVIAN BARBARY.

7        MS. BREALL, WOULD YOU STATE THE TERMS OF THE

8    AGREED-UPON DISPOSITION.

9        AND MS. BARBARY, I WANT YOU TO LISTEN TO THE AGREED-

10   UPON DISPOSITION AND SEE IF WHAT SHE SAYS AGREES WITH YOU.

11       MS. BREALL:  THE PROPOSED DISPOSITION, YOUR HONOR, IS

12   IMPOSITION OF SENTENCE SUSPENDED.  THE DEFENDANT IS TO BE

13   PLACED ON THREE YEARS PROBATION WITH THE ADULT PROBATION

14   DEPARTMENT ON INTENSIVE SUPERVISION.

15       HE'S GOING TO RECEIVE CREDIT FOR TIME SERVED AT THE

16   TIME OF SENTENCING, WHICH IS APPROXIMATELY ONE YEAR.

17       HE'S TO HAVE A 1035 SEARCH CONDITION, WHICH MEANS HIS

18   PERSON, HIS RESIDENCE, HIS VEHICLE MAY BE SEARCHED WITH OR

19   WITHOUT A WARRANT, WITH OR WITHOUT REASONABLE OR PROBABLE

20   CAUSE, BY ANY PEACE OR PROBATION OFFICER, ANY TIME OF THE

21   DAY OR NIGHT.

22       HE'S TO HAVE NO WEAPONS ON HIM DURING THE TERM OF HIS

23   PROBATION.

24       HE IS TO STAY AWAY FROM THE VICTIM IN THIS CASE, VIVIAN

25   BARBARY, B-A-R-B-A-R-Y.  HE'S TO HAVE NO CONTACT WITH HER,

26   NO WRITTEN CONTACT, NO PHONE CONTACT, NO CONTACT OF ANY

27   KIND.

28       HE IS TO ON THE DAY OF SENTENCING WHEN HE IS RELEASED

1    HAVE IN HIS HAND PLANE TICKETS TO CHICAGO --

2        THE COURT:  DIRECT FLIGHT.

3        MS. BREALL:  -- THAT DAY, DIRECT FLIGHT FROM SAN

4    FRANCISCO TO CHICAGO.  AND HE WILL BE ABLE TO TRANSFER HIS

5    PROBATION TO CHICAGO.

6        HE'S TO UNDERGO DOMESTIC VIOLENCE COUNSELING IN

7    CHICAGO.

8        AND ALL THIS IS CONDITIONED UPON A PSYCHIATRIC

9    EXAMINATION THAT TELLS US THAT THE DEFENDANT DOES NOT PLAN

10   TO CARRY OUT HIS THREATS AND IS NOT A DANGER TO THE VICTIM.

11       THE COURT:  THE COURT IS GOING TO APPOINT DR. LEVY TO

12   EXAMINE THIS DEFENDANT PURSUANT TO A 730/1017 FOR AN

13   ADVISEMENT AS TO WHETHER OR NOT MR. MARTHA POSES A DANGER TO

14   OTHERS, INCLUDING THE ALLEGED VICTIM, MS. BARBARY.

15       MS. BARBARY, THAT IS THE TENTATIVE AGREEMENT WE HAVE

16   ARRIVED AT.  DOES THAT DISPOSITION SATISFY YOU?

17       MS. BARBARY:  YES, IT DOES, YOUR HONOR.

18       THE COURT:  OKAY.  MR. CONROY, IS YOUR CLIENT PREPARED

19   TO ACCEPT THAT DISPOSITION?

20       MR. CONROY:  YES, HE IS, YOUR HONOR.

21       THE COURT:  PLEASE ADVISE YOUR CLIENT OF HIS RIGHTS.

22       MR. CONROY:  OKAY.

23       MR. MARTHA, I'M GOING TO MAKE A STATEMENT TO THE COURT

24   ABOUT YOUR CASE; IT'S VERY IMPORTANT THAT YOU LISTEN TO IT

25   CAREFULLY.

26       YOUR HONOR, GEORGE MARTHA WANTS TO ENTER A PLEA OF

27   GUILTY TO THE CHARGE OF A VIOLATION OF CALIFORNIA PENAL CODE

28   SECTION 422, MAKING THREATS INVOLVING BODILY INJURY TO

1   VIVIAN BARBARY, WHICH IS A FELONY.

2       I HAVE TOLD HIM THAT SEVERAL CONSTITUTIONAL RIGHTS WILL

3   BE GIVEN UP IF THE COURT ACCEPTS THIS PLEA INCLUDING, FIRST,

4   HIS PRIVILEGE AGAINST SELF-INCRIMINATION; THAT IS, HE IS

5   UNDER NO OBLIGATION TO SAY ANYTHING THAT MAY TEND TO

6   INCRIMINATE HIM.  AND I HAVE TOLD HIM THAT BY PLEADING

7   GUILTY HE IS, IN FACT, INCRIMINATING HIMSELF.

8       SECOND, HIS RIGHT TO BE TRIED BY A JURY.  IN THIS

9   REGARD, I HAVE ADVISED HIM THAT HE CANNOT BE CONVICTED

10   UNLESS ALL 12 JURORS AGREE THAT THE PROSECUTION HAS PROVED

11   HIS GUILT BEYOND A REASONABLE DOUBT.

12       THIRD, HIS RIGHT TO SEE AND HEAR HIS ACCUSERS TESTIFY

13   IN OPEN COURT IN HIS PRESENCE AND TO HAVE HIS ATTORNEY

14   CROSS-EXAMINE THEM.

15       WE HAVE DISCUSSED THE ELEMENTS OF THE CHARGE AGAINST

16   HIM AND THE POSSIBLE DEFENSES TO THE CHARGE, AND I HAVE

17   ADVISED HIM OF THE LAW AS IT RELATES TO THE FACTS OF HIS

18   CASE.  I HAVE ADVISED HIM OF THE LEGAL CONSEQUENCES OF A

19   GUILTY PLEA TO THE CHARGE AND THAT THE PUNISHMENT FOR THE

20   OFFENSE IS 16 MONTHS, TWO YEARS OR THREE YEARS IN STATE

21   PRISON.

22       UPON HIS RELEASE FROM CUSTODY, HE MAY BE PLACED ON

23   PAROLE FOR A PERIOD OF FOUR YEARS FROM THE DATE OF HIS

24   INITIAL PAROLE.  HOWEVER, IF PAROLE IS REVOKED, CONFINEMENT

25   PURSUANT TO A REVOCATION OF PAROLE IN THE ABSENCE OF A NEW

26   CONVICTION AND COMMITMENT TO PRISON UNDER OTHER PROVISIONS

27   OF LAW SHALL NOT EXCEED 12 MONTHS EXCEPT AS PROVIDED BY

28   PENAL CODE SECTION 3057(C), SUBSEQUENT ACTS OF MISCONDUCT

4

1    COMMITTED BY A PAROLEE WHILE CONFINED PURSUANT TO THAT

2    PAROLE REVOCATION.

3        THE PLEA IS OFFERED AS A RESULT OF DISCUSSIONS WITH THE

4    COURT AND ASSISTANT DISTRICT ATTORNEY SUSAN BREALL.

5        WE PREVIOUSLY STATED IN OPEN COURT WHAT THE TERMS ARE,

6    AND THOSE ARE THE TERMS MR. MARTHA UNDERSTANDS.

7        THE COURT:  BEFORE I TAKE THE PLEA, MS. BREALL, PLEASE

8    VOIR DIRE THE VICTIM.

9                        EXAMINATION

10       MS. BREALL:  Q.  VIVIAN, DO YOU UNDERSTAND THE TERMS

11   AND CONDITIONS OF THIS DISPOSITION AS I'VE STATED THEM?

12       A.  YES, I HAVE.

13       Q.  DO YOU UNDERSTAND IT'S POSSIBLE WITHIN TWO WEEKS

14   THE DEFENDANT WILL BE RELEASED FROM JAIL?

15       A.  YES, I DO.

16       Q.  IS THIS WITH YOUR APPROVAL?

17       A.  YES.

18       Q.  DID YOU, IN FACT, ASK ME TO TRY TO SETTLE THIS CASE

19   IN THIS FASHION?

20       A.  YES.

21       Q.  WILL YOU BE AFRAID OF THE DEFENDANT IF HE IS

22   RELEASED FROM JAIL WITH AN APPROPRIATE PSYCHIATRIC

23   EXAMINATION?

24       A.  NO, I WON'T BE.

25       Q.  DID YOU WANT TO GO TO JURY TRIAL ON THIS MATTER?

26       A.  NO, I DIDN'T.

27       Q.  DID YOU WANT TO SEE THE DEFENDANT IN JAIL OR STATE

28   PRISON?

5

1    A.  NO, I DON'T.

2        THE COURT:  OKAY.  MR. MARTHA, SIR, YOU'VE HEARD THE

3    STATEMENTS MADE TO THE COURT BY YOUR ATTORNEY, MR. CONROY,

4    AND THOSE MADE BY MS. BREALL.  ARE THEY TRUE IN ALL

5    RESPECTS?

6        THE DEFENDANT:  YES, YOUR HONOR.

7        THE COURT:  YOU HAVE A RIGHT TO BE TRIED BY A JURY.  DO

8    YOU WAIVE THAT RIGHT?

9        (THE DEFENDANT CONFERRED WITH COUNSEL.)

10       MR. CONROY:  IF YOU WANT TO HAVE THIS DISPOSITION,

11   WHAT WE JUST SAID, YOU HAVE TO WAIVE THESE RIGHTS.

12       THE DEFENDANT:  I WAIVE THE RIGHTS.

13       THE COURT:  SIR, YOU HAVE A RIGHT TO BE TRIED BY A

14   JURY.  DO YOU WAIVE THAT RIGHT?

15       THE DEFENDANT:  YES, SIR.

16       THE COURT:  YOU HAVE A RIGHT TO SEE, TO QUESTION AND

17   TO EXAMINE ALL THE WITNESSES WHO WOULD TESTIFY AGAINST YOU.

18   DO YOU WAIVE THAT RIGHT?

19       THE DEFENDANT:  YES, SIR.

20       THE COURT:  YOU HAVE A RIGHT TO REMAIN SILENT AND NOT

21   TO SAY ANYTHING WHICH MIGHT TEND TO INCRIMINATE YOU.  DO YOU

22   WAIVE THAT RIGHT?

23       THE DEFENDANT:  YES, SIR.

24       THE COURT:  GEORGE MARTHA, YOU ARE FURTHER ADVISED THAT

25   IF YOU ARE NOT A CITIZEN OF THE UNITED STATES, A GUILTY PLEA

26   TO THE CHARGE MENTIONED BY YOUR ATTORNEY COULD SUBJECT YOU

27   TO DEPORTATION, EXCLUSION FROM ADMISSION AND OF DENIAL OF

28   NATURALIZATION.  OBVIOUSLY, IF YOU'RE A CITIZEN, IT DOESN'T

6

1  APPLY.  IS THAT CLEAR, SIR?

2      THE DEFENDANT:  CAN I FILE FOR CITIZENSHIP WHILE I'M

3  ON PROBATION?

4      THE COURT:  SIR, I'M ADVISING YOU WHAT THE LAW IS.  I'M

5  NOT AN IMMIGRATION EXPERT; I CAN'T ADVISE YOU ON THAT, BUT

6  DO YOU UNDERSTAND THAT PART?

7      THE DEFENDANT:  YES, SIR.

8      MR. CONROY:  LET ME JUST TAKE ONE MINUTE HERE.

9      (THE DEFENDANT CONFERRED WITH COUNSEL.)

10      THE COURT:  YOU UNDERSTAND THAT, SIR?

11      THE DEFENDANT:  YES, SIR.

12      THE COURT:  MR. MARTHA, YOU'LL BE PLACED ON PROBATION

13  FOR THREE YEARS.  IF YOU VIOLATE ANY OF THE TERMS OF THAT

14  PROBATION, YOU MAY BE SENTENCED TO THE STATE PRISON UP TO

15  THREE YEARS WITHOUT A TRIAL.  IS THAT CLEAR?

16      THE DEFENDANT:  YES, SIR.

17      THE COURT:  LASTLY, MR. MARTHA, YOU ARE ADVISED THAT MY

18  TAKING THE PLEA AT THIS TIME DOESN'T BIND ME.  IF I CAN'T

19  GIVE YOU THIS AGREEMENT THAT WE HAVE, YOU CAN TAKE BACK YOUR

20  GUILTY PLEA AND GO TO TRIAL.  IS THAT CLEAR?

21      THE DEFENDANT:  I UNDERSTAND.

22      THE COURT:  GEORGE MARTHA, WHAT'S YOUR PLEA TO A

23  VIOLATION OF 422 OF THE PENAL CODE AS A FELONY AS IT APPEARS

24  IN COUNT 1 OF THE INFORMATION?

25      THE DEFENDANT:  GUILTY.

26      THE COURT:  MR. CONROY, BASED ON THE EVIDENCE RECEIVED

27  BY YOU PURSUANT TO DISCOVERY, IS THERE A FACTUAL BASIS FOR

28  THE PLEA?

1     MR. CONROY:  SO STIPULATED.

2     THE COURT:  MS. BREALL?

3     MS. BREALL:  YES, SO STIPULATED.

4     THE COURT:  THE COURT ACCEPTS THE GUILTY PLEA.  THE

5    COURT FINDS THAT THIS DEFENDANT IS GUILTY OF THE CHARGE,

6    OBVIOUSLY.

7     THE COURT FINDS THE DEFENDANT WAS FULLY ADVISED OF HIS

8    RIGHTS, THAT HE UNDERSTOOD HIS RIGHTS, THAT HE FREELY AND

9    VOLUNTARILY WAIVED HIS RIGHTS AND THAT HE ENTERED INTO THE

10    GUILTY PLEA WELL KNOWING THE CONSEQUENCES OF THAT PLEA.

11     WHAT DATE DO YOU RECOMMEND, MR. CONROY?

12     MR. CONROY:  YOUR HONOR, MAY WE HAVE THE 17TH OF

13    JANUARY?

14     THE COURT:  SURE.  I'M NOT SURE WE CAN MAKE IT ON THE

15    17TH.  I KNOW FOR SURE WE CAN MAKE IT ON THE 20TH.  I THINK

16    THE 17TH MAY BE --

17     MR. CONROY:  COULD WE TRY FOR THE 17TH, AND I WILL

18    TRY --

19     THE COURT:  JANUARY 17TH.

20     MR. CONROY:  THANK YOU VERY MUCH.

21     THE COURT:  WE'LL NEED TWO DOCUMENTS BEFORE THE PLEA

22    CAN GO THROUGH:  ONE IS THE REPORT FROM DR. LEVY ADVISING US

23    THAT MR. MARTHA IN HIS OPINION DOESN'T POSE A DANGER TO

24    OTHERS AND TO HIMSELF; AND, SECONDLY, WE MUST HAVE A ONE-WAY

25    PLANE TICKET ON A DIRECT FLIGHT FROM SAN FRANCISCO TO

26    CHICAGO ON THAT DAY.

27     AND MR. CONROY, ASSUME FOR THE SAKE OF ARGUMENT WE CAN

28    SETTLE THIS CASE AND SENTENCE THIS DEFENDANT BY 9:00

8

1    O'CLOCK.  I BELIEVE THAT THE FLIGHT IN QUESTION SHOULD BE
2    ABOUT 11:00 O'CLOCK IN THE MORNING.

3        MR. CONROY:  WELL, ACTUALLY, JUDGE, WHAT I WOULD
4    PROPOSE IS THIS, YOUR HONOR. I WOULD GET A FLIGHT THAT LEFT
5    6:00 P.M. OR LATER ON THE 17TH.  THE REALITY IS HE MIGHT BE
6    HERE ALL DAY UPSTAIRS.

7        THE BAILIFF:  I WOULD REQUEST THEY EXPEDITE IT.

8        THE COURT:  I DON'T WANT HIM HERE IN THE CITY;
9    OTHERWISE, HE'S GOT TOO MUCH FREE TIME.  ANYTHING CAN
10   HAPPEN, MR. CONROY.

11       MR. CONROY:  WE APPRECIATE THAT.  ALSO, IF EVERYONE
12   DOES THEIR BEST AND HE MISSES THE PLANE -- MY SUGGESTION IS
13   WHAT ABOUT 3:00 O'CLOCK IN THE AFTERNOON?

14       THE COURT:  IS THERE A FLIGHT GOING BACK TO CHICAGO AT
15   3:00 O'CLOCK?

16       THE DEFENDANT:  THERE'S FLIGHTS THAT LEAVE SAN
17   FRANCISCO INTERNATIONAL ABOUT FOUR OR FIVE TIMES A DAY FROM
18   SOUTHWEST AIRLINES, IF NOT THERE, OAKLAND.

19       THE COURT:  ISN'T SOUTHWEST OVER IN OAKLAND?

20       THE DEFENDANT:  SOUTHWEST IS IN OAKLAND AND IN SAN
21   FRANCISCO.

22       THE CLERK:  BOTH PLACES, YOUR HONOR.

23       THE COURT:  YOU'VE BEEN TO CHICAGO FROM HERE?

24       THE CLERK:  YES, YOUR HONOR, THAT'S HOW I HAVE TO GO
25   HOME.

26       THE DEFENDANT:  YOUR HONOR, AM I KICKED OUT OF SAN
27   FRANCISCO OR SOMETHING?

28       THE COURT:  SIR.

1    THE DEFENDANT:  THAT'S WHAT I NEED TO ASK YOU.

2    THE COURT:  YES, YOU ARE.

3    THE DEFENDANT:  I CANNOT --

4    THE COURT:  I'M GLAD YOU ASKED ME THAT.  THE ANSWER IS

5    YES, A COMPLETE YES, BECAUSE WE'RE CONCERNED THAT IF YOU

6    STAY IN SAN FRANCISCO, YOU MIGHT HURT SOMEBODY, NAMELY

7    MS. BARBARY.  YOU ASKED ME.  THAT'S MY OPINION.  THE ANSWER

8    IS YES.

9    THE DEFENDANT:  THIS IS NOW IF I WANTED TO COME BACK

10   TO VISIT IN SAN FRANCISCO OR LIVE IN SAN FRANCISCO, I CAN

11   JUST HAVE MY PROBATION MOVED BACK, RIGHT?

12   THE COURT:  I DON'T KNOW ABOUT THAT.  I DON'T KNOW

13   ABOUT THAT.

14   THE DEFENDANT:  WHAT I'M ASKING YOU IS:  AM I KICKED

15   OUT OF SAN FRANCISCO FOR THREE YEARS?

16   THE COURT:  LET'S PUT IT THIS WAY.  I CAN'T KICK YOU

17   OUT FOR THREE YEARS.

18   THE DEFENDANT:  THAT'S WHAT I'M ASKING.

19   THE COURT:  I'M ONLY SAYING YOU CAN'T HAVE ANY CONTACT

20   WITH MS. BARBARY, EITHER DIRECT OR INDIRECT, DURING THE

21   THREE-YEAR PERIOD OF PROBATION.

22   THE DEFENDANT:  THAT'S FINE.

23   THE COURT:  IF YOU DO VIOLATE PROBATION, YOU'LL BE IN

24   STATE PRISON.

25   THE DEFENDANT:  I UNDERSTAND THOSE RIGHTS.  THANK YOU.

26   THE COURT:  IS THERE A MOTION?

27   THE CLERK:  JUST TO COUNT ONE?

28   MR. CONROY:  RIGHT.

1    THE COURT:  MR. VALENZUELA, HE'S NOT BEING O.R.'ED AT

2  ALL.

3    THE BAILIFF:  NO, YOUR HONOR.

4    THE COURT:  AND WE NEED TO CONTACT DR. LEVY TO HAVE HIM

5  EXAMINED.

6    (DISCUSSION OFF THE RECORD.)

7    THE COURT:  WE'RE ON FOR THE 17TH OF JANUARY.  IF THE

8  PLANE TICKET IS NOT AVAILABLE OR IF LEVY'S REPORT IS NOT

9  AVAILABLE, NOTHING GOES THROUGH; THAT'S ALL THERE IS TO IT.

10    MR. CONROY:  I UNDERSTAND.

11    THE COURT:  YOUR MOTION TO HAVE THE CHARGES DISMISSED

12  IS TAKEN UNDER SUBMISSION AND THE COURT WILL RENDER A

13  DECISION ON JANUARY 17TH.

14    MS. BREALL:  THANK YOU.

15    (WHEREUPON, THE PROCEEDINGS CONCLUDED.)

16

17

18

19

20

21

22

23

24

25

26

27

28

STATE OF CALIFORNIA           )
                               )    SS

CITY AND COUNTY OF SAN FRANCISCO   )

     I, CONNIE MIHOS, OFFICIAL COURT REPORTER OF THE SUPERIOR

COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, STATE OF

CALIFORNIA, DO HEREBY CERTIFY:

     THAT THE FOREGOING IS A FULL, TRUE AND CORRECT

STATEMENT OF THE TESTIMONY AND PROCEEDINGS HAD IN THE

ABOVE-ENTITLED MATTER AND THAT THE SAME IS A FULL, TRUE AND

CORRECT TRANSCRIPTION OF THE STENOTYPE NOTES AS TAKEN BY ME

IN SAID MATTER.

         DATED:   1/20/95

         SAN FRANCISCO, CALIFORNIA

                              CONNIE MIHOS, CSR NO. 7391

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE LENARD D. LOUIE, JUDGE

DEPARTMENT NO. 25

---oOo---

**FILED**

San Francisco County Superior Court

JAN 2 0 1995

ALAN CARLSON, Clerk

BY: _____ Deputy Clerk

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ) ) ) | |
| PLAINTIFF, ) ) | |
| VS. ) ) | |
| GEORGE NIMER MARTHA, ) ) | NO. 157784 |
| DEFENDANT. ) ) ) | JUDGMENT & SENTENCE |

RECEIVED
DEPARTMENT OF JUSTICE

JAN 2 1 1999

EXECUTIVE OFFICE
IMMIGRATION REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA

---oOo---

REPORTER'S TRANSCRIPT
JANUARY 17, 1995

A P P E A R A N C E S:

FOR THE PEOPLE:                    HON. ARLO E. SMITH
                                   DISTRICT ATTORNEY
                                   BY:  R. RING
                                   ASST. DISTRICT ATTORNEY

FOR THE DEFENDANT:                 B. CONROY, ESQ.

REPORTED BY:    CONNIE MIHOS, CSR 7391
                OFFICIAL COURT REPORTER

ORIGINAL

1

| | |
|---|---|
| 1 | JANUARY 17, 1995 | A.M. SESSION |

2          P R O C E E D I N G S

3      THE COURT:  GEORGE MARTHA.

4      THIS IS MR. MARTHA ON LINE 5.

5      MR. CONROY, REFRESH MY MEMORY AS TO THE DISPOSITION.  I

6  DO REMEMBER THAT THE WIFE WAS IN COURT AND WE ALL AGREED HE

7  WOULD RECEIVE C.T.S. IF HE WERE TO LEAVE SAN FRANCISCO

8  TODAY.

9      MR. CONROY:  YES.

10      THE COURT:  IF YOU COULD SHOW TO THE COURT HE HAS A

11  ONE-WAY PLANE TICKET ON A DIRECT FLIGHT TO CHICAGO, NO

12  STAY-OVER IN DENVER.

13      MR. CONROY:  I'VE GIVEN THAT TO YOUR BAILIFF.  I GAVE

14  HIM $45.00 CASH AND A PLANE TICKET ONE-WAY FROM SAN

15  FRANCISCO TO CHICAGO LEAVING AT 1:30 THIS AFTERNOON.

16      THE BAILIFF:  THAT'S CORRECT, YOUR HONOR.

17      THE COURT:  SUBMITTED BY BOTH SIDES?

18      MR. CONROY:  IT IS, YOUR HONOR.  DR. LEVY'S REPORT IS

19  WITH THE COURT.  HE SAYS THE DEFENDANT IS NOT A DANGER.  AND

20  I'D SUBMIT THE MATTER EXCEPT FOR SOME COMMENTS ON THE

21  PROBATION REPORT.

22      THE COURT:  OKAY, SURE.

23      MR. CONROY:  JUDGE, ON THE PROBATION REPORT, AT LINE 8,

24  IT INDICATES THE DEFENDANT -- WE DISCUSSED INTENSIVE

25  SUPERVISION AS WE UNDERSTAND IT IN SAN FRANCISCO.  HOWEVER,

26  WHAT THEY CALL INTENSIVE SUPERVISION IN CHICAGO MEANS FIVE

27  MEETINGS A WEEK WITH THE PROBATION OFFICER, A CURFEW FROM

28  7:00 AT NIGHT TO 7:00 IN THE MORNING, AND THAT'S NOT WHAT'S

1   ANTICIPATED.

2       SO I DON'T THINK WE SHOULD SAY INTENSIVE SUPERVISION.

3   I THINK ENHANCED SUPERVISION IS THE WAY THE PROBATION

4   OFFICER TALKS ABOUT IT IN PAGE 8, AND I THINK THAT'S WHAT'S

5   CONTEMPLATED BY THE COURT.

6       THE COURT:  SUBMITTED?

7       MR. CONROY:  YES.

8       MR. RING:  SUBMITTED.

9       THE COURT:  THIS IS A NEGOTIATED DISPOSITION.

10  SUBMITTED, MR. RING?

11      MR. RING:  YES, IT IS.

12      THE COURT:  IT WAS -- IN FACT, WE HAD THE VICTIM IN

13  COURT AND SHE TESTIFIED UNDER OATH, NOW, THAT SUCH A

14  DISPOSITION IS ACCEPTABLE TO HER.

15      OKAY.  MR. MARTHA, YOUR SENTENCE IS IMPOSITION OF

16  SENTENCE SUSPENDED, THREE YEARS PROBATION -- THREE YEARS OF

17  ENHANCED PROBATION TO THE ADULT PROBATION DEPARTMENT.

18      AS CONDITIONS OF PROBATION, YOU'LL RECEIVE CREDIT FOR

19  TIME SERVED OF 159 DAYS.

20      YOU'LL STAY AWAY FROM VIVIAN BARBARY, B-A-R-B-A-R-Y.

21  BY STAY AWAY, YOU'RE TO HAVE NO CONTACT WITH THAT PERSON

22  EITHER DIRECTLY OR INDIRECTLY.

23      YOU MUST UNDERGO PSYCHIATRIC, PSYCHOLOGICAL AND ANY

24  OTHER TYPE OF COUNSELING AND TREATMENT AND TESTING AS DEEMED

25  REQUIRED BY THE ADULT PROBATION DEPARTMENT.

26      YOU'LL PAY A FINE OF $200 TO THE VICTIM'S INDEMNITY

27  FUND.

28      MR. MARTHA, DO YOU HAVE THE PLANE TICKET WITH YOU TO

1    CHICAGO?

2        MR. CONROY:  I THINK THE SHERIFF'S DEPARTMENT IS GOING

3    TO TAKE CARE OF IT.

4        THE BAILIFF:  I WILL LEAVE IT WITH THE DEPUTY AT THE

5    DISCHARGE AREA, YOUR HONOR.

6        THE COURT:  MR. CONROY, AS AN OFFICER OF THE COURT,

7    YOU'RE ADVISING THE COURT THAT THE PLANE TICKET IS A DIRECT

8    FLIGHT FROM HERE TO CHICAGO?

9        MR. CONROY:  I AM, YOUR HONOR.  YOU CAN TAKE A LOOK FOR

10   YOURSELF IN CASE I'M MISSTATING IT.

11       THE BAILIFF:  IT'S BEEN SEALED, YOUR HONOR, SO THERE'S

12   NO TAMPERING WITH THE CASH.

13       THE COURT:  LASTLY, THERE ARE TWO CIVIL PENALTIES:

14   $150 FOR THE COST OF THE PREPARATION OF THIS REPORT AND UP

15   TO $40 A MONTH FOR PROBATION COSTS.

16       MR. MARTHA, DO YOU ACCEPT THE TERMS AND CONDITIONS OF

17   PROBATION?

18       THE DEFENDANT:  YES.

19       THE COURT:  LET THE RECORD SHOW THE COURT HAD

20   CONSIDERED THE REPORT AND ALSO DR. LEVY'S REPORT IN

21   PRONOUNCING THE SENTENCE.

22       MR. CONROY:  THANK YOUR HONOR.

23       THE COURT:  THANK YOU.

24       MR. RING:  IT SAID SOMETHING ABOUT A DEPORTATION

25   CLAUSE.

26       THE COURT:  HE'S A CITIZEN.

27       MR. CONROY:  I THINK THE OTHER COUNT HAS TO BE

28   DISMISSED.

1        THE COURT:   RIGHT.   AND THE MOTION BY THE PEOPLE TO

2   DISMISS THE OTHER COUNT WHICH THE COURT TOOK UNDER

3   SUBMISSION IS HEREBY GRANTED.

4        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TE OF CALIFORNIA          )
                          )   SS
Y AND COUNTY OF SAN FRANCISCO  )

I, CONNIE MIHOS, OFFICIAL COURT REPORTER OF THE SUPERIOR

RT OF THE CITY AND COUNTY OF SAN FRANCISCO, STATE OF

IFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING IS A FULL, TRUE AND CORRECT

TEMENT OF THE TESTIMONY AND PROCEEDINGS HAD IN THE

VE-ENTITLED MATTER AND THAT THE SAME IS A FULL, TRUE AND

RECT TRANSCRIPTION OF THE STENOTYPE NOTES AS TAKEN BY ME

SAID MATTER.

DATED:  1/20/95

SAN FRANCISCO, CALIFORNIA

**CONNIE MIHOS, CSR NO. 7391**

| SUPERIOR COU⌐ IN THE CITY AND COUNTY OF SAN FR⌐ ISCO - MINUTES | |
|---|---|

| People of the State of California vs. | GEORGE NIMER  MARTHA | | | [X] Present |
|---|---|---|---|---|

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 157784 | S. BREALL | ☐ Present | E. FREDRICH | [X] Present |
| | Clerk | | Judge | |
| | ALICE REDMOND | | DOUGLAS C. MUNSON | |

Reporter

MARTIN SHARP #1005, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing: PROOF OF PROGRAM
Special appearance by KOELLING/G, DA for the Assistant DA of Record.
Court has appointed FREDRICH/E, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | G |

Defendant shall continue on probation on its original terms and conditions.

Probation is modified as follows:

Upon release from jail, defendant must enter and complete Walden House.

Upon completion of aforementioned program, Defendant must enter and complete Manalive.
Failure to complete these programs may result in a loss of credit for
time served and a violation of probation.

| Dept. | S22 | Date | 10/28/96 | Page 1 |
|---|---|---|---|---|
| Attest: | ALICE REDMOND | | | Deputy Clerk |

## SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES

| People of the State of California vs. | GEORGE NIMER   MARTHA | | | ☐ Present |
|---|---|---|---|---|

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 157784 | S. BREALL | ☒ Present | E. FREDRICH | ☒ Present |
| | Clerk | | Judge | |
| | ALICE REDMOND | | DOUGLAS C. MUNSON | |

Reporter

JUANITA GONZALEZ#3003, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing
Court has appointed FREDRICH/E, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | G |

No appearance by defendant.

The Court orders that a bench warrant issue.

No Bail.

The matter is ordered off calendar.

MOTION TO REVOKE PROBATION-APD - Granted

| Dept. | S22 | Date | 01/15/97 | Page 1 |
|---|---|---|---|---|
| Attest: | ALICE REDMOND | | | Deputy Clerk |

| SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES | |

People of the State of California vs.    GEORGE NIMER   MARTHA                                    ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|------|------------------------|--|--------------------|--|
| 157784 | S. BREALL | ☐ Present | D. WISE | ☒ Present |
| | **Clerk** ALICE REDMOND | | **Judge** DOUGLAS C. MUNSON | |

**Reporter**
MARTIN SHARP#1005, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing: HR/----09/A/FTA-MTR/APD
Special appearance by SCHALLON/M, DA for the Assistant DA of Record.
Court has appointed WISE/D, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|-------|------|---------|--------|------|--------------|
| 1 | PC | 422/F | | 01533143 | G |

Motion to revoke probation by Adult Probation:

Cause is referred to the Adult Probation Department for a supplemental
report to be filed by 02-27-97.

Defendant is remanded into the custody of the Sheriff.

Cause is ordered transferred to Judge Lee D. Baxter Department 25.

Cause is continued to set hearing whether probation should remain
revoked by the Adult Probation Department.

Cause is ordered continued to 03/03/97 at 09:00 a.m. in Department S25 for Hearing.

| | | | | |
|---|---|---|---|---|
| Dept. | S22 | Date | 01/28/97 | Page 1 |
| Attest: | ALICE REDMOND | | | Deputy Clerk |

| SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES | | | | |
|---|---|---|---|---|

People of the State of California vs.    GEORGE NIMER    MARTHA    ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 157784 | T. BOGOTT | ☐ Present | D. WISE | ☒ Present |
| | **Clerk** | | **Judge** | |
| | LAWRENCE HAYES | | DOUGLAS C. MUNSON | |

Reporter

MARTIN SHARP#1005, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing
Special appearance by SCHALLON/M, DA for the Assistant DA of Record.
Court has appointed WISE/D, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | G |

Cause on calendar: motion to release on O.R. or bail.

Motion is denied.

Bail is set at $5,000.

Cause is ordered continued to 03/03/97 at 09:00 a.m. in Department S25 for Hearing.

SUPERIOR C'̄ ̄ ̄T IN THE CITY AND COUNTY OF SAN F̄ ̄ ̄ ̄CISCO - MINUTES

People of the State of California vs.   GEORGE NIMER   MARTHA                                  ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 157784 | T. BOGOTT | ☐ Present | D. WISE | ☒ Present |
| | Clerk | | Judge | |
| | ALICE REDMOND | | LENARD D. LOUIE | |

Reporter

JUDITH ANN OSSA #2310, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing: HR/-----31/D/MO FOR CONT PURS 1050PC
Special appearance by SCHALLON/M, DA for the Assistant DA of Record.
Court has appointed WISE/D, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | G |

Cause on calendar for motion to continue; by defense.

Motion is granted.

Cause is ordered continued to 03/11/97 at 09:00 a.m. in Department S25 for Hearing.

Dept. S22   Date   02/28/97   Page 1

Attest: ALICE REDMOND   Deputy Clerk

| | SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES | | |
|---|---|---|---|

| People of the State of California vs. | GEORGE NIMER | MARTHA | | ☒ Present |
|---|---|---|---|---|

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 157784 | T. BOGOTT | ☐ Present | D. WISE | ☒ Present |
| | Clerk | | Judge | |
| | ERNEST ARNDT | | LEE D. BAXTER | |

Reporter

LAVENA WARD-PAGE#7077, ROOM 306, 850 BRYANT STREET - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing: HR/----31/D/MO FOR CONT PURS 1050PC
Special appearance by BOGOTT/T, DA for the Assistant DA of Record.
Court has appointed WISE/D, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | G |

For today's proceedings, the defendant's appearance is waived.

Cause is continued for hearing whether probation should remain
revoked by the Adult Probation Department.

Cause is ordered continued to 03/11/97 at 09:00 a.m. in Department S25 for Hearing.

| Dept. | S25 | Date | 03/03/97 | Page | 1 |
|---|---|---|---|---|---|
| Attest: | ERNEST ARNDT | | | Deputy Clerk | |

**SUPERIOR COUI**   **N THE CITY AND COUNTY OF SAN FRA**   **:O - MINUTES**

People of the State of California vs.   GEORGE NIMER   MARTHA    [X] Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|------|------------------------|--|--------------------|--|
| 157784 | T. BOGOTT | [ ] Present | D. WISE | [X] Present |
| | Clerk | | Judge | |
| | ESTHER BERICK | | LEE D. BAXTER | |

Reporter

ANN F. SOLIMAN#6812, ROOM 306, 850 BRYANT STREET - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing
Special appearance by KNOWLES/D, DA for the Assistant DA of Record.
Court has appointed WISE/D, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|-------|------|---------|--------|------|--------------|
| 1 | PC | 422/F | | 01533143 | G |

Cause is continued to set hearing whether probation should remain
revoked by the Adult Probation Department.

Cause is ordered continued to 04/08/97 at 09:00 a.m. in Department S25 for Hearing.

| | | | | |
|--|--|--|--|--|
| Dept. | S25 | Date | 03/11/97 | Page 1 |
| Attest: | ESTHER BERICK | | | Deputy Clerk |

## SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES

People of the State of California vs.    GEORGE NIMER    MARTHA    ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 157784 | S. BREALL | ☐ Present | E. FREDRICH | ☒ Present |
| | Clerk | | Judge | |
| | ALICE REDMOND | | ALEX SALDAMANDO | |

Reporter

VALERIE PAPALE #6899, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing: BW–HRG––FTA-MTR/APD
Special appearance by JOHNS/C, DA for the Assistant DA of Record.
Court has appointed FREDRICH/E, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea | Finding |
|---|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | G | |

Motion to revoke probation by Adult Probation:

Cause is referred to the Adult Probation Department for a supplemental report to be filed by 07-11-96.

Defendant is remanded into the custody of the Sheriff.

Cause is continued to set hearing whether probation should remain revoked by the Adult Probation Department.

Cause is ordered continued to 07/11/96 at 09:00 a.m. in Department S22 for Hearing.

Dept. S22   Date   06/12/96      Page 1

Attest:   ALICE REDMOND      Deputy Clerk

## SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES

People of the State of California vs. GEORGE NIMER MARTHA                    ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|------|------------------------|--|--------------------|--|
| 157784 | S. BREALL | ☐ Present | E. FREDRICH | ☒ Present |
| | Clerk | | Judge | |
| | ALICE REDMOND | | LENARD LOUIE | |

Reporter

CONNIE MIHOS#7391, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing
Special appearance by JOHNS/C, DA for the Assistant DA of Record.
Court has appointed FREDRICH/E, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|-------|------|---------|--------|------|--------------|
| 1 | PC | 422/F | | 01533143 | G |

Cause on calendar: motion to release on O.R. or bail reduction.

Motion is granted.

Defendant is released on his-her own recognizance. Defendant is
ordered to appear on next and all subsequent court date(s).

Cause is ordered continued to 07/19/96 at 09:00 a.m. in Department S22 for Hearing.

Dept. __S22__ Date __07/02/96__ Page __1__

Attest: __ALICE REDMOND__ Deputy Clerk

**SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES**

People of the State of California vs.   GEORGE NIMER    MARTHA                                    ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 157784 | S. BREALL | ☐ Present | E. FREDRICH | ☒ Present |
| | Clerk | | Judge | |
| | LAWRENCE HAYES | | ALEX SALDAMANDO | |

Reporter

VALERIE PAPALE #6899, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing
Special appearance by JOHNS/C, DA for the Assistant DA of Record.
Court has appointed FREDRICH/E, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | G |

Motion to revoke probation by Adult Probation:   The Court has read
and considered the supplemental report.

Probation revocation of 06-03-96 is set aside.

Probation is reinstated on the original terms and conditions. Defendant to continue on probation.

Probation is modified as follows:

The defendant shall serve a term in County Jail of 22 days.

Defendant shall receive additional credit for time served of 22 days.

Defendant must enter MOVE Program.
Failure to complete the program may result in a loss of credit for
time spent in program and a violation of probation.

Cause is referred to the Adult Probation Department for a progress report to be filed by 08-28-96.

Cause is continued for hearing on same.

Cause is ordered continued to 08/28/96 at 09:00 a.m. in Department S22 for Hearing.

## SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES

People of the State of California vs.   GEORGE NIMER   MARTHA                                                    [X] Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|------|------------------------|---|--------------------|---|
| 157784 | S. BREALL | ☐ Present | E. FREDRICH | [X] Present |
| | Clerk | | Judge | |
| | LAWRENCE HAYES | | DOUGLAS C. MUNSON | |

Reporter

MARTIN SHARP #1005, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing
Special appearance by SCHALLON/M, DA for the Assistant DA of Record.
Court has appointed FREDRICH/E, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|-------|------|---------|--------|------|--------------|
| 1 | PC | 422/F | | 01533143 | G |

Cause is referred to the Adult Probation Department for a progress report to be filed by 09-26-96.

\* Proof of MANALIVE Program enrollment.

Cause is ordered continued to 09/26/96 at 09:00 a.m. in Department S22 for Hearing.

## SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES

People of the State of California vs.   GEORGE NIMER   MARTHA    [X] Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|------|------------------------|--|--------------------|--|
| 157784 | S. BREALL | ☐ Present | E. FREDRICH | [X] Present |
| | Clerk | | Judge | |
| | ALICE REDMOND | | DOUGLAS C. MUNSON | |

Reporter

MARTIN SHARP  #1005, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing
Special appearance by KOELLING/G, DA for the Assistant DA of Record.
Court has appointed FREDRICH/E, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|-------|------|---------|--------|------|--------------|
| 1 | PC | 422/F | | 01533143 | G |

Cause is referred to the Adult Probation Department for a progress report to be filed by 10-28-96.

Cause is continued for hearing on same.

Cause is ordered continued to 10/28/96 at 09:00 a.m. in Department S22 for Hearing.

Dept.  S22   Date    09/26/96    Page  1

Attest:  ALICE REDMOND    Deputy Clerk



## $\mathcal{M}$ endelson
### & Associates

ATTORNEYS AT LAW

October 18, 1999

Dr. Jess Ghanim

**VIA FACSIMILE ONLY**

    Re:    <u>George Martha</u>

Dear Dr. Ghanim:

        I am writing to follow up our telephone conversation regarding George Martha's mental condition. As I mentioned over the telephone, in order for Mr. Martha to have a chance of avoiding deportation to Jordan, he needs a letter from you containing:

- your qualifications;

- your confirmation that you read the letter from Mr. Martha's psychiatrist and that you are therefore familiar with Mr. Martha's condition;

- a description of the projects you have done in connection with Jordan, to establish your knowledge about conditions for mental patients there; and

- your conclusion that, in your professional opinion, should Mr. Martha be deported to Jordan, he would likely be confined to an insane asylum due to his mental condition, be denied treatment, or be subject to some other horrible fate.

        Thank you for assistance in this matter.

                    Sincerely,

                    Dana Mendelson

**SUPERIOR COURT THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES**

People of the State of California vs.   GEORGE NIMER   MARTHA                                               ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 157784 | T. BOGOTT | ☐ Present | D. WISE | ☒ Present |
| | Clerk | | Judge | |
| | ERNEST ARNDT | | JACK K. BERMAN | |

Reporter

LAVENA WARD-PAGE#7077, ROOM 306, 850 BRYANT STREET - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing
Special appearance by BALDOCCHI/V, DA for the Assistant DA of Record.
Court has appointed WISE/D, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | G |

Cause on calendar: surrender.

Cause is continued for hearing on same.

Cause is ordered continued to 04/22/97 at 09:00 a.m. in Department S25 for Hearing.

## SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES

| People of the State of California vs. | GEORGE NIMER MARTHA | | | ☒ Present |
|---|---|---|---|---|
| SC # | Assistant DA of Record | | Attorney of Record | |
| 157784 | T. BOGOTT | ☐ Present | D. WISE | ☒ Present |
| | Clerk | | Judge | |
| | ERNEST ARNDT | | JACK K. BERMAN | |

Reporter

KATHY BARUCH#7530, ROOM 306, 850 BRYANT STREET - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing
Special appearance by RING/R, DA for the Assistant DA of Record.
Court has appointed WISE/D, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | G |

Cause on calendar: surrender.

Defendant surrendered as heretofore ordered.

| Dept. | S25 | Date | 04/22/97 | Page 1 |
|---|---|---|---|---|
| Attest: | ERNEST ARNDT | | | Deputy Clerk |

## SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES

People of the State of California vs.   **GEORGE NIMER MARTHA**          ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|------|------------------------|--|--------------------|--|
| **157784** | . | ☐ Present | **REBECCA   YOUNG** | ☒ Present |
| | **Clerk** | | **Judge** | |
| | **ALICE REDMOND** | | **DAVID A.  GARCIA** | |

Reporter

## JOSEPH VICKSTEIN #4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment
Special appearance by C. LANKFORD-GROSS, DA for the Assistant DA of Record.
Defendant has retained YOUNG/REBECCA, Esq.

| Count | Code | Section | Degree | MC # | Plea |
|-------|------|---------|--------|------|------|
| 1 | PC | 422/F | | 01533143 | |
| 2 | PC | 646.9(A)/F | | 01533143 | |
| 3 | PC | 646.9(B)/F | | 01533143 | |
| 4 | PC | 422/F | | 01533143 | |
| 5 | PC | 422/F | | 01533143 | |
| 6 | PC | 422/F | | 01533143 | |

Defendant personally enters a general time waiver.


Cause is ordered continued to 11/15/94 at 09:00 a.m. in Department S22 for Arraignment.

Susan Breall
553-1849

| Dept. | **S22** | Date | **11/03/94** | Page **1** |
|-------|---------|------|--------------|------------|
| Attest: | **ALICE REDMOND** | | | Deputy Clerk |

## SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES

| People of the State of California vs. | GEORGE NIMER  MARTHA | | | | | [X] Present |
|---|---|---|---|---|---|---|

| SC # | Assistant DA of Record | | | Attorney of Record | | |
|---|---|---|---|---|---|---|
| 157784 | S. BREALL | | [ ] Present | | | [ ] Present |
| | Clerk | | | Judge | | |
| | JOSIE C. ROQUE | | | DAVID A. GARCIA | | |

**Reporter**
JOSEPH VICKSTEIN #4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment: PLEA & COUNSEL
Special appearance by C. LANKFORD-GROSS, DA for the Assistant DA of Record.
Special appearance by L. DAVIS, Deputy Public Defender for the Attorney of Record.

| Count | Code | Section | Degree | MC # | Plea |
|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | NG |
| 2 | PC | 646.9(A)/F | | 01533143 | NG |
| 3 | PC | 646.9(B)/F | | 01533143 | NG |
| 4 | PC | 422/F | | 01533143 | NG |
| 5 | PC | 422/F | | 01533143 | NG |
| 6 | PC | 422/F | | 01533143 | NG |

Defendant waives formal reading of the information.

Defendant is duly arraigned. Not guilty plea(s) as to each count
and denial of any and all allegation(s), entered.

The defendant declares his/her true name to be that stated in the accusatory pleading.

Court appoints the Public Defender.

Cause is ordered continued to 12/08/94 at 10:30 a.m. in Department S22 for Pretrial.
Cause is ordered continued to 12/19/94 at 09:30 a.m. in Department S22 for Trial.

| Dept. | S22 | Date | 11/15/94 | Page 1 |
|---|---|---|---|---|
| Attest: | JOSIE C. ROQUE | | | Deputy Clerk |

SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES

People of the State of California vs.   GEORGE NIMER  MARTHA                          [X] Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|------|------------------------|--|-------------------|--|
| 157784 | S. BREALL | [X] Present | B. CONROY | [X] Present |
| | Clerk | | Judge | |
| | ALICE REDMOND | | DAVID A. GARCIA | |

Reporter
JOSEPH VICKSTEIN#4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Pretrial
Court has appointed CONROY/B, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea |
|-------|------|---------|--------|------|------|
| 1 | PC | 422/F | | 01533143 | NG |
| 2 | PC | 646.9(A)/F | | 01533143 | NG |
| 3 | PC | 646.9(B)/F | | 01533143 | NG |
| 4 | PC | 422/F | | 01533143 | NG |
| 5 | PC | 422/F | | 01533143 | NG |
| 6 | PC | 422/F | | 01533143 | NG |

The court appoints Brendan Conroy, Esq. as conflict counsel.

Cause is ordered continued to 01/03/95 at 02:00 p.m. in Department S22 for Pretrial.
Cause is ordered continued to 01/09/95 at 09:30 a.m. in Department S22 for Trial.

Dept.  S22   Date  12/08/94   Page  1
Attest:  ALICE REDMOND   Deputy Clerk

**SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES**

People of the State of California vs.    GEORGE NIMER    MARTHA          ☐ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 157784 | S. BREALL | ☒ Present | B. CONROY | ☒ Present |
| | Clerk | | Judge | |
| | ALICE REDMOND | | ALEX SALDAMANDO | |

Reporter
VALERIE PAPALE #6899, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Hearing
Court has appointed CONROY/B, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea Finding |
|---|---|---|---|---|---|
| 1 | PC | 422/F | | 01533143 | G |

No appearance by defendant.

The Court orders that a bench warrant issue.

No Bail.

The matter is ordered off calendar.

MOTION TO REVOKE PROBATION-APD - Granted

| Dept. | S22 | Date | 06/03/96 | Page | 1 |
|---|---|---|---|---|---|

Attest:    ALICE REDMOND          Deputy Clerk

**FILE**

1   McCUTCHEN, DOYLE, BROWN & ENERSEN, LLP
    ANGEL A. GARGANTA, SB 163957
2   SEJAL A. MISTRY, SB 209616
    REBECCA HOOLEY SB 212881
3   Three Embarcadero Center
    San Francisco, California 94111-4067
4   Telephone: (415) 393-2000

5   Attorneys for Respondent
    GEORGE N. MARTHA
6

7
                    UNITED STATES DEPARTMENT OF JUSTICE
8

9

10
                  EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
11

12

13                     BOARD OF IMMIGRATION APPEALS

14

15
                              FALLS CHURCH, VA
16

17

18  In the Matter of:                    No. A17-796-939

19                                       SUPPLEMENTAL BRIEF FILED IN
    George N. MARTHA,                    SUPPORT OF GEORGE N.
20                                       MARTHA'S MOTION TO REOPEN
            Respondent,                  AND, IF NECESSARY, REQUEST FOR
21                                       STAY OF REMOVAL PENDING
    In Removal Proceedings               DECISION ON MOTION TO REOPEN
22

23

24  **SUPPLEMENTAL BRIEF IN SUPPORT OF GEORGE N. MARTHA'S MOTION TO**

25  **REOPEN AND, IF NECESSARY, REQUEST FOR STAY OF REMOVAL PENDING**

26                **DECISION ON MOTION TO REOPEN**

21353466.1/23130-0007                                        07/10/01 01:28 PM

SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO REOPEN

1    **I.    INTRODUCTION**

2            The Respondent, George N. Martha, submits this supplemental brief in support of

3    his Motion to Reopen, and if Necessary, Request for Stay of Deportation Pending Decision on

4    Motion to Reopen, based on the Supreme Court's June 25, 2001 decision in *Immigration and*

5    *Naturalization Service v. St. Cyr*, 553 U.S. ___ (2001); 121 S.Ct. 2271. The *St. Cyr* decision

6    definitively holds that Section 440(d) of the Antiterrorism and Effective Death Penalty Act of

7    1996 ("AEDPA") and Section 304(a) of the Illegal Immigration Reform and Immigrant

8    Responsibility Act of 1996 (IIRIRA) did not retroactively repeal the availability of Immigration

9    and Nationality Act (INA) Section 212(c) relief for aliens who entered a guilty plea to an

10   "aggravated felony" prior to the passage of the laws in reliance on the availability of INA

11   Section 212(c) relief. Mr. Martha, who was convicted of an "aggravated felony" prior to passage

12   of these laws and relied on the availability of the Section 212(c) waiver, is therefore eligible to

13   apply for Section 212(c) relief. Based on this fundamental change in the law, Mr. Martha

14   respectfully requests the Board of Immigration Appeals (BIA) to reopen his case and remand to

15   the Immigration Court for an evidentiary hearing on the merits.

18

19   **II.    ARGUMENT**

20           **A.    The Supreme Court's Decision in _INS v. St. Cyr_ Presents a**
                      **Fundamental Change in Immigration Law that Gives the Board the**
21                   **Power to Reopen Mr. Martha's Case.**

22           8 C.F.R. Section 3.2(c)(2) provides that only one motion to reopen is allowed and

23   it must be filed with the Board no later than 90 days on which the final administrative decision is

24

25   rendered. However, the Board has held that a motion to reopen based on a fundamental change

26

1    in the immigration laws that affords an alien relief that was not previously available is not barred

2    by the limitations in 8 C.F.R. Section 3.2. *See In re X-G-W*, Int. Dec. 3352 (BIA 1998).

3

4         The Supreme Court's June 25, 2001 decision in *Immigration and Naturalization*

5    *Service v. St. Cyr*, 553 U.S. ___ (2001); 121 S.Ct. 2271, holds that Section 440(d) of AEDPA

6    and Section 304(a) of IIRIRA, which repealed the availability of the INA Section 212(c) waiver

7    for a lawful permanent resident convicted of an aggravated felony, does not apply to those lawful

8    permanent residents who entered a guilty plea to the conviction underlying their deportation or

9    removal proceedings prior to the effective date of the repeal in reliance on the availability of

10   Section 212(c) relief. *See St. Cyr*, 553 U.S. at ___. Because Mr. Martha is a lawful permanent

11   resident who entered a guilty plea prior to the passage of AEDPA and IIRIRA in reliance on the

12

13   Section 212(c) waiver, the *St. Cyr* decision presents an avenue of relief to Mr. Martha that was

14   unavailable to him during the pendency of his removal proceedings.   Thus, the Board has the

15   power to reopen Mr. Martha's case despite the limitations in 8 C.F.R. Section 3.2.

16

17   **B.    Because Mr. Martha Entered His Guilty Plea in Reliance on the**
        **Availability of §212(c) Relief, the Board Should Reopen and Remand**
18      **the Case for an Evidentiary Hearing Before the Immigration Court.**

19         The Supreme Court's June 25, 2001 *St. Cyr* decision holds that Section 440(d) of

20   the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and Section 304(a) of the

21   Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) cannot be

22

23   retroactively applied to aliens who were convicted of an aggravated felony prior to passage of

24   these laws and relied on the availability of INA Section 212(c). *See id.* The Court held that

25   "§ 212(c) relief remains available for aliens . . . whose convictions were obtained through plea

26

1    agreements and who, notwithstanding those convictions would have been eligible for § 212(c)

2    relief at the time of their plea under the law then in effect." *St. Cyr*, 553 U.S. at ___.

3

4        Mr. Martha falls squarely within this category of aliens. He entered a guilty plea

5    to the conviction that is the basis for his final order of removal in 1995, two years prior to the

6    effective date of the relevant AEDPA and IIRIRA provisions.[1]  In his declaration, he states that

7    his attorney, Mr. Brendan Conroy, advised him that if he entered the plea and was placed in

8    immigration proceedings, he would be able to apply for a discretionary waiver.[2]  *See* Exhibit B

9
10   of Motion To Reopen, Declaration of George N. Martha. Mr. Martha chose to enter the plea so

11   that he could get credit for time served and three years probation, rather than staying in jail

12   during the pendency of a trial. *See id.* Moreover, Mr. Martha, in his declaration, states that he

13   never would have entered a guilty plea if he had known that he would be deported. *See id.* He

14   knew that the waiver was not automatic, but he thought and was advised by his attorney that

15   because he had lived in the U.S. for such a long time and his crime was not particularly serious,

16   he would not be deported.[3]  *See id.* Therefore, under *St. Cyr*, Mr. Martha is now eligible for

17   Section 212(c) relief.

18

19   _____

20   [1]  IIRIRA went into effect in April 1997. *INS v. St. Cyr*, 553 U.S. at ___.

21   [2]  California law requires the trial judge to advise defendants that immigration consequences may
22   result from accepting a plea agreement. *See* Cal. Penal Code § 1016.5 (West 1985).

23   [3]  "There can be little doubt that, as a general matter, alien defendants considering whether to
     enter into a plea agreement are acutely aware of the immigration consequences of their
24   convictions. [citations omitted]  Given the frequency with which § 212(c) was granted in the
     years leading up to AEDPA and IIRIRA, preserving the possibility of such relief would have
25   been one of the principle benefits sought by defendants deciding whether to accept a plea offer or
     instead proceed to trial." *St. Cyr,* 553 US at ___.

26

1        A motion to reopen must be based on evidence that is (1) material, (2) unavailable

2    at the time of the original hearing, and (3) that could not have been discovered or presented at the

3    original hearing. *See* 8 C.F.R. §3.2. Here, Mr. Martha's evidence of his reliance on the

4
     availability of Section 212(c) relief in entering his guilty plea is material in light of the *St. Cyr*
5
6    decision. It presents an avenue of relief for Mr. Martha that did not exist during the pendency of

7    his proceedings. While this evidence was available at the time of Mr. Martha's Immigration

8    Court hearing, it was irrelevant to the proceedings because the Supreme Court had not yet

9    decided *Immigration and Naturalization Service v. St. Cyr.*[4] Therefore, the evidence could not

10   have been presented at the original hearing because it was irrelevant to Mr. Martha's case at that

11   time.

12

13       Based on this fundamental change in the law and the new material evidence

14   presented, the Board should reopen Mr. Martha's case and remand to the Immigration Court for

15   an evidentiary hearing on the merits.

16

17   **III.    CONCLUSION**

18       The U.S. Supreme Court's decision in *St. Cyr* mandates reopening of Mr.

19
     Martha's case. *St. Cyr*'s holding that Section 212(c) relief remains available for aliens who
20
21   "would have been eligible for § 212(c) relief at the time of their plea under the law then in

22   _____

23   [4] As discussed in Mr. Martha's Motion to Reopen, the Ninth Circuit decisions in *Magana-*
     *Pizano v. Immigration and Naturalization Service*, 200 F.3d 603 (9th Cir. 1999) and *Richards-*
24   *Diaz v. Fasano*, 233 F.3d 1160 (9th Cir. 2000), which also found that aliens convicted of an
     aggravated felony who had relied on availability of 212(c) relief prior to the effective date of
25   IIRIRA, had also not been decided at the time the Board entered its final order of removal in Mr.
     Martha's case.

26

1    effect," presents an avenue of relief from removal that was previously unavailable to him. Thus,

2    it profoundly affects Mr. Martha's case, as he entered his guilty plea in reliance on the

3    availability of Section 212(c) relief prior to the passage of IIRIRA and AEDPA. The Board

4    should therefore reopen the case for an evidentiary hearing on the merits.

5    DATED: July 10, 2001

6

7                                    McCUTCHEN, DOYLE, BROWN & ENERSEN, LLP

8

9

10                          By:
                                        Rebecca Hooley
11                                      Attorneys for Respondent
                                        GEORGE N. MARTHA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1                          PROOF OF SERVICE

2              I am over 18 years of age, not a party to this action and employed in the County

3    of San Francisco, California at Three Embarcadero Center, San Francisco, California 94111-

4    4067. I am readily familiar with the practice of this office for collection and processing of

5    correspondence for mailing with the United States Postal Service and correspondence is

6    deposited with the United States Postal Service that same day in the ordinary course of business.

7              Today I served the attached:

8              **SUPPLEMENTAL BRIEF FILED IN SUPPORT OF**
               **GEORGE N. MARTHA'S MOTION TO REOPEN AND, IF**
9              **NECESSARY, REQUEST FOR STAY OF REMOVAL**
               **PENDING DECISION ON MOTION TO REOPEN**
10
     by causing a true and correct copy of the above to be placed in the United States Mail at San
11
     Francisco, California in sealed envelope(s) with postage prepaid, addressed as follows:
12
     Board of Immigration Appeals          Assistant District Counsel
13   Clerk's Office                        Office of the District Counsel, USINS
     P.O. Box 8530                         550 Kearny Street, Suite 1000
14   Falls Church, VA  22041               San Francisco, CA  94108

15             I declare under penalty of perjury under the laws of the State of California that the

16   foregoing is true and correct and that this declaration was executed on July 10, 2001.

17

18                                              Quintella Warren
19

20

21

22

23

24

25

26

-1-



**U.S. Department of Jus**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*



*5201 Leesburg Pike, Suite 1300*
*Falls Church, Virginia 22041*

**Agarwal, Monty**
**Three Embarcadero Center,**
**San Francisco, CA 94111-0000**

**Office of the District Counsel/SFR**
**P.O. Box 26449**
**San Francisco, CA 94126-6449**

**Name: MARTHA, GEORGE NIMER**

**A17-796-939**

**Date of this notice: 07/31/2001**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Very Truly Yours,

Lori Scialabba
Acting Chairman

Enclosure

Panel Members:
JONES, PHILEMINA M.

**U.S. Department of Justice**
**Executive Office for Immigration Review**

Decision of the Board of Immigration Appeals

**Falls Church, Virginia 22041**

File:  A17-796-939 - SAN FRANCISCO

Date:

In re:  MARTHA, GEORGE NIMER

JUL 31 2001

IN REMOVAL PROCEEDINGS

APPEAL AND MOTION

ON BEHALF OF RESPONDENT:  Agarwal, Monty

ON BEHALF OF SERVICE:  James S. Stolley, Jr., Assistant District Counsel

ORDER:

PER CURIAM. The respondent has now filed a motion to remand, and the Service does not oppose the motion. Accordingly, the motion is granted.

The record will be remanded to afford the respondent an opportunity to apply for relief under section 212(c) of the Act, 8 U.S.C. section 1182(c).  See INS v. St. Cyr, 121 S.Ct. 2271 (2001).

FURTHER ORDER: The record is remanded to the Immigration Judge for further proceedings consistent with this opinion.

_____
FOR THE BOARD

RECEIVED-SF CALENDAR
August 3, 2001
c/m# 96041.860

Dates to be Entered
Please advise re
Good ne lan later
to copy

The attorney, whose initials appear below,
has reviewed the applicable court rules, and
has verified that the above dates are correct.

Atty:
Date Processed:  8 / 3 / 61
Rec'd: Mail In Box/Fax/Record
or Other:
Routed to:  MXA
Processed by:  CDG



RECEIVED
MDB & E

AUG 3 2001

Atted._____

**U.S. Department of Justice**
Executive Office for Immigration Review
*Office of the Clerk*
*Board of Immigration Appeals*
"O. Box 8530
*Its Church, Virginia 22041*

Official Business
Penalty for Private Use $300

# IMMIGRANT VISA AND ALIEN REGISTRATION

DE 1- 2626276

| (Family name) | (First name) | (Middle name) |
|---|---|---|
| Martha | George | Nimr |

**PORT OF** 035 / MYC

**ACTION OF SPECIAL INQUIRY OFFICER**

I certify that the immigrant named herein arrived in the United States at this port on

GR-91

(Name of vessel or flight No. of aircraft)

and was inspected by me and

OCT 26 1967

CLASS

detained for further inquiry by special officer under Symbol 12-7 Section ............... of the Immigration and Nationality Act.

*Immigration Inspector,*

STATISTICS

AMERICAN Consulate General

AT Jerusalem

David K. Mack

Vice Consul of the United States of America.

U.S.P.H.S.
S. Letter

PASSED

USPHS New York

PHOTOGRAPH ATTACHED
FOREIGN SERVICE
UNITED STATES OF AMERICA

Service No. 2424619
Tariff Item No. 21
Fee Paid $20
Local Cy equiv. IL 60.00
Section 212(a)(14) - Not Statutorily Required

The immigrant herein was (admitted) (excluded) and { no appeal taken / appeal taken } under

Symbol .................... 4

Section .................... 57 of the Immigration and Nationality Act.

*Special Inquiry Officer.*

**ACTION ON APPEAL**

ADMITTED

EXCLUDED

DATE

This visa is issued under Section 221 of the Immigration and Nationality Act, and upon the basis of the facts stated in the application.

**IMMIGRANT CLASSIFICATION**

| NONQUOTA (Symbol) | QUOTA (Symbol) |
|---|---|
| -4- | P2-2 |

VISA PETITION NO., IF ANY
Petition attached

| IMMIGRANT VISA NO. | QUOTA |
|---|---|
| -511- | Palestine |

| ISSUED ON | (Day) | (Month) | (Year) |
|---|---|---|---|
| | 4 | October | 1967 |

THE VALIDITY OF THIS VISA EXPIRES MIDNIGHT AT THE END OF

| | (Day) | (Month) | (Year) |
|---|---|---|---|
| | 3 | February | 1968 |

NATIONALITY (If stateless, so state, and give previous nationality)

Jordanian

**PASSPORT**

NO.
Passport not required under 22 CFR 42.6(a)

OR OTHER TRAVEL DOCUMENTS (Describe)
XXX

ISSUED
TO
1-151 MAILED

BY
NOV 4 - 1967

ON
P H U

EXPIRES

16—74687-2    U.S. GOVERNMENT PRINTING OFFICE

Exhibit 6



lost my Right to
be an American Boy
Because I was punished
for being mentally sick
By INTRApment.
She only Rewarded what
She wanted the court
to hear.
To KidNAp my Baby
to go back to
SF Cr. for
our son

The person identified on the reverse of this card is
authorized to engage in employment in the United States
pursuant to Section 274A of the Immigration and Nationality
Act, as amended, during the period of validity of this card
and in accordance with the restricting terms stated on the
reverse of the card.

This document is VOID if altered and may be revoked
pursuant to 8 CFR 274a. This document is not evidence of
citizenship or permanent residence in the United States.
If this card is found, please return to the nearest office
of the Immigration and Naturalization Service.

EXAM 1 MARY9

OR NAL JAN 90

IMMIGRATION COURT
550 KEARNY ST., SUITE 800
SAN FRANCISCO, CA 94108

In the Matter of
Martha, George Nimer
Respondent

Case 14-496-939

IN REMOVAL PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on _November 19, 2001_.
This memorandum is solely for the convenience of the parties. If the
proceedings should be appealed or reopened, the oral decision will become
the official opinion in the case.

[ ] The respondent was ordered removed from the United States to _____.
[ ] Respondent's application for voluntary departure was denied and
respondent was ordered removed to _____ or in the alternative
to _____.
[ ] Respondent's application for voluntary departure was granted
until _____ upon posting a bond in the amount of $_____ by
_____ for each Respondent.
with an alternative order of removal to_____.
[ ] Respondent's application for asylum was ( ) granted ( ) denied
( ) withdrawn ( ) other.
[ ] Respondent's application for withholding of removal was ( ) granted
( ) denied ( ) withdrawn ( ) other.
[ ] Respondent's application for cancellation of removal under section
240A(a) was ( ) granted ( ) denied ( ) withdrawn ( ) other.
[ ] Respondent's application for cancellation of removal under section
240A(b) was ( ) granted ( ) denied ( ) withdrawn ( ) other. If
granted, it was ordered that the respondent be issued all appropriate
documents necessary to give effect to this order.
[X] Respondent's application for a waiver under section 212(c) of the INA
was (X) granted ( ) denied ( ) withdrawn ( ) other.
[ ] Respondent's application for adjustment of status under section _____
of the INA was ( ) granted ( ) denied ( ) withdrawn ( ) other.
If granted, it was ordered that respondent be issued all appropriate
documents necessary to give effect to this order.
[ ] Respondent's status was rescinded under section 246 of the INA.
[ ] Respondent is admitted to the United States as a _____ until _____.
[ ] As a condition of admission, respondent is to post a $_____ bond.
[ ] Respondent knowingly filed a frivolous asylum application after
proper notice.
[ ] Respondent was advised of the limitation on discretionary relief for
failure to appear as ordered in the Immigration Judge's oral decision.
[ ] Proceedings were terminated.
[ ] Relief under Convention Against Torture ( ) granted ( ) denied.
[ ] Other:
Waived / Appeal: A / I / B
Appeal due by:_____

Immigration Judge

Date: 11/19/01

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY: MAIL [ ] PERSONAL SERVICE [X]
TO: [ ] ALIEN [ ] ALIEN c/o Custodial Officer [X] ALIEN'S ATTY/REP [ ] INS
DATE: 11/19/01 BY: COURT STAFF _____
Attachments: [ ] EOIR-33 [ ] EOIR-28 [ ] Legal Services List [ ]

| ACTION NOS. | DEFENDANTS | VIOLATIONS | DEPT. 10 |

**S.F.P.D.#**
**880471493**

GEORGE MARTHA

459 P.C./Felony
664/484f(2) P.C./Felony
(2 cts.);
484f(2) P.C./Felony
(4 cts.)

THE PEOPLE OF THE STATE OF CALIFORNIA VS. THE DEFENDANTS ABOVE NAMED

IN THE MUNICIPAL COURT
CITY AND COUNTY OF SAN FRANCISCO
STATE OF CALIFORNIA

**JUN 2 2 1988**
**F I L E D**
Clerk of the Municipal court

COMPLAINT

Deputy _____

KARL RICHMOND

_____ _____ ___ states and declares on information and belief

that the said defendant(s) did in the City and County of San Francisco,

State of California, on or about the    19th day of April, 1988

commit the crime of  FELONY    , to wit: Violating section 459(2d)

of the California Penal Code, in that the said defendant did willfully
and unlawfully enter the premised and building of SEARS ROEBUCK, with
thee intent to commit larceny.

#### COUNT II

That the said defendant did in the City and County of San Francisco,
State of California, on or about the 19th day of April, 1988, commit
the crime of FELONY, to wit: Violating Section 664/484f(2) of the
California Penal Code, in that the said defendant did willfully, unlawfully,
and with intent to defraud ATTEMPT TO sign the name of another, to wit: ROBERT RAEL.
RAEL, to a credit card, for the payment of money which evidenced a
credit card transaction in the sum of Fifty Four Dollars and Thirty
Cents ($54.30), said defendant being a person other than the cardholder,
with intent to defraud SEARS ROEBUCK a corporation, and without authorization
of the cardholder.

#### COUNT III

That the said defendant did in the City and County of San Francisco,
State of California, on or about the 19th day of April, 1988, commit
the crime of FELONY, to wit: Violating Section 484f(2) of the California
Penal Code, in that the said defendant did willfully, unlawfully and
with intent to defraud sign the name of another person, to wit:  ROBERT
RAEL, to a credit card, for the payment of money which evidenced a
credit card transaction in the sum of One Hundred and Six Dollars and
Forty Nine Cents ($106.49), said defendant being a person other than
the cardholder, with intent to defraud SEARS ROEBUCK,    poration,
and without authorization of the cardholder.

- 1 -

I THEREBY CERTIFY the foregoing to be a full, true and correct copy of the original of record in this office.
Gordon Park-Li, Clerk of the Municipal Court of the City and County of San Francisco, State of California.

Dated: _____ By: _____ COURT _____ Deputy Clerk

That the said defendant did in the City and County of San Francisco, State of California, on or about the 18th day of April, 1988, commit the crime of FELONY, to wit: Violating Section 484f(2) of the California Penal Code, in that the said defendant did willfully, unlawfully and with intent to defraud sign the name of another person, to wit: ROBERT RAEL, to a credit card, for the payment of money which evidenced a credit card transaction in the sum of Two Hundred and Fifty Five Dollars ($255.00), said defendant being a person other than the cardholder, with intent to defraud SEARS ROEBUCK, a corporation, and without authorizatiion of the cardholder.

## COUNT V

That the said defendant did in the City and County of San Francisco, State of California, on or about the 18th day of April, 1988, commit the crime of FELONY, to wit: Violating Section 484f(2) of the California Penal Code, in that the said defendant did willfully, unlawfully and with intent to defraud sign the name of another person, to wit: ROBERT RAEL, to a credit card, for the payment of money which evidenced a credit card transaction in the sum of One Hundred and Fifty Four Dollars and Forty Three Cents ($154.43), said defendant being a person other than the cardholder, with intent to defraud SEARS ROEBUCK, a corporation and without authorization of the cardholder.

## COUNT VI

That the said defendant did in the City and County of San Francisco, State of California, on or about the 19th day of April, 1988, commit the crime of FELONY, to wit: Violating Section 484f(2) of the California Penal Code, in that the said defendant did willfully, unlawfully and with intent to defraud sign the name of another person, to wit: ROBERT RAEL, to a credit card, for the payment of money which evidenced a credit card transaction in the sum of One Hundred and Seventeen Dollars and Fifteen Cents, ($117.15), said defendant being a person other than the cardholder, with intent to defraud SEARS ROEBUCK, a corporation and without authorization of the cardholder.

## COUNT VII

That the said defendant did in the City and County of San Francisco, State of California, on or about the 19th day of April, 1988, commit the crime of FELONY, to wit: Violating Section 664/484f(2) of the California Penal Code, in that the said defendant did willfully, unlawfully and with intent to defraud ATTEMPT TO sign the name of another person, to wit: ROBERT RAEL, to a credit card, for the payment of money which evidenced a credit card transaction in the sum of Two Hundred and Ninety Nine Dollars and Ninety Nine Cents, ($299.99), said defendant being a person other than the cardholder, with intent to defraud SEARS ROEBUCK, a corporation and witout authorization of the cardholder.

DECLARATION ATTACHED HERETO AND INCORPORATED HEREIN SETS FORTH THE UNDERLYING FACTS ESTABLISHING PROBABLE CAUSE FOR THE ARREST OF THE DEFENDANT NAMED IN THIS COMPLAINT.

I state, declare, verify and certify under penalty of perjury that the foregoing is true and correct. Executed in San Francisco, California on June 1, 1988.

KARL RICHMOND

RING:tdb

- 2 -

Case 3:08-cv-01966... Document 7-3 Filed 05/05/2008 Page 42 of 4...

**MUNICIPAL COURT OF THE CITY AND COUNTY OF SAN FRANCISCO**
**STATE OF CALIFORNIA**

People of The State of California

MARTIN/GEORGE/M

PAGE 1 OF 2

| COURT NO. 1093976 | ACTION NO. 0269189 | CHARGES 451(20)PC |
|---|---|---|
| | 90 | 664/484F(2)PC/F |
| DA Warrant | 91 | 664/484F(2)PC/F |
| $10,000 | 92 | 484F(2)PC/M |
| | 93 | 484F(2)PC |

CMB

Co-Defendants

MOT. TO REVOKE PROB. _____ OC
MOT. TO REVOKE PROB. _____ OC
MOT. TO REVOKE PROB. _____ OC

JUN 2 2 1988  Defendant status: [ ]  [XX] Custody  OR [ ]  Bail

Bail set $ _____ CT OR by Judge: **DAVID A GARCIA**  JUN 2 2 1988

Name _____ Date _____ Bail Recne _____ Amount

**ARRAIGNMENT**  DEPT. 10  JUDGE: **DAVID A GARCIA**  REPORTER: **LINDA J. HOGAN**

Date  Initials

JUN 2 2 1988 ● 10  pursuant to PC 1320 Bail reset at $ _____ by Judge _____ Name

Defendant thru counsel waives formal arraignment and advisement of Rights.

Defendant informed of charges and arraigned. (See reverse side.)

JUL 0 6 1988 ● 10  Cmplt orally amended. Waived 1+A, filing cmplt, any irregularities

**ATTORNEY**
Date  Initials

JUN 2 2 1988 ● 10  PD appointed ✓ Dewberry General appearance by _____ Attorney's Name

_____ substituted as attorney for Defendant.
Attorney's Name

**PLEA**
Date  Initials

JUN 2 2 1988 ● 10  Not Guilty ✓ _____ Other _____

**STATUTORY TIME**
Date  Initials

JUN 2 2 1988 ● 10  Deft. thru Atty. waives right to speedy trial and preliminary hearing within 10 days.  +60

NO TIME WAIVER by Defendant.

_____ Defendant withdraws time waiver.

AUG 0 3 1988 ● 10 (other) JRAD motion granted. PD Dewberry to prepare order.

Continued for further proceedings:

| DATE/TIME | DEPT. | | FOR | | STAT TIME WAIVED: Yes No | CMB |
|---|---|---|---|---|---|---|
| 7-6-88 | 0900 | 10 | Plea Hrg (DOP) | ORCT | ✓ (P/10-60) | |
| 8-3-88 | 0900 | 10 | JRAD Mot | (PROB) | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

CHARGE(S) REDUCED TO MISDEMEANORS pursuant to PC 17(b); case transferred to

Dept. _____ on _____ at _____ for further proceedings.

**EXTRADITION**
Date  Initials

Arraigned: _____ Date _____

_____ Waived/Not Waived _____ (Formal Extraditon Proceedings).

Defendant delivered to custody of _____

**PRELIMINARY HEARING**    DEPT._____ JUDGE:_____    REPORTER:_____

Upon calling of this case, the court ordered the following:

| Date | Initials | |
|---|---|---|
| | | That the matter be continued to_____ in Dept._____ at_____ |
| | | Time waived by Defendant(s)_____ |
| | | That the Deft. be held to answer and admitted to Bail of $_____ and that the case be |
| | | transferred to the Superior Court for further proceedings in Dept._____ on_____ at_____ |
| | | That the pending misdemeanor be certified to the Superior Court for further proceedings. |
| | | That the case be dismissed and the Defendant discharged on the grounds of_____ |
| | | Exhibits released to custody of_____ |
| | | Files transferred to Superior Court. |
| | | That the case be certified to Superior Court. |
| | | (other orders of court)_____ |

**PLEA OF GUILTY**    To charge(s) of __484 (e), 2 PC__ Felony/Misdemeanor reduced pursuant to PC 17(b).

JUL 0 6 1988 ♀10    Amended to a lesser included offense by stipulation._____ Yes/No

JUL 0 6 1988 ♀10    DEPT. _10_ JUDGE: _DAVID A GARCIA_ REPORTER: _LINDA J. HOGAN_

Deft. advised of and personally waived his right to a speedy trial by jury or court; advised of and personally waived his rights to confront and cross-examine the witness against him, advised of and personally waived his right against self-incrimination; and was further advised of the nature of the charge(s) and that a plea of guilty was, in fact, a conviction; and was advised of the maximum and minimum penalties of each charge and the consequences of a plea to each charge; and (if applicable) was advised and waived his right to a preliminary hearing before he could be held to answer to the charge against him; and after inquiry by the court, the court found that the Deft. understood the charges against him and that the above waivers of his rights were intelligently and voluntarily made.

Certified to Superior Court for sentencing on _____ Date _____ Dept.

JUL 0 6 1988 ♀10    Statutory time for sentencing waived.

JUL 0 6 1988 ♀10    Sentence of Court: __ISS 3 yrs APD: 3 days CT - 3 CTS o/o rest TRD,__
__stay away fr Sears, obey all laws__ · 10%% Warrantless Search Condition As
__apts *25/mo prob costs__    ... is Deft's res, person, premises or ...
...    Patro... ... bation Officer.

Sentence Modified to _____

Stay of Execution until_____ Date

Defendant remanded to custody.

Pre-sentence/pre-plea report ordered, continued to_____ Date

JUL 0 6 1988 ♀10    1385/1382 Dismissal of charge(s) of __459 PC, 664/484(e), 2 PC (2 cts), 484(e), 2 PC__
(other orders of court)_____ __(3 cts) — in view of plea__

AUG 0 3 1988 k 10    __TRAD motion granted. PD Dewberry to__
__prepare order.__

**BENCH WARRANT**    Issued_____ for_____ recalled/discharged_____ Date

Disposition re BW_____ Contempt

Issued_____ for_____ recalled/discharged_____

Disposition re BW_____ Contempt

**BAIL FORFEITURE**    Bail No._____ Forfeited on:_____ Amount $_____

| Date | Initials | |
|---|---|---|
| | | Forfeiture set aside and bail reinstated/exonerated. |
| | | Bail No._____ Forfeited on:_____ Amount $_____ |
| | | Forfeiture set aside and bail reinstated/exonerated. |

**RIGHTS**

| Date | Initials | |
|---|---|---|
| | | Deft. advised of each of the following Constitutional Rights: Right to attorney and to have court appoint lawyer if he is indigent; Right to a speedy, public trial by jury; Right to be released on reasonable bail; Right to exercise privileges against self-incrimination; Right to confront and cross-examine witness against him; Right to use subpoena power of court to produce witness and to present evidence on his behalf; Right to a Preliminary hearing within 10 days or have charges dismissed, and Right to appeal if convicted. |

EXHIbIT (c)

$1^{32}$

This is a true copy of the
San Francisco Police Record
of _George N. MARTHA_
Date of Birth _06-01-1967_
as of this date _DEC 13 2000_

```
***********************************************Rank*************Star#*****************
                     SAN FRANCISCO POLICE DEPARTMENT
                       CRIMINAL HISTORY RECORD
DATE:12/13/2000                   SFNO:S422949                        FROM:ID01
*********************************************************************************
RELEASE OF THIS RECORD TO UNAUTHORIZED PERSONS IS A MISDEMEANOR PER SEC 11142PC
RELEASED TO:               RELEASED BY:               RELEASE DATE:
*********************************************************************************


       *************** SUBJECT ***************        ****** ID NUMBERS ******
       *  NAME:MARTHA/GEORGE/N              *        *  CII:08310586         *
       *  RACE:W                            *        *  FBI:545070FA2        *
       *  SEX :M        HGT:509   HAIR:BR   *        *  SSN:573556761        *
       *  DOB:06-01-1967 WGT:160  EYES:HZ   *        * OPLIC:                *
       *                                    *        *                       *
       *  ADDR:76 WILLITS ST DC    POB:PK   *        *HFPC:8   M 1   U III 12*
       *  SCARS:TAT L ARM   TAT R ARM       *        *         S 17  U 000   *
       ***********************************************************************


*********************************************************************************

   TEXT:BURGLARY-CREDIT CARD-NARCOTICS

*********************************************************************************
10-01-1986   COURTNO:00935731 RPTNO:861082330   STAR:1703/1972   SCN:
             ARREST LOCATION:0035 /SOUTHVANNESS /AV

             V311781    10-01-1986   459PC/F        BURGLARY
             DISP:02-24-1988 MC CHG:459PC/M PB:SD/036M
             JCOP: 004D CJS :006M

             V311782    10-01-1986   466PC/M        POSSESS/ETC BURGLAR TOOLS
             DISP:02-24-1988 MC
             DISMISSED ON MOTION OF DISTRICT ATTORNEY

             U207951    01-21-1988   V311781BW/I    W#322914,459PC

04-19-1988   COURTNO:01078694 RPTNO:880471493   STAR:1188/2104   SCN:
             ARREST LOCATION:2675 /GEARY /BL

             U243847    04-19-1988   484E(2)PC/M    PT CR CARD/ACQUIRES LOST CARD
             DISP:04-20-1988
             DA WARRANT ISSUED

             U243848    04-19-1988   484F(2)PC/F    FORGE NAME ON CREDIT CARD
             DISP:04-20-1988
             DA WARRANT ISSUED

06-21-1988   COURTNO:01093976 RPTNO:880471493   STAR:2203/0000   SCN:
             ARREST LOCATION:0850 /BRYANT /ST

             U269189    06-21-1988   459PC/F        DAW#335028,A#22935F,TB#10000
             DISP:07-06-1988 MC
             DISMISSED ON MOTION OF DISTRICT ATTORNEY

             U269190    06-21-1988   484F,2PC/F     ATMPTED,DAW#335028,A#22935F
             DISP:07-06-1988 MC
             DISMISSED ON MOTION OF DISTRICT ATTORNEY
```

DISMISSED ON MOTION OF DISTRICT ATTORNEY

U269192   06-21-1988  484F,2PC/F     DAW#335028,A#22935F
DISP:08-03-1988 MC CHG:484F,2PC/M PB:SD/003Y
ISS JCOP: 003D

U269193   06-21-1988  484F,2PC/F     DAW#335028,A#22935F
DISP:07-06-1988 MC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

U269194   06-21-1988  484F,2PC/F     DAW#335028,A#22935F
DISP:07-06-1988 MC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

U269195   06-21-1988  484F,2PC/F     DAW#335028,A#22935F
DISP:07-06-1988 MC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

08-16-1988  COURTNO:01106497 RPTNO:881025489   STAR:1481/1728   SCN:
ARREST LOCATION:GENEVA AV/MISSION ST

U289852   08-16-1988  11350HS/F     POSS NARC CONTROLLED SUBSTANCE
DISP:08-17-1988
DA DISCH — QUESTIONABLE SEARCH OR SEIZURE

U289853   08-16-1988  11364HS/M     POSS CONTRLD SUB PARAPHERNALIA
DISP:08-17-1988
DA DISCH — QUESTIONABLE SEARCH OR SEIZURE

U289854   08-16-1988  22350VC/M     BASIC SPEED LAW
DISP:08-17-1988
DA DISCH — QUESTIONABLE SEARCH OR SEIZURE

09-09-1994  COURTNO:01533143 RPTNO:941094877   STAR:2178/1641   SCN:00157784
ARREST LOCATION:OUT OF TOWN

L281816   09-09-1994  422PC/F     DAW#441739 ACT#32102F    $1MIL
DISP:01-17-1995 SC CHG:422PC/F
PROBREVD SP 001Y/004M

L281817   09-09-1994  646.9APC/F     DAW#441739 ACT#32102F
DISP:01-03-1995
DISMISSED ON MOTION OF DISTRICT ATTORNEY

L281818   09-09-1994  646.9BPC/F     DAW#441739 ACT#32102F
DISP:01-03-1995
DISMISSED ON MOTION OF DISTRICT ATTORNEY

L298591   11-02-1994  422PC/F     THRT CRIME W/INT TO TERRORIZE
DISP:01-03-1995 SC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

L298592   11-02-1994  422PC/F     THRT CRIME W/INT TO TERRORIZE
DISP:01-03-1995 SC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

L298593   11-02-1994  422PC/F     THRT CRIME W/INT TO TERRORIZE
DISP:01-03-1995 SC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

R254508   06-10-1996  L281816BW/I     W#S470245,422PC

08-22-1996   COURTNO:01666770 RPTNO:961170231   STAR:1099/0000   SCN:
             ARREST LOCATION:3025 /FOLSOM /ST

             R277537   08-22-1996   11350HS/F   POSS NARC CONTROLLED SUBSTANCE
             DISP:08-23-1996
             DA DISCH - SUBSTANCE NOT PROHIBITED BY LAW

             R277538   08-22-1996   602,5PC/M   ENTER/ETC NONCOMMERCL DWELLING
             DISP:08-23-1996
             DA DISCH - INTEREST OF JUSTICE

01-24-1997   COURTNO:01533143 RPTNO:   STAR:2101/0000   SCN:00157784
             ARREST LOCATION:OUT OF TOWN

             S208335   01-24-1997   L281816BW/I   W‡S481309,422PC

             S235875   04-22-1997   L281816BW/I   W‡REMS25,422PC

10-29-1997   COURTNO:01745894 RPTNO:   STAR:0000/0000   SCN:
             ARREST LOCATION:0001 /HOLLAND /CT

             S294406   10-29-1997   PAROLEXX/F   3056PC ONLY CDC‡K48697 $NB

07-14-1998   COURTNO:01794773 RPTNO:   STAR:0000/0000   SCN:
             ARREST LOCATION:0001 /HOLLAND /CT

             T263612   07-14-1998   PAROLEXX/I   CDC 3056PC K48697 N/B

     **** FOR "AKA" OR ADDITIONAL ADDRESS INFORMATION, USE A "QPA" TRANSACTION ****

             DISMISSED ON MOTION OF DISTRICT ATTORNEY

             U269190   06-21-1988   484F,2PC/F'   ATMPTED,DAW‡335028,A‡22935F
             DISP:07-06-1988 MC
             DISMISSED ON MOTION OF DISTRICT ATTORNEY

ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE

275

CR-290

*[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-290 ATTACHED]*

☒ **SUPERIOR** COURT OF CALIFORNIA, COUNTY OF **SAN MATEO**
☐ **MUNICIPAL** BRANCH OR JUDICIAL DISTRICT **41100**

**FILED**
**SAN MATEO COUNTY**

**OCT 0 9 2002**

Clerk of the Superior Court
By Kristy Nelson
DEPUTY CLERK

| PEOPLE OF THE STATE OF CALIFORNIA vs. ...ENDANT: **George Martha** | DOB: **06-01-67** | **SC051811** | -A |
|---|---|---|---|
| | | | -B |
| CIM: | | | |
| BOOKING #: | ☐ NOT PRESENT | CMG | -C |
| COMMITMENT TO STATE PRISON ABSTRACT OF JUDGMENT | ☐ AMENDED ABSTRACT | | -D |

| DATE OF HEARING 10-09-02 | DEPT. NO. 12 | JUDGE H. JAMES ELLIS |
|---|---|---|
| CLERK Kristy Nelson | REPORTER SANDRA BETTENCOURT | PROBATION NO. OR PROBATION OFFICER |
| COUNSEL FOR PEOPLE ALLHISER | | COUNSEL FOR DEFENDANT BRAMY ☒ APPT'D. |

1. Defendant was convicted of the commission of the following felonies:
   ☐ Additional counts are listed on attachment ___ (number of pages attached)

| CNT. | CODE | SECTION NO. | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO./DATE/YEAR) | CONVICTED BY JURY | COURT | PLEA | TERM (L, M, U) | CONCURRENT | CONSECUTIVE 1/3 VIOLENT | CONSECUTIVE 1/3 NON-VIOLENT | CONSECUTIVE FULL TERM | INCOMPLETE SENTENCE (refer to line 5) | 654 STAY | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YRS. | MOS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | VC | 2800.2 | EVADE PEACE OFFICER | 2002 | 09-06-02 | X | | | M | | | | | | | 2 | 0 |
| 2 | VC | 10851(A) | TAKE VEHICLE W/O CONSENT | 2002 | 09-06-02 | X | | | M | | | X | | | | 1 | 4 |
| | | | | | · · | | | | | | | | | | | | |
| | | | | | · · | | | | | | | | | | | | |
| | | | | | · · | | | | | | | | | | | | |
| | | | | | · · | | | | | | | | | | | | |

2. ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

3. ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTION OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|
| PRISON PRIOR | 1 | | | | | | 1 | 0 |
| PC 667.5(B) | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

4. ☒ Defendant was sentenced pursuant to PC 667 (b)-(i) or PC 1170.12 (two-strikes). ✳

5. INCOMPLETED SENTENCE(S) CONSECUTIVE

| COUNTY | CASE NUMBER |
|---|---|
| | |
| | |
| | |

6. ☐ TOTAL TIME ON ATTACHED PAGES: [ ]

7. ☐ Additional indeterminate term (see CR-292).

8. ☐ TOTAL TIME: | 6 | 4 |

This form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for determinate sentences. Attachments may be used but must be referred to in this document.
(Continued on reverse)

Form Adopted by the
Judicial Council of California
CR-290 (Rev. January 1, 1999)

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE**
*[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-290 ATTACHED]*

Penal Code
§§ 1213, 1213.5

U.S. Department of Justice
Immigration and Naturalization Service



## Order of Supervision

File No: A17 796 939

Date: May 24, 2000

Name: __MARTHA, George Nimer__

On __January 6, 2000__ , you were ordered:
(Date of final order)

☐ Excluded or deported pursuant to proceedings commenced prior to April 1, 1997.

☒ Removed pursuant to proceedings commenced on or after April 1, 1997.

Because the Service has not effected your deportation or removal during the period prescribed by law, it is ordered that you be placed under supervision and permitted to be at large under the following conditions:

☒ That you appear in person at the time and place specified, upon each and every request of the Service, for identification and for deportation or removal.

☒ That upon request of the Service, you appear for medical or psychiatric examination at the expense of the United States Government.

☒ That you provide information under oath about your nationality, circumstances, habits, associations, and activities and such other information as the Service considers appropriate.

☒ That you do not travel outside __the State of California__ for more than 48 hours without first
(Specify geographic limits, if any)
having notified this Service office of the dates and places of such proposed travel.

☒ That you furnish written notice to this Service office of any change of residence or employment within 48 hours of such change.

☒ That you report in person on the __2nd Wed.__ day of __every month__ to this Service office at:
__630 Sansome Street, Room 113, San Francisco, CA 94111__
unless you are granted written permission to report on another date.

☒ That you assist the Immigration and Naturalization Service in obtaining any necessary travel documents.

☒ Other: You must complete one year treatment at Milestones, 291 Tenth Street, San Francisco, CA 94103.
must continue treatment @ Milestones thru February 2001.

☐ See attached sheet containing other specified conditions (Continue on separate sheet if required)

(Signature of INS official)

Roberto A. Morales, Deputy Assistant District Director
(Print name and title of INS official)

## Alien's Acknowledgment of Conditions of Release under an Order of Supervision

I hereby acknowledge that I have (read) (had interpreted and explained to me in the __English__ language)
the contents of this order, a copy of which has been given to me. I understand that failure to comply with the terms of this order may subject me to a fine, detention, or prosecution.

(Signature of INS official serving order)

Signature of INS alien)

May 24, 2000
(Date)

Form I-220B (Rev. 4/1/97)N

| 8/16/99 | GM makes motion for calendaring of bond hearing and release on bond |
|---|---|
| 8/25/99 | BIA Decision<br>• Rev IJ: PC §422 not "particularly serious crime"<br>• Aff'd IJ: Not more likely than not that he will be subject to persecution |
| 9/7/99 | Custody Hearing before Immigration Court |
| 9/15/99 | Bond Redetermination Hearing before Immigration Court |
| 9/23/99 | GM referred to Dr. Craig Fischer from INS custody |
| 10/11/99 | Letter from Dr. Fischer evaluating GM's health |
| 11/22/99 | Motion to Reopen filed based on Convention Against Torture and new evidence about GM's mental disorder |
| 12/1/99 | Custody review |
| 12/17/99 | DOJ's response to Motion to Reopen |
| 1/6/2000 | BIA decision on Motion to Reopen<br>• Convention Against Torture is same std as withholding - IJ decision holds<br>• Lack of medical care in Jordan not supported by sufficient independent corroborating evidence and lack of medical care is not torture |
| 1/26/00 | Petition for Review and Stay of Deportation filed by Mr. Martha's father. He makes a request for a stay of deportation and to review BIA decision.<br>Letter from Jordanian Embassador informing that there is no record of GM's birth in Jordan |
| 1/27/00 | Ninth Circuit order granting temporary stay of deportation until 3/9/00 |
| 2/8/00 | Mr. Martha's father files and informal brief |
| 2/18/00 | Mr. Martha asks the Ninth Circuit to release him on OR |
| 3/3/00 | Mr. Martha makes an inquiry regarding his request to be released OR |
| 3/9/00 | INS files Motion to Dismiss and Opposition for Stay of Deportation |
| 3/22/00 | Ninth Circuit denies motion for release OR<br>Ninth Circuit has no authroity to grant relief under 8 USC 1226(e) and 8 CFR 236.1 |
| 3/26/00 | Letter requesting bond sent to DOJ |
| 4/6/00 | Mr. Martha's father sends a letter to Ninth Circuit regarding facts that were not presented in court about the nature of the conviction. |
| 4/14/2000 | Motion for bond redetermination denied |
| 5/24/00 | INS issues an Order of Supervision |
| 6/28/2000 | 9th Cir. petition for review dismissed |
| 8/21/2000 | 9th Cir. final order |
| 5/24/2000-2/2001 | Order of supervision |

CHRONOLOGY OF GEORGE NIMER MARTHA

| | |
|---|---|
| 10/26/67 | GM entered the U.S.; port of entry - New York, NY |
| 1988 | Convicted under PC § 484; JRAD granted |
| 11/2/94 | Charges filed against GM |
| 1/3/95 | GM pled guilty to PC §422 - sentenced to one year and four months - suspended and awarded time served (159 days) and 3 yrs. probation |
| 1/3/95 | INS institutes removal proceedings based on conviction of aggravated felony |
| 10/17/96-12/4/96 | GM in Walden House substance abuse program<br>• kicked out because left the premises w/o staff permission<br>• inappropriate behavior w/females in facility |
| 1/8/97 | Altercation w/mom and sister-in-law; destroyed personal items and furniture; tried to pull ring off mom's finger |
| 1/15/97 | Probation revoked |
| 4/21/97 | GM stipulated to probation violation based on faulty advice about immigration consequences |
| 4/24/97 | Entered San Quentin based on guilty plea (16 mos.) |
| 6/10/97 | Deportation proceedings begin |
| 7/10/97 | Initial parole date |
| 7/11/97 | Detained in Lancaster, CA detention center |
| 7/15/97 | GM request to move to another INS detention center |
| 8/6/97 | Tries to get bail |
| 10/29/97 | Parole violations<br>• use of cocaine (719) discovered through drug testing<br>• use of methamphetamine (778)<br>• reporting a false address (022)<br>• grand theft auto (655) |
| 6/4/98 | GM released on $2000 bond |
| 6/23/98-7/5/99 | GM in Milestones Program |
| 7/10/98 | Notice to Appear issued |
| 10/14/98 | GM admitted into Substance Abuse Treatment Care Unit (SATCU) located at Santa Rita jail |
| 12/7/98 | Case administratively closed by IJ Ramirez IJ Yamaguichi denies application for withholding because failed to establish that it would be more likely than not that he would be subject to persecution. |
| 12/31/98 | Master Calendar custody hearing |
| 2/1/99 | GM filed for restriction of removal |
| 2/12/99 | IJ Hearing and Decision |
| 3/8/99 | Appeal of IJ decision to BIA |
| 3/11/99 | Incident in Kern County jail |
| 4/13/99 | DOJ files opposition to GM's appeal of IJ decision to BIA |
| 5/4/99 | INS Motion to administratively close the case (GM in Santa Rita jail) |



Mom is American Now.
   Son
   Dad
   Sister





بسم الله الرحمن الرحيم

المملكة الأردنية الهاشمية
دائرة الداخلية

عمان

الرقم ٣٨٩٨
٤٠٥٧/١/١/٣٥م
التاريخ
الموافق ٢٦/١١/٢٠٠٠

معالي السفير الأردني/ واشنطن

اشارة لكتابكم رقم ق/١٣٠٤/١٣ تاريخ ١٩٩٩/١٢/١٢ بخصوص المدعو جورج مسلم مرثا

يرجى العلم بتعذر الموافقة على اجابة الطلب لعدم وجود مايثبت بانه اردني
الجنسية .

وثيقة سفر xxxxxxxxxxxxxx اشظرية xxxxxxxxxx

وتقبلوا الاحترام ،،،

نايف سعود القاضي

نسخة/الى عطوفة مدير المخابرات العامة اشاره لكتابه رقم ١٤٠٤/٥/٢ تاريخ ٢٠٠٠/١/٤

نسخة/الى عطوفة مدير عام دائرة الاحوال المدنية والجوازات اشاره
لكتابه رقم  ج/٢٥٣٩/٥٥/قانوني/اوس ٣٠١ تاريخ ٢٠٠٠/١/١٢

نسخة/الى عطوفة مدير xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

نسخة/الى عطوفة القائد العسكري اشاره لكتابه
ش م ٢٩٨/١٦١ تاريخ ٢٠٠٠/١/١٦

نسخة/الى عطوفة مدير الجنسية وشؤون الاجانب .
نسخة/الى قسم الاستقبال والتنسيق .
نسخة/الى الملف العام / الحاسوب .

Hashimite Kingdom of JORDAN
MINISTRY OF INTERIOR - AMMAN

# 10/12/ K 830 857
Date 1/26/2000

His Highness the JORDANIAN EMBASSADOR - WASH. D.C.

Referring to your letter Q 1304/13 dated 12/12/1999
concerning the person called GEORGE MARTHA,
We beg to let you know that we cannot comply
with your request, because there is nothing
to prove that he is a JORDANIAN CITIZEN

Respectfully
signed

NAYEF SAUD EL QADI

# Copy to Chief of Internal Sec # 3/5/1404    #14/2000
# Copy to head of Passport and related Civic Matters
# C/55/9538 LEGAL WS 301   1/3/2000

" Public Security - Residents and Foreigners Section
#C/  not legible
" for Military Safly Intelligence Div.
# SH/11/358   1/16/2000

Copy Head of Dept of Citizenship and Foreigners
Copy for Section of Filing and Receiving
Copy for the General File - Computer.

END of LETTER

I testify that the above translation is an accurate
and true for wich I testify

NIMER ABU MARTA
Nimer Abumarta - Daly City
5/8/9000

## INDEX OF ATTACHMENTS

Application for Restriction on Removal (I-589)
George Nimer MARTHA

| Title of Attachment | Page |
|---|---|
| A | Amnesty International, *Annual Report on Worldwide Human Rights Violations, Jordan* (1998)...................................................1 |
| B | Amnesty International, *Annual Report on Worldwide Human Rights Violations, Jordan* (1997)...................................................5 |
| C | Amnesty International, *Annual Report on Worldwide Human Rights Violations, Jordan* (1996)...................................................8 |
| D | U.S. Department of State, *Report on Human Rights Practices, Jordan* (1997) ...........................................................................10 |
| E | Amnesty International, *Worldwide Appeals, February 1996* ...........................................................................................26 |
| F | Amnesty International, *Jordan: An Absence of Safeguards* (Report, Nov. 1998) ...............................................................29 |
| G | Amnesty International, News Release: *Jordan, Amnesty International Calls on the Government to End Continuing Human Rights Violations* (Nov. 18, 1998) ...........................................................................................46 |
| H | Freedom in the World: 1997-1998 Country Reports (excerpt on Jordan) ...........................................................................49 |
| I | Countries of the World and Their Leaders: Yearbook 1999 (excerpt on Jordan)...............................................................50 |
| J | ABC News, 20/20: *Family Honor Leads to Women Killed* (aired Jan. 22, 1999).........................................................................51 |

Exhibit 4

**25 February 1999**

# *Cries in the wilderness*
# Unpleasant conditions at
# Jordan's mental institute

"Rushing through the ecstasies of ambition, we only awake when plunged into dread or grief. In darkness, then, we grope for solace, for meaning, for prayer,"
Abraham Heschel

By Rasheed Al Roussan
Star Staff Writer

FROM A distance, the Al Fuheis National Center for Mental Health looks like any normal building. Downstairs, the reception is like any typical office in any typical hospital or institute. Upstairs, the corridor to the main offices and sections is painted in off-white, with a slight glimmer that gives the place a tranquilizing atmosphere.

If you follow the corridor to the end, you will end up in Dr Jalal Qardn's office, director of the center. Warm sunlight filters through the curtains into the office, a peaceful feeling in a peaceful asylum!

"The center was established as a hospital in 1967, after the loss of the West Bank. The only asylum in Jordan at that time was in Bethlehem. The new institute in Fuheis was a single building, which received patients with various kinds of mental illness," Qardn told The Star.

But it was only in 1987 that the center became fully operational, comprising nine sections, three for women, four for men, including one for drug addicts, and one for the mentally handicapped and a special wing for criminals with a history of mental illness. The center is linked to 33 clinics and a number of voluntary societies in the Kingdom.

It also holds seminars every week for psychology students who intend to specialize in psychiatry. After four years and after they join the Jordan Board of Psychiatry, graduates can become full-time professionals.

"The cases we receive are varied. Starting with psychosis, hallucination, depression, neurosis and ending with schizophrenia," Qardn pointed out.

But 90 percent of patients arriving at the center are between the ages of 15 and 25, and most suffer from schizophrenia, most of whom never get to see life beyond the dreary walls of their residence.

"What makes these cases incurable is that they arrive too late. Mental disease is like any physical illness; it needs to be treated in early stages," Qardn explained. "Most families, especially those in urban areas who live in poverty and ignorance, are engulfed by superstition. They spend time and money taking their relatives to spiritual healers, where they desperately ask for a cure or a miracle to happen," he added. What they don't know, is that they are severely lessening the chance for any cure, he continued. After their pointless efforts, they are left with the choice to take them to a "shrink" or put them in an asylum!

"Even five years ago, it was impossible to find people who were willing to put their patients in an asylum or an institution." And hence, it is blatantly obvious that people, poor or rich, are still ignorant about the essential role psychology plays in our daily life.

In spite of this, the Center has come to play a central role in mental rehabilitation. Despite the limited resources, patients do have social and recreational activities, including a room for women activities and a TV room. Some patients are also paid for some of their work in the center.

Those who leave the center face disappointing results. "When patients are ready to go out to society, they are rejected and often humiliated. I had one case that was ready to return home, but his family treated him badly, calling him crazy and depriving him from meeting people. He returned to the center after a few days." There are many similar cases, especially when it comes to female patients. Some women who enter the center have been sexually harassed, physically abused and even raped.

Qardn pointed out these are often found by police and by pedestrians. But there is another twist to the story. "We had a case of a woman who was taken advantage of by a man. She ended up pregnant.

As expected, her family refused to take her in. Fortunately enough, we managed to find someone who offered to marry her," Qardn said.

But the story doesn't end at this point. Honor killing, is another problem that the center has to deal with. "We actually had several cases of women who returned to their families only to be murdered by their brothers or fathers," added Qardn.

Children are also victims of sexual and physical abuse, and visit the center as out patients. "Unfortunately, we don't have a section for children in the center. Actually, there are no specialized practitioners in the field of child abuse in the whole Kingdom." In addition, Qardn sheds light on a very sensitive issue related to child abuse in Jordan. "We had an American professor last year who conducted a survey of Al Hussein refugee camp, regarding the number of child abuse cases in that area. He ended up with a staggering result. It was estimated that sexual abuse of children in that area is very high, one of the highest rates ever discovered by the professor himself, who was just shocked by the figures. Moreover, the age group of children who are exposed to sexual harassment and rape in Al Hussein camp is between five to eight years old only!"

Different incidents have taken place in the center, some false and some are true accounts. There was an incident that was reported by a Jordanian newspaper, saying that there have been homosexual practices in the center. "The journalist saw two retarded male patients

jumping on each other. He assumed that they were having sex, and this is just ridiculous. Severe mental retards have the brain of a two-year-old. Therefore, they don't develop any sexual tendencies, they don't even have the instinct for sexual intercourse. What the journalist saw was two children playing together, and nothing else."

Nevertheless, there are incidents of suicide that took place at the center. The doctor stated that they had several suicide incidents, the last one goes back five years ago. "We had a patient who climbed the pipelines of the center's building, and jumped from the fourth floor." Such kind of events happen rarely because the sections inside are fully secured and there are no blunt instruments that could be used for such incidents.

After the interview with doctor Qardn, it was time to have a tour of the Center.

The tour was not pleasant, foul smell coming from some rooms was nauseating, and the bathrooms lacked basic hygiene. Some patients who were waiting to be transferred to another institution, slept on mattresses on the floor. All patients were in worn-out clothes. Their hair was uncombed hair and seemed that they hadn't used water for a while! However, a number of hot air conditions existed to keep the patients warm. But the rooms stand with no carpets.

On the sideways of the corridors, we found cats wandering about.

Surely enough, if the Minister of Health pays a visit to the center, he won't be happy. On the contrary, he might be appalled to see the conditions underwhich these inmates live.

As we stepped out from the gateway, we came out with a totally different impression from the one we had when we first entered. The voices within the center's building are no longer heard, the patients' echoes are like a soundless prayer, waiting for an answer.



Content

Archive Site for State Department information prior to January 20, 2001.
This site is not updated.
**RETURN** to the current State Department web site.

 **1999 Country Reports on Human Rights Practices**
Released by the Bureau of Democracy, Human Rights, and Labor
U.S. Department of State, February 25, 2000

## JORDAN

The Hashemite Kingdom of Jordan is a constitutional monarchy that was ruled by King Hussein bin Talal from 1952 until his death in February. On February 7, King Hussein's eldest son, Crown Prince Abdullah bin Hussein, acceded to the throne. The Constitution concentrates a high degree of executive and legislative authority in the King, who determines domestic and foreign policy. In the King's absence, a regent, whose authority is outlined in the Constitution, assumes many of these responsibilities. The Prime Minister and other members of the Cabinet are appointed by the King and manage the daily affairs of government. The Parliament consists of the 40-member Senate, appointed by the King, and the 80-member Chamber of Deputies, which is elected every 4 years. The lower house asserts itself only intermittently on domestic and foreign policy issues. The 1997 parliamentary elections were marred by reports of registration irregularities, fraud, and restrictions on the press and on campaign materials. According to the Constitution, the judiciary is independent of other branches of government; however, in practice it is susceptible to political pressure and interference by the executive.

General police functions are the responsibility of the Public Security Directorate (PSD). The PSD, the General Intelligence Directorate (GID), and the military share responsibility for maintaining internal security and have authority to monitor the activities of persons believed to be security threats. The security forces continue to commit human rights abuses.

Jordan has a mixed economy, with significant but declining government participation in industry, transportation, and communications. The country has few natural resources and relies heavily on foreign assistance and remittances from citizens working abroad. The economy continues to suffer from chronically high unemployment. As part of its reenergized economic reform program, the Government has removed subsidies on several staple goods, lifted price controls on others, and streamlined government budget practices. Price controls remain on bread, pharmaceuticals, and a small number of other staple items. In mid-year, the sales tax was increased from 10 percent to 13 percent. Wages remained stagnant and continued to erode the purchasing power of most citizens. Exporters have not yet found adequate replacement markets for those lost as a result of U.N. sanctions against Iraq. Additional trade with Iraq under the " oil for food" resolution has not affected the economy significantly. High expectations that significant markets would develop in the West Bank, Gaza, and Israel following the 1994 signing of the Jordan-Israel peace treaty have not been realized. Per capita gross domestic product in 1998 was approximately $1,553.

There continued to be significant problems in the Government's human rights record. Citizens do not have the right to change their government, although they may participate in the political system through political parties and parliamentary elections. Other human rights problems include police abuse and mistreatment of detainees; allegations of torture; arbitrary arrest and detention; lack of accountability within the security services; prolonged detention without charge; lack of due process of law and interference in the judicial process; infringements on citizens' privacy rights; harassment of members of opposition political parties and the press; and significant restrictions on freedom of speech, press, assembly, and association. The 1998 Press and Publications Law placed major restrictions on the ability of journalists and publications to function and report freely; however, the 1999 Press and Publications Law, which became effective on October 16, reduced these restrictions somewhat. The Government imposes some limits on freedom of religion, and there is official and societal discrimination against adherents of the Baha'i Faith. Early in the year, the evangelical Christian community reported an increased incidence of governmental harassment. There are some restrictions on freedom of movement. Violence against women, restrictions on women's rights, and societal discrimination against women are problems. The law still allows for reduced punishments for violent " honor crimes" against women for alleged immoral acts. Child abuse remains a problem, and discrimination against Palestinians persists. Abuse of foreign servants is a problem.

## RESPECT FOR HUMAN RIGHTS

Section 1 -- Respect for the Integrity of the Person, Including Freedom From:

a. Political and Other Extrajudicial Killings

There were no reports of political or other extrajudicial killings by government officials.

In May Mahmoud Rashid Qasem Mohammed Ishtayeh died in a hospital while in police custody. In August his family claimed that he died of injuries suffered in a beating; however, prison officials maintained that Ishtayeh died of natural causes. Human rights sources were unable to uncover any evidence to support the family's claims or refute the Government's position.

The security services continue to be reluctant to conduct transparent investigations into allegations of wrongful deaths that occurred in previous years during police detention.

There was no further investigation of the March 1998 incidents in which Masaeed tribesmen were killed by security forces. There were no new developments in the killing of Mohammad Al-Khattub, who was shot during an altercation between demonstrators and security forces in February 1998. A subsequent government investigation stated that Al-Khattub was killed by demonstrators; however, the media cited alleged witness accounts that he had been shot by security forces while fleeing.

There were no developments in the investigation of the police officers involved in the alleged wrongful deaths of Ismail Suleiman Ajarmeh, who died in February 1998; Samer Muhammad Ziyad, who died in June 1997; Younis Mahmoud Abu Dawlah, who died in

December 1996; or Mahmoud Khalifah, who died in June 1995. All four men died while in government custody.

Women continued to be victims of " honor killings" (see Section 5).

b. Disappearance

There were no reports of politically motivated disappearance.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the law provides prisoners with the right to humane treatment, the police and security forces sometimes abuse detainees physically and verbally during detention and interrogation and allegedly use torture as well. Allegations of torture are difficult to verify because security officials frequently deny detainees timely access to lawyers. The most frequently alleged methods of torture are sleep deprivation, beatings, and extended solitary confinement. Defendants in high-profile cases before the State Security Court have claimed to have been subjected to physical and psychological abuse while in detention. Government officials deny allegations of torture and abuse.

Approximately 40 cases of beatings while in police custody were reported to the Arab Organization for Human Rights. There are believed to be many more incidents that were not documented.

Periodic detentions of foreign workers continue and allegations of overcrowded cells and physical abuse by guards persist.

Filipino and other foreign workers who were arrested at their homes in September and October 1998 subsequently were released. Senior government officials publicly took responsibility for the incidents; however, no action was taken against the members of the security forces who were involved.

Prisons and local police detention facilities are Spartan, and on the whole are severely overcrowded and understaffed.

Prisoners detained on national security grounds often are kept in separate prisons maintained by the GID. Conditions in GID facilities are significantly better than general police detention facilities.

With some exceptions, the ICRC is permitted unrestricted access to prisoners and prison facilities, including GID facilities and the recently reopened Al-Jafr prison. However, from late December 1998 through March 8, the ICRC suspended visits to facilities where security detainees were being held because the authorities refused to give the ICRC access to one specific detainee. Local human rights monitors are allowed to visit prisons, but complain that they are required to go through a lengthy and difficult procedure with the authorities to obtain permission for such visits.

d. Arbitrary Arrest, Detention, or Exile

The security forces arbitrarily arrest and detain citizens. Under the Constitution, citizens are subject to arrest, trial, and punishment for the defamation of heads of state, dissemination of " false or exaggerated information outside the country that attacks state dignity," or defamation of public officials.

The Criminal Code requires that legal authorities file formal charges within 10 days of an arrest. However, the courts routinely grant requests from prosecutors for 15-day extensions as provided by law. This practice generally extends pretrial detention for protracted periods of time. In cases involving state security, the authorities frequently hold defendants in lengthy pretrial detention, do not provide defendants with the written charges against them, and do not allow defendants to meet with their lawyers until shortly before trial. Defendants before the State Security Court usually meet with their attorneys only 1 or 2 days before their trial.

The Government detains persons, including journalists, for varying amounts of time for what appear to be political reasons (see Section 2.a.). Human rights sources reported that more than 300 persons were detained for security reasons throughout the year. This number likely underestimates the total number of detainees.

In January a student at the Jordan Evangelical Theological Seminary (JETS) was jailed for 2 weeks and then deported to Egypt. In February a Sudanese national was jailed for 17 days and then deported to Sudan. In April a church worker for Campus Crusade for Christ was detained for 5 days and questioned about his religious activities (see Section 2.c.).

On his arrival at Amman's Queen Alia International Airport on May 17, Mohammed Nizami was arrested and charged with " lese majeste," or slandering the King, stemming from his purported comments on an Internet " chat" site critical of the Government. He was incarcerated for 18 days and his passport was confiscated. He was released on $10,000 (7,000 dinars) bail and departed the country without standing trial (see Section 2.a.).

Upon arrival at Queen Alia International Airport on September 22, two leaders of the Islamic Resistance Movement (HAMAS), Khaled Mishal and Ibrahim Ghosheh, were detained along with four of their bodyguards (all six are Jordanian citizens). The bodyguards subsequently were released. Mishal and Ghosheh were held for 1 month and then expelled along with two other HAMAS leaders, Izzat Rishuq and Sami Khater (see Sections 2.b. and 2.d.).

The Government uses the threat of detention to intimidate journalists into practicing self-censorship (see Section 2.a.). Typically, a journalist who has criticized a government official or policy is detained for 5 to 10 days. While in detention, the journalist may experience abuse (see Section 2.a.). Charges rarely are filed. Convictions are rare, but proceedings may last several years, with defendants required to appear in court regularly, only to be informed that another in a series of continuances has been issued in their case.

In June journalist Shaker Al-Jawhari was summoned to GID headquarters and then detained overnight. While detained he was questioned about his political writings, which were critical of the Government (see Section 2.a.).

In July journalist Senan Shaqdih was detained for 2 weeks, during which time he was subjected to psychological abuse. He was accused of publishing items harmful to Jordan's ties with a neighboring country. He finally was released in August by order of King Abdullah (see Section 2.a.).

In August editor Abdul Karim Al-Barghouti was detained pending investigation of the allegation that he slandered Prime Minister Rawabdeh's son. He was released on bail 4 days later. After his release, he reported having been treated well (see Section 2.a.).

In September Azzam Yunis, the editor in chief of the independent newspaper Al-Arab Al-Yawm, was arrested in connection with the publication of articles by Shiekh Abdul Mun'em Abu Zant, a pro-HAMAS Islamist and former legislator, and was released on bail the same day.

Laith Shubaylat, who was sentenced in 1998 to 9 months in prison for inciting riots but refused a pardon claiming that he was not guilty, was released from prison in October 1998.

There was no further information on Basil Abu Ghoshe, a 21-year-old man who continued to be detained despite having completed his sentence in 1998, ostensibly for his own protection against threats from a rival tribe.

The security services detained approximately 65 persons, described in the press as " Islamists," during the year; this figure includes 15 persons arrested in December. These detentions were related to allegations of involvement in terrorist or strictly political activities.

The Government does not use forced exile routinely; however, Jordanian HAMAS leaders Khaled Mishal, Ibrahim Ghosheh, Izzat Rishuq, and Sami Khater were expelled in October (see Sections 2.b. and 2.d.).

e. Denial of Fair Public Trial

The Constitution provides for the independence of the judiciary; however, the judiciary is subject to pressure from the executive branch. A judge's appointment to, advancement within, and dismissal from the judiciary are determined by a committee whose members are appointed by the King. The Ministry of Justice has great influence over a judge's career and often subverts the judicial system in favor of the executive branch. There have been numerous allegations that judges have been " reassigned" temporarily to another court or judicial district in order to remove them from a particular proceeding. In one instance in 1998, in order to avoid a trial before the regular court of appeals, the Minister of Justice allegedly formed a special appeals court panel to try several counts against to an influential member of society who had been charged with the sale of children to foreign adoptive parents. In February 1998, Judge Farouk Al-Kilani was forced to retire from the Supreme Court. Kilani alleged that he was asked to step down because of his involvement in the High Court of Justice's decision that rejected the legality of the May 1997 amendments to the Press and Publications Law. (The Court ruled that the amendments had been approved in an unconstitutional manner on an emergency basis.) Judges also

complain of unlawful telephone surveillance.

The judicial system consists of several types of courts. Most criminal cases are tried in civilian courts, which include the appeals courts, the Court of Cassation, and the Supreme Court. Cases involving sedition, armed insurrection, financial crimes, drug trafficking, and offenses against the royal family are tried in the State Security Court. In 1997 the Parliament passed amendments to the law governing the State Security Court that effectively extended its mandate indefinitely. The amendments had been rejected earlier by the lower house's judicial committee as " undemocratic" and contrary to the principle of judicial independence. Shari'a (Islamic) courts have jurisdiction over marriage and divorce among Muslims and inheritance cases involving both Muslims and non-Muslims (see Section 5).

Most trials in the civilian courts are open. Defendants are entitled to legal counsel, may challenge witnesses, and have the right to appeal. Defendants facing the death penalty or life imprisonment must be represented by legal counsel. Public defenders are provided if the defendant in such cases cannot afford to hire legal counsel. Shari'a regards the testimony of one man to be equal to the testimony of two women. This technically applies only in religious courts but, in the past, has been imposed in civil courts as well, regardless of religion.

The State Security Court consists of a panel of three judges who may be either civilians or military officers. Sessions frequently are closed to the public. Defendants tried in the State Security Court often are held in pretrial detention without access to lawyers, although they are visited by representatives of the ICRC. In the State Security Court, judges have inquired into allegations that defendants were tortured and have allowed the testimony of physicians regarding these allegations. The Court of Cassation has ruled that the State Security Court cannot issue a death sentence on the basis of a confession obtained as a result of torture. Defendants in the State Security Court have the right to appeal their sentences to the Court of Cassation, which is authorized to review issues of both fact and law. Appeals are automatic for cases involving the death penalty.

In the past, defense attorneys have challenged the appointment of military judges to the State Security Court to try civilian cases as contrary to the concept of an independent judiciary. Military judges appear to receive adequate training in civil law and procedure, and State Security Court decisions are subject to review by the Court of Cassation.

In the past, the press routinely has carried details of cases tried before the State Security Court. However, provisions of the 1998 Press and Publication Law prohibit press coverage of any case that is under investigation without explicit permission from the authorities. The 1999 Press and Publications Law, which became effective on October 16, now allows journalists to cover court proceedings " unless the court rules otherwise;" however, this change in the law still has not been tested.

There were no reports of political prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Constitution requires that security forces obtain a warrant from the Prosecutor

General or a judge before conducting searches or otherwise interfering with these rights, and the security services generally respect these constitutional restrictions; however, in security cases, the authorities sometimes--in violation of the law--obtain warrants retroactively or obtain preapproved warrants. Security officers monitor telephone conversations and Internet communication, read correspondence, and engage in surveillance of persons who are considered to pose a threat to the Government or national security. The law permits these practices if the Government obtains a court order. Judges complain of unlawful telephone surveillance (see Section 1.e.).

In May Mohammed Nizami was arrested for remarks about the Jordanian Government made in an Internet chat room (see Section 1.d. and 2.a.). Unlike the previous year, the Government did not block the entry of foreign publications (see Section 2.a.).

Section 2 -- Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and of the press; however, the Government imposes some restrictions on these rights.

The 1998 Press and Publications Law, combined with the 1998 Press Association Law, impose stringent restrictions on the operation of newspapers. The Government also intimidates journalists to encourage self-censorship. Private citizens may be prosecuted for slandering the royal family, the Government, or foreign leaders, and for sowing sedition. Citizens generally do not hesitate to criticize the Government openly, but are more circumspect in regard to the King and the royal family.

The Press Association Law limits the practice of journalism to Jordan Press Association (JPA) members, potentially excluding dozens of practicing journalists from the profession. No publishers or journalists have been cited for violating the law. However, in August Prime Minister Abdur-Ra'uf Rawabdeh issued an order directing government offices to cooperate only with JPA members. In October the JPA voted to expel three of its members, who had traveled to Israel, for participation in " normalization" activities. Such an expulsion would have prevented these journalists from practicing their profession. However, the decision was never conveyed formally and, therefore, was never binding. In November the three men signed statements in which they asserted that they saw the fight against normalization with Israel as necessary, and the JPA dropped the matter.

The 1998 Press and Publications Law granted the Government wide discretionary powers to issue fines, withdraw licenses, and order shutdowns to control the editorial content of newspapers. The law prohibited reporting on criminal cases at any stage of the investigation into any case or crime without prior authorization from the public prosecutor. Details of court proceedings may not be published without a court's permission. Violations of this section of the Press and Publications Law entailed a fine of between $7,000 and $14,000 (5,000 and 10,000 dinars). The publication of a newspaper or periodical without a license entails the same fine. However, the 1999 Press and Publications Law, which became effective on October 16, allows journalists to cover court proceedings " unless the court rules otherwise" and reduces the prescribed fine to between

Case 3:08-cv-01982-SI     Document 7-4     Filed 05/05/2008     Page 24 of 61

$700 and $1,400 (500 to 1,000 dinars) (see Section 1.e.).

It was illegal under the 1998 Press and Publications Law to publish news, opinion, information, reports, caricatures, or photos that disparage the King or the royal family, pertain to the armed forces or security services, harm national unity, disparage religion, offend an individual or harm his reputation, disparage the heads of friendly states, harm the country's relations with other nations, promote perversion or lead to moral corruption, shake confidence in the national currency, or feature false news or rumors. However, amendments that became effective on October 16 removed these specific prohibitions from the Press and Publications Law. Criminal law still places significant restrictions on what can be published.

The 1998 Press and Publications Law also provided that those who seek to obtain a newspaper license must show proof of capital of $700,000 (500,000 dinars) for a daily newspaper, $140,000 (100,000 dinars) for most other publications, and $7,000 (5,000 dinars) for specialized publications. The editor in chief of a newspaper was required under the law to be a citizen and to have 8 years of experience as a full-time journalist. However, the 1999 Press and Publications Law reduced these requirements by half.

Persons accused of violating the Press and Publications Law are tried in a special court for press and copyright cases. Journalists also are prosecuted for criminal and security violations in connection with their work. Although a substantial number of cases are dismissed before trial, many other cases linger for years. The Government routinely uses detention and prosecution or the threat of prosecution to intimidate journalists and to encourage self-censorship (see Section 1.d.).

The Penal Code authorizes the State to take action against any person who incites violence, defames heads of state, disseminates " false or exaggerated information outside the country that attacks state dignity," or defames a public official.

In June journalist Shaker Al-Jawhari was summoned to GID headquarters and then detained overnight. While there, he was questioned about his political writings, which were critical of the Government (see Section 1.d.).

In July journalist Senan Shaqdih was detained for 2 weeks, during which he was subjected to psychological abuse. He was accused of publishing items harmful to Jordan's ties with a neighboring country. He finally was released by order of King Abdullah in August (see Section 1.d.).

For a 4-week period starting on July 17, the official government news agency, Petra, refused to provide news to the Arabic language daily, Al-Arab Al-Yawm, charging its staff with " unethical reporting."

In August editor Abdul Karim Al-Barghouti was detained pending investigation of charges of slandering Prime Minister Rawabdeh's son. He was released on bail 4 days later. After his release, he reported having been treated well (see Section 1.d.).

In September Azzam Yunis, the editor in chief of the independent newspaper Al-Arab Al-Yawm, was arrested in connection with the publication of articles by Sheikh Abdul

Mun'em Abu Zant, a pro-Hamas Islamist and former legislator, and was released on bail the same day.

Radio and television news broadcasts are more restricted than the print media. The Government is the sole broadcaster of radio and television programs. The Government has commercial agreements with the British Broadcasting Corporation, the London-based Middle East Broadcasting Center, and Radio Monte Carlo that allows it to simulcast regional programs using local radio transmitters. Jordan Television (JTV) reports only the Government's position on controversial matters. International satellite television and Israeli and Syrian television broadcasts are available and unrestricted.

In May Mohammed Nizami was arrested and charged with " lese majeste," or slandering the King for allegedly making critical remarks about the Government in an Internet chat room (see Sections 1.d. and 1.f.).

Unlike the previous year, the Government did not block the entry of foreign publications (see Section 1.f.).

In a high profile case, Dr. Mustafa Hamarneh was demoted in July from his position as head of the Center for Strategic Studies at Jordan University, apparently as a result of his outspoken political views.

b. Freedom of Peaceful Assembly and Association

The Government restricts freedom of assembly. Citizens must obtain permits for public gatherings. The Government granted almost no permits for demonstrations during the year and denies permits for public protests and rallies that it determines pose a threat to security.

The Government restricts freedom of association. The Government requires but routinely grants approval for conferences, workshops, and seminars.

The Government routinely licenses political parties and other associations. There are currently 23 licensed political parties. Membership in an unlicensed political party is illegal. The Government may deny licenses to parties that it decides do not meet a list of political and other criteria contained in the Political Parties Law. The High Court of Justice may dissolve a party if it violates the Constitution or the Political Parties Law.

Upon arrival at Queen Alia International Airport on September 22, two leaders of HAMAS, Khaled Mishal and Ibrahim Ghosheh, were detained along with four of their bodyguards (all six are Jordanian citizens). The bodyguards subsequently were released. Mishal and Ghosheh were held for 1 month and then expelled, along with two other HAMAS leaders, Izzat Rishuq and Sami Khater (see Sections 1.d. and 2.d.).

Freedom of Religion

The Constitution provides for the safeguarding of " all forms of worship and religious rites in accordance with the customs observed in the Kingdom, unless such is inconsistent with public order or morality;" however, the Government imposes some restrictions on

Case 3:08-cv-01982-SI   Document 7-4   Filed 05/05/2008   Page 26 of 61

freedom of religion. Citizens may not always practice the religion of their choice. According to the Constitution, Islam is the state religion.

Islamic institutions are managed by the Ministry of Religious Affairs and Trusts, which appoints imams and subsidizes certain activities sponsored by mosques. Religious institutions, such as churches that wish to receive official government recognition, must apply to the Prime Ministry for registration. The Protestant denominations registered as " societies" come under the jurisdiction of one of the recognized Protestant churches for purposes of family law, such as divorce and child custody. The Government does not recognize a number of religions.

Over 90 percent of the population are Sunni Muslim, and approximately 6 percent are Christian. The Government does not recognize religious faiths other than the three main monotheistic religions: Islam; Christianity; and Judaism. In addition not all Christian denominations have been accorded official government recognition. Officially recognized denominations include the Greek Orthodox, Roman Catholic, Greek Catholic (Melkite), Armenian Orthodox, Maronite Catholic, and the Assyrian, Anglican, Lutheran, Seventh-Day Adventist, United Pentecostal, and Presbyterian Churches. Other churches, including the Baptist Church, the Free Evangelical Church, the Church of the Nazarene, the Assembly of God, and the Christian Missionary Alliance, are registered with the Ministry of Justice as " societies" but not as churches. There are also small numbers of Shi'a and Druze, as well as adherents of the Baha'i Faith.

The Government does not interfere with public worship by the country's Christian minority. However, although the majority of Christians are allowed to practice freely, some activities, such as proselytizing or encouraging conversion to the Christian faith--both considered legally incompatible with Islam--are prohibited. Christians are subject to aspects of Shari'a (Islamic law) that designate how inheritances are distributed.

The Government does not recognize Jehovah's Witnesses, the Church of Christ, or the Church of Jesus Christ of Latter-Day Saints, but each of these denominations is allowed to conduct religious services and activities without interference.

The Government does not recognize the Baha'i Faith as a religion but does not prohibit the practice of the faith. However, Baha'is face both official and societal discrimination. The Government does not record the bearer's religion on national identity cards issued to Baha'is, nor does it register property belonging to the Baha'i community. Adherents of the Baha'i Faith are considered as Muslims for purposes of family and inheritance law. Unlike Christian denominations, the Baha'i community does not have its own court to adjudicate personal status and family matters. Baha'i personal status matters are heard in Shari'a courts.

Non-Jordanian Christian missionaries operate in the country but are subject to restrictions. Christian missionaries may not proselytize Muslims. In late 1998 and early 1999, foreign Christian mission groups in the country complained of increased bureaucratic difficulties, including refusal by the Government to renew residence permits. One couple affiliated with the Anglican Church was accused of converting a Muslim minor to Christianity and ordered to leave the country. The couple stated that the minor in question had been attending their church for several months before they met him.

has converted to Islam become ineligible to inherit from their father if they do not themselves convert to Islam. In cases where a Muslim converts to Christianity, the act is not recognized legally by the authorities, and the subject continues to be treated as a Muslim in matters of family and property law, and the minor children of a male Muslim who converts to Christianity continue to be treated as Muslims under the law.

The law prohibits non-Muslims from proselytizing Muslims. Conversion to the Muslim faith by Christians is allowed; however, a Muslim may not convert to another religion. Muslims who convert to other faiths complain of social and government discrimination. The Government does not recognize fully the legality of such conversions. Under Shari'a converts are regarded as apostates and legally may be denied their property and other rights. However, this principle is not applied. Converts from Islam do not fall under the jurisdiction of their new religion's laws in matters of personal status and still are considered Muslims under Shari'a, although the reverse is not true. Shari'a prescribes a punishment of death for conversion; however, there is no equivalent statute under national law.

The Political Parties Law prohibits houses of worship from being used for political party activity. The law was designed primarily to prevent Islamist parliamentarians from preaching in mosques.

Religious instruction is mandatory for all Muslim students in public schools. Christian and Baha'i students are not required to attend courses in Islam.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The law provides for the right of citizens to travel freely abroad and within the country except in designated military areas; however, there are some restrictions on freedom of movement. The law requires that all women, including foreign women married to citizens, obtain written permission from a male guardian--usually their father or husband--to apply for a Jordanian passport. Authorities enforce requests from fathers to prevent their children from departing the country, even when the children are traveling with their mothers.

Jordanians with full citizenship receive passports that are valid for 5 years. Most Palestinians living in Jordan are citizens and receive passports that are valid for 5 years. However, approximately 150,000 Palestinian residents--most refugees or children of refugees who arrived from Gaza after 1967--do not qualify for citizenship. They receive 2-year passports valid for travel only. (In the period following the country's administrative and legal disengagement from the West Bank in 1988, Palestinians residing in the West Bank received 2-year passports valid for travel only, instead of 5-year Jordanian passports.) In 1995 King Hussein announced that West Bank residents without other travel documentation again would be eligible to receive 5-year passports. However, the Government has stressed that these passports are for travel only and do not connote citizenship, which only can be shown by presenting one's " national number," a civil registration number accorded at birth or upon naturalization to persons holding citizenship. The national number is recorded on national identity cards and in family registration books, which are issued only to citizens.

Following a successful lawsuit in 1997 by a West Bank resident who, prior to 1988, had held a Jordanian passport (the authorities had refused to issue the plaintiff a new passport), the authorities began to issue 5-year Jordanian passports to those who are deemed to be noncitizens of Palestinian origin. However, such residents do not enjoy the rights of citizens because they have no national number. All Palestinians must obtain permits from the Ministry of the Interior for travel between Jordan and the Israeli-occupied territories. Such permission is granted routinely.

The Constitution specifically prohibits the deportation of citizens. However, the Government expelled four leaders of HAMAS, Khaled Mishal, Ibrahim Ghosheh, Izzat Rishuq, and Sami Khater, all four of whom are citizens (see Sections 1.d. and 2.b.).

There is no law or statute that provides for the granting of refugee status to asylum seekers. The Government generally cooperates with the office of the U.N. High Commissioner for Refugees (UNHCR). The UNHCR must resettle refugees in other countries. However, in April 1998, the Ministry of Interior signed a memorandum of understanding with the UNHCR concerning the status and treatment of refugees. Under the agreement, the Government admits asylum seekers, including those who have entered the country clandestinely, and respects the UNHCR's eligibility determinations under the refugee definitions set forth in the 1951 U.N. Convention Relating to the Status of Refugees and its 1967 Protocol. The agreement provides protection against the forcible return of refugees from the country, and recognizes the legal definition of a refugee as set forth in the U.N. Convention. Since 1996 the UNHCR has held regular seminars to train law enforcement officials in international refugee law, including specialized courses for policewomen. The Government provides first asylum. According to UNHCR figures, 48,588 persons have sought asylum through the UNHCR, and in approximately 6,000 cases (approximately 14 percent), applicants have been accorded refugee status.

The Government estimates that over 180,000 Iraqis reside in the country. Since 1991 thousands of Iraqis have applied for refugee status and received legal and material assistance from the UNHCR. During the year, 8,633 persons applied for, and 1,174 were accorded, refugee status. The UNHCR also received applications for refugee status during the year from Sudanese, Syrian, and Libyan asylum seekers.

For one school year (1998-99), Iraqi children were permitted to enroll in school regardless of their status. However, for the 1999-00 school year, the Government reverted to its previous policy of denying Iraqi children admittance to school unless they were residents of the country or recognized as refugees by the UNHCR.

Over 1.5 million Palestinian refugees are registered in Jordan with the U.N. Relief and Works Agency for Palestine Refugees (UNRWA). The UNRWA counts another 800,000 Palestinians as either displaced persons from the 1967 war, arrivals following the 1967 war, or returnees from the Gulf between 1990 and 1991.

Section 3 -- Respect for Political Rights: The Right of Citizens to Change Their Government

Citizens do not have the ability to change their government. The King has sole

discretionary authority to appoint and dismiss the Prime Minister and the Cabinet, to dissolve Parliament, and to establish public policy. Appointments made by the King to high government posts do not require legislative approval. Executive power is vested in the King (or, in his absence, in the Regent), who exercises his power through his ministers in accordance with the provisions of the Constitution.

The Parliament is composed of the 40-member Senate, appointed by the King, and the popularly elected 80-member Chamber of Deputies. The Parliament is empowered by the Constitution to initiate legislation, and it can approve, reject, and amend legislation proposed by the Cabinet. A group of 10 senators or deputies may submit draft bills for consideration; however, in practice legislation is initiated and drafted by the Cabinet of Ministers and submitted by the Government to the Parliament for its consideration. Opposition Members of Parliament have complained that attempts by members of the lower house to initiate legislation receive no response from the Government. The King proposes and dismisses extraordinary sessions of Parliament and may postpone regular sessions for up to 60 days. By law if the Government amends or enacts a law when Parliament is not in session, it must submit the law to Parliament for consideration during the next session; however, this does not always occur.

The Electoral Law and the distribution of parliamentary seats deliberately favor electorates in rural and southern Jordan, regions with populations known for their traditional, pro-Hashemite views.

Over 500 candidates competed in the 1997 parliamentary elections, despite a boycott by Islamist and other parties. There were many reports of registration irregularities and fraud on the part of candidates. Restrictions on the press and on campaign materials also had a negative effect on the campaign, which elicited much debate over the fairness of the Electoral Law and its implementation. Voter turnout was significantly lower in most urban areas than in rural areas. Centrist candidates with ties to major tribes dominate the Parliament.

The municipal elections in July featured the participation of the parties that had boycotted the 1997 parliamentary elections; however, low voter turnout necessitated a second day of balloting. The process generally was regarded as free and fair.

The so-called one-man, one-vote amendment to the Electoral Law was ratified by Parliament in 1997, nearly 4 years after it was first enacted by royal decree. The amendment allows voters to choose only one candidate in multiple-seat districts. In the largely tribal society, citizens tend to cast their first vote for family members, and any additional votes in accordance with their political leanings. As a result, the amendment in practice has tended to limit the chances of some nontribal candidates, including women, to be elected.

Women have the right to vote, and women's groups encourage women to vote and to be active in the political process; however, they are underrepresented at the local and national level. There is one female minister. There are three female senators, but no women hold seats in the Chamber of Deputies.

Of the 80 seats in the lower house, 9 are reserved for Christians, 6 for Bedouins, and 3 for

Case 3:08-cv-01982-SI    Document 7-4    Filed 05/05/2008    Page 30 of 61

the Circassian or Chechen ethnic minorities.

The Palestinian community, estimated to be slightly over half of the total population, is not represented proportionately in the Government and legislature. Only 7 of 24 ministers, 7 of 40 senators, and 11 of 80 lower house deputies are of Palestinian origin. The electoral system gives greater representation to areas that have a majority of inhabitants of non-Palestinian origin.

Section 4 -- Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Domestic and international human rights groups investigate allegations of human rights abuses and publish and disseminate findings critical of government policy. However, the Press and Publications Law has restricted the publication of information about the military and security services, which, in effect, prevented the publication by domestic groups of reports alleging torture and other abuses committed by the security services. The 1999 amendments to the Press and Publications Law removed these specific restrictions, but restrictions still exist in the penal code.

The local chapters of the Arab Organization for Human Rights (AOHR) and the Jordanian Human Rights Organization (JHRO) are registered with the Government. The AOHR has drawn public attention to alleged human rights abuses and a range of other political issues and has pressed the Government to bring formal charges against political detainees or to release them promptly. It asserts that the Government responds to only about 10 percent of the complaints that it submits on behalf of individuals who allegedly were subjected to human rights violations by the authorities.

The ICRC generally is permitted full and unrestricted access to detainees, including those held by the GID and the military intelligence directorate. However, for 2 months during the year, the ICRC was not allowed to visit one specific prisoner who was detained by the GID (see Section 1.c.). As a result, the ICRC suspended its visits to GID detention facilities during that period. After the GID relented, the ICRC resumed visits to GID detainees.

Section 5 -- Discrimination Based on Race, Sex, Religion, Disability, Language, or Social status

Although the law does not distinguish between citizens on the basis of race, women, minorities, and others are treated differently under the law and face discrimination in employment, housing, and other areas.

Women

Violence against women is common. Reported incidents of violence against women do not reflect the full extent of the problem. Medical experts acknowledge that spousal abuse occurs frequently. However, cultural norms discourage victims from seeking medical or legal help and frustrate an objective assessment of the extent of such abuse.

Abused women have the right to file a complaint in court against their spouses for

physical abuse but in practice familial and societal pressures discourage them from seeking legal remedies. Marital rape is not illegal. NGO's, such as the Jordanian Women's Union, which has a telephone hot line for victims of domestic violence, provide assistance in such matters. Wife beating is technically grounds for divorce, but the husband may seek to demonstrate that he has authority from the Koran to correct an irreligious or disobedient wife by striking her.

The Criminal Code allows leniency for a person found guilty of committing a " crime of honor," a euphemism that refers to a violent assault with intent to murder against a female by a male relative for alleged sexual misconduct. Law enforcement treatment of men accused of " honor crimes" reflects widespread unwillingness to recognize the abuse involved or take action against the problem. Sixteen such murders were reported during the year in which the victims were shot, strangled, stabbed, bludgeoned, and run over with vehicles. Human rights monitors believe that many more such crimes were committed but not documented as honor crimes. Moreover, most crimes of honor are not reported by the press. The actual number of honor crimes is believed to be significantly higher. One forensic medical examiner estimated that 25 percent of all murders committed in the country are honor crimes. The police regularly imprison women who are potential victims of honor crimes for their own protection. There were up to 50 women involuntarily detained in this form of " protective custody" during the year.

According to Article 340 of the Penal Code, a " crime of honor" defense may be invoked by a defendant accused of murder who " surprises his wife or any close female relative" in an act of adultery or fornication, in which case the perpetrator of the " honor crime" is judged not guilty of murder. Although few defendants can meet the stringent requirements for a crime of honor defense, that is, the defendant personally must have witnessed the female victim engaging in sexual relations, most avoid trial for the crime of murder, being tried instead on the charge of manslaughter, and even those convicted of murder rarely spend more than 2 years in prison. (In contrast to honor crimes, the maximum penalty for first-degree murder is death, and the maximum penalty for second-degree murder is 15 years.) Such defenses commonly also rely on the male relative having acted in the " heat of passion" upon hearing of a female relative's alleged sexual transgression, usually without any investigation on the part of the assailant to determine the veracity of the allegation before committing the assault. Defenses in these cases fall under Article 98 of the Penal Code. Women may not invoke these defenses for murdering a male relative under the same circumstances, nor may they use them for killing men who attempt to rape, sexually harass, or otherwise threaten their " honor."

On February 6, Hussein Suleiman ran over his pregnant sister Malak Suleiman three times with his pickup truck. According to his own testimony, he wanted to make sure that his sister was dead so that he could " cleanse his family honor." On July 27, he was sentenced to 1 year in prison.

On February 10, after providing bail for her release from prison, Maha Walid's father, brother, and uncle took her to the back yard of their home. They argued about her alleged " immoral behavior." Her uncle then shot her in the head and handed the gun to her father, who shot her twice, fired the gun into the air, and shouted that he had " cleansed his honor." On July 12, the three men were sentenced to 5 months each for the crime.

In June one judge broke with tradition and refused to accept the " heat of passion" defense in an honor crime case. The court sentenced Khalil Mohammad to 15 years in prison for the murder of his wife, rejecting his plea that he had killed her in a fit of fury, " because he already knew about her behavior in the past and did not kill her."

In December the National Committee to Eliminate " Crimes of Honor" presented leaders of the upper and lower houses of the Parliament with a petition signed by 15,000 citizens demanding an end both to crimes of honor and the legislation that protects perpetrators of such crimes.

The lower house rejected in November a government-supported amendment that would have eliminated Article 340; however, the Senate approved the same measure in December. The amendment was returned to the lower house for reconsideration. If the lower house again rejects the measure, the two houses would meet in joint session to settle the issue.

Women experience legal discrimination in matters of pension and social security benefits, inheritance, divorce, and the value of court testimony. A woman's testimony is worth only half that of a man (see Section 1.e.). The Government provides men with more generous social security benefits than women. The Government continues pension payments of deceased male civil servants to their heirs but discontinues payments of deceased female civil servants.

Under Shari'a female heirs receive half the amount of a male heir's inheritance, and the non-Muslim widows of Muslim spouses have no inheritance rights. A sole female heir receives half of her parents' estate; the balance goes to designated male relatives. A sole male heir inherits all his parents' property. Male Muslim heirs have the duty to provide for all family members who need assistance. Under Shari'a men are able to divorce their spouses more easily than women. Marriage and divorce matters for Christians are adjudicated by special courts for each denomination. Married women are ineligible for work in the diplomatic service, and, until recently, most women in the diplomatic corps automatically were assigned to administrative positions. There are five female judges in the country.

The law requires a married woman to obtain her husband's permission to obtain a passport (see Section 2.d.). Married women do not have the legal right to transmit citizenship to their children. Furthermore, women may not petition for citizenship for their non-Jordanian husbands. The husbands themselves must apply for citizenship after fulfilling a requirement of 15 years continuous residence. Once the husbands have obtained citizenship, they may apply to transmit the citizenship to their children. However, in practice such an application may take years and, in many cases, citizenship ultimately still may be denied to the husband and children. Such children become stateless and lack the rights of citizen children, such as the right to attend school or seek other government services. Civil law grants women equal pay for equal work, but in practice this law often is ignored.

Social pressures discourage many women from pursuing professional careers. Nonetheless, women have employment opportunities in many professions, including

engineering, medicine, education, and the law. Women constitute approximately 14 percent of the work force and 50 percent of university students. Women's groups stress that the problem of discrimination is not only one of law, but also of women's lack of awareness of their rights or unwillingness to assert those rights. The U.N. Food and Agriculture Organization reported in 1995 that women who work in agriculture average 15-hour days and earn less than men. The Jordanian chapter of the Business and Professional Women's Club gives seminars on women's rights and assists women in establishing small businesses. Members of the royal family work actively to improve the status of women.

Children

The Government is committed to children's rights and welfare in the areas of education and health. However, government efforts in these areas are constrained by limited financial resources. Education is compulsory until age 15, but children who do not attend school or attend infrequently are not considered truant. The law prohibits corporal punishment in schools; however, such punishment is known to occur. For one school year (1998-99), Iraqi children were permitted to enroll in school regardless of their status. However, for the 1999-00 school year, the Government reverted to its previous policy of denying Iraqi children admittance to school unless they were residents of the country or recognized as refugees by the UNHCR (see Section 2.d.).

The Government safeguards some children's rights, especially regarding child labor. Although the law prohibits children under the age of 16 from working, child vendors work the streets of Amman (see Section 6.d.). The Ministry of Social Development has a committee to address the problem and in some cases removes the children from the streets, returns them to their families or to juvenile centers, and may provide the families with a monthly stipend. However, the children often return to the streets. Declining economic conditions have caused the number of these " street children" to increase steadily over the last 10 years. Selling newspapers, tissues, small food items, or gum, these street vendors, along with the other children who pick through trash dumpsters to find recyclable cans to sell, are sometimes the sole source of income for their families.

Although the problem is difficult to quantify, social and health workers believe that there is a significant incidence of child abuse in families, and that the incidence of child sexual abuse is significantly higher than reported. The law specifies punishment for abuses against children. Rape or sodomy of a child under 15 years of age carries the death penalty.

Illegitimate children are entitled to the same rights under the law as legitimate children. However, in practice they suffer severe discrimination in a society that does not tolerate adultery. Most illegitimate children become wards of the State or live a meager existence on the fringes of society. In either case, their prospects for marriage and gainful employment are limited. Furthermore, illegitimate children who are not acknowledged legally by their fathers are considered stateless and are not given passports or identity numbers.

People with Disabilities

High unemployment in the general population restricts job opportunities for disabled persons, estimated by the Ministry of Social Development to number 100,000. Eighty percent of disabled citizens receive monetary assistance from the Government. The Government passed legislation in 1993 requiring future public buildings to accommodate the needs of the disabled and to retrofit existing public buildings, but implementation has been slow. Since 1993 the Special Education Department of the Ministry of Social Development has enrolled approximately 10,000 mentally and physically disabled persons in public and private sector training courses. It has placed approximately 400 disabled persons in public and private sector jobs. The law requires that 2 percent of the available jobs be reserved for the physically disabled. Private organizations and members of the royal family actively promote programs to protect and advance the interests of the disabled.

Indigenous People

The country's indigenous people, nomadic Bedouin and East Bank town dwellers, traditionally have been the backbone of popular support for the Hashemite monarchy. As a result, they generally have enjoyed considerable influence within the political system. They are represented disproportionately in senior military, security, and civil service jobs. Nevertheless, many Bedouin in rural areas are severely disadvantaged economically.

Religious Minorities

In general Christians do not suffer discrimination. Christians hold government positions and are represented in the media and academia approximately in proportion to their presence in the general population, which is estimated at 6 percent. Baha'is face some societal and official discrimination. Their faith is not recognized officially, and Baha'is are classified as Muslims on official documents, such as the national identity card. Christian and Baha'i children in public schools are not required to participate in Islamic religious instruction.

National/Racial/Ethnic Minorities

The Government granted citizenship to all Palestinians who fled to Jordan in the period after the 1948 Arab-Israeli war, and to a large number of refugees and displaced persons who arrived as a result of the 1967 war. However, most refugees who fled Gaza after 1967 are not entitled to citizenship and are issued 2-year passports valid for travel only. In 1995 King Hussein announced that West Bank residents without other travel documentation would be eligible to receive 5-year Jordanian passports. However, the Government has stressed that these passports are for travel only and do not connote citizenship (see Section 2.d.). Palestinians residing in Jordan, who make up about 60 percent of the population, suffer discrimination in appointments to positions in the Government and the military, in admittance to public universities, and in the granting of university scholarships.

Section 6 -- Worker Rights

a. The Right of Association

Workers in the private sector and in some state-owned companies have the right to establish and join unions. Unions must be registered to be considered legal. The law prohibits union membership for noncitizens. Over 30 percent of the work force are organized into 17 unions. Although union membership in the General Federation of Jordanian Trade Unions (GFJTU), the sole trade federation, is not mandatory, all unions belong to it. The Government subsidizes and audits the GFJTU's salaries and activities. Union officials are elected by secret ballot to 4-year terms. Although the Government cosponsors and approves the timing of these elections, it does not interfere in the choice of candidates.

Labor laws mandate that workers must obtain permission from the Government in order to strike. Unions generally do not seek approval for a strike, but workers use the threat of a strike as a negotiating tactic. Strikes are prohibited if a labor dispute is under mediation or arbitration. If a settlement is not reached through mediation, the Ministry of Labor may refer the dispute to an industrial tribunal by agreement of both parties. The tribunal is an independent arbitration panel of judges appointed by the Ministry of Labor. The decisions of the panel are binding legally. If only one party agrees, the Ministry of Labor refers the dispute to the Council of Ministers and then to Parliament. Labor law prohibits employers from dismissing a worker during a labor dispute.

In July in protest over a recent contract between the Pepsi-Cola Company and The Food Workers Union, 255 of Pepsi's approximately 1,200 employees staged an illegal strike. The company issued two warnings to the workers and then dismissed them. After the Minister of Labor intervened, the company reinstated all but 115 of the employees and offered a severance package to the rest. After this agreement, the Ministry of Labor continued to urge the company to reinstate the remaining fired employees.

In August the Jordan Cable and Wire Company laid off 20 of its 220 workers. In protest 100 other employees staged an illegal strike. A week later the company fired an additional 72 employees from among the strikers. Also in August, following an intervention from the Ministry of Labor, the company reinstated the 72 strikers. In November the Labor Court ruled that the initial 20 layoffs were illegal and ordered the company to reinstate those employees. The company had not done so at year's end.

The GFJTU belongs to the Arab Labor organization, the International Confederation of Arab Trade Unions, and to the International Confederation of Free Trade Unions (ICFTU).

b. The Right to Organize and Bargain Collectively

Unions have, and exercise, the right to bargain collectively. The Constitution prohibits antiunion discrimination, but the ICFTU claims that the Government does not protect adequately employees from antiunion discrimination and that the Government has dismissed public-sector employees for political reasons. Workers may lodge complaints of antiunion discrimination with the Ministry of Labor, which is authorized to order the reinstatement of employees discharged for union activities. There were no complaints of antiunion discrimination lodged with the Ministry of Labor during the year.

The national labor laws apply in the free trade zones in Aqaba and Zarqa. Private sector

employees in these zones belong to one national union that covers both zones and have the right to bargain collectively.

c. Prohibition of Forced or Compulsory Labor

The Constitution forbids compulsory labor except in a state of emergency such as war or natural disaster, and it generally is not practiced; however, foreign domestic servants often are subject to coercion and abuse, and in some cases work under conditions that amount to forced labor (see Section 6.e.). The law does not prohibit specifically forced or compulsory labor by children, but such practices are not known to occur.

d. Status of Child Labor Practices and Minimum Age for Employment

Labor law forbids children under the age of 16 from working full time except as apprentices. At age 13, children may begin part-time training for up to 6 hours a day, with night work prohibited. Ministry of Labor inspectors have the authority to enforce laws on child labor, but in practice, enforcement often does not extend to small family businesses that employ underage children. Education is compulsory to age 15. Families in remote areas frequently keep school-age children at home to work. Child vendors work on the streets of Amman (see Section 5). The law does not prohibit forced or compulsory labor by children specifically, but such practices are not known to occur (see Section 6.c.).

e. Acceptable Conditions of Work

On October 2, the Government implemented a national minimum wage of $114 (80 dinars) per month for all workers except domestic servants and those in the agricultural sector. Workers earning the minimum wages find it difficult to provide a decent standard of living for their families. The Government estimates that the poverty level is at a monthly wage of about $125 (89 dinars) per month for a family with 7.5 members. A study completed by the Ministry of Labor in July found that 18.7 percent of the population live at or below the poverty level; 1.5 percent live in " abject" poverty, defined by the Government as $58 (40.5 dinars) per month for a family with 7.5 members. The Government provides minimal, assistance to 45,000 indigent families.

The law prohibits most workers from working more than the customary 48 hours per week. Hotel, restaurant, and cinema employees may work up to 54 hours per week. Workers may not work more than 16 hours in any continuous period or more than 60 hours of overtime per month. Employees are entitled to 1 day off per week.

Labor law does not apply to domestic servants, who do not have a legal forum to address their labor grievances and have no standing to sue in court for nonpayment of wages. Abuse of domestic servants, most of whom are foreign, is widespread. Imprisonment of maids and illegal confiscation of travel documents by employers is common. Complaints of beatings, insufficient food, and rape generally are not reported to officials by victims, who fear losing their work permits and being returned to their country. Domestic servants generally are not given days off and frequently are called upon to work at any hour of the day or night. The law specifies a number of health and safety requirements for workers, including the presence of bathrooms, drinking water, and first aid equipment at work sites. The Ministry of Labor is authorized to enforce health and safety standards. The law does

© Copyright Amnesty International







# AI REPORT 1998:
# JORDAN

(This report covers the period January-December 1997)

**Five prisoners of conscience arrested in previous years continued to be held. About 350 people, including prisoners of conscience, were detained for political reasons during the year. Approximately 50 people were sentenced following trials before the State Security Court, some of which failed to meet international fair trial standards. There were reports of torture or ill-treatment of detainees arrested for common law offences, particularly during incommunicado detention. At least 11 people were executed and 21 others were sentenced to death.**

'Abd al-Salam al-Majali became Prime Minister in March following the resignation of 'Abd al-Karim Kabariti. Elections, held in November, were boycotted by the Islamic Action Front, the main opposition party, in protest at what it said was the erosion of parliamentary authority. Seven other parties also boycotted the elections. Supporters of the government won a majority of seats in the new parliament. No woman was elected.

In May amendments to the Press and Publications Law were introduced shortly after a speech by King Hussein bin Talal in which he severely criticized the Jordanian press and accused newspapers of basing stories on false information. The new law limited even further the freedom of

the press, forbidding publication of anything "which includes false information

or rumours which relate to the general

interest, or government institutions or its workers". Weekly newspapers had to increase their capital to 300,000 dinars

(approximately US$420,000) or cease pub-lication. The police reacted strongly to

protest demonstrations by journalists, reportedly beating and kicking protesters and hitting them with batons. In September the government suspended 13 newspapers

because they were unable to raise the

required capital within the three months laid down by law; other newspapers, including the satirical journal 'Abed Rabbo, ceased publication because they feared the effect of heavy fines.

Prisoners of conscience arrested in previous years who remained in detention included 'Ata' Abu'l-Rushta, spokesperson for the Hizb al-Tahrir fi'l-'Urdun (LPJ), Liberation Party in Jordan _ a party seeking to re-establish the Islamic Caliphate _ who was serving a six-month sentence for membership of an unlicensed organization after having completed a three-year sentence for an interview published in 1995 in the journal al-Hiwar (see Amnesty International Report 1997). 'Abdallah Bani 'Issa, editor of al- Hiwar, was sentenced in January to six months in prison for publishing the interview. However, he was not detained pending appeal, and the Court of Appeal overturned the conviction in April. Four members of the LPJ sentenced in previous years for distributing leaflets remained in prison as prisoners of conscience (see Amnesty International Report 1995).

About 350 people, including prisoners of conscience, were detained for political reasons during the year. Many were members of Islamist or other radical groups opposed to the peace treaty with Israel. Other prisoners of conscience were detained for articles or lectures critical of the government. Most were released without charge or trial. They included Ramadan Hassan Jilad, a teacher of religious sciences in the Jerash Mosque who was arrested in May and detained for three weeks. Twelve students from Amman University were also arrested in May for taking down a portrait of King Hussein from a room where they were holding a meeting. They were held for up to eight days before being released without charge.

Ibrahim Ghoshe, a spokesperson for the Islamist group Hamas, was arrested in September after suicide bombings in Jerusalem (see **Israel and the Occupied Territories** entry). He was held for 14 days without access to his family and lawyers before being released without charge.

A number of prisoners were released in January and February in the second batch of releases under the royal amnesty granted in November 1996 (see Amnesty International Report 1997); however, none was being held for political offences. A total of 20 Jordanians held in Israeli prisons were released in October in exchange for Jordan's release of Israeli intelligence agents involved in the attempted killing of Khaled Mesh'al, a leader of Hamas living in Amman.

Approximately 60 political prisoners sentenced, often following unfair trials, for violent activities in previous years also remained in prison. Some 50 people, about 20 of whom had been arrested in previous years, were tried for political offences before State Security Courts which were invariably composed of military judges; some trials failed to meet international fair trial standards. Some of those sentenced by the courts for political offences were prisoners of conscience. For example, Jubra'il Hassan was sentenced to 13 months' imprisonment in October for membership of the LPJ and for distributing illegal pamphlets. Others brought before the State

Security Court included 'Ikrimeh Mahmud, Yusef Ahmad and 'Ali Muhammad Mustafa. They were convicted of plotting acts of "terrorism" and possession of illegal land-mines; they pleaded guilty to the latter charge only. They were sentenced to death in February; the sentence was immediately commuted to life imprisonment.

A Jordanian soldier, Ahmad al-Daqamsa, who killed seven Israeli schoolgirls and wounded five others by automatic gunfire in al-Baqura Island in March, was found guilty of unpremeditated murder and sentenced by a military court in July to life imprisonment with hard labour.

In March the Court of Cassation ratified the State Security Court verdicts in the *Bay'at al-Imam* (Allegiance to the Imam) case, involving 10 members of an Islamist group sentenced to up to life imprisonment on charges including manufactur-

ing explosives, and in the case of

Salem Bakhit and Ahmad Khaled, sentenced to life and 10 years' imprisonment for attacking a French diplomat (see

*Amnesty International Reports 1996* and *1997*).

There were reports of torture and ill-treatment of common law detainees at the hands of the Criminal Investigation, Preventive Security and Metropolitan Police. For example, in July five men involved in a razor attack were allegedly beaten with cables and hoses by members of the Criminal Investigation in Jebel Hussein Police Station in Amman; two were beaten while suspended in contorted positions. They were released on bail after eight months in detention without trial.

Samer Khazer died after being beaten by members of the Criminal Investigation at his home in Zabda al-Wasatiya in June. The police stated that he had resisted arrest but statements by the family and villagers suggested that no serious attempt was made to arrest him. No independent inquiry was held into his death. Muntasser Rajab Abu Zayd, who was allegedly tortured and ill-treated in order to extract a confession which reportedly formed the basis of his conviction for murder (see *Amnesty International Report 1997*), was executed in June. No investigation had been initiated into the allegations of torture or ill-treatment.

At least 10 other people were executed. Among the women executed were Amira Salem and 'Aidah Hussein, who were hanged at Swaqa Prison in June. They had been convicted of killing the husband of Amira Salem who was said to have regularly abused her. Those sentenced to death were reportedly not informed of their execution until about 15 minutes before it took place. A total of 21 people were sentenced to death for murder during the year. They included eight people from Amir al-Iraq convicted by the Criminal Court of killing two members of another family in a quarrel. One death sentence was overturned by the Court of Cassation.

In correspondence with the government Amnesty International responded in detail to criticisms by the authorities of the *Amnesty International Report 1997* received in December 1997. The organization continued to raise concerns about the use of the death

penalty and urged the government not to forcibly return
asylum-seekers to Libya or Iraq.

**COPYRIGHT NOTICE:** This report is an extract from the Amnesty
International Report 1998 and is copyright (c) Amnesty International
Publications. You may not alter this information, repost or sell it
without the permission of Amnesty International. The complete
edition of the Report, covering more than 140 countries and
territories,is published in several languages and is available from
Amnesty International sections or, in case of difficulty, from the
International Secretariat. Additional places where you can purchase
copies of the Annual Report can be found here.

1998 Annual Report Index | Country Index

**Library**

## COPYRIGHT NOTICE

This report is an extract from the Amnesty International Report 1997 and is copyright (c) Amnesty International Publications. You may not alter this information, repost or sell it without the permission of Amnesty International. The complete edition of the Report, covering 151 countries and territories,is published in several languages and is available from Amnesty International sections or, in case of difficulty, from the International Secretariat. Additional places where you can purchase copies of the Annual Report can be found here.



# AI REPORT 1997: JORDAN

**Five prisoners of conscience arrested in previous years continued to be held. Hundreds of people, including prisoners of conscience, were detained for political reasons during the year, among them more than 500 people arrested after violent anti-government protests in August. Political detainees were held incommunicado in prolonged preventive detention for up to 40 days. More than 100 political detainees were sentenced to prison terms, some after unfair trials before the State Security Court. Reports of torture and ill-treatment, particularly of detainees arrested for common law offences, continued. One person died in custody, allegedly after torture or ill-treatment. At least nine people were executed and 21 others were sentenced to death. At least five asylum-seekers were sent back to countries where they were at risk of torture.**

'Abd al-Karim Kabariti was appointed Prime Minister in February by King Hussein bin Talal. He promised to "respect human rights and the freedom of the press". In August, demonstrations and riots against a doubling of the price of bread took place in Krak, Tafileh, Amman, the capital, and other towns.

A total of 107 detainees were released in royal amnesties in November and December.

Prisoners of conscience who remained in prison during the year included 'Ata' Abu'l-Rushta, spokesperson for the *Hizb al-Tahrir fi'l-'Urdun* (lpj), Liberation Party in Jordan, a party seeking to re-establish the Islamic Caliphate, was sentenced to three years' imprisonment in February by the State Security Court for lese-majesty under Article 195(1) of the Penal Code in connection with an interview he had given to the newspaper *al-Hiwar* (see *Amnesty International Report 1996*). The statements on which the charges were based did not advocate violence. Leith Shubeilat, head of the Engineers' Union and an Islamist leader, who had been arrested in December 1995 (see *Amnesty International Report 1996*) and sentenced to three years' imprisonment in March by the State Security Court on charges that included lese-majesty, was released in November when King Hussein bin Talal came personally to the prison and granted him an amnesty. Four other members of the lpj, sentenced in previous years for distributing leaflets, remained held as prisoners of conscience (see *Amnesty International Report 1995*).

Prisoners of conscience included at least five journalists who were held in detention on remand for up to 10 days on charges such as lese-majesty or inciting sectarian or ethnic disorder. Hilmi Asmar, editor of the newspaper *al-Sabil*, was held for nine days in September before being released without charge after publishing a report which alleged that members of the internal security service had tortured detainees.

Other prisoners of conscience included members of various political opposition groups, including the Arab Socialist Ba'th Party and *Hashad*, the Jordan People's Democratic Party, arrested at the time of the violent anti-government protests in August and charged with inciting riots.

Hundreds of people arrested on political grounds were held incommunicado for up to 40 days. They included members of groups opposed to the peace process with Israel and more than 500 people accused of inciting or participating in the August bread riots. Walid Ahmad Taylakh, arrested in March, was held for 37 days in incommunicado detention in the General Intelligence Department (gid) detention centre, where he was allegedly tortured by methods including *falaqa* (beatings on the soles of the feet). 'Umar Abu Ragheb, a board member of the Arab Organization for Human Rights in Jordan, was held incommunicado in the gid headquarters in Amman and released in August. Many of those arrested were released without charge. Others were charged with offences including lese-majesty or destruction of property.

At least 120 people were brought to trial for political offences. They included journalists, most of whose trials ended in acquittals. Among them were Jihad al-Khazen, director of the newspaper *al-Hayat* in the United Kingdom, who was tried *in absentia*, and Salameh Ne'mat, a journalist on the newspaper. They were brought to trial in April before the Court of First Instance in Amman and acquitted on four charges, including slander, after writing an article stating that a number of journalists and officials were on the payroll of the Iraqi authorities.

Those brought before the State Security Court on charges involving political violence included seven members of an Islamist group known as the *Bay'a al-Imam* (Allegiance to the Imam) who were tried on charges including manufacturing explosives (see *Amnesty International Report 1996*). Six others, tried in the same case but released on bail, were charged with lese-majesty. At a session in June all retracted their confessions, stating that they had been subjected to physical and psychological torture during more than six months' pre-trial incommunicado detention in the gid headquarters in Amman. The judge agreed to hear evidence on alleged falsification of arrest dates to conceal their prolonged detention. In November, nine defendants were sentenced to between two years' and life imprisonment and four were acquitted. Salem Bakhit and Ahmad Khaled, accused of attacking a French diplomat in March 1995 (see *Amnesty International Report 1996*), were sentenced to life imprisonment with hard labour and 10 years' imprisonment respectively on charges which included "conspiring to carry out terrorist actions".

Reports of torture or ill-treatment continued. Most such reports concerned those held by the police, the police of the capital or the preventive security. However, six supporters of *Hamas* arrested in March and April alleged that they were tortured in the headquarters of the gid by being severely beaten, especially by *falaqa*, after arrest. Medical certificates of four of the detainees, who were released without charge in May and June, showed injuries consistent with their allegations. A complaint about the alleged torture was made to the military public prosecutor but no action was known to have been taken by the end of the year.

Dozens of those arrested in August after riots in Krak and other towns stated that they were beaten after arrest by police or preventive security in local police stations or in Swaqa Prison. One person,

arrested in Tafileh, said that he was tortured by the preventive security police with electric shocks, beatings and suspensions in a painful position. He was brought before the military public prosecutor after 23 days' incommunicado detention. He stated that he made a complaint about his treatment, but was not informed about any action taken.

Yunus Abu Dawleh died in December, three hours after he had been arrested by the police in Jabal Hussein, Amman. His body reportedly showed signs of bruising on the shoulder and neck; however, the medical certificate stated that he died of "heart disease". No investigation was carried out into the alleged extrajudicial execution of Mahmud Khalifeh in July 1995 (see *Amnesty International Report 1996*).

At least nine people were executed during the year. They included 'Uthman 'Ali Abu Lawi and Sabri 'Abdallah Abu Fawdeh, both convicted of raping minors. These were the first executions for rape, which had been made a capital offence under an amendment to the Penal Code in 1988. At least 21 people were sentenced to death including Muntasser Rajab Abu Zayd, who was allegedly beaten and deprived of sleep, together with his wife, who was not a suspect. His confession reportedly formed the basis of his conviction for murder. Death sentences on 18 prisoners were commuted, including the death sentences imposed in 1995 on eight prisoners known as the "Arab Afghan" group. They had been convicted of attempting to destabilize the Jordanian Government by carrying out armed attacks on cinemas. Death sentences imposed on the eight in 1994 had been overturned by the Court of Cassation in March 1995 and reimposed by the State Security Court in July 1995 (see *Amnesty International Reports 1995* and *1996*).

Asylum-seekers continued to be returned to countries where they were at risk of torture. They included Hassan Adam 'Ali, a Sudanese national and a political activist, who had lived in Jordan since 1993. He was arrested by Jordanian security officials in January and deported to Khartoum, Sudan, where he was detained for six weeks. A deserter from the Iraqi army deported to Jordan from the United Arab Emirates in June was deported the same month to Iraq where he was arrested and may have suffered torture or amputation of the ear as punishment.

In correspondence with the Jordanian Government, Amnesty International raised concerns about continuing executions and the expansion of the number of crimes punishable by the death penalty; the *refoulement* of asylum-seekers; and the detention of prisoners of conscience. The gid responded on specific questions concerning individual detainees and sent a response to the *Amnesty International Report 1996*.

**Back to Country Index**

**Library**

for prisoners awaiting executions. The report called on the government to commute all death sentences, to take steps to abolish the death penalty in law and to end the ill-treatment of prisoners under sentence of death. The government did not respond to Amnesty International's recommendations.

# JORDAN



**Scores of political detainees were held during the year. They included dozens of prisoners of conscience and possible prisoners of conscience. Many of those arrested were held in prolonged incommunicado detention. Most were released without charge. At least 48 were brought to trial before the State Security Court, which did not appear to satisfy international standards for fair trial. There were several reports of torture. One extrajudicial execution was reported. At least 12 people were executed and 10 people remained under sentence of death.**

A new government, headed by Sharif Zaid bin Shaker, was formed in January, after the resignation of the previous prime minister. A Jordanian parliamentary committee on civil liberties issued a report in September which said that liberties had diminished since the peace with Israel in 1994; the Jordanian Government rejected the report.

on several issues including the number of allegations of torture; the right of officers of the General Intelligence Department (GID) to act as public prosecutors and detain suspects incommunicado; the continuing use of the death penalty; and the *refoulement* of asylum-seekers to countries where they might be at risk of torture.

Scores of people, including prisoners of conscience and possible prisoners of conscience, were arrested on political grounds. Those arrested included dozens of suspected members of Islamist and leftist opposition groups opposed to the peace treaty with Israel. Prisoners of conscience included at least two journalists, who were detained for up to two days, and an opposition leader. Leith Shubeilat, an Islamist leader, was arrested in December and detained in Jwaideh Prison on charges that included lese-majesty after a speech the previous month in which he criticized King Hussein bin Talal. He had not been brought to trial by the end of the year. The public prosecutor's office served scores of writs on newspapers charging them with offences such as harming national unity under the Law on Press and Publications. Cases lasted several months and ended in fines or acquittals.

Those arrested on security grounds were held incommunicado for up to nine months by the GID. Detainees held by the GID were frequently not told the charges against them; they were allowed irregular access to relatives but denied access to lawyers. Most detainees were released without charge.

More than 40 alleged members of Islamist groups were brought before the State Security Court in at least seven trials. 'Ata' Abu'l-Rushta, an engineer and spokesman for the *Hizb al-Tahrir fi'l-'Urdun*, Liberation Party in Jordan, was arrested in October and brought to trial in November before the State Security Court on charges of insulting the King and membership of an illegal party, after an interview published in the weekly newspaper *al-Hiwar*. He appeared to be a prisoner of

*Was a member of Parliment*

In March the Court of Cassation overturned the judgment in the "Mu'ta" case, in which five military cadets and five others were accused of plotting to kill King Hussein bin Talal during a ceremony in Mu'ta University in June 1993 (see *Amnesty International Reports 1994* and *1995*). The Court found that the confessions of the accused were inadmissible because they had been made after torture. The defendants were released immediately. In the same month, the Court of Cassation refused to uphold the convictions of 25 people accused of conspiracy to carry out "terrorist" actions, known as the "Arab Afghans" case, as some of those involved had returned from fighting with Islamist forces in Afghanistan (see *Amnesty International Report 1995*). Eleven death sentences had been passed, three *in absentia*. The Court of Cassation ordered the State Security Court to hear further witnesses. In July new judgments were given after a retrial. Ten death sentences (including two *in absentia*) were maintained.

There were a number of reports of torture in the GID headquarters in the capital, Amman, and in police stations. Thirteen members of an Islamist group known as *Bay'a al-Imam*, Allegiance to the Imam, were held for up to nine months in incommunicado detention and tortured in the GID headquarters before being charged with offences including manufacturing explosives. For instance, Muhammad al-Wasfi was reportedly held incommunicado in the GID headquarters for more than six months. He was allegedly tortured by being beaten and by being hung by ropes tied above the knees.

Marwan Thabet 'Ajuh and 'Usama 'Adel Husni 'Abed were among a number of detainees arrested in October, apparently as a preventive measure before the Amman economic summit. They were held for over a month in incommunicado detention in the GID headquarters before being allowed irregular access to relatives. They were allegedly tortured by being beaten, including on the soles of the feet (*falaqa*), and were deprived of sleep for up to 22 hours a day while being forced to

incommunicado detention at the end of the year. He was reportedly seen by his wife only once. The GID denied torture allegations and a medical report by a GID doctor stated that no marks of torture were found. However, no independent doctor's report was provided.

One extrajudicial execution was reported. Scores of members of the security forces, including the special forces and the royal guard, stormed the flat of Mahmud and Bashar al-Khalifah al-'Awamlah in June, using massive fire-power. Mahmud al-Khalifah was killed and his brother, Bashar al-Khalifah, was severely wounded. After the attack there were over 100 bullet holes made by automatic weapons in almost every room of the brothers' apartment in Amman. The body of Mahmud al-Khalifah was examined by a forensic pathologist who found abrasions and at least four wounds caused by firearms, three on the left arm and a fourth which damaged the left lung. The victim died from this wound. The government stated that Mahmud al-Khalifah had been killed while resisting arrest with a pistol. However, no investigation was known to have been set up into the circumstances of the killing nor was any explanation given for the use of scores of armed men and massive fire-power.

At least 12 people were executed during the year for crimes such as murder. Those executed included Mohamed Nimr al-Rawahna and three others who had been convicted of sexually abusing and strangling a child.

An Iraqi asylum-seeker who had been active in the Iraqi opposition was forcibly returned to Iraq in March. Many members of his family had been executed by the Iraqi authorities and Amnesty International considered him at serious risk of execution. He was expelled before representatives of the UN High Commissioner for Refugees had the opportunity to examine his case, and without the fair and adequate procedure required under international law.

Amnesty International expressed concern about incommunicado detention and torture by the GID, lack of access to family, lawyers and independent doctors for

AMNESTY INTERNATIONAL REPORT 1996



# U.S. Department of State

## Jordan Report on Human Rights Practices for 1997

Released by the Bureau of Democracy, Human Rights, and Labor, January 30, 1998.

### JORDAN

The Hashemite Kingdom of Jordan is a constitutional monarchy that has been ruled by King Hussein since 1952. The Constitution concentrates a high degree of executive and legislative authority in the King, who determines domestic and foreign policy. The Prime Minister and the Cabinet manage the daily affairs of government. The Parliament consists of the 40-member Senate appointed by the King and the 80-member Chamber of Deputies, which is elected by the people every 4 years. After the 1989 elections and the lifting of martial law in 1991, the lower house began to assert itself on domestic and foreign policy issues. The Parliament elected in 1993, however, was less assertive than its predecessor. Over 500 candidates competed in the October parliamentary elections, despite a boycott by the Islamist and other parties. The election was marred by reports of registration irregularities, fraud, and restrictions on the press and on campaign materials. According to the Constitution, the judiciary is independent of other branches of government; however, in practice, it is susceptible to outside influences.

General police functions are the responsibility of the Public Security Directorate (PSD). The PSD, the General Intelligence Directorate (GID), and the military share responsibility for maintaining internal security and have authority to monitor the activities of persons believed to be security threats. The State Security Court and broad police powers are vestiges of martial law, which was in place from 1967 to 1991. The security forces continue to commit human rights abuses.

Jordan has a mixed economy, with significant government participation in industry, transportation, and communications. The country has few natural resources and relies heavily on foreign assistance and remittances from citizens working abroad. The economy has suffered from chronically high unemployment since the late 1980's. As part of a structural adjustment program, the Government has removed subsidies on several staple goods and lifted price controls on bread, soft drinks, fruits, and vegetables. While consumer prices and interest rates have risen, wages have remained stagnant, eroding the purchasing power of most citizens. Exporters have not yet found adequate replacement markets for those lost as a result of United Nations sanctions against Iraq. Additional trade with Iraq under "food for oil" arrangements has not significantly affected the economy. High expectations that significant markets would develop in the West Bank, Gaza, and Israel following the 1994 signing of the Jordan-Israel peace treaty have not been realized. Per capita gross domestic product in 1996 was $1,632.

Since the revocation of martial law in 1991, there has been noticeable improvement in the human rights situation, however, problems remain, including: abuse and mistreatment of detainees; arbitrary arrest and detention; lack of accountability within the security services; prolonged detention without

charge; lack of due process; infringements on citizens' privacy rights; harassment of opposition political parties; and restrictions on the freedom of speech, press, assembly, and association. Citizens do not have the right to change their form of government, although they can participate in the political system through political parties and municipal and parliamentary elections. New restrictions on the press decreed by the King in May shutdown many smaller publications and led the others to practice increased self-censorship. In reaction to these limitations and to the "one-man, one-vote" change in the election process, the Islamist and other parties boycotted the October parliamentary elections. Abuse of foreign servants is a problem. Restrictions on women's rights, violence against women, and abuse of children are also problems. The Government imposes some limits on freedom of religion, and there is official discrimination against adherents of the Baha'i faith.

## RESPECT FOR HUMAN RIGHTS

### Section 1 Respect for the Integrity of the Person, Including Freedom from:

a. Political and other Extrajudicial Killing

There continues to be a reluctance on the part of the security services to transparently investigate allegations of wrongful death in police custody. In one incident, family members accused police of killing Samer Mohammed Ziyad on June 23. The 29-year-old man was wanted for theft, fraud, and arson. According to relatives, police first assaulted Samer's brother outside of the family home. After the injured brother left to seek medical attention, two police officers entered the house, found Samer, and escorted him to a bedroom. There, according to the family members who witnessed events, a policeman struck Samer twice on the head with a heavy wooden baton causing him to collapse, unconscious, to the floor. Samer was instructed to get up by police. When he remained motionless, the same policeman sprayed a mace-like substance into his face. The fumes were so strong that the policemen and family members left the house and remained outside for approximately 90 minutes. At that time an officer arrived and, after assessing the situation, instructed family members to take Samer to the hospital. Samer was pronounced dead on arrival. Police officials claim that Ziyad had already collapsed when police arrived to arrest him. A government autopsy reported the cause of death to have been a heart attack caused by blockage in the coronary arteries. Family members countered that Ziyad had no history of medical problems and demanded a second autopsy. A second autopsy was performed by a panel of five independent physicians. While the second autopsy did not directly contradict the first autopsy's stated cause of death, it did describe two severe wounds to the victim's head and surrounding brain tissue. Police officials claim to have conducted an investigation of the incident and the allegation of wrongful death but have refused to release any findings. The policemen involved in the incident have not been censured and remain on active duty.

In March a member of the army border guard member, Ahmed Daqamseh, shot and killed seven Israeli schoolgirls and wounded three others on Naharayim Island in the Jordan River. In June he was tried in military court, convicted, and sentenced to life in prison. The Government immediately condemned the act and the King made an unprecedented trip to visit the schoolgirls' families.

There were no developments in the investigation of police officers involved in the alleged wrongful deaths of Younis Mahmoud Abu Dawlah, who died in December 1996, and Mahmoud Khalifah, who died in June 1995. Both men died while in police custody.

b. Disappearance

There were no reports of politically motivated disappearance.

c. Torture And Other Cruel, Inhuman, Or Degrading Treatment Or Punishment

Although the legal code provides prisoners with the right to humane treatment, security and police forces sometimes abuse detainees physically during interrogation. Torture allegations are difficult to verify because security officials frequently deny detainees timely access to lawyers. The most frequently alleged methods of torture are sleep deprivation, beatings, and extended solitary confinement. Defendants in high-profile cases before the state security court occasionally claim to have undergone physical and psychological abuse while in detention. Government officials reject allegations of abuse.

In May Fahd Rimawi, editor of the weekly tabloid Al Majd, publicly alleged that he was slapped in the face, insulted, and threatened by officers of the General Intelligence Directorate. Rimawi had been called in for questioning after publishing an editorial in which he stated that it was "unfortunate" that an Israeli stabbing victim in Jordan survived the attack. The Minister of State for Information Affairs said that Rimawi was summoned and interrogated for publishing "erroneous news" about changes in the security forces' leadership. The Government denied that Rimawi was abused and said that he was released with a warning.

During the June military trial of Ahmed Daqamseh, an army border guard convicted of killing seven Israeli schoolgirls and wounding three others (see Section 1.a.), the defendant displayed bruises to his face and back. Daqamseh's lawyer claimed that Daqamseh was beaten by the soldiers guarding him. The director of the military prosecutor's office alleged that Daqamseh beat himself against his cell door "in an attempt to escape from captivity." Court was adjourned for 3 days so Daqamseh could be examined and the source of the injuries determined, but the results of the examination were not made available to Daqamesh's attorneys.

Montasser Abu Zaid was hanged in June for murder. Abu Zaid was convicted in 1996 on the basis of a confession that he claimed was extracted under duress. He alleged that he and his wife were beaten and deprived of sleep in pretrial detention. These allegations were made during the course of the trial, but no investigation was conducted.

In May police used force to disperse demonstrating journalists, striking protesters (see Section 2.b.).

Prisons and local police detention facilities are Spartan but generally meet minimum international standards. Prisoners detained on national security grounds are often kept in separate prisons maintained by the GID, where conditions are much the same as other incarceration facilities.

There were reports in April of a hunger strike staged by prisoners at Suwaqah prison after they were not included in a royal amnesty. Relatives of prisoners told the Parliament's Public Freedoms Committee that personnel from the PSD entered the prison and beat those inmates who were participating in the hunger strike.

The International Committee of the Red Cross (ICRC) is permitted unrestricted access to prisoners and prison facilities, including GID facilities.

d. Arbitrary Arrest, Detention, Or Exile

Security forces arbitrarily arrest and detain citizens. Under the Constitution citizens are subject to arrest, trial, and punishment for the defamation of heads of state, dissemination of "false or exaggerated information outside the country which attacks state dignity," or defamation of public officials.

The Criminal Code requires legal authorities to file formal charges within 10 days of arrest. The courts routinely grant requests from prosecutors for 15-day extensions as provided by law. This practice generally extends pretrial detention for protracted periods of time. In cases involving state security, the authorities frequently hold defendants in lengthy pretrial detention, do not provide defendants with the written charges against them, and do not allow defendants to meet with their lawyers until shortly before the trial. Security defendants usually meet with their attorneys 1 to 2 days prior to the trial.

The Government detains persons, including journalists, for varying amounts of time for what appear to be political reasons. During the year all such detainees were released within 3 months; most were released immediately after questioning. Approximately 350 people, including journalists, were detained for national security reasons during the year.

The Government does not use forced exile.

E. Denial Of Fair Public Trial

The Constitution provides for an independent judiciary, and court rulings against the Government in past years indicate that the judiciary can function independently. However, the judiciary is susceptible to outside pressure, because a judge's appointment to, and advancement within the judiciary, is determined by a committee whose members are appointed by the King.

There are several types of courts. Most criminal cases are tried in the civilian courts, which also include appeals courts, the Court of Cassation, and the Supreme Court. Cases involving sedition, armed insurrection, financial crimes, drug-trafficking, and offenses against the King are tried in the State Security Court, a remnant of the pre-1991 martial law period. In January Parliament passed amendments to the law governing the State Security Court effectively extending its jurisdiction indefinitely. The amendments had been rejected earlier by the lower house's judicial committee as "undemocratic" and contrary to the concept of an independent judiciary. Islamic, or Shari'a, courts, have jurisdiction over marriage and divorce among Muslims and inheritance cases involving both Muslims and non-Muslims (see Section 5). Under Shari'a, a woman's testimony is only equal to half that of a man (see Section 5).

Most trials in the civilian courts are open. Defendants are entitled to legal counsel, may challenge witnesses, and have the right to appeal. Defendants facing the death penalty or life imprisonment must be represented by legal counsel. Public defenders are provided if the defendant cannot afford to hire legal counsel.

The State Security Court consists of a panel of three judges, who may be either civilians or military officers. Sessions are frequently closed to the public. Defendants tried in the State Security Court are often held in pretrial detention without access to lawyers, although they are visited by representatives of the ICRC. In the State Security Court, judges have inquired into allegations of that defendants were tortured and have permitted the testimony of physicians regarding these allegations. To date the Court has not invalidated a confession obtained under duress, but on review, the Court of Cassation has ruled that the State Security Court cannot issue a death sentence on the basis of such a confession alone. Defendants in the State Security Court have the right of appeal to the Court of Cassation, which is authorized to review testimony, evidence, and judgment. Appeals are automatic for cases involving the death penalty.

In the past, defense attorneys have challenged the appointment of military judges to the State

Security Court to try civilian cases as contrary to the concept of an independent judiciary. Military judges appear to receive adequate training in civil law and court procedure and State Security Court decisions are reviewed by the Court of Cassation.

Journalists Nahed Hattar and Abdullah Abu Roman were charged with offenses against the King in August 1996. The State Security Court dropped charges during the summer of 1997, but the state prosecutor is appealing the decision. Hattar is accused of slandering King Hussein and Crown Prince Hassan. The evidence against him includes published articles that criticize the permanent settlement of Palestinian refugees in Jordan. Abu Roman is accused of slandering the King. The evidence against him is based on articles seized when police raided his office. The two are also being tried in civil court on charges including propagating material that "harms relations between Jordan and Palestine, sows sectarianism and ethnicism, instigates violence, terror, and hatred, and undermines national unity."

The press routinely carries details of the security court cases.

There were no reports of political prisoners.

F. Arbitrary Interference With Privacy, Family, Home, Or Correspondence

The Constitution dictates that security forces must obtain a warrant from the Prosecutor General or a judge before conducting searches or otherwise interfering with privacy, family, home, or correspondence. The security services generally respect these constitutional restrictions; however, in security cases, authorities sometimes--in violation of the law--obtain warrants retroactively or obtain preapproved warrants. Security officers reportedly monitor telephone, read correspondence, and engage in surveillance of persons who may pose a threat to the Government or national security. While these practices are not believed to be widespread, the law permits them if the Government obtains a court order.

## Section 2 Respect For Civil Liberties, Including:

A. Freedom Of Speech And Press

The Constitution provides for freedom of speech and of the press; however, the Government imposes some restrictions on these rights. Freedom of the press was curtailed by restrictive new amendments to the Press Law. The Government also intimidates journalists to encourage self-censorship. Private citizens can be prosecuted for slandering the royal family, the Government, or foreign leaders and for sowing sedition. Citizens generally do not hesitate to criticize the Government openly, but are more circumspect in regard to the King and the royal family.

The Press and Publications Law was amended by royal decree--i.e., without parliamentary approval--in May. The amendments gave daily and weekly newspapers 3 months to meet greatly increased capitalization requirements, ranging from $70,000 to $840,000 and $21,000 to $420,000, respectively. The amended law further prohibits the publication of news, opinion, information, reports, caricatures, or photos that: offend the King or the royal family; pertain to the armed forces or security services; harm national unity; disparage religion; offend an individual or harm his reputation; disparage the heads of friendly states; harm the country's relations with other nations; promote perversion or lead to moral corruption; shake confidence in the national currency; or feature false news or rumors. Fines for violations of the law were raised from a maximum of $1,400 to between $21,000 and $35,000. Newspapers deemed to be in violation of the law can be shut down until all fines are paid.

- \4 -

The Press and Publications Law amendment also mandates that editors must be citizens, resident in the country, and have 10 years of full-time experience as journalists. In September chief editor Nabil Al-Sharif of the nation's second largest daily, Al-Dustur, received a letter from the Ministry of Information ordering him to resign because he had less than 10 years full-time experience as a journalist. The Al-Sharif family and the Government each control three seats on the paper's nine-member board. Mr. Al-Sharif said that the Government was unhappy with Al-Dustur's editorial policy and that it had been trying use the board of directors to oust him for some time.

The Government exercises control over the daily print media through its ownership of 61 percent of the Jordan Press Foundation, and 32 percent of the Jordan Press and Publications Company, which together publish three of the country's five dailies. The amended Press Law dropped an earlier clause requiring the Government to reduce its shares in press establishments to a maximum of 30 percent. The Government also requires licenses for newspapers and periodicals, but the Press Law does not prescribe penalties for publishing without a license. Specialized publications may not publish material other than that for which they are licensed. The Government may revoke the licenses of periodicals that repeatedly violate the Press and Publications Law or which fail to publish for an extended period of time. The Government licensed one new publication in 1997. No licenses were revoked.

The Government also requires licenses for journalists, editors, and publishers. Journalists have long complained about the requirement that they must join the government-sponsored Jordan Press Association (JPA). However, the Government has not taken legal action against journalists who refuse to join the association. Foreign journalists and Jordanians working for foreign news agencies must register with the Ministry of Information. The Press Law offers limited protection for the confidentiality of a journalist's sources.

Persons accused of violating the Press and Publications Law are tried in a special court for press and copyright cases. Journalists are also prosecuted for criminal and security violations in connection with their work. Most such cases result in acquittal or are dismissed before coming to trial. No guilty verdicts have been handed down since the May amendment to the Press and Publications Law. Nevertheless, the Government routinely uses detention and prosecution or the threat of prosecution of press and publications cases as a means to intimidate journalists and to encourage self-censorship.

Credible observers expect the broad definition of punishable offenses in the amendments to the Press Law to encourage increased self-censorship. The first newspaper to close following the press amendments was the satirical weekly Abed Rabbo, which printed its final issue on June 14. The paper cited the decree's broad definition of prohibited reporting and the severity of fines as the reasons for its closure. Two of the paper's editors, Omar Nadi and Yousef Gheishan, had been detained in January, charged with slandering a Member of Parliament and a government minister. The paper had called the parliamentary deputy a hypocrite and printed a cartoon depicting the minister stealing cars.

As a direct result of the new capitalization requirements promulgated in the Press and Publication Law amendments, 14 of 23 weeklies were forced to cease publication. Of the nine weeklies still publishing, four are considered party publications which are not yet subject to the same restrictions. Regarding the new senior editor qualifications contained in the law, two of the five senior editors of daily newspapers--i.e., all but one of the dailies not completely controlled by the Government--and one of the weekly senior editors have been asked to resign.

In January Abdullah Bani Issa, editor of the weekly Al Hiwar, was sentenced to 6 months in prison and fined $700 for publishing an interview in which Ata Abu Rishtah, leader of the illegal Tahrir Party, allegedly slandered the King and the Crown Prince. The sentence cited the Press and Publications Law in imposing the fine and the Penal Code in passing the jail sentence. The decision was overturned in April by the Court of Appeals, which ruled that the content of the interview was neither criminal nor slanderous. Abu Rishtah is currently in jail for an earlier 1996 State Security Court conviction for slandering the King.

Also in January, Na'el Salah, editor of the weekly Al Haqiqa, was sentenced to 9 months in prison and fined $21,000 for "spreading false news and publishing pornographic material" for reporting on prostitution in Amman. Salah had been detained for 4 days in 1996 in connection with the case.

The editor in chief of the Al-Ahali weekly newspaper Jamil Nimri, and reporters Basel Tallouzi and Ramadan Rawashdeh were acquitted in February of charges of "instigating the masses" against the Jordan-Israel peace treaty and harming national security. The Al-Ahali newspaper is linked to the Jordan People's Democratic Party. In May Osama Rantisi, editor of the Al-Ahali, was detained for 10 days before being charged with lack of accuracy and objectivity in reporting, and slandering individuals. The arrest came after Rantisi published a story alleging that one of Amman's private hospitals was failing financially and was going to be purchased by a group of Israeli investors.

Zarqa mayor Mustafa Fayyad was detained for 3 days in February for slandering members of parliament. The Speaker of the lower house of Parliament requested mayor Fayyad's arrest after he said in an interview that "three quarters of the Members of Parliament are liars."

Journalists Nahed Hattar and Abdullah Abu Roman faced charges in the State Security Court, Hattar for slandering the King and the Crown Prince, and Abu Roman for slandering the King (see Section 1.e.).

The Penal Code authorizes the State to take action against any person who incites violence, defames heads of state, disseminates "false or exaggerated information outside the country which attacks state dignity," or defames public officials. Ahmed Oueidi Abbadi was charged with undermining national unity, inciting people to criminal acts, and fueling bigotry, for a 1996 editorial in which he called for government confiscation of the property of Palestinians living in Jordan. The case was postponed in April and eventually dismissed. Abbadi was elected to Parliament in the October elections.

The Government is the sole broadcaster of radio and television programs. Radio and television news broadcasts are more restricted than the print media. Television news airs reports critical of the Government but rarely covers alleged human rights abuses. Opposition parties have complained that Jordan Television (JTV) reports only the Government's position on controversial matters. International satellite television and Israeli and Syrian television broadcasts are available and unrestricted.

In March the Government announced an end to pre-distribution censorship of publications entering the country. Previously, imported magazines and newspapers were subject to a pre-distribution check for violations of the press and publications law. In October, in the period leading up the parliamentary elections, the Government resumed pre-distribution censorship of foreign publications, blocking the distribution of 54 Arabic language publications and 16 issues of British newspapers.

There were no dismissals of university professors for their political views in 1997. However, intellectuals believe that there are no safeguards to prevent such dismissals.

b. Freedom Of Peaceful Assembly And Association

The Government restricts freedom of assembly. Citizens must obtain permits for public gatherings. Since 1989 the Government has granted some permits for peaceful demonstrations. The Government denies permits for public protests and rallies that it determines pose a threat to security.

In January the Government permitted a demonstration at the site of an Israeli trade fair on the outskirts of Amman. Water cannons were fired over the heads of the 500 demonstrators to maintain order, and security forces prevented demonstrators from approaching the entrance to the site. Organizers of the demonstration alleged that members of the security forces prevented buses full of people arriving from outside Amman to reach the demonstration site.

The Government issued permits for a large gathering in March "in solidarity with the Palestinian people." Opposition figures from political parties, professional associations, women's groups, and grass roots organizations took part and addressed the crowd. Some would-be participants did not make it to the rally site, however, when police stopped buses hired for the event that had not obtained the appropriate permit for changing their routes. The drivers were fined and the buses were impounded, leaving passengers without transportation. The usual penalty for this infraction is a small fine.

Police used force on May 20 during an unlicensed demonstration at the offices of the Prime Minister by approximately 50 journalists to protest amendments to the Press and Publications Law. As the demonstrators dispersed, security forces became involved in a dispute with journalists over the filming of an interview with prominent opposition figure Layth Shubaylat. In the ensuing fracas several people were pushed, shoved, and struck by police. At least one demonstrator was kicked and hit several times with batons. Nine people were detained for several hours following the demonstration. The Government said the police actions were justified because the protest was unlicensed. The demonstration and the police response were reported in the print media.

The Government restricts freedom of association. The Government requires and routinely grants approval for conferences, workshops, and seminars. In January the Ministry of Culture announced its decision to require Ministry approval, in writing, for any cultural, scientific or artistic activity. The decision was revoked 3 weeks later after public complaints.

The Government routinely licenses political parties and other associations. There are currently 17 licensed parties. Membership in an unlicensed political party is illegal. The High Court of Justice may dissolve a party if it violates the Constitution or the Political Parties Law. The Government can deny licenses to parties that it decides do not meet a list of political criteria contained in the Political Parties Law.

In a July statement to the Minister of Interior, 11 opposition parties complained that during a government-ordered audit of parties' finances, some parties were asked to submit unrelated information, including party members' names and addresses. The Minister responded that the audit was being conducted in accordance with the law, and that all parties were being treated equally.

c. Freedom Of Religion

According to the Constitution, Islam is the state religion. The Constitution prohibits discrimination on the basis of religion and provides for "personal freedom." Sunni Muslims constitute over 90 percent of the population. Islamic institutions are managed by the Ministry of Religious Affairs and Trusts, which appoints imams and subsidizes certain activities sponsored by mosques. The Political

Parties Law prohibits houses of worship from being used for political party activity. The law was primarily designed to prevent Islamist parliamentarians from preaching in mosques; however, enforcement of the law has not been consistent. Religious instruction is mandatory for all Muslim students in public schools. Christian and Baha'i students are not required to attend courses in Islam.

The Government does not interfere with public worship by the country's Christian minority. Established religious groups, which include Islam, Roman Catholicism, Greek Orthodoxy, the Baptist Church, the Anglican Church, the Presbyterian Church, the Assyrian Church, and Armenian Orthodoxy, require official government recognition in order to register property in the name of the church, but members may practice their religion without government recognition. The Government does not recognize the Baha'i faith as a religion but does not prohibit the practice of the faith. The Government does not record the bearer's religion on national identity cards issued to Baha'is, nor does it register property belonging to the community. Unlike Christian denominations, the Baha'i community does not have its own court to adjudicate personal status and family matters. Baha'i personal status matters are heard in Islamic law courts.

The Government does not recognize Jehovah's Witnesses, the United Pentecostal Church, the Church of Christ, and the Church of Jesus Christ of Latter-Day Saints, but each denomination is allowed to conduct religious services and activities without interference.

The law prohibits non-Muslims from proselytizing Muslims. Muslims who convert to other faiths complain of social and government discrimination. The Government does not fully recognize the legality of such conversions. Under Shari'a, converts are regarded as apostates and may be legally denied their property and other rights. In Jordan this principle is not applied. Converts from Islam do not fall under the jurisdiction of their new religion's laws in matters of personal status and are still considered Muslims under Shari'a, although the reverse is not true. Christians are also subject to aspects of Shari'a designating how inheritances should be distributed.

d. Freedom Of Movement Within The Country, Foreign Travel, Emigration, And Repatriation

The law provides for the right of citizens to travel freely abroad and within the country except in designated military areas. The law requires that all women and foreign women married to Jordanians obtain written permission from their male guardian--usually their fathers or husbands--to apply for a passport. A woman traveling abroad with children may also be required to show written authorization from her spouse before departure. Legal authorities enforce requests from fathers to prevent their children from departing the country, even when traveling with their mothers.

Following the shooting in March of seven Israeli girls by an army border guard Ahmed Daqamseh, security forces closed the entrance to Daqamseh's home village of Ibdir to all except the village's inhabitants. A delegation from a neighboring tribe coming to inquire about the Daqamseh family's welfare and opposition figures attempting to deliver the family material support were prevented from doing so by security forces. Foreign diplomats were also denied entry.

Jordanians with full citizenship receive passports valid for 5 years. Most Palestinian living in Jordan are citizens and receive passports valid for 5 years. However, approximately 150,000 Palestinian residents--most refugees or children of refugees, who arrived from Gaza after 1967--do not qualify for Jordanian citizenship. They receive 2-year passports valid for travel only. Following Jordan's administrative and legal disengagement from the West Bank in 1988, Palestinians residing in the West Bank received 2-year passports valid for travel only, instead of the 5-year Jordanian passports they had received previously. In October 1995, King Hussein announced that West Bank residents

- 18 -

without other travel documentation would again be eligible to receive 5-year Jordanian passports. However, the Government has stressed that these passports are for travel only and do not connote citizenship. All Palestinians must obtain permits from the Ministry of the Interior for travel between Jordan and the Israeli-occupied territories. Such permission is routinely granted.

The Constitution prohibits the deportation of citizens; the Government respects this prohibition.

The Government generally cooperates with the office of the U.N. High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting refugees. The Government provides for first asylum. Since 1991 thousands of Iraqis have sought asylum in Jordan and been given assistance by the UNHCR. There were two reports of forced expulsion of Iraqis to Iraq. The Government forcibly deported Iraqi national Adnan Karam Tu'ma to Iraq on March 25 despite his plea that he be granted temporary political asylum based on his claim that he was a member of the Iraqi opposition. In the second instance, the Jordanian chapter of the Arab Organization for Human Rights (AOHR) alleged that Iraqi national and opposition figure Samir Al-Sa'di was detained and then deported to Iraq by security services in June without having had the chance to file for refugee status with the UNHCR.

Over 1.35 million Palestinian refugees are registered in Jordan with the United Nations Relief and Works Agency. The Agency counts another 800,000 Palestinians as either displaced persons from the 1967 War, arrivals following the 1967 War, or returnees from the Gulf.

### Section 3 Respect For Political Rights: The Right Of Citizens To Change Their Government

Citizens do not have the ability to change their system of government. The King has sole discretionary authority to appoint and dismiss the Prime Minister and the Cabinet, to dissolve Parliament, and to establish public policy. Appointments made by the King to high government posts do not require legislative approval. Executive power is vested in the King, who exercises his powers through his ministers in accordance with the provisions of the Constitution.

The Parliament is composed of a 40-member Senate appointed by the King and a popularly elected 80-member Chamber of Deputies. The Parliament is empowered by the Constitution to approve, reject, and amend legislation proposed by the Cabinet. A group of 10 senators or deputies may submit draft bills for consideration, however, in practice, Members of Parliament ask the Government to initiate legislation for consideration. Opposition members of Parliament have complained that attempts by members of the lower house to initiate legislation receive no response from the Government. The King proposes and dismisses extraordinary sessions of Parliament and may postpone regular sessions up to 60 days. By law, if the Government amends or enacts a law when Parliament is not in session, it must submit the law to Parliament for consideration during the next session. However, this does not always occur.

The Electoral Law and the distribution of parliamentary seats deliberately favor regions with populations known for their traditional, pro-Hashemite views, i.e., rural and southern Jordan.

Over 500 candidates competed in the October parliamentary elections, despite a boycott by Islamist and other parties. There were many reports of registration irregularities and fraud on the part of candidates. Restrictions on the press and on campaign materials also had a negative effect on the campaign, which elicited much debate over the fairness of the Electoral Law and its implementation. Voter turnout was significantly lower in most urban areas than in rural areas. Centrist candidates with ties to major tribes dominate the new Parliament.

The so-called one-man, one-vote amendment to the Electoral Law was ratified by Parliament in January, nearly 4 years after it was first promulgated by royal decree. The amendment allows voters to choose only one candidate in multiple-seat districts. In the largely tribal society, citizens tend to cast their first vote for family members, and any additional votes in accordance with their political leanings. Hence, the amendment limits the chances of some non-tribal candidates, including women, to be elected.

Women have the right to vote, and women's groups encourage women to vote and to become active in the political process. There is one woman in the cabinet. She and two other women were appointed to the Senate. Fifteen women were elected to municipal posts in 1997, bringing the total number of women in such posts to 28, including one as mayor of Khirbet Al Wahadneh, near Ajloun. None of the 17 female candidates won seats in the October parliamentary elections.

Of the 80 seats in the lower chamber, 9 are reserved for Christians, 6 for Bedouins, and 3 for the Circassian or Chechen ethnic minorities.

The Palestinian community, estimated to be slightly over one-half the total population, is not represented proportinately in the Government. Only 7 of 24 ministers, 6 of 40 senators, and 11 of 80 lower house deputies are of Palestinian origin. The electoral system gives greater representation to areas that have few inhabitants of Palestinian origin.

### Section 4 Governmental Attitude Regarding International And Nongovernmental Investigation Of Alleged Violations Of Human Rights

Local and international human rights groups investigate allegations of human rights abuses and publish and disseminate findings critical of government policy. However, the Press and Publications Law restricts the publication of information about the military and security services, which, in effect, prevents the publication by local groups of reports alleging torture and other abuses committed by the security services.

The ICRC is permitted to visit prisoners and assess the condition of security detainees, including those held by the General Intelligence Directorate.

The local chapter of the Arab Organization for Human Rights and the Jordanian Human Rights Society (JHRS) are registered with the Government. The AOHR has drawn public attention to alleged human rights abuses and has pressed the Government to bring charges against political detainees or to release them promptly. In February the AOHR released its annual report detailing human rights abuses in 1996. The Minister of Information called it "more of a political statement than a factual, realistic, and objective report." The JHRS was licensed in November 1996. It released a statement in May calling on the Government to expand the freedom of the press.

In June Human Rights Watch/Middle East issued a report on the amendments to the Press and Publications Law entitled, A Death Knell for Free Expression?. The report was covered in the Arabic and English press.

### Section 5 Discrimination Based On Race, Sex, Religion, Disability, Language, Or Social Status

Although the law does not distinguish between citizens on the basis of race, women and minorities are treated differently under the law and may face discrimination in employment, housing, and other areas.

Women

Violence against women over the age of 15 is common. Reported incidents of violence against women do not reflect the full extent of the problem. Medical experts acknowledge that spouse abuse occurs frequently. However, cultural norms discourage victims from seeking medical or legal help and frustrate an objective assessment of the extent of such abuse.

Abused women have the right to file a complaint in court against their spouses for physical abuse, but in practice, familial and societal pressures discourage them from seeking legal remedies. Marital rape is legal. Nongovernmental organizations (NGO's) such as the Jordanian Women's Union's, which has a hot-line for victims of domestic violence, provide assistance in such matters. Wife beating is technically grounds for divorce, but the husband may seek to demonstrate that he has authority from the Koran to correct an irreligious or disobedient wife by striking her.

The Criminal Code allows leniency for a person found guilty of committing a "crime of honor," a euphemism that refers to a violent assault against a female by a male relative for alleged sexual misconduct. Law enforcement treatment of men accused of "honor crimes" reflects widespread unwillingness to condemn or take action against the problem. The press reported 24 such cases in 1997. However, these figures likely understate the actual number of cases, as most "crimes of honor" are not reported by the press. The actual number of "honor crimes" is believed by a local expert to be *4 times* as high. The police regularly imprison women who are liable to become victims of "honor crimes" "for their own protection."

According to the law, a "crime of honor" defense may be invoked only by the defendant who "surprises his wife or any close female relative" in the act of adultery or fornication, in which case the male perpetrator of the "honor crime" is not guilty of murder. Though few defendants can meet the stringent requirements for a "crime of honor" defense, which require that the defendant must personally have witnessed the female victim engaging in sexual intercourse, they are not tried for murder and convicted offenders rarely spend more than 2 years in prison. In contrast to "honor crimes," the maximum penalty for first-degree murder is death, and the maximum penalty for second degree murder is 15 years. More commonly, such defenses rely on the male relative having acted in the heat of passion upon hearing of a female relative's alleged sexual transgression, usually without any investigation on the part of the assailant to determine the veracity of the allegation before committing an act of violence, and murdering his wife, sister, niece, or cousin. Women may not invoke this defense for murdering a male relative under the same circumstances; nor may they use it for killing men who attempt to rape, sexually harass, or otherwise threaten their "honor."

In May a man who killed his sister invoked an "honor crime" defense and received a 3-month sentence. In contrast, two women, Amira Salem and Eidah Hussein, who killed Salem's husband for physically and emotionally abusing her, were sentenced to death and hanged. In January a man was sentenced to 12 years imprisonment for killing a man who had harassed and made unwanted sexual advances toward his sister over a long period of time.

Women experience legal discrimination in matters of pension and social security benefits, inheritance, divorce, and the value of testimony in court (see Section 1.e.). The Government provides men with more generous social security benefits than women. The Government continues pension payments of a deceased male civil servant to his heirs but discontinues payments of a deceased female civil servant.

Under Shari'a, female heirs receive half the amount of a male heir's inheritance, and the non-Muslim

widows of Muslim spouses have no inheritance rights. A sole female heir receives half her parents' estate; the balance goes to designated male relatives. A sole male heir inherits all his parents' property. Male Muslim heirs have the duty to provide for all family members who need assistance. Shari'a regards the testimony of two women to be equal to the testimony of one man. This technically applies only in religious courts but in the past has been imposed in civil courts as well, irrespective of religion. Under Shari'a, men are able to divorce their spouses more easily than women. Marriage and divorce matters for Christians are adjudicated by special courts for each denomination. The Government bans married women from applying for diplomatic posts. There are two female judges.

The law requires a married woman to obtain her husband's permission to obtain a passport (see Section 2.d.). Married women do not have the legal right to transmit Jordanian citizenship to their children. They may obtain citizenship for their non-Jordanian husbands who may then confer citizenship on the children. However, in practice, such an application can take years, and in many cases citizenship may still ultimately be denied to both husband and children. Civil law grants women equal pay for equal work, but in practice this law is often ignored.

Social pressures discourage many women from pursuing careers. Nonetheless, women have employment opportunities in many professions, including engineering, medicine, education, and the law. Women constitute approximately 14 percent of the work force. Women's groups stress that the problem of discrimination is not only one of law but also of women's lack of awareness of their rights or unwillingness to assert those rights. The United Nations Food and Agricultural Organization reported in 1995 that women who work in agriculture average 15-hour days and earn less than men. The Jordanian chapter of the Business and Professional Women's Club gives seminars on women's rights and assists women in establishing small businesses. Members of the royal family work actively to improve the status of women.

Children

The Government is committed to children's rights and welfare in the areas of education and health. However, government efforts in these areas are constrained by limited financial resources. Education is compulsory to age 15. The children of Iraqi citizens living in Jordan without residence permits are not permitted to attend school.

The Government safeguards some children's rights, especially regarding child labor. Although the law prohibits children under the age of 16 from working, child peddlers work the streets of Amman. The Ministry of Social Development has a committee to address the problem and in most cases removes the children from the streets, returns them to their families or to juvenile centers, and may provide the families with a monthly stipend. However, the children often return to the streets. The law prohibits corporal punishment in schools.

Although the problem is difficult to quantify, social workers believe that there is a significant incidence of child abuse in families. The law specifies punishment for specific abuses against children. Social workers believe that the incidence of sexual crimes is significantly higher than reported. Rape or sodomy of a child under 15 years of age carries the death penalty.

Illegitimate children are entitled to the same rights under the law as legitimate children. In practice, however, they suffer severe discrimination in a society that does not tolerate adultery. Most illegitimate children become wards of the state or manage a meager existence on the fringes of society. In either case, their prospects for marriage and other than menial employment are extremely

limited.

## People with Disabilities

High unemployment in the general population restricts job opportunities for the disabled, estimated by the Ministry of Social Development to number 100,000. Eighty percent of disabled citizens receive monetary assistance from the Government. The Government passed legislation in 1993 requiring future public buildings to accommodate the needs of the disabled and the retrofitting of existing public buildings, but implementation has been slow. Since 1993 the Special Education Department of the Ministry of Social Development has enrolled approximately 10,000 mentally and physically disabled persons in public and private sector training courses. It has placed approximately 400 disabled persons in public and private sector jobs. The law requires that 2 percent of the available jobs be reserved for the physically disabled. Private organizations and members of the royal family actively promote programs to protect and promote the interests of the disabled. Jordan participates in the Special Olympics with the active encouragement of the royal family.

## Indigenous People

The country's indigenous people, nomadic Bedouin and East Bank town dwellers, have traditionally been the backbone of popular support for the Hashemite monarchy. As a result, they have generally enjoyed considerable influence within the political system. They are disproportionately represented in senior military, security, and civil service jobs. Nevertheless, the Bedouin face some social and economic discrimination.

## Religious Minorities

In general Christians do not suffer discrimination. Christians hold government positions and are represented in the media and academia approximately in proportion to their presence in the general population, which is estimated at 6 percent. Baha'is face some societal as well as official discrimination. Christian and Baha'i children in public schools are not required to participate in Islamic religious instruction.

## National/Racial/Ethnic Minorities

The Government granted citizenship to all Palestinians who fled to Jordan in the period after the 1948 Arab-Israeli war and to a large number of refugees and displaced persons who arrived as a result of the 1967 War. However, most refugees who fled Gaza after 1967 are not entitled to citizenship and are issued 2-year passports valid for travel only. Following Jordan's administrative and legal disengagement from the West Bank in 1988, Palestinians residing in the West Bank received 2-year passports valid for travel only, rather than the 5-year Jordanian passports they had received previously. In October 1995, King Hussein announced that West Bank residents without other travel documentation would again be eligible to receive 5-year Jordanian passports. The Government has stressed, however, that these passports are for travel only and do not connote citizenship (see Section 2.d.) Palestinians residing in Jordan suffer discrimination in appointments to positions in the Government and the military, and in the awarding of university scholarships.

### Section 6 Worker Rights

A. The Right Of Association

Workers in the private sector and in some state-owned companies have the right to establish and join

unions. Unions must be registered to be considered legal. The law prohibits union membership for non-citizens. Over 30 percent of the work force is organized into 17 unions. Although union membership in the General Federation of Jordanian Trade Unions (GFJTU), the sole trade federation, is not mandatory, all unions belong to it. The Government subsidizes and audits the GFJTU's salaries and activities. Union officials are elected by secret ballot to 4-year terms. Although the Government cosponsors and approves the timing of these elections, it does not interfere in the choice of candidates.

Labor laws mandate that workers must obtain permission from the Government in order to strike. Unions generally do not seek approval for a strike, but workers use the threat of a strike or wildcat action as a negotiating tactic. Strikes are prohibited if a labor dispute is under mediation or arbitration. If a settlement is not reached through mediation, the Ministry of Labor may refer the dispute to an industrial tribunal by agreement of both parties. If only one party agrees, the Ministry of Labor refers the dispute to the Council of Ministers and then to Parliament. The tribunal is an independent arbitration panel of judges appointed by the Ministry of Labor. The decisions of the panel are legally binding. Labor law prohibits employers from dismissing a worker during a labor dispute. There were no reported strikes in 1997.

The GFJTU belongs to the Arab Labor Organization, the International Confederation of Arab Trade Unions, and to the International Confederation of Free Trade Unions (ICFTU).

B. The Right To Organize And Bargain Collectively

Unions have, and exercise, the right to bargain collectively. the Constitution prohibits antiunion discrimination, but the ICFTU claims that the Government does not adequately protect employees from antiunion discrimination and that the Government has dismissed public-sector employees for political reasons. Workers may lodge complaints of anti-union discrimination with the Ministry of Labor, which is authorized to order the reinstatement of employees discharged for union activities. There were no complaints of antiunion discrimination lodged with the Ministry of Labor in 1997.

The national labor laws apply in the free trade zones in Aqaba and Zarqa. Private sector employees in these zones belong to one national union that covers both zones and have the right to bargain collectively.

C. Prohibition Of Forced Or Compulsory Labor

The Constitution forbids compulsory labor, except in a state of emergency such as war or natural disaster. Compulsory labor is not practiced. The law does not specifically prohibit forced or compulsory labor by children, but such practices are not known to occur.

d. Status of Child Labor Practices and Minimum Age for Employment

Labor law forbids children under the age of 16 from working except as apprentices. At age 13 children may begin part-time training for up to 6 hours a day, with night work prohibited. Ministry of Labor inspectors attempt to enforce the law on child labor, but in practice enforcement often does not extend to some small family businesses that employ underage children. Education is compulsory to age 15. Families in remote areas frequently keep some school-age children at home to work. Child peddlers work on the streets of Amman (see Section 5). The law does not specifically prohibit forced or compulsory labor by children, but such practices are not known to occur (see Section 6.c.).

E. Acceptable Conditions Of Work

There is no national minimum wage. The Government periodically adjusts a minimum wage schedule for various trades, based on the recommendations of an advisory panel representing workers, employers, and the Government. The lowest minimum wage rate on the schedule is about $112 (80 dinars) a month, including allowances. Workers earning the lowest wage find it difficult to provide a decent living for their families. The Government estimates the poverty level at a monthly wage of about $91 (65 dinars) per month for a family of three. A study conducted by the Ministry of Social Development found that 150,000 families, or 21 percent of citizens, live at or below the poverty level. Nine percent live in "abject" poverty. The Government provides assistance to 33,000 indigent families.

The law prohibits most workers from working more than the customary 48 hours a week, and 54 hours for hotel, restaurant, and cinema employees. Workers may not work more than 16 hours in any continuous period or more that 60 hours of overtime per month. Employees are entitled to 1 day off each week.

The law does not apply to domestic servants, who do not have a legal forum to address their labor grievances and have no standing to sue in court for nonpayment of wages. Abuse of domestic servants, most of whom are foreign, is widespread. Imprisonment of maids and illegal confiscation of travel documents by employers is common. Complaints of beatings, underfeeding, and rape generally are not reported to officials by victims, who fear losing their work permits and being sent back to their nation of origin should they file a complaint. Domestic servants are generally not given a day off.

The law specifies a number of health and safety requirements for workers, including the presence of bathrooms, drinking water, and first aid equipment at work sites. The Ministry of Labor makes an effort to enforce health and safety requirements but is hampered by the lack of qualified inspectors. The inspectors do not have the power to order firms to comply with health and safety standards. The law does not require employers to report industrial accidents or occupational diseases to the Ministry of Labor. Workers do not have a statutory right to remove themselves from hazardous conditions without risking the loss of their jobs.

[end of document]



Return to 1997 Human Rights Practices report home page.
Return to DOSFAN home page.
This is an official U.S. Government source for information on the WWW. Inclusion of non-U.S. Government links does not imply endorsement of contents.

# W●RLDWIDE
## appeals

## Amnesty International's Worldwide Appeals
## February 1996

An appeal from you to the authorities can help the victims of human rights violations whose stories are told below. You can help free a prisoner of conscience or stop torture. You can bring liberty to a victim of "disappearance". You may prevent an execution. **Every appeal counts.** (Reminder: AI members should not send appeals to the authorities of their own countries). Here are the worldwide appeals for February. An index of earlier appeals is available.

• Myanmar
• Jordan
• Bosnia and Herzegovina

FEBRUARY

# MYANMAR

Ye Htut was arrested on 27 September 1995 by Military Intelligence officers in Yangon. The only reason given for his arrest was that he had been sending "concocted news" to dissident groups abroad "in order to mislead foreign nations concerning Myanmar". In December he was sentenced to seven years' imprisonment. AI believes Ye Htut is a prisoner of conscience and is calling for his immediate and unconditional release.

The allegation against Ye Htut, as reported in the official newspaper The New Light of Myanmar, is that he "admitted" sending material to people abroad since 1991. However, his sister, who lives outside Myanmar, said that he only sent her non political letters, Burmese magazines approved by the official censors, and clippings from the two official newspapers.

Surveillance by Military Intelligence officers of critics or people connected with critics of the government is pervasive in Myanmar. People meeting or communicating with foreign nationals are particularly vulnerable to surveillance and possible arrest and imprisonment. AI believes that Ye Htut is a victim of such surveillance, and that he has been arrested solely for exercising his rights to freedom of expression and to association.

Ye Htut was initially held at Ye Kyi Aung Military Intelligence office outside Yangon before being transferred to Insein Prison for trial. AI is particularly concerned for the well being of Ye Htut because ill treatment is common in Myanmar's detention centres. Conditions in prisons fall far short of international minimum standards, and torture and ill treatment are common both during initial interrogation and after sentencing.

+Please write, calling for the immediate and unconditional release of prisoner of conscience Ye Htut,

-26 -

to: Senior General Than Shwe/ Chairman/ State Law and Order Restoration Council/ c/o Ministry of Defence/ Signal Pagoda Road/ Yangon/ Union of Myanmar.

# JORDAN

On the morning of 1 June 1995 the apartment of the al Khalifeh al Awamleh brothers, in Amman, was surrounded by scores of members of the security forces. These forces dispersed later in the morning. However, at about 5am the following morning the two brothers, Mahmud and Bashar, were awakened by members of the security forces climbing onto the balcony of the apartment.

A massive barrage of shooting took place, lasting about 15 minutes, before the apartment was entered. Mahmud al Khalifeh al Awamleh was hit by four bullets and died almost immediately. His brother Bashar al Khalifeh al Awamleh was severely wounded. Bashar stated that no warning had been given before the attack.

For the past four years the family had carried on a dispute with the government over a number of issues apparently related to jobs, land and accusations of corruption. The family had sent faxes inside and outside the country making accusations against King Hussein and the Prime Minister, Sherif Zayd bin Shaker.

AI delegates visiting Amman counted more than 100 bullet holes in the walls of the apartment. The organization wrote to the government in June 1995 calling for an inquiry to be set up. The government did not answer this request but stated that the brothers were shot while resisting arrest. Although Mahmud al Khalifeh al Awamleh had apparently fired shots from a pistol (allegedly kept for hunting) during the attack, this does not appear to justify the use of such massive firepower apparently without any prior attempt to make a peaceful arrest.

+Please write, calling for a thorough and impartial investigation into the circumstances surrounding the death of Mahmud al-Khalifeh al-Awamleh and for the findings to be made public, to: Sharif Zayd bin Shaker/ Prime Minister and Minister of Defence/ Office of the Prime Minister/ PO Box 80/ Amman/ Jordan.

# BOSNIA AND HERZEGOVINA

Nura Berbic['], a Bosnian Muslim, and her 69 year old mother, Hasnija Demirovic['] , went "missing" from Hasnija Demirovic[']'s apartment in the Bosnian Serb controlled town of Banja Luka on 14 August 1995. That afternoon two armed men, one of them wearing a military or police camouflage uniform, came to Hasnija Demirovic[']'s apartment asking for information about the whereabouts of her daughter's husband, Dz[']emil. After being alerted by telephone, Nura Berbic['] went to her mother's apartment.

At around 9pm that evening two cars were seen driving away from the apartment. Neither woman has been seen since and the police and other authorities have provided no information about their whereabouts despite their relatives' persistent inquiries. Relatives believed that the abduction was associated with attempts by the authorities to confiscate the family business.

Most Bosnian Muslims have fled or been expelled from the area after being subjected to various forms of persecution, from dismissal from work and confiscation of property, to deliberate and arbitrary killings, arbitrary detention and forced labour in dangerous conditions.

-74-

+Please write, asking for an immediate, impartial and thorough inquiry into the abduction of Nura Berbic['] and Hasnija Demirovic['] , to:

The Representative Office of the Republika Srpska/ Biro Republike Srpske/ Mos[']e Pijade 8/ 11000 Beograd/ Yugoslavia.

ACT NOW



**Amnesty International - Report - MDE 16/11/98**
**November 1998**
**Jordan**
## Jordan. an Absence of Safeguards

**Copyright notice:** The copyright for this document rests with <u>Amnesty International</u>. You may download and read it. You may not alter this information, repost or sell it without permission. If you use this document, you are encouraged to make a donation to Amnesty International to support future research. Here you can find the <u>address of your nearest AI office</u>

## TABLE OF CONTENTS

INTRODUCTION
Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Human Rights Concerns

I. INCOMMUNICADO DETENTION WITHOUT TRIAL OF POLITICAL SUSPECTS

II. RESTRICTIONS ON FREEDOM OF EXPRESSION
Laws which allow the Imprisonment of Prisoners of Conscience
The Press and Publications Law

III. TORTURE AND ILL-TREATMENT
Political Detainees
Common Law Detainees
Deaths in Custody

CONCLUSION

RECOMMENDATIONS TO THE GOVERNMENT OF THE HASHEMITE KINGDOM OF JORDAN

# JORDAN
## An Absence of Safeguards

**INTRODUCTION**

**Background**
Six years ago the Jordanian Government dismantled a system which had allowed large- scale arrest and detention of prisoners of conscience, widespread torture, and unfair trials of political detainees. Martial law courts, "frozen" in 1989, were abolished in 1992 and a state of emergency, in force since 1939, was lifted. Later in 1992 the Law on Resistance to Communism (which had allowed the imprisonment of suspected communists for up to 15 years) was abolished and a new law on political parties was adopted which eventually led to the legalization of most political parties.

Elections were held in 1993 and in 1997 to the 80-member parliament. The 1997 elections were

boycotted by the Islamic Action Front, the main opposition party, as well as seven other opposition parties which complained at what they called the erosion of parliamentary authority. Supporters of the government won a majority of seats in the new assembly.

Discussions about the different Press and Publications Laws dominated much of the national agenda during 1997 and 1998. Amendments to the 1993 Press and Publications Law which were promulgated by Royal Decree on 17 May 1997 led to the closure of 13 journals which failed to raise the required capital of 300,000 dinars ($423,000) in the three months required by the law. After the High Court of Justice declared the 1997 law illegal in January 1998 the Jordanian Government introduced a new Press and Publications Law in the parliament. This law, which imposed many restrictions on the freedom of expression, passed through the parliament and was promulgated in September 1998.

### Human Rights Concerns
Jordan has ratified a number of important human rights treaties. Since 1976 Jordan has been a State Party to both the International Covenant on Civil and Political Rights (ICCPR) and the International Covenant on Economic, Social and Cultural Rights. In November 1991 it acceded also to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention against Torture). In addition, Jordan is a State Party to the Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW) and the Convention on the Rights of the Child.

In 1994 Amnesty International published a report *Jordan: Human Rights Reforms: Achievements and Obstacles*,See footnote 1 welcoming reforms and outlining a number of areas where Jordanian law or practice still fell short of international human rights standards. Over the past years the organization has continued to be concerned at persisting reports of human rights violations and a lack of legal safeguards to prevent such violations. This report deals with some of these continuing concerns of Amnesty International:

. The use of prolonged incommunicado detention against a range of political suspects who are frequently arbitrarily arrested before being held without access to families and lawyers.

. Restrictions on freedom of expression and the existence of laws and articles of the Penal Code which permit the sentencing of prisoners of conscience and possible prisoners of conscience, for instance the charge of *lèse majesté,* which has been used to arrest political opponents, and the Press and Publications Law, which has in the past frequently been used to harass and even imprison journalists.

. Continuing reports of the use of torture or ill-treatment both of political and of common law suspects. Such torture is facilitated by pre-trial incommunicado detention and a lack of the safeguards which should ensure the thorough and prompt investigation of allegations of torture and compensation for those who have suffered such treatment at the hands of the security forces.

The concerns raised in this report have previously been raised by the United Nations (UN) Human Rights Committee and the UN Committee against Torture in their examination of Jordan's reports in 1994 and 1995 respectively. The UN committees asked Jordan to take measures to end the use of prolonged incommunicado detention, detention of possible prisoners of conscience and torture or ill-treatment.

In addition, these areas of concern have been raised on more than one occasion by Jordanian human

rights groups. The Arab Organization for Human Rights (Jordan Branch) issues communiques and an annual report and takes up individual complaints. The Jordanian Society for Human Rights was founded in 1997 and has issued communiques on a range of human rights concerns.

Other serious concerns of Amnesty International in Jordan, including the continuing use of the death penalty, trials before the State Security Court and the forcible return of asylum seekers to countries where they are at risk of serious human rights violations, are not considered in the present report.See footnote 2

Amnesty International delegates have frequently visited Jordan and the organization has raised its concerns with members of past Jordanian governments and with government officials. In June 1998 the concerns detailed in this report, were sent as a memorandum to His Majesty King Hussein, His Royal Highness Crown Prince Hassan, Prime Minister 'Abd al-Salam Majali, and a number of members of the then Jordanian Government.

In July 1998, in expectation of a prolonged absence in the United States for cancer treatment, King Hussein delegated Crown Prince Hassan as regent of Jordan with a wide range of powers including, from August 1998, the power to dismiss and appoint governments. A new government under Fayez Tarawneh as Prime Minister and Minister of Defence was formed in August 1998, after the resignation of 'Abd al-Salam Majali, partly triggered by a water crisis during the summer which had left much of Amman with no water or heavily polluted water.

In September 1998, a further copy of Amnesty International's memorandum was sent to the new Prime Minister, Fayez Tarawneh. No comments on the memorandum were received by mid-October. However, the new Jordanian Government has taken positive steps to lift some of the restrictions on freedom of expression by, in October 1998, dropping pending cases against journalists and promising that the restrictive powers in the 1998 Press and Publications Law would not normally be imposed. By placing its concerns on the public record Amnesty International hopes that the fundamental rights described in this report -- the right to freedom of expression, the right not to be tortured and the right of an arrested person to have prompt access to the outside world -- will be similarly and seriously addressed by the new Jordanian Government.

## I. INCOMMUNICADO DETENTION WITHOUT TRIAL OF POLITICAL SUSPECTS

*"Anyone arrested or detained on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power... It shall not be the general rule that persons awaiting trial shall be detained in custody..."*[ICCPR, Article 9(3)]

Amnesty International has frequently raised with the Jordanian Government the practice of prolonged detention of political suspects without access to family or lawyers. Some of those detained incommunicado have committed violent acts, but the majority of those arrested and detained incommunicado for political reasons appear not to have been accused of violence. Amnesty International does not question the right of the Jordanian Government to arrest and interrogate persons against whom there is a reasonable suspicion of involvement in violent crimes; however, whatever the charge against them, and however well those detained are treated, prolonged incommunicado detention without access to lawyers or families is outlawed by international standards ratified by Jordan.

Scores of people are detained every year in Jordan by the General Intelligence Department (GID), the main security service concerned in the arrest of political detainees, on suspicion of opposition to

the government, held for up to three months and released without charge. Detainees are visited by the International Committee of the Red Cross (ICRC) in the GID detention centre and elsewhere but have irregular access (usually only after the first 15 days) to their families and no access to a lawyer. Some detainees accused of security offences have been held without access to lawyers for six months or more.See footnote 3 For some months after October 1997 visits from the ICRC to the GID were suspended "because the authorities refused to grant access to all detainees."See footnote 4 The ICRC continued to have access to other detention centres and ICRC visits to the GID have now reportedly resumed.

From the point of view of the Jordanian Government, short-term arrests followed by release could be cases where adequate grounds existed to justify the initial arrest but subsequent investigation showed insufficient evidence to bring charges. But the prevalence of the practice and the number of those apparently arrested without any intention of bringing them to trial suggests that arrest and short-term detention may be used as a means of harassment and intimidation against suspected government opponents and also as a means of obtaining information concerning members of opposition groups.

Since 1993, the year of the Oslo Agreement between Israel and the Palestine Liberation Organization, and 1994, when a peace accord was signed between Jordan and Israel, those who have been arrested and released without trial in this way have frequently been Palestinians or Islamist opposition activists who oppose the peace process with Israel.

A few of the arrests reported for the single month of May 1997, show the diversity of reasons for political arrest.

- Ramadan Hassan Jilad, aged 34, an electrical engineer of Palestinian origin, was arrested on 5 May 1997, apparently after preaching a sermon in the mosque at Jerash; he was held in the GID in Amman and questioned about his teachings. He was released at the end of May after three weeks' detention without charge.

- Two fans of heavy metal music, Hanna Abu Barhan and Ahmad al-'Umari, were arrested, apparently accused of being Satanists, which they denied. One of their colleagues wrote:

*"Accusations of being a satanist are: heavy metal music, long hair, torn jeans, freedom of speech. Simply being rebellious and different."*

Ahmad al-'Umari was arrested on 6 May 1997 at his home in Irbid by the police and the GID; he was taken to the GID in Amman where he was held for 14 days and then released without charge. His family only learnt of his arrest from the ICRC, who visited him in detention. He said:

*"...as for the kind of questions they asked; well I can't think of a question they didn't ask. They asked about my academic life, my social life and even my sex life. Each question was repeated so many times in different forms that I doubt any interrogator had any idea what I told the previous investigators (there were eight in all). They inquired about my religious beliefs (naturally), of whether I belonged to any political group, how I chose my friends and why I wore my hair long."*

- Twelve students of the University of Amman, who had removed a portrait of the King from a room where they were holding a meeting, were arrested on 18 May and were held for up to eight days before being released without charge.

A number of Palestinians opposed to the peace process with Israel are reported to have been subjected to short-term detention without trial. For instance, Yunus Salem al- Rajub, who had spent

13 years in prison in Israel before being released in 1985, was arrested in September 1997 by the GID and held for 18 days before being released uncharged. He stated that he was asked to give names of fellow Palestinians who opposed the peace process. In a case which gained much publicity, following a suicide bombing in Jerusalem, claimed by *HamasSee footnote 5* leaving four civilians dead and about 170 wounded, Ibrahim Ghosheh, spokesman of *Hamas* based in Jordan, was arrested on 7 September 1997. During his detention, which lasted 14 days, he had access to the ICRC but, contrary to international standards, had no contact with family or lawyers.

Such incommunicado detention of political detainees in Jordan denies them the safeguards laid down in international standards. The United Nations Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, adopted by the United Nations General Assembly on 9 December 1988, states that a detained person "shall be entitled to communicate and consult with his legal counsel" (Principle 18) and that a "detained or imprisoned person shall have the right to be visited by and to correspond with...members of his family"(Principle 19).

Detainees arrested by the GID are frequently held in incommunicado detention without access to their family for periods of up to a month. Families are often not even informed that a relative has been arrested nor where he or she is being held. Even when access to family members is granted, it is not necessarily regular, and access to lawyers is generally granted only when a detainee is formally charged and transferred to court. Although the Jordanian Code of Criminal Procedure states that access to lawyers should normally be allowed, articles in the code allow for situations where a detainee may be interrogated and detained without access to a lawyer. Articles 63(2) and 64 allow prosecutors exceptionally to interrogate detainees without lawyers in situations of urgency, but these articles have been used to enforce regular bans on access to lawyers. On the basis of Article 66(1) public prosecutors may forbid all contacts with detainees for renewable periods of up to 10 days at a time. Article 66(2) specifies that this prohibition does not apply to lawyers " unless the public prosecutor determines otherwise" ; the grounds for such prohibition are not specified and there is no reference to any possibility of appeal. These provisions appear to be used by GID officers, who are granted the authority of public prosecutors, to detain people without access to lawyers until the end of their interrogation.

The use of officers of the GID as officers "authorized by law to exercise judicial power" contravenes the intention of Article 9 of the ICCPR, which is to provide an independent control of arrest, outside the security services. The Human Rights Committee, in its General Comment 8(16) on Article 9 of the ICCPR, stressed that "pre-trial detention should be an exception and as short as possible" and that, where preventive detention was used, it must not be arbitrary and "information of the reasons must be given." In its comments on Jordan's Third Periodic Report of its implementation of the ICCPR in 1994, the Human Rights Committee stressed that "Cases of administrative detention, denial of access of detainees to legal counsel, long periods of pre-trial detention without charges and pre-trial incommunicado detention are also matters of great concern." The Committee recommended that "the detention premises controlled by the Central [i.e. General] Intelligence Department be placed under close supervision of the judicial authorities" and that "measures of administrative detention and incommunicado detention be restricted to very limited and exceptional cases."

## II. RESTRICTIONS ON FREEDOM OF EXPRESSION

**"Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either**

**orally, in writing or in print, in the form of art, or through any other media of his choice."**
[ICCPR, Article 19(2)]

The ICCPR does impose restrictions on the rights contained in Article 19(2), but states that they

*"shall only be such as are provided by law or are necessary:*
*(a) For respect of the rights or reputations of others;*
*(b) For the protection of national security or of public order or of public health or morals. See*
*footnote 6*

### Laws which Allow the Imprisonment of Prisoners of Conscience

Although most detainees, including possible prisoners of conscience, arrested for suspected opposition to the government are released without charge, some are tried and sentenced. Amnesty International is concerned that certain laws are vaguely worded and abused in such a way as to allow the arrest and imprisonment of prisoners of conscience.

One such legal provision is Article 195 of the Penal Code, which prescribes a sentence of up to three years on charges of *lèse majesté* (*italat al-lisan*), insulting the dignity of the sovereign. This law has been used to sentence political opponents of Jordanian government policy who, while they may have criticised the King, have nevertheless not advocated violence nor gone beyond acceptable criticism in line with principles of freedom of expression.

For instance, Ata' Abu'l-Rushta, the spokesperson of the *Hizb al-Tahrir fi'l-'Urdun* (Liberation Party of Jordan, LPJ) a small Islamist party which refuses to seek registration and, according to its program, advocates the restoration of the Islamic caliphate by non- violent means, was arrested in October 1995 and sentenced to three years' imprisonment for *italat al-lisan* after giving an interview in which he implicitly criticised the King for the peace treaty with Israel. His published statements did not advocate violence. He was released in 1998.

Laws imposing imprisonment of up to two years for membership of illegal associations or up to six months for distribution of leaflets have also frequently been used against members of *Hizb al-Tahrir*. More than 30 members of *Hizb al-Tahrir* were arrested in July and August 1998; some were released after a few days, but many were held in incommunicado detention in the GID for up to three weeks. At least 25 were brought to trial during September and October 1998 and 13 were sentenced to up to 18 months' imprisonment on charges of membership of illegal associations and distribution of leaflets; one such leaflet was said to have strongly criticised officials for negligence over the water crisis.

After violent riots against a rise in the price of bread in August 1996 hundreds of people were arrested in many towns in Jordan. Many of those who were arrested had not participated in the demonstrations but were supporters of opposition political parties. Most of these, who included leading members of human rights organizations and political parties, were released after around 10 days' imprisonment without charge; they included 'Umar Abu Ragheb, a board member of the Arab Organization for Human Rights, arrested on 19 August and released after 10 days' incommunicado detention and Dr Hani Gharaybah, from Irbid, a leader of the doctors' union, who was arrested on 18 August and released without charge on 26 August. Dozens of other people from different areas of the country, many of them unaffected by riots, were charged with *italat al-lisan* under Article 195 of the Penal Code. The charge sheet almost invariably failed to detail the time and place the offence was committed or the words used, whether verbal or written. After up to three months in detention, all

-34-

those involved in the bread riots, including those charged with attacks on property during the riots, were freed by royal amnesty in November and December 1996.

Layth Shubeilat, a well-known Islamist critic of Jordanian government policy, has frequently been the target of imprisonment for his outspoken criticisms of the government. In December 1995 he was arrested, charged with *italat al-lisan* and sentenced by the State Security Court to three years' imprisonment after he had made speeches strongly criticising the peace policy with Israel. He was released by a special royal amnesty in November 1996. Fifteen months later, on 20 February 1998, during the Iraq crisis, 10 days after the government declared a ban on demonstrations, Layth Shubeilat was again arrested and charged with *italat al-lisan* and inciting an illegal gathering after addressing a meeting in Ma'an calling on people to defy the official ban and demonstrate their support for Iraq. The day after his arrest a demonstration took place after Friday prayers which, according to eyewitnesses, started peacefully; however when the security forces arrived there were violent confrontations, the security forces shot tear gas and then fired in the air. A bystander, Muhammad 'Abdallah al-Kateb, 23, was killed. The following day violent protests in support of Iraq and against the Jordanian Government took place. A curfew was imposed and communications between Ma'an and the outside world were cut by the authorities; at least 250 people were reportedly arrested; scores of houses were searched, reportedly violently, and 350 weapons were seized.

The charge of *italat al-lisan* against Layth Shubeilat was later dropped, but the charge of inciting an illegal gathering was maintained. An injunction by the state security public prosecutor barred any public reporting of the case. On 14 April, after seven weeks in detention, when several bail applications had been refused by the State Security Court,
Layth Shubeilat was released on bail by order of the Court of Cassation. However, on 12 May, he was sentenced to nine months' imprisonment and immediately rearrested. Four days after the verdict, King Hussein granted him an amnesty. Layth Shubeilat refused to accept this amnesty saying that he would wait for a judgment of the court to declare his innocence. However, the Court of Cassation, in July 1998, confirmed the sentence stating that "the misery of the inhabitants of Ma'an and his [Layth Shubeilat's] emphasis on the injustice that they suffer in all fields of life...and his use of people's sentiments...removes his discourse from the domain of freedom of expression to the domain of agitation." Layth Shubeilat was eventually released on 8 October 1998, after having served seven months' imprisonment as a prisoner of conscience. On his release he said:

*" My basic right is freedom of speech and I don't expect it to be a gift from anybody. Not even the king. If he wants to give me a gift, let him choose something I don't have a right to. "*

### The Press and Publications Law

In the past the Press and Publications Law and articles in the Penal Code have been used to imprison journalists as prisoners of conscience.

Many Jordanian newspapers and journals have been outspoken in their opposition to government policy especially the government's peace policy with Israel and the Jordanian authorities attempted to use the 1993 Press and Publications Law to suppress this and other opposition. Under the 1993 Law journalists and newspapers were frequently brought before a court for offences under Article 40 which listed a range of prohibited subjects: news offensive to the King or royal family; unauthorized information about the armed forces; articles which show contempt for religion; articles which harm national unity, incite crime or sow hatred, discord or conflict in society; articles intended to shake confidence in the national currency; articles which insult heads of Arab, Islamic or friendly states or members of diplomatic missions; articles contrary to public morals; and articles offending the dignity of officials or other individuals. Between 1994 and 1998 a number of journalists were even

committing a crime "or any other person deemed to be a danger to society." The order is made by the provincial governor (*muhafez*). This law has been used to keep detainees (usually common law detainees) in indefinite pre-trial detention sometimes for years.

## Political Detainees

As regards political detainees, officials of the GID, including the Deputy Director and the Chief Medical Officer, who have met Amnesty International delegates over the past eight years, have stated that no one is tortured and that a number of measures are taken to ensure this. However Amnesty International has received some allegations of torture and ill- treatment at the hands of the GID over the past years. Mostly such torture allegations relate to members of Islamist groups who have been accused of violent actions or of plotting violent actions; such detainees may be held in the GID in prolonged incommunicado detention for months until they are brought for trial and frequently state that confessions to the offences they are accused of have been extracted by torture. Other allegations of torture were made in 1996 by some members of *Hamas* arrested after the suicide bombs in Israel in early 1996 and released after up to three months' incommunicado detention.

Allegations of torture are made by only a small minority of those who are arrested by the GID and held in their new centre in Wadi Sir, Amman. When it does occur, torture appears to be invariably linked to prolonged incommunicado detention which, by enabling the intelligence services to keep the suspect without access to the outside world for periods of time sufficiently long for the signs of torture to disappear, makes allegations of torture difficult to prove or to disprove. In numerous visits to the GID Amnesty International delegates were assured that detainees were well looked after and received medical checks on their arrival at the facility. Such medical checks immediately on arrival and regular medical checks of detainees throughout their detention should be a method by which allegations of torture might be verified. The fact that medical checks are carried out by doctors who are military officers attached to the GID may put the independence of such doctors in question; in addition, the medical reports on detainees appear never to be made available to lawyers or courts, even when requested by the detainee.

While recognizing the progress made, reforms in regulations governing pre-trial detention are urgently needed. The allegations of torture of detainees arrested in 1998 is related to the lack of safeguards for those under detention. The ending of prolonged pre-trial incommunicado detention is a must and visits to places of detention by the ICRC, whose mandate enforces confidentiality, should be supplemented by the establishment of an independent body which should carry out regular inspection of places of detention as well as visits made without advance warning.

At present, political detainees who are brought to trial come before the State Security Court which uses the normal criminal procedure code with three judges appointed by the Prime Minister on the recommendation of the armed forces chief of staff for military judges and the Minister of Justice for civilian judges. However, the court has been almost invariably staffed by military judges; civilian judges are known to have been appointed on only one occasion. The ordinary judicial system supervised by the Ministry of Justice has no role in the detention, prosecution or trial of political offenders until the verdict has been given by the State Security Court and comes before the Court of Cassation.

The Court of Cassation, which, in State Security Court cases, is allowed to examine the substance as well as the procedure of a case, is an important check on the State Security Court. Allegations of torture made by defendants in cases involving political violence, although denied by the GID, have led to the Court of Cassation annulling individual or collective convictions in some political cases. For instance, in the Mu'ta Case, the 10 defendants, arrested in early 1993, had been held

incommunicado for up to three months in the GID in Amman, where they alleged that they had been tortured to make confessions of involvement in a plot to kill King Hussein during a university ceremony. They all retracted their confessions in court. Eventually, in October 1993, as a result of complaints by the defence, four of the detainees were examined by doctors of the Ministry of Health who noted injuries " less than six months old " on all four. Notwithstanding the evidence of torture the defendants were convicted and one was sentenced to death. On 13 March 1995 the Court of Cassation, partly because of the strong evidence that the confessions on which the case was largely based were obtained by torture, quashed the verdicts in the Mu'ta Case and the accused were immediately released.

In March 1995 in the so-called Arab Afghan Case, the Court of Cassation also returned for a retrial a case involving a group said to have returned from Afghanistan and to be planning terrorist attacks in Jordan. The 16 defendants found guilty had retracted confessions which they had made during up to six months' incommunicado detention in the GID. The sentences were later confirmed by the State Security Court. Amnesty International remains concerned that some of the defendants were convicted on the sole basis of confessions extracted under torture.

Another political case involving allegations of torture in pre-trial detention is that of a group of militant Islamists known as *Bay'at al-Imam* (Allegiance to the Imam). Those accused stated that they were detained for six months in incommunicado detention immediately after their arrest in 1994, during which they made confessions under duress. For instance, one of them, Muhammad Wasfi, stated that he had been severely beaten and suspended by a rope in order to confess during six months' incommunicado detention; the date of arrest on his form was later falsified to suggest that he had been arrested several months later. Muhammad Wasfi's lawyer raised his torture before the State Security Court and he was one of those acquitted in the case.

Some allegations of torture have involved detainees later released without charge or trial. Six members of *Hamas* arrested in March and April 1996 after suicide bombs in Israel which killed 59 people including civilians alleged that they had been tortured, including by beatings combined with *falaqa* (beating on the soles of the feet) immediately after arrest. They were held in incommunicado detention without charge for up to four months before being released in May and June 1996. Medical certificates of four of the detainees immediately after their release showed injuries consistent with their allegations. After their release one of those tortured, Walid Ahmad Taylakh, brought a criminal prosecution against the GID; however the investigation of a criminal prosecution against the GID (or any other security force) is carried out by the security forces themselves. Thus the case against the police was presented to the very same military prosecutor who had renewed the detention of the six suspects. Ahmad Taylakh, fearing that the criminal case would be unlikely to succeed, therefore also brought a civil case against the GID. This case is constantly being adjourned by the courts.

In a case which is still (in October 1998) before the courts, most of the 10 detainees standing trial in connection with a number of explosions in central Amman in early 1998 alleged torture in the GID. Among them, Samer Muhammad Isma'il 'Amer; 'Abd al-Nasser Shehadeh Salim, Ahmad Hussein Shehadeh, Samir Sa'id Shebayeh, Ra'ed 'Abd al-Karim, 'Abd al-Nasser Sayyed Hassanayn and Mahmud 'Abd Tawfiq Sabtiti were reportedly arrested between 4 and 7 May 1998 by the GID and were held incommunicado without access to lawyers and families for two to three months. The detainees were allegedly subjected to beatings, *shabeh* (prolonged sleep-deprivation in painful positions); *falaqa* (beating on the soles of the feet), and prolonged suspension in contorted positions with nylon ropes. Members of the families and lawyers who visited some of the detainees have stated that during their visits traces of torture were visible, especially the marks of beating on the feet. One

detainee, 'Abd al-Nasser Shehadeh Salim, reportedly lost four toenails as a result of torture; the leg of another detainee, 'Abd al-Nasser Sayyed Hassanayn, was reportedly broken. They said that they were also given drugs, apparently to make them confess. They stated that when they were brought before the Prosecutor General they were warned that they would suffer further tortures if they complained of torture or failed to repeat their confessions; they said that they repeated what they were told "like a film script". When they were brought to trial before the State Security Court in September their lawyers raised the alleged torture and asked for medical examinations. The judge initially turned down the request. Later the detainees were examined by forensic doctors but, by 20 October when the court went into recess for three weeks, the results of the medical examinations had not yet been made available to the defence. Before and during the trial the defence lawyers were frequently barred from access to their clients.

Amnesty International raised the allegations of torture of the detainees in this case with members of the Jordanian Government and directly with the GID in September 1998. In response the GID denied that the detainees had been tortured saying that they had responded negatively when asked about torture before the public prosecutor. The GID stated that interrogation was carried out "in a scientific and civilized manner" and reiterated that the extension of their detention was carried out "according to legal procedures". No details were given as to the length of time spent by each detainee in incommunicado detention.

**Common Law Detainees**

Common law detainees are less frequently held in prolonged incommunicado detention and they are tried by ordinary courts, where judges more often are prepared to throw out cases where detainees show signs of torture or ill-treatment at the hands of the detaining authority. Common law suspects are arrested by the police (*al-shurta*); the preventive security (*al-amn al-wiqa'i*); the criminal investigation (*al-bahth al-jina'i*); and the metropolitan police (*shurtat al-'asima*). Amnesty International has received reports of torture or ill-treatment of common law suspects, especially by the three last forces. Torture of detainees followed by prolonged incommunicado detention to hide the marks of torture, is sometimes reported, but it is more common to find detainees who have been severely beaten immediately after arrest. Frequently common law suspects who have received beatings and then been released fail to complain; lawyers are expensive and lawsuits unlikely to succeed. On three occasions known to Amnesty International beatings appear to have caused or hastened the deaths of common law detainees (see below).

Torture appears to be used to gain confessions and frequently contains an element of punishment. Most commonly the method complained of is beating, sometimes using hoses, cables or sticks, but on at least three occasions suspension in a contorted position (the *farruj* -- chicken, because the detainee is tied on a pole like a trussed chicken on a spit) has been alleged. Amnesty International has, over the past three years, received a number of cases (involving more than 20 persons) of torture or ill treatment of common law detainees and three cases involving detainees who appear to have died following beating by the police. Such figures almost certainly understate the importance of the problem, since many common law detainees who have been beaten do not have lawyers and are unwilling to make complaints. Torture, involving severe beating sometimes together with methods such as *falaqa* or suspension in painful positions, appears to be infrequent. However, there seems to be almost total impunity for members of the security services involved in torturing or ill-treating detainees. There is, therefore, a danger that, unless the Jordanian Government takes steps against torture or ill-treatment, treatment which is now infrequent might, if ever there is a crisis or perceived crisis, become generalised; this, apparently, is what happened in at least two towns after the August 1996 bread riots. On that occasion, many of those arrested after riots opposed to the rise in the price

- 40 -

of bread allege that they were tortured by being severely beaten by security services in Tafila and Kerak before being taken to Swaqa Prison, where several also allege that they were tortured or ill-treated. For example, one person, arrested in Tafila, said that he was tortured by the preventive security police with electric shocks, beatings and suspensions in a painful position. He was brought before the military public prosecutor after 23 days' incommunicado detention. He stated that he made a complaint about his treatment, but was not informed about any action taken.

A number of allegations of torture of common law detainees involve those accused of serious crime, such as murder, in situations where there may be heavy pressure on the security services to find the culprit and to ensure that whoever is arrested for the offence confesses. For instance, Mustafa Abu Hamid, accused of murder, was held for one month in police custody without charge following his arrest in April 1995. He stated that he confessed to the crime after torture including being hung upside down from nails inserted into his ankles; he was then allegedly sent by the police to hospital under a false name for treatment. During the trial a complaint was lodged about the torture, but no medical reports were brought before the court and no investigation was ordered by the judge. He was convicted by the criminal court and sentenced to death on 27 February 1996, a sentence which was confirmed by the Court of Cassation in June 1996. However, the sentence was commuted to life imprisonment by King Hussein in October 1996.

Another case of alleged torture was that of Muntasser Rajab Abu Zaid who alleged that he and his wife were beaten and deprived of sleep while held in detention in the police station in Salt, during which time he made a confession saying that he had murdered his children. His wife, who was not a suspect in the case, was released from police custody. Muntasser Rajab Abu Zaid's confession reportedly formed the basis for his conviction. The court did not order an investigation into these allegations and Muntasser Abu Zaid was convicted and sentenced to death in November 1996. He was executed in June 1997, after the failure of his appeals.

In July 1997 five young men Musbah Ibrahim Khatib, Suleiman Kamel Sa'ed, Ahmad Baha al-Din, Nidal Husni Rashed al-Haza'i, Rashad 'Abd al-Muhsin al-'Abbasi, involved in a brawl in an Amman street in July during which one man was cut with a razor, were arrested and taken to the police station at Jebel Hussein. There they allege that they were severely beaten by the criminal investigation service with cables and hoses. Two of the four, Musbah Khatib and Ahmad Baha al-Din, were beaten while suspended in contorted positions (the *farruj*); Rashad al-'Abbasi was allegedly beaten on both sides of his head with electric cables. The detainees stated that they complained of their beating before the public prosecutor, however he ignored their complaints and failed to order an investigation. They were charged with attempted murder and conspiracy to commit a crime. After four days in the police station they were moved to Jweideh Prison. They stated that they continued to suffer headaches and sickness as a result of the beatings. While in prison they did not meet any representative of the ICRC.

Another case appears to show torture of young people who were not even charged with the offence investigated. Three students were arrested in a town on the outskirts of Amman when a friend had been injured after having been shot by an unlicensed gun. During the night after their arrest two of the students, of Palestinian origin, were reportedly beaten by the criminal investigation service and the preventive security service in the local police station in order to make them reveal what had really happened. One of the students was tortured by the *farruj* method. The following morning all were released; they decided not to complain of their treatment out of fear for any consequences which might harm their ability to find jobs.

On occasion the judges have remedied, for the victim, the wrongs committed by the security services; however, those members of the security services who have committed abuses almost invariably remain unpunished and the victim is not compensated. For instance, Khalaf Musa al-Ziyabat, a 14-year-old boy from Ramtha, was arrested on 4 December 1997 and accused of stealing his cousin's gold. He said:

*"Some people of the criminal investigation came to my house about 7.30pm. When they began interrogating me ...they began beating me to confess, with sticks and punches and kicks all over my body. The torture continued all night, I thought 'they are going to torture me to death' so I made a false confession. The next day my brother came to see me, he couldn't recognize me because my skin turned blue...Then they began asking me where I put the gold, I began making up locations, and when they went to each location, they found nothing".*

After 48 hours Khalaf Musa al-Ziyabat was brought before a judge and was able to show him the marks of beating. The judge then ordered a medical examination which recorded numerous bruises and swellings on the face, arms, legs and body including "a 15cm-long bruise on the back of the left shoulder resulting from a blow by a stick." The fingerprints of Khalaf Musa al-Ziyabat were found not to match fingerprints on the scene of the crime and, after five days in a juvenile centre, Khalaf Musa al-Ziyabat was released on bail. However, no further investigation is known to have been ordered into the beating which occurred.

In its comments on Jordan's first periodic report in 1995, the UN Committee Against Torture expressed its concern that "allegations [of torture] are rarely subjected to independent, impartial investigations." It recommended that the State party "should further strengthen measures: to protect the rights of detainees, especially to have access to judges, lawyers and doctors of their choice; to investigate promptly allegations of torture and ill- treatment and to ensure that appropriate penalties are applied whenever such offences are committed...and to reduce the length of preventive detention, taking into account the presumption of innocence."

### Deaths in Custody

At least two detainees are known to have died in circumstances where beatings by the members of the security forces appear to have caused or hastened their deaths over the past two years. In another case no independent investigation is known to have been carried out into these deaths and no member of any of the security services has been brought to justice.

Yunus Abu Dawleh, a 34-year-old mechanic, died on 24 December 1996 some hours after he had been arrested by the police in his home in Zarqa. He was apparently accused of murder in Jebel al-Amman in Amman. Yunus Abu Dawleh's wife stated that a large number of people, in plain clothes and uniform came to their flat in Zarqa at 1.30am. From the window of her third-floor flat she said she saw Yunus Abu Dawleh pushed to the ground and a plain-clothes policeman sat on his chest and slapped him on the face. Then police pulled Yunus Abu Dawleh by his hair and beard to their cars 150 metres away. He was apparently taken with his brother Isma'il to the metropolitan police department in Amman where Yunus died some hours later. The autopsy report described signs of bruising on the shoulder, the neck and the genitals; however the medical certificate stated that he died of heart disease.

Samer Muhammad Ziyad Khazer, who had a history in the months before his death of criticisms or confrontations with the police, was beaten to death on 23 June 1997 in Zebda al-Wasatiya village near Irbid. According to eyewitnesses, the house was surrounded by large numbers of members of the criminal investigation service in civilian clothes at a moment when all the family members were

away besides Samer, aged 29, his younger brother 'Abdallah, a university student, and his sister
Manar, aged 19. When Samer Khazer heard about the police he tried to escape, but saw that the route
was blocked and returned to the house. The police then charged the house, reportedly without any
attempt to arrest Samer Khazer peacefully and without presenting any warrant. 'Abdallah, who tried
to block their way, was beaten on the head and shoulders and escaped to call help. Samer Khazer
escaped into the house and shut the door, but the criminal investigation service entered through the
window and beat him for 10 minutes on the head and body, leaving him unconscious; they then left.
Soon afterwards members of the uniformed force came, together with two villagers; instead of taking
Samer Khazer, who was lying unconscious to hospital, the police chief, according to those present,
was primarily interested in leaving the village, and suggested leaving Samer Khazer's body under the
trees (perhaps to suggest that he had been beaten while trying to escape or had attacked the criminal
investigation service). They arrested 'Abdallah Khazer, who had then returned, and detained him all
night in the police station. After the police had left, villagers took the body of Samer Khazer to the
hospital where he was pronounced dead.

The police issued a report which conflicts with the evidence given by eyewitnesses. The report states
that the police were prevented from entering the house for half an hour by 'Abdallah Khazer and
local villagers; they then entered together with the local *mukhtar* and found Samer dead from a heart
attack. The *mukhtar*, who should, according to the law, have accompanied any police force with a
warrant for the arrest of a villager, told an Amnesty International delegate that he had not been called
by the criminal investigation service or, later, by the police to witness the arrest.

The public prosecutor at Irbid opened an investigation into the death, but the result of this
investigation is not known. Normally, if an investigation finds members of any security force to be
responsible, the file is handed over to special police courts to take action. No result of the public
prosecutor's investigation has been disclosed to the family or lawyer and no action is known to have
been taken against those who killed Samer Khazer. Amnesty International delegates, who raised
Samer Khazer's death with the Minister of the Interior in December 1997, were told that the minister
accepted the police report that they had found Samer Khazer dead.

Isma'il Suleiman al-Hamdan al-Ajarmeh died on 11 February 1998 after having spent more than four
months in detention. He had been arrested at the end of September, apparently in connection with an
attack on employees of the Israeli Embassy, and held at the GID. He had no access to a lawyer for
the whole of that period. According to the Jordanian authorities Isma'il al-Ajarmeh committed
suicide by throwing himself down a stairwell and died instantly. The Minister of Interior stated that
the prisoner's death " happened shortly after an interrogation session and that the autopsy confirmed
the cause of death." Amnesty International asked for an investigation and requested a copy of the
autopsy report. The deputy head of the GID replied reaffirming the government account of the death,
but no autopsy report has been received to date.

According to the UN Principles on the Effective Prevention and Investigation of Extra-Legal,
Arbitrary and Summary Executions:

"*There shall be a thorough, prompt and impartial investigation of all suspected cases of extra-legal,
arbitrary and summary executions, including cases where complaints by relatives or other reliable
reports suggest unnatural death in the above circumstances...*" (Principle 9)

According to Principle 17:

"*A written report shall be made within a reasonable period of time on the methods and findings of*

> *The report shall be made public immediately and shall include the scope of the*
> *'nd methods used to evaluate evidence as well as conclusions and*
> *'d on findings of fact and on applicable law. The report shall also describe in*
> *'t were found to have occurred, and the evidence upon which such findings*
> *.ae names of witnesses who testified with the exception of those whose identities*
> *.eld for their own protection. The Government shall, within a reasonable period of*
> *. reply to the report of the investigation, or indicate the steps to be taken in response to it. "*

## ⌐ONCLUSION

Incommunicado detention without access to family or lawyers, often after arbitrary arrest, breaches international standards to which Jordan is a State Party. Amnesty International is additionally concerned at laws which allow the detention of prisoners of conscience, sentenced to up to three years for expressing their opinions without using or advocating violence.

Among the factors which lead to the continuing existence of torture or ill-treatment are: incommunicado detention and the impunity of the security services who carry out such treatment. One of the most important measures to end torture or ill-treatment is to ensure detainees' prompt access to families and lawyers. Medical examinations immediately after arrest and upon leaving a place of detention, which should be made available to the defence with the consent of the detainee, will also help to prove or disprove allegations of torture. Jordanian courts have frequently made decisions to remedy abuses by freeing those detained who have made their confessions under torture. But others whose confessions are suspect may appear before judges who are unwilling to question police methods and may be sentenced to long periods of imprisonment -- or even death.

When there are complaints against police violations, the preliminary investigation is carried out on the orders of the *niyaba* (Prosecutions Department) under the Ministry of Justice, but the case is then handed over to the police prosecutor. On almost every occasion, the police investigation appears to have accepted the police version of the case. The six detainees who alleged torture by the GID after their arrest in March and April 1996 saw the same military prosecutor who had renewed their detention orders examining their complaints. The families of those who died after police beatings have raised complaint after complaint, to find that the same department they accuse of helping to cause these deaths is also carrying out the investigations.

## RECOMMENDATIONS TO THE GOVERNMENT OF THE HASHEMITE KINGDOM OF JORDAN

In this year, 1998, the 50th anniversary of the Universal Declaration of Human Rights (UDHR), Amnesty International is calling on all Heads of State, Ministers, members of governments, politicians and each individual to reaffirm their commitment to the values of the UDHR.

Amnesty International urges the authorities to implement the following steps without delay. These measures would bring Jordanian law and practice closer to the letter and spirit of the international human rights treaties to which Jordan is a State Party.

**1) Prolonged incommunicado detention should be ended and all detainees should be ensured immediate access to family and lawyers.**

**2) Detainees should be brought before an independent judicial authority separate from the security forces promptly after arrest; if no recognizably criminal charges are brought against them they should be released.**

3) Article 195 of the Penal Code which allows prisoners of conscience to be sentenced to up to three years' detention for non-libellous criticism of the King and the Royal Family should be repealed.

4) All prisoners of conscience should be immediately released.

5) All allegations of torture and deaths in custody should be promptly and thoroughly investigated by an independent body which will make public its findings.

6) The inquiries into the deaths of Yunus Abu Dawleh and Samer Khazer should be r eopened with independent experts. An independent inquiry whose working methods and findings should be made public should be established into the death in custody of Isma'il Sulayman al-Hamdan al-Ajarmeh.

7) All members of the security services and other law enforcement officials who have ordered or used torture or ill-treatment against detainees should be brought to justice and victims or families of those who have died in custody compensated.

8) All detention centres should be regularly inspected by an independent body which should report publicly on its findings.

9) The Press and Publications Law should be amended to ensure that it conforms with the right to freedom of expression as guaranteed by Article 19 of the International Covenant on Civil and Political Rights.

*Footnote: 1 March 1994, AI Index: MDE 16/02/94 .*

*Footnote: 2 See, besides news services and urgent actions, Jordan: Human Rights Reforms (op.cit.) and Jordan: Executions on the Increase, March 1994 (AI Index MDE 16/05/94).*

*Footnote: 3 These prolonged incommunicado detentions involve allegations of torture and will be considered in Section 3.*

*Footnote: 4 ICRC Annual Report 1997, p.252.*

*Footnote: 5 An Islamist group opposed to the peace process with Israel. Its military wing has carried out many suicide bomb and other armed attacks against Israeli targets.*

*Footnote: 6 In addition, under Article 20 of the ICCPR:*
*1. Any propaganda for war shall be prohibited by law.*
*2. Any advocacy of national, racial or religious hatred that constitutes incitement to discrimination, hostility or violence shall be prohibited by law,*

*Footnote: 7 "The peace park is burning at al-Baqura" -- the headline referred to a fire at al-Baqura, but al-Baqura was also the scene of an attack by a Jordanian soldier on a party of Israeli schoolgirls, killing seven.*

AI Index: MDE 16/11/98

Amnesty International November 1998

Topic/Regional Index | AI Publication Index | Home



**Amnesty International - News Release - MDE 16/17/98**
**18 November 1998**
**JORDAN**
## Amnesty International calls on the government to end continuing human rights violations

Copyright notice: The copyright for this document rests with <u>Amnesty International</u>. You may download and read it. You may not alter this information, repost or sell it without permission. If you use this document, you are encouraged to make a donation to Amnesty International to support future research. Here you can find the <u>address of your nearest AI office</u>

News Service: 225/98
AI INDEX: MDE 16/17/98
18 NOVEMBER 1998

# Jordan

## Amnesty International calls on the government to end continuing human rights violations

Human rights violations have continued in Jordan despite a series of reforms undertaken by the government since 1989, Amnesty International says in a report launched today which also underlines "a lack of legal safeguards to prevent such violations".

The report (Jordan - An absence of safeguards , AI Index MDE 16/11/98), based on a memorandum sent to the Jordanian government in June 1998, focuses on three main areas: the use of prolonged incommunicado detention against political suspects; restrictions on freedom of expression sometimes leading to the detention of suspected political opponents for non-violent activities; and reports of torture and ill-treatment of political and common law suspects.

The report details cases of people apparently arbitrarily detained for political reasons by the General Intelligence Department (GID) before being released without charge. For instance, in the month of May 1997, those arrested included students who took down a portrait of the King; fans of heavy metal music, accused of being "satanists"; and an Islamist preacher. Though they are normally well-treated, they are often held in incommunicado detention - contrary to international standards ratified by Jordan which insist that detainees have prompt access to lawyers and family.

Non-violent political opponents, such as Layth Shubeilat, a well-known opposition leader, and 'Ata' Abu 'l-Rushta, spokesperson of Hizb al-Tahrir (Liberation Party), a small Islamist party which refuses registration and declares itself to be non-violent, have been detained more than once under vaguely-worded laws which allow the detention of opponents of the government who have not advocated or used violence. One such article of the penal code prescribes a sentence of up to three years on charges of italat al-lisan (lèse majesté, insulting the dignity of the sovereign); After violent bread riots in August 1996, hundreds of people were arrested and charged with italat al-lisan. "The charge sheet almost invariably failed to detail the time and place of the offence committed or the words used", the report says. After up to three months in detention, all those involved in the riots were freed by royal amnesty.

Newspapers have long been restricted in their freedom of expression by press and publications laws
which have an obscure list of large areas off bounds to journalists - they include "articles which
insult heads of friendly states" and "articles offending the dignity of officials". Until August 1998
journalists and editors were frequently arrested or harassed by endless court appearances.

In January 1998 the Jordanian High Court of Justice declared the restrictive 1997 Press and
Publications Law unconstitutional, but the 1998 Press Law also imposes heavy charges on
newspapers and threats of crippling fines which seem equally designed to create an atmosphere of
self-censorship. Amnesty International's report welcomes the government's commitment, in October
1998, not to enforce punitive articles of the law and "to turn a page in relations between the press and
the government". However, the report points out that "as long as vaguely worded prohibitions and
punitive articles continue on the statute book, press freedom remains endangered".

Among the factors which lead to continuing reports of torture and ill-treatment are incommunicado
detention without access to family or lawyers. Although most political detainees are well-treated
there have been some well-substantiated allegations of torture or ill-treatment, over the past years.
For instance, most of the 10 detainees now standing trial in connection with several explosions in
Amman in early 1998 were held incommunicado for more than two months after their arrest in May.
They allege that they were subjected to beatings, shabeh (prolonged sleep-deprivation in painful
positions), falaqa (beating on the soles of the feet), and prolonged suspension in contorted positions.

In at least three cases over the past two years detainees appear to have died following beating by
different security services. Sometimes there has been no proper investigation; other prosecutions
appear to have foundered on being passed to the police prosecution department. "There seems to be
almost total impunity for members of the security services involved in torturing or ill-treating
detainees", the report adds.

The report praises many court decisions, including a number of decisions of the Court of Cassation,
to retry or release detainees whose confessions appeared to have been extracted by torture.

Amnesty International's report calls on the new Jordanian government to reaffirm the country's
commitment to the values of the Universal Declaration of Human Rights by bringing Jordanian law
and practice closer to the letter and spirit of international human rights treaties to which it is a state
party. Its recommendations include an end to incommunicado detention, amending the Press Law to
guarantee the right to freedom of expression and the inspection of detention centres by an
independent body.

## Background

After 1989 the Jordanian Government dismantled a system which had allowed large-scale arrest and
detention of prisoners of conscience, widespread torture, and unfair trials of political detainees.

Reforms included the lifting of the state of emergency in force since 1939 and the abolition of
martial law courts. In 1992 the Law on Resistance to Communism which had allowed the
imprisonment of suspected communists for up to 15 years, was abolished. A new law was adopted
which eventually led to the legalization of most political parties.

Hundreds of political prisoners were released and measures which might prevent torture or
ill-treatment of political prisoners began to be put in place.

. Since 1976 Jordan has been a State Party to the International Covenant on Civil and Political Rights
(ICCPR) and the International Covenant on Economic, Social and Cultural Rights.

-47-

. In November 1991, Jordan acceded to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention against Torture).

. Jordan is also a State Party to the Convention on the Elimination of All Forms of Discrimination against Women (CEDAW) and the Convention on the Rights of the Child.

**Source:** *Amnesty International, International Secretariat, 1 Easton Street, WC1X 8DJ, London, United Kingdom*

**AI News | AI Publication Index | Home**

- 48 -

Case 3:08-cv-01982-SI    Document 7-5    Filed 05/05/2008    Page 22 of 42

ment has barred the entry of several foreign Arab publications for alleged violation of the law. Broadcast media are all state-owned and occasionally criticize state policy. Journalists routinely practice self-censorship.

The Jordanian government grants permits for demonstrations. In May, a peaceful protest against the new press law escalated into clashes which ended in the arrest and injury of several journalists by police. According to Human Rights Watch, the government increased pressure on opposition political parties, professional associations, and cultural clubs in 1997. Prior to the elections, public meetings, lectures and rallies were widely prohibited.

Islam is the state religion. The government does not permit the Baha'i faith to run schools, and Baha'i family legal matters are handled in the Islamic *Shari'a* courts. Beginning in 1997, Christian students in public schools will study their religion, using a curriculum from Syria. Islamists have criticized the decision to teach Christianity, asserting that it will breed sectarianism which will lead to disputes.

Some 30 to 60 women are the victims of "honor killings" by male relatives each year for alleged moral offenses. The penal code sharply limits the penalties for such killings. Women must receive permission from a male guardian to travel abroad and are discriminated against in inheritance and divorce settlements.

Private sector workers may join independent trade unions. The government can prohibit private sector strikes by referring a dispute to an arbitration committee. Some government employees can form unions but none may strike. The International Confederation of Trade Unions has called for greater protection against anti-union discrimination. An intellectual property rights law is currently being finalized.

# Kazakhstan

**Polity:** Dominant party (presidential-dominated)    **Political Rights:** 6
**Economy:** Statist transitional    **Civil Liberties:** 5
**Status:** Not Free
**Population:** 16,460,000
**PPP:** $3,284
**Life Expectancy:** 67.5
**Ethnic Groups:** Kazakh (43 percent), Russian (35 percent), Ukrainian (6 percent), others
**Capital:** Almaty



**Overview:** In 1997, President Nursultan Nazarbayev reasserted his grip on power by drastically reducing the number of government structures and undermining the authority of popular Prime Minister Akezhan Kazhegeldin, who resigned in October, ostensibly for health reasons. Kazhegeldin, who had overseen economic improvement and built a power base among the country's economic elite, was seen by many as a possible threat to the

Schistosomiasis (or bilharzia) is present in the area of the Nile and in several other areas in North Africa and the Middle East. These parasites are best avoided by not swimming or wading in fresh water in endemic areas.

## Drug Offenses

Drug enforcement policies in the region are strict. Possession of even small amounts of narcotics, including substances such as marijuana, LSD, or amphetamines, can lead to arrest. If found guilty, drug offenders are subject to lengthy prison sentences. Because what is considered to be 'narcotics' varies from country to country, learn and obey the laws in the places you will visit. Keep all prescription drugs in their original containers clearly labeled with the doctor's name, pharmacy and contents. In addition, if you take an unusual prescription drug, carry a letter from your doctor explaining your need for the drug and a copy of the prescription.

## Dress and Local Customs

### Islam

Islam is the pre-eminent influence on local laws and customs in much of the Middle East and North Africa. The extent of this influence varies. Some Arab countries have secular governments, but in certain other countries, particularly those in the Arabian peninsula, Islam dictates a total way of life. It prescribes the behavior for individuals and society, codifying law, family relations, business etiquette, dress, food, personal hygiene, and much more. Among the important values is a family-centered way of life, including a protected role for women and clear limits on their participation in public life. In traditional societies, Muslims believe open social relations between the sexes result in the breakdown of family life. Contact between men and women, therefore, is rigidly controlled in traditional societies.

Travel during Ramadan, the holiest time in the Islamic year, can prove to be very difficult. Business is rarely conducted during this time and non-observance of the Ramadan tradition of fasting during daylight hours can carry penalities in some countries.

In the traditional societies of the region, it is considered rude to face the soles of one's feet toward other people. At traditional meals, the left hand is not used for eating.

### Apparel

Conservative Western street clothing (except for shorts) is appropriate in most areas. In more traditional societies, however, attire for women should be more conservative, garments should have sleeves, and dress length should be below the knee. On the other hand, in some areas of the region visited by many tourists—for example, the beaches of Israel and Morocco—attire similar to that worn in the United States is acceptable.

### The Workweek

In many countries in the Middle East and North Africa, the weekend is either Thursday/Friday or Friday/Saturday. Workweek information is included in the list of U.S. embassies at the end of this document.

## Country Information

### ALGERIA

Travelers to Algeria are warned that due to political, social, and economic problems a climate of violent unrest has occurred. A number of terrorist attacks have been carried out against foreigners. Terrorists have also threatened to kill all foreigners who are in Algeria. A state of emergency has been in effect since early 1992.

Crime is also a major problem in Algeria. Crimes include car break-ins, theft of auto parts from parked cars, theft of items (even those of moderate value) left in hotel rooms, home burglary, and pickpocketing and purse snatching near hotels and on trains and buses. Some tactics that residents of Algeria use to avoid being victimized include carrying only a minimum amount of cash and concealing it well and parking only in guarded locations. The police can be reached in Algerian cities by dialing 17. In rural areas, contact the gendarmerie nationale.

Algeria does not give visas to persons whose passports indicate travel to Israel. Some hotels accept some credit cards. Before traveling, ask your credit card company if your card will be accepted in Algeria, and if not, bring travelers checks to cover your expenses.

Algerian currency and customs regulations are strictly enforced. All currency must be declared upon entering the country, and completely accounted for when departing. Non-residents are required to change the equivalent of approximately $200 into Algerian dinars at the official exchange rate while in Algeria. You will need to present evidence of this currency exchange before you are allowed to depart the country. All hotel bills must be paid in hard currency such as U.S. dollars. Paid hotel receipts may be used as evidence of currency exchange.

### BAHRAIN

Business representatives, conference and exhibition delegates, and holders of diplomatic and official passports may obtain a visitors visa, valid for up to three months, from the Bahrain Embassy in Washington, DC, or the UN Mission for Bahrain in New York. Persons in the above categories may also be able to obtain either a 7-day visa or a 72-hour transit visa at the Bahrain airport upon arrival if they present a confirmed return or onward air ticket. Single women who have no sponsor or family ties in Bahrain may have difficulty in obtaining an airport visa. In addition to an onward ticket, they may wish to secure in advance a sponsorship from a hotel that will arrange to have an airport visa waiting for them. The 72-hour airport visa can be extended, on a case by case basis, for up to one week if a Bahraini sponsor applies to the



Foreign Travel



Network

GO Kids    GO Family    GO Money    GO Sports    GO Home
INFOSEEK SEARCH ◉ ABCNEWS ◯ Web    About GO Network
[          ]  [Search]    Sign In
Free E-mail





# Honor Killings?

## 20/20

**SUMMARY**
Women fear for their lives, because family members threaten to kill them in the name of honor.

**Friday, January 22, 1999**
*(This is an unedited, uncorrected transcript.)*

**BARBARA WALTERS, ABCNEWS** Good evening, and welcome to *20/20 Friday*. We're very glad to have you with us tonight because it's a special night. Our colleague Diane Sawyer is here to bring us a story that is so powerful, it so frightening, it is beyond belief that this can be happening in this day and age, Diane. Let me tell you why. Can you imagine a place where murderers are hailed as heroes? Can you imagine a custom that rewards families for killing their own daughters, where fathers and brothers stalk the women they say they love?



TO PURCHASE A TRANSCRIPT OR VIDEOCASSETTE CALL 1-800-CALL-ABC VIA

FEDERAL DOCUMENT CLEARING HOUSE

Content and programming copyright 1998 ABC News. Transcript by Federal Document Clearing House, Inc. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to ABC News. This transcript may not be copied, resold or redistributed in any media.



**UP TO**

amazon.com

**HUGH DOWNS, ABCNEWS** Right now, thousands of women are living in fear. And if they survive, they are forced to spend their entire lives in hiding. Diane, you've been a lot of places and covered some shocking situations, I know. But I know this got to you, this really strange world of honored death.

**DIANE SAWYER, ABCNEWS** It did. Because it seems to me that it has a kind of unique cruelty. The whole thing originates with the fact that men in certain traditional cultures feel that everything a woman in their family does reflects on them—their stature, their manhood. Now, by the way, this is not about any one religion. It's not about Islam, nor is it about the Middle East. Honor killings occur in Pakistan and India as well. And what about the country of Jordan where we go? Well, it is a very modern country. But in some areas, there is still an ancient code designed to keep women from living independent lives. We are going to begin now with a

terrified woman. A fugitive who is hiding out right
here in this country.

(VO) We'll call her Samyra. We cannot show you
her face because this Jordanian woman has been
marked for execution by the people she loves.

**SAMYRA** I was followed by my father and his
relatives, and they were after me to kill me.

**DIANE SAWYER** (VO) She escaped to America.
She speaks perfect English, though we've had to
disguise her voice. And what did she do to provoke
this? She fell in love with a man her family
disapproved of, got pregnant and married him—and
became a hunted woman.

**SAMYRA** I have locks on the doors that I check
every night and every day. I do go through periods of
time where every single sound that goes on in the
house makes me nervous.

**DIANE SAWYER** (VO) She says the male members
of her family are trying to kill her to restore family
honor. And she told us back in Jordan, for months she
had to look over her shoulder, worried that someone
was in the shadows, around the corner. She and her
husband hid, fleeing from home to home.

**SAMYRA** We had to do everything we could to
mislead and lose anyone who was following us. I
basically had to disguise myself by wearing the
traditional Muslim dress and head cover.

**DIANE SAWYER** (VO) And the threat to Samyra's
life was real. In Jordan alone, a quarter of all the
homicides are honor killings, an average of 25
women at least every year.

**RANA HUSSEINI, JORDAN TIMES REPORTER**
People need to know the truth. People need to know
that there are things like this happening, that women
are killed for no reason.

**DIANE SAWYER** (VO) Rana Husseini is a
trail—blazing journalist for the Jordan Times, whose
fearless reporting on this secret, taboo subject has
made headlines around the world. She says in some
of her country's traditional communities, the men feel
that a woman's purity is the most important part of a
family's reputation. The family is shamed if there's

even a rumor that a daughter is not a virgin, or if she refuses an arranged marriage, or has an extramarital affair or is disobedient. One girl was murdered because she smoked a cigarette in public.

**RANA HUSSEINI** In many families, they believe that once she tarnishes the image, it's just like breaking glass. It can't be fixed. And the only way to fix it is to kill her.

**DIANE SAWYER** (VO) Today in Jordan, if a woman is being stalked by family, her only hope may be prison, where government officials often send women in danger. This is Jweidah (ph) prison in Amman, the capital of Jordan.
(on camera) So we don't know what we're going to find here. All we know is that we've been told that at least 30 women have come here because they were pregnant out of wedlock, because there were rumors that they weren't virgins and they're fugitives. And the situation is dire enough that they're here not as prisoners but to be protected. (VO) Slowly, from among the women who surround us in the courtyard, a frightened young girl comes forward to tell her story. This is a teenager we'll call Mona. She has been here for over nine months.
(on camera) Your father pulled a gun out and shot you?

**MONA** Uh—huh.

**DIANE SAWYER** (VO) Mona comes from a rural area of Jordan where her father forced her into an arranged marriage with a man 30 years her senior. She was miserable, and one night slipped away with the man she really loved. When her father found out, he brought her to this park, handed her pills - poison—saying he didn't want to go to jail so she knew what she must do.

**MONA** (through translator) He gave me a bottle of pills. He told me, "You do whatever you have to do to kill yourself. Burn yourself, or even poison yourself. I just don't want to see you on the face of the earth."

**DIANE SAWYER** (on camera) Did you think about taking them?

**MONA** (through translator) No.

**DIANE SAWYER** (VO) Instead, she says she fled to the police, who brought her to prison. Then, three months later, her father told her that all was forgiven and that he would never hurt her.

**MONA** (through translator) He told me not to be afraid, "No harm will happen to you."

**DIANE SAWYER** (VO) A few visits later, as Mona dreamed of going home, her father walked through the door, saw her, pulled out a gun and fired four times—twice in the abdomen, once in her leg and hand.
(on camera) Did he say anything to you before he shot.

**MONA** (through translator) He said, "How are you, my daughter? How is your health?" And that's it.

**DIANE SAWYER** How is your health?
(VO) Today, this is Mona's home, a prison bed.

**MONA** (through translator) There is no place to go. Where should I go? I'm afraid. Here it's better. It's safer.

**DIANE SAWYER** (on camera) So this will be your whole life?

**MONA** (through translator) I don't know.

**DIANE SAWYER** (VO) Another girl came forward, we'll call her Fatima. She's a Christian and says her father turned on her, horrified that she became pregnant and, even worse to him, by a Muslim man.
(on camera) I don't know how you live with the idea that your own family might try to hurt you. And do you know that in the rest of the world this looks impossible?

**FATIMA** (through translator) These are our traditions from long ago.

**DIANE SAWYER** Do you love your father?

**FATIMA** Yes.

**DIANE SAWYER** Yes, still?

**FATIMA** Yeah.

**DIANE SAWYER** How is that possible?

**FATIMA** (through translator) I've made a mistake. I know I'm wrong.

**DIANE SAWYER** So you think it's your fault?

**FATIMA** (through translator) Yes.

**RANA HUSSEINI** Most of them who I've talked to, I said, "Do you prefer to be outside or inside?" They said, "It doesn't matter because I'm already dead."

**DIANE SAWYER** (VO) A warning, we are going to show you some forensic photographs that are not easy to look at. The fate Mona and Fatima and Samyra are desperate to avoid—girls and women shot, strangled, stabbed—hideous murders all committed by fathers, brothers or uncles who suspected that the women were sexually impure. But in fact, autopsies showed that more than half of the women turned out to have been virgins after all.

**SARHAN ABDULLAH** (through translator) That was it. When I knew that she made a mistake, there was no other solution but that she should die.

**DIANE SAWYER** (VO) This 27-year-old Sarhan Abdullah. He sells fruit juice on the streets of Amman. He says last year, he learned his youngest sister, 20-year-old Yasmine, was no longer a virgin. (on camera) And so, it's right to kill her?

**SARHAN ABDULLAH** (through translator) Yes, of course.

**DIANE SAWYER** (VO) Sarhan says her loss of virginity was an unbearable shame, even though, according to court documents, Yasmine lost her virginity because she was sexually assaulted. (on camera) But if she's raped, it's not her fault.

**SARHAN ABDULLAH** (through translator) What do you mean, it's not her mistake? Certainly, it's her mistake.

**DIANE SAWYER** But she had no choice?

**SARHAN ABDULLAH** (through translator) What led her to this situation? For me, an honorable girl, while she's on the street, I cannot rape her unless she

comes along with me in my car or to my house.

**DIANE SAWYER** (VO) Sarhan says his duty was to his family, once his sister lost her virginity. That if he didn't act, they would be outcasts in their community. The women might have trouble finding husbands, and the men would be ridiculed.

**SARHAN ABDULLAH** (through translator) I might have an argument with a friend of mine or a relative. First thing he would say to me is, "If you had honor, you would not be a pimp for her." Letting her live means I am a pimp.

**DIANE SAWYER** (VO) Yasmine knew her life was in danger and for protection went to the police.

**HUGH DOWNS** Had she found a safe haven, or would the men in her family follow her to the end and exact their revenge? There's much more of Diane's story. Stay with us.

**ANNOUNCER** In a moment, a family sets a trap for a trusting daughter.

**DIANE SAWYER** Did you at any point say, "I can't do this? This is my sister. I can't do this?"

**ANNOUNCER** And across the border, a celebration in the town square as another young woman is slaughtered for honor, when *20/20 Friday* continues.

(Commercial Break)

**ANNOUNCER** *20/20 Friday* continues. Now, Barbara Walters.

**BARBARA WALTERS** We continue now with Diane's rare journey into a terrifying world, where women live in fear that their own relatives want them dead.

**DIANE SAWYER** As you said earlier, it is unfathomable. We are going to go again to Jordan. And by the way, later in the report, we will speak with Her Majesty, the queen of Jordan—Queen Noor. But first, back to the young woman we told you about a few moments ago. The young woman who finds herself in an aftermath of sexual assault — alone, afraid and desperate for help.
(VO) March 1 of last year—a frightened 20-year-old

Yasmine Abdullah went to this police precinct in Amman, Jordan, seeking protection, suspecting correctly that her father and brother had turned against her.

(on camera) How did it happen? One night you sat with your father, and the two of you decided she had to die?

**SARHAN ABDULLAH** (through translator) Yes, of course.

**DIANE SAWYER** (VO) Sarhan says they made a plan — send word to Yasmine that she was safe. He even had his father sign a guarantee that he wouldn't hurt her.

**SARHAN ABDULLAH** (through translator) I was the one who told him to do it so that she would come out and I would kill her.

**DIANE SAWYER** (VO) Yasmine trusted the guarantee and went home. She had spent two days with the family when her brother Sarhan returned from a trip. Immediately the two went into the living room to talk about what had happened in the last few days. Without uttering a word, Sarhan pulled a gun and shot his sister four times in the head and chest. Yasmine died on the spot.

(on camera) Did you at any point say, "I can't do this. This is my sister. I can't do this." This is her life. You're proud of it?

**SARHAN ABDULLAH** (through translator) Yes, of course.

**DIANE SAWYER** Is your family pleased?

**SARHAN ABDULLAH** (through translator) Yes, of course.

**DIANE SAWYER** Your mother?

**SARHAN ABDULLAH** Yes.

**DIANE SAWYER** Your father?

**SARHAN ABDULLAH** Yes.

**DIANE SAWYER** Your other sisters?

**SARHAN ABDULLAH** Yes.

**DIANE SAWYER** (VO) Afterwards, he walked to the police station and turned himself in. (on camera) Which raises the question, what protection does the law provide? Well, Jordanian courts specifically grant leniency in these cases to the killer. On average, in Jordan, the man spends only three months to a year in jail. Which is exactly what happened to Sarhan. He was sentenced to one year, but after just six months, the judge set him free. Here at his cousin's bachelor's party, he's a celebrated member of the family. In releasing him, the judge said Sarhan's "great anger when he learned that his sister was no longer a virgin" was justification for a short sentence.

**ASMA KHADER (PH), WOMEN'S RIGHTS ADVOCATE** The problem is that the society deal with such a person as a hero. As a person who was strong enough, a man enough to clean, to wash with blood the honor of the family.

**DIANE SAWYER** (VO) Asma Khader is one of the chief women's rights advocates in Jordan. She is outraged by Sarhan's light sentence and horrified by the message the law sends to Jordanian society.

**ASMA KHADER** It's too difficult. The message is that there is nothing wrong in what he did. This will encourage other young men, other men to kill.

**DIANE SAWYER** (on camera) It looks crazy to the rest of the world. What if you go back into your community and say, "Let's stop this now. I don't want it to happen to my daughters. Let's stop it."

**SARHAN ABDULLAH** (through translator) If I would tell my family not to kill her, my father, for example, how could he sit among the men and talk with them? How will he be able to face the people?

**DIANE SAWYER** Could we see a photo of her? Do you have a photograph?

**SARHAN ABDULLAH** (through translator) I don't think so. They've burned them all.

**DIANE SAWYER** It's as if she never existed.

**SARHAN ABDULLAH** (through translator) Yes.

**DIANE SAWYER** (VO) And what about this baby

girl, Sarhan's niece. Someday, will the men in her family turn against her?
(on camera) Would you do the same thing again to another sister, to a daughter?

**SARHAN ABDULLAH** (through translator) Yes, because for us there is no other solution.

**DIANE SAWYER** (VO) And that's what these people thought, too, here in this Arab community in Israel. In this 1995 home video, a crowd has gathered in the street to celebrate because one of the town's daughters has just been slaughtered. Daliet El Carmel (ph) is a Druze community. The Druze are Arabs who broke away from Islam 1,000 years ago. Here, it's considered unforgivable to marry someone not Druze because they're a small minority worried that their culture will disappear. So when 39-year-old Ibtihaj Hassoun (ph) lived with a man outside the community, the village so disapproved of her, her brother, Amer (ph), was taunted for years and not even allowed to marry. Finally, he snapped. One day, prosecutors say, he lured Ibtihaj home with a lie, saying her father was paralyzed. They were in the car together when Amer says an argument broke out. He pulled out a knife and attacked Ibtihaj, stabbing her 10 times, including in the heart and lungs. The village heard about it and came. (on camera) That scene you saw, with the crowd gathered around, was right here. And in the center, Ibtihaj dead on the ground. (Applause) (VO) The crowd cheered at her death, elated to be rid of the woman who had shamed them, celebrating when the ambulance took her away. Amer, now in Shata (ph) prison, was convicted of first—degree murder and sentenced to 20 years to life by an Israeli court. But his attorney, Zaki Hammal (ph), is appealing the conviction, arguing that the three years Amer has spent in prison are enough.

**ZAKI HAMMAL, AMER'S ATTORNEY** He is isolated from his family, from his community, from everything in his life just because he was involved in the death of his sister. I don't think that he is, in his character, a killer or a murderer.

**AIDA TOUMA—SULLMAN (PH), ACTIVIST** Of course he is a murderer. Somebody who murders somebody else is a murderer. There is no excuses for murders. There is no justification.

- 59 -

**DIANE SAWYER** (VO) Aida Touma—Sullman is an Arab-Israeli activist against honor killing.

**AIDA TOUMA—SULLMAN** To see the village going out happily for what happened, that was very ugly. That was very frightening.

**DIANE SAWYER** (VO) We found Ibtihaj's family and persuaded them to talk. The mother was grieving, but not for her daughter.
(on camera) Do you still love Ibtihaj?

**MRS HASSOUN** (through translator) To tell you that I love her, I don't because she made my blood boil, really boil.

**DIANE SAWYER** You're very tough.

**MRS HASSOUN** (through translator) Yes, I know I'm tough.

**DIANE SAWYER** (VO) In the living room, not one remembrance of Ibtihaj anywhere, while Amer's photograph dominates the room. Every day, the family lovingly awaits his call from prison. (Telephone rings) But what if he is eventually free to come home? Will his sisters, Jaqulin (ph) and Johanna (ph) live in fear?
(on camera) If some day you make a mistake, are you going to be afraid of Amer?

**JAQULIN** No.

**DIANE SAWYER** But why not? If you make a mistake, what's to stop your brothers from killing you?

**JAQULIN** (through translator) She's the one who made the mistake. She's different than we are.

**AIDA TOUMA—SULLMAN** A murder happened in this family so they are threatened. Even if they think differently, they will not speak about it.

**DIANE SAWYER** (on camera) I get the sense that you don't agree with what your brother did. I get the sense that you don't feel as your mother and brother do.

**JOHANNA** (through translator) Yes.

**JAQULIN** (through translator) Yes, you're right about that. But also, what they said was right.

**DIANE SAWYER** (VO) We also went in search of the village leader, Akram (ph) Hassoun. He says he opposes honor killing. Yet he, too, is working nonstop to bring Amer home and says no one in the village wept for Ibtihaj.

(on camera) Would what happened to her have happened to a man?

**AKRAM HASSOUN** No. We believe that the woman, they are the honor, the respect of the society.

**DIANE SAWYER** When you use the word "respect"
...

**AKRAM HASSOUN** Yes?

**DIANE SAWYER** ... it kind of sends a shiver through women in America. With this kind of respect, who needs enemies?

**AKRAM HASSOUN** You know, nobody will understand the situation in your society in America. You will not understand this well.

**DIANE SAWYER** (VO) But what about an American-born woman who lives in Jordan? Her Majesty Queen Noor. She says for years she wasn't aware of honor killing because the practice was so hidden. But now, she adds, momentum is building for change.

(on camera) The big question is, what's taking so long? They assume that you could go in, or His Majesty could go in tomorrow, issue a decree and just say, "It's over. Don't do this anymore. Won't tolerate this anymore." And it can happen. Why not?

**QUEEN NOOR OF JORDAN** It isn't ever really possible to change an ancient cultural tradition by decree. But for those who have lost their lives, there is no—we all should have acted sooner.

**DIANE SAWYER** (VO) The queen is pushing for a new law to eliminate the kind of lenient sentencing which allowed Sarhan to get out of jail. She also is supporting the creation of shelters so that women like Mona will have someplace to go.

(on camera) Is this of personal importance to you?

**QUEEN NOOR** Oh, yes, of course it is. It's important to me as a Jordanian. It's important to me as a Muslim, and it's important to me as a woman, of course.

**DIANE SAWYER** And a mother.

**QUEEN NOOR** And of course, as a mother.

**DIANE SAWYER** (VO) Again, Rana Husseini, the Jordanian journalist who brought the story out into the open.

**RANA HUSSEINI** I think this is very important for people to see that the leaders are talking about it. And this is how we start. You know, something has to change. We're approaching the 21st century, and we're still living in the 19th century.

**DIANE SAWYER** (VO) Which brings us back to Samyra, who is hiding in America, the woman you saw at the top of this report. She says some day if her family does find her and carries out its death sentence, at least in America the law might make them pay.

**SAMYRA** (through translator) And even if it comes to the point where I am killed, at least I will die knowing that they will be prosecuted, that they will get their just punishment. And they will not get away with it as they would have in Jordan.

**DIANE SAWYER** You should know that Jordan's Queen Noor is trying to establish a shelter for these women. And now that King Hussein is back home after cancer treatment in the United States, there is hope that he will speak out even more forcefully.

**BARBARA WALTERS** Diane, if these women can leave the country, do they find asylum in other countries? For example, do they here?

**DIANE SAWYER** The United States still has a very ambiguous record on taking them in, but Canada tends to take them in and be friendlier.

**HUGH DOWNS** What happens to the ones who are still hiding in prisons?

**DIANE SAWYER** Occasionally, they can broker marriages with widowed men, older men who don't

care if their wives are virgins. Otherwise, the rest of
their lives in prison.

**BARBARA WALTERS** It is horrific. Thank you,
Diane, for bringing this to us. We'll be right back.

### Search for more on:

| 20/20 | SEEK |
|-------|------|



Copyright ©1998 ABCNEWS and Starwave Corporation. All rights
reserved. This material may not be published, broadcast, rewritten
or redistributed in any form. Please click here for legal restrictions
and terms of use applicable to this site. Use of this site signifies
your agreement to the terms of use.

EXHIBIT (D)

IF I would had had proper Treatment
I would of Never had a History so long.

Rank: _____ Star #: _____
Date of Birth _06-01-1967_
as of this date _DEC 13 2000_

```
********************************************************************
                    SAN FRANCISCO POLICE DEPARTMENT
                       CRIMINAL HISTORY RECORD
DATE:12/13/2000              SFNO:S422949                    FROM:ID01
********************************************************************
RELEASE OF THIS RECORD TO UNAUTHORIZED PERSONS IS A MISDEMEANOR PER SEC 11142PC
RELEASED TO:              RELEASED BY:              RELEASE DATE:
********************************************************************
```

```
     ***************** SUBJECT ****************      ****** ID NUMBERS ******
     *  NAME:MARTHA/GEORGE/N                *       *    CII:08310586        *
     *  RACE:W                              *       *    FBI:545070FA2       *
     *  SEX :M        HGT:509    HAIR:BR    *       *    SSN:573556761       *
     *  DOB:06-01-1967  WGT:160  EYES:HZ    *       *  OPLIC:               *
     *                                      *       *                       *
     *  ADDR:76 WILLITS ST DC      POB:PK   *       *HFPC:8   M 1   U III 12*
     *  SCARS:TAT L ARM   TAT R ARM         *       *         S 17  U 000    *
     ***************************************       ***********************
```

```
********************************************************************

   TEXT:BURGLARY-CREDIT CARD-NARCOTICS

********************************************************************
10-01-1986   COURTNO:00935731 RPTNO:861082330   STAR:1703/1972  SCN:
             ARREST LOCATION:0035 /SOUTHVANNESS /AV

             V311781   10-01-1986   459PC/F      BURGLARY
             DISP:02-24-1988 MC CHG:459PC/M PB:SD/036M
             JCOP: 004D CJS :006M

             V311782   10-01-1986   466PC/M       POSSESS/ETC BURGLAR TOOLS
             DISP:02-24-1988 MC
             DISMISSED ON MOTION OF DISTRICT ATTORNEY

             U207951   01-21-1988   V311781BW/I   W#322914,459PC

04-19-1988   COURTNO:01078694 RPTNO:880471493   STAR:1188/2104  SCN:
             ARREST LOCATION:2675 /GEARY /BL

             U243847   04-19-1988   484E(2)PC/M   PT CR CARD/ACQUIRES LOST CARD
             DISP:04-20-1988
             DA WARRANT ISSUED

             U243848   04-19-1988   484F(2)PC/F   FORGE NAME ON CREDIT CARD
             DISP:04-20-1988
             DA WARRANT ISSUED

06-21-1988   COURTNO:01093976 RPTNO:880471493   STAR:2203/0000  SCN:
             ARREST LOCATION:0850 /BRYANT /ST

             U269189   06-21-1988   459PC/F       DAW#335028,A#22935F,TB$10000
             DISP:07-06-1988 MC
             DISMISSED ON MOTION OF DISTRICT ATTORNEY

             U269190   06-21-1988   484F,2PC/F    ATMPTED,DAW#335028,A#22935F
             DISP:07-06-1988 MC
             DISMISSED ON MOTION OF DISTRICT ATTORNEY

             U269191   06-21-1988   484F,2PC/F    ATMPTED,DAW#335028,A#22935F
             DISP:07-06-1988 MC
```

DISMISSED ON MOTION OF DISTRICT ATTORNEY

U269192   06-21-1988   484F,2PC/F      DAW#335028,A#22935F
DISP:08-03-1988 MC CHG:484F,2PC/M PB:SD/003Y
ISS JCOP: 003D

U269193   06-21-1988   484F,2PC/F      DAW#335028,A#22935F
DISP:07-06-1988 MC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

U269194   06-21-1988   484F,2PC/F      DAW#335028,A#22935F
DISP:07-06-1988 MC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

U269195   06-21-1988   484F,2PC/F      DAW#335028,A#22935F
DISP:07-06-1988 MC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

08-16-1988   COURTNO:01106497 RPTNO:881025489   STAR:1481/1728  SCN:
ARREST LOCATION:GENEVA AV/MISSION ST

U289852   08-16-1988   11350HS/F      POSS NARC CONTROLLED SUBSTANCE
DISP:08-17-1988
DA DISCH - QUESTIONABLE SEARCH OR SEIZURE

U289853   08-16-1988   11364HS/M      POSS CONTRLD SUB PARAPHERNALIA
DISP:08-17-1988
DA DISCH - QUESTIONABLE SEARCH OR SEIZURE

U289854   08-16-1988   22350VC/M      BASIC SPEED LAW
DISP:08-17-1988
DA DISCH - QUESTIONABLE SEARCH OR SEIZURE

09-09-1994   COURTNO:01533143 RPTNO:941094877   STAR:2178/1641  SCN:00157784
ARREST LOCATION:OUT OF TOWN

L281816   09-09-1994   422PC/F      DAW#441739 ACT#32102F   $1MIL
DISP:01-17-1995 SC CHG:422PC/F
PROBREVD SP 001Y/004M

L281817   09-09-1994   646.9APC/F      DAW#441739 ACT#32102F
DISP:01-03-1995
DISMISSED ON MOTION OF DISTRICT ATTORNEY

L281818   09-09-1994   646.9BPC/F      DAW#441739 ACT#32102F
DISP:01-03-1995
DISMISSED ON MOTION OF DISTRICT ATTORNEY

L298591   11-02-1994   422PC/F      THRT CRIME W/INT TO TERRORIZE
DISP:01-03-1995 SC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

L298592   11-02-1994   422PC/F      THRT CRIME W/INT TO TERRORIZE
DISP:01-03-1995 SC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

L298593   11-02-1994   422PC/F      THRT CRIME W/INT TO TERRORIZE
DISP:01-03-1995 SC
DISMISSED ON MOTION OF DISTRICT ATTORNEY

R254508   06-10-1996   L281816BW/I      W#S470245,422PC

```
08   2-1996  COURTNO:01666770 RPTNO:961170231   STAR:1099/0000  SCN:
             ARREST LOCATION:3025 /FOLSOM /ST

             R277537   08-22-1996  11350HS/F     POSS NARC CONTROLLED SUBSTANCE
             DISP:08-23-1996
             DA DISCH - SUBSTANCE NOT PROHIBITED BY LAW

             R277538   08-22-1996  602,5PC/M     ENTER/ETC NONCOMMERCL DWELLING
             DISP:08-23-1996
             DA DISCH - INTEREST OF JUSTICE

01-24-1997  COURTNO:01533143 RPTNO:            STAR:2101/0000  SCN:00157784
            ARREST LOCATION:OUT OF TOWN

            S208335   01-24-1997  L281816BW/I   W#S481309,422PC

            S235875   04-22-1997  L281816BW/I   W#REMS25,422PC

10-29-1997  COURTNO:01745894 RPTNO:            STAR:0000/0000  SCN:
            ARREST LOCATION:0001 /HOLLAND /CT

            S294406   10-29-1997  PAROLEXX/F    3056PC ONLY CDC#K48697 $NB

07-14-1998  COURTNO:01794773 RPTNO:            STAR:0000/0000  SCN:
            ARREST LOCATION:0001 /HOLLAND /CT

            T263612   07-14-1998  PAROLEXX/I    CDC 3056PC K48697 N/B

**** FOR "AKA" OR ADDITIONAL ADDRESS INFORMATION, USE A "QPA" TRANSACTION ****
```

# Craig Fischer, M.D.

177 LA CASA VIA, SUITE 1 • WALNUT CREEK, CA 94598 • 925-280-8787 • FAX 925-280-8783

October 11, 1999

Dana Mendelson
211 Gough Street, Suite 112
San Francisco, California 94102
VIA Fax 415-255-9919

Re:    George Martha

Dear Ms. Mendelson,

At your request, I am reporting on my evaluation and treatment of George Martha. As you are aware, Mr. Martha was admitted to Walnut Creek Hospital under my care on September 23, 1999. He remains hospitalized at this time. I have reviewed information sent with him, have interviewed him approximately ten times, and have reviewed his current hospital record.

Mr. Martha was referred to Walnut Creek Hospital by the Immigration and Naturalization Service because his behavior while in custody indicated that he was mentally ill. He reportedly had been diagnosed previously, while in INS custody, as having a bipolar disorder. He had been on medications to treat this disorder, but the medications had been discontinued. He was again demonstrating irritability, poor judgment, and poor impulse control, to the extent that he was placing himself at risk of harm by other inmates.

Based on my evaluation of Mr. Martha, I concur with the diagnosis of Bipolar Disorder, Currently Hypomanic. It is manifest by hyperactivity, increased internal energy, irritability, poor impulse control, impaired judgment, and insomnia. In addition, he is suffering from Psychotic Disorder, Not Otherwise Specified. This latter disorder is most likely the residual of prior amphetamine use, and consists of mild paranoid ideation and infrequent hallucinations.

Mr. Martha's psychiatric disorders are treatable, although he will likely need lifelong treatment, including medication. He currently is in need on ongoing psychiatric hospital treatment, for approximately two to four more weeks. He is taking psychiatric medication to control the symptoms of both of his disorders, currently consisting of Depakote and Neurontin, two mood stabilizing drugs, and Seroquel, an antipsychotic drug. Although still symptomatic, he is responding to treatment.

With treatment, Mr. Martha's prognosis is good. If he continues on medication, he should have minimal or no symptoms. I would anticipate that he would be able to return to be a productive member of society. He should be able to work if he stays in treatment.

Re: George Martha
October 11, 1999
Page 2

Without ongoing treatment, including medication, his prognosis is very poor. He is very likely at least periodically to have significant symptoms of his illness. He is likely to again have poor impulse control, poor judgment, and irritability. I believe he would again quickly get himself in trouble, most likely by provoking others. While in custody, he apparently has often provoked others, thus setting himself up to be victimized. Without medication, he will no doubt continue this pattern. In my opinion, if he is deported to a country where he is unlikely to be continued on medication, and where psychiatric illness is not tolerated or appropriately recognized, his safety would be at significant risk.

You have asked if his psychiatric illness could have been a factor in the incident that led to his arrest, i. e., making threatening remarks to his wife during a phone conservation. Although I obviously have no information as to his mental state at that time, his actions were typical of acutely manic patients. Such patients frequently become hostile and threatening, and often act without any recognition of the consequences of their actions. Impulse control and judgment are usually impaired.

I hope I have provided the information you need. Please let me know if I can be of further assistance.

Very truly yours,

Craig Fischer, M.D.
Diplomate, American Board of Psychiatry
and Neurology

CF:cw
Martha 101199.wpd

**JESS H. GHANNAM, PHD**
1939 DIVISADERO, SUITE 3
SAN FRANCISCO, CALIFORNIA 94115

TEL 415 921 8096 / FAX 415 921 8095

27 October 1999

Dana Mendelson
Attorney at Law
211 Gough Street, Suite 112
San Francisco, CA 94102                    Re: George Martha

Dear Ms. Mendelson:

Per your request I have reviewed the letter from Mr. Martha's psychiatrist, Dr. Craig Fischer, and I am in a position to render an opinion regarding the implications of Mr. Martha's psychiatric condition should he be deported to Jordan.

Let me begin by stating my qualifications. I have a PhD from the University of California at Berkeley and am currently the Chief of Medical Psychology and the Director of Training in the Department of Psychiatry at UCSF-Stanford, Mount Zion. I am a licensed psychologist in the state of California (PSY 9261) and have a private practice in San Francisco. I have been practicing for about 14 years and have worked in the Middle East as a consultant for the past 6 years. My main area of work in Middle East, specifically, in Palestine, Jordan, and Egypt, has been to help establish mental health clinics and training programs to help local professionals improve the quality of care in this region. Mental illness in this part of the world is seen as the "work of the devil" and most people with mental disorders do not have access to modern treatments. Typically they go without treatment or are housed in unregulated locked facilities or simply put in jail and tortured. These conditions frequently make these individual decompensate very quickly and often they do not live very long.

Given that Mr. Martha have a very severe and chronic form of mental illness requiring ongoing treatment for the rest of his life, should he be deported to Jordan it is my professional opinion that his condition would worsen and he would not receive the care that he so badly needs. He would run the risk of decompensating to a condition that could precipitate his early and painful demise. Please feel free to contact me should you have any additional questions or concerns.

Very truly yours,

*[signature]* PhD

Jess H. Ghannam, PhD

0031

EXHibit D

ADMIN.



Dear Dad,                                    May 22, 1999

    How are you doing? I miss you. What are you doing? I went on a family picnic with Aunty Sabrina today. I got wet by water balloons. My teacher threw them at me. I also went bowling and to the video arcade. It was lots of fun. I had my first communion and here is the picture. I love you.



Anthony

Love Anthony

9th  Circuit Court of Appeals                    Daly City 4/3/2000

# 00-70094

I like to submit the following to your Court.

The attorneys representing George in the domestic violence case that resulted in his conviction, never represented to the Court in 1995 the following facts:

1- George was doped into believing if he took his wife and his son Antony to San Francisco from Chicago, he was guaranteed the following by his father in law, the same repeated to me by Anton Barbary to me in person in my house in Chicago:
  (a) to share the house with Anton (Seperated from his wife)
  (b) to find George a good job in S.F.

2- George has to sell a lucrative shoe shine business in Holiday Inn Schiller Park - Ill. and sell all his new furniture, then drive his Wife Vivian and his son Antony to S.F.; to find Anton Barbary promises where a bunch of lies, where he lived in a studio apartment, where George had no privacy with his wife, and where George was sleeping directly on the floor, and where no jobs materialized.

3- George for his frustration was kicked out where he came back to Chicago, loosing his business, his wife, his son and his other assets.

These your honours was the circumstances that led to George meaningless threats that where in the form of long distance Telephone calls originating from my house.

4- George wife Vivian, complained to me and to my wife a few times and we counselled her that George is incapable of doing any of the threats he verbalized, but was wrongly expressing his frustration at being taken for a stupid person. We further counselled Vivian to
  (a) hang up on George or
  (b) to Change her Telephone Number to an unlisted one.
both where not carried

page 1 of 2 pages

the time frame is 92-93

5- Vivian taped the threats, accepted in court without challenge as to

(a) Where these tapes, as bases for conviction of George Martha, ~~Display~~ original, undoctored, un audited tapes, and can they prove beyond doubt that they where?

(b) the time frame of the threats should be 92-93. and if they where authenticated as original, ~~thos~~ the evidence was preceeding the claim by two to three years; my understanding that there is a limit to cases envolving personal engury to body or character, for the court to admit such recording without authentication does not look correct to me, and for George of defence to be so sleepy in court is beyond my belief.

(6) Vivian had an insurance settlement of mony, as they kicked George from the studio apartment she shared with her father, this to this day was kept secret from George, wich she still was legally his wife; the mony we where told where used to by a house by her father, in his name. which a couple of years later ~~was~~ she was kicked from with her son.

(7) Vivian and her father, capable of such acts are equally capable of tampering with evidence presented to the court to convict my son, and if there is a motive for all these actions, the motive is present.

Daly City  4/3/2000

9th circuit Court of Appeals

Case No# 00-70094

I like to submit the following to your court.

The act of expressing my violent emotions, described in California law as an act of terrorism, did surprise me, and to find the meaning of the word, and in the most complete dictionary of the english langage "Webster third New Int. Dic. of the English language, 1964 Edition and on page 2361 I find out the following:

① Terrorism : ① the systematic use of terror as a means of coercion and I like to point to the court the use of the adj systematic. wich was not the way George conducted his business.

② And in the New Lexicon, Webster Dic. of the English Langage 1989, Lexicon Publication N.Y. the following definition

Terrorism: N. the policy of using acts inspiring terror asa method of ruling or of conducting political opposition

Terrorist . a person who favours or pratices terrorism.

To be noted here is the emergence of the meaning of terrorism as a political practice, and in the context applied to George there is an obvious error, because what he did falls in a different category of famlly arguments and disputes

③ Third College Edition of Webster New World Dictionary of American English Prentice Hall N.Y © 1991

Terrorism : the act of terrorizing; use of force or threats to demoralize, intimidate, and subjugate, esp. such as a political weapon or policy.

and domestic violence should not be described as terrorism. and if it was, there should have been a distinguished line between acts of violence against a spouse, and between a long distance telephone threats of a father that has lost his family.

respectfully

NIMER ABUMARTA

Nimer Abumarta
324 San Diego Ave
Daly City  CA
94014



**ATTORNEYS AT LAW**

December 1, 1999

U.S. Department of Justice
Immigration and Naturalization Service
Attn: Deportation Officer Herrmann
630 Sansome Street, Twelfth Floor
San Francisco, California 94111

**VIA HAND DELIVERY**

Re:    **George Nimer MARTHA**
        **A17 796 939**
        **Submission of Documentation in Support of Custody Review**

Dear Officer Herrmann:

I am the attorney of record for Respondent George Martha, and I am submitting this letter and the attached documentation in connection with the review of Mr. Martha's custody status scheduled for December 2, 1999. I am submitting this document to you via hand delivery on December 2 because the notice of the review was only served on Mr. Martha in the evening of December 1.

Mr. Martha does not pose a danger to the community. Mr. Martha was placed in removal proceedings based on a single crime -- a conviction under California Penal Code section 422 for making verbal threats. Although his crime technically falls within the definition of an "aggravated felony" because it involves threatened harm to a third party, Mr. Martha was not convicted of any offense involving actual violence. According to the testimony of Vivian Barbary, Mr. Martha's ex-wife and the victim of the crime, before Immigration Judge Michael J. Yamaguchi, the crime involved a threat Mr. Martha made in a telephone call to Ms. Barbary while Mr. Martha was in Chicago and Ms. Barbary was in San Francisco. Mr. Martha never intended to carry out his threat, and could not carry out the threat because of the physical distance between him and Ms. Barbary.

Furthermore, as demonstrated by the attached declaration of Ms. Barbary, at no time did Ms. Barbary actually believe that Mr. Martha would carry out his threats. His crime involved such strong mitigating circumstances that the sentencing court saw fit

*Page 2*

to give Mr. Martha the lowest term of punishment, as stated in the attached sentencing document.

The mitigating circumstances surrounding this single conviction demonstrate that Mr. Martha would not be a danger to the community if released on bond. In addition, while counsel for the Service has previously presented a police report that alleged that Mr. Martha took a car belonging to his mother, the attached letter from Mr. Martha's mother demonstrates that neither she nor his family consider him a danger.

Mr. Martha is also not a flight risk. His family brought him to the United States when he was only several months old. He is now 32 years old, and has lived in the United States that entire time. He has lived in the San Francisco Bay Area for many years, and his family lives in the San Francisco Bay Area. Because he is fighting to keep his residency, he has every incentive to appear. He therefore poses no flight risk.

For these reasons Mr. Martha should be released on an order of supervision.

Sincerely,

Dana Mendelson



ATTORNEYS AT LAW

October 18, 1999

Dr. Jess Ghanim

**VIA FACSIMILE ONLY**

    Re:    George Martha

Dear Dr. Ghanim:

    I am writing to follow up our telephone conversation regarding George Martha's mental condition. As I mentioned over the telephone, in order for Mr. Martha to have a chance of avoiding deportation to Jordan, he needs a letter from you containing:

- your qualifications;

- your confirmation that you read the letter from Mr. Martha's psychiatrist and that you are therefore familiar with Mr. Martha's condition;

- a description of the projects you have done in connection with Jordan, to establish your knowledge about conditions for mental patients there; and

- your conclusion that, in your professional opinion, should Mr. Martha be deported to Jordan, he would likely be confined to an insane asylum due to his mental condition, be denied treatment, or be subject to some other horrible fate.

Thank you for assistance in this matter.

Sincerely,

Dana Mendelson



## ATTORNEYS AT LAW

### FACSIMILE TRANSMISSION COVER SHEET

Date:   **November 17, 1999**          Time:  **6:49 PM**

From:   **Dana Mendelson, Esq.**

To:     **George N. Martha**
        **Walnut Creek Hospital**

Number of pages (including cover sheet):     **14**

Comments:

**Send any corrections within 2 hours.**

*IMPORTANT NOTICE:*  **This facsimile transmission contains confidential attorney-client communications and is intended to be viewed only by the recipient indicated above. If you have received this transmission in error, please contact Mendelson & Associates immediately at (415) 255-9922. You may contact this facsimile machine at (415) 255-9919.**

*211 Gough Street, Suite 112 ♦ San Francisco, California 94102*
*Telephone: (415) 255-9922 ♦ Facsimile: (415) 255-9919*



$\mathcal{M}$ *endelson*
*& Associates*

ATTORNEYS AT LAW

October 11, 1999

Ms. Susan Breall
Assistant District Attorney
850 Bryant Street, Third Floor
San Francisco, California 94103

Re:    **People v. George Martha, Superior Court No. 157784**

Dear Susan:

I am responding to your request for more information concerning Mr. George Martha's criminal matter, as we discussed previously over the telephone. In this letter I will briefly explain (a) Mr. Martha's background and his mental disorder; (b) the circumstances of the guilty plea to Penal Code § 422, which he now wishes to withdraw or modify to prevent deportation; (c) the severe immigration consequences that flowed from that plea; and (d) the danger Mr. Martha will face if he is deported to Jordan, his country of citizenship. I am also attaching the documentation you requested.

Background on Mr. Martha and his medical condition

Mr. Martha, a 32-year-old citizen of Jordan, was brought to the United States while he was only a few months old. He was brought by his family, who fled Jordan after being persecuted by the government. He has lived in the United States practically his entire life, speaks no Arabic (the language in Jordan), and has no family or contacts whatsoever in Jordan. Mr. Martha and his family are Christians, a religion that is not tolerated by the Moslem majority in Jordan. Mr. Martha is divorced, and has a young son.

Mr. Martha also has a serious mental condition -- he is bipolar. As the attached letter from his current treating psychiatrist fully explains (Exhibit A), his mental condition, when left untreated, can lead to severe mood swings, such as manic or very aggressive behavior. It can also lead Mr. Martha to irrational behavior when placed under pressure, for example in a courtroom setting. While Mr. Martha's condition is fully treatable with medication, he was only diagnosed with the condition approximately two years ago, and prior to that he was not even aware he had it.

### Circumstances surrounding Mr. Martha's plea to PC § 422

In 1994, Mr. Martha was arrested and charged under Penal Code § 422. The charges arose from a telephone call Mr. Martha made to his ex-wife, Vivian Barbary, shortly after their separation. At the time, Mr. Martha was in Chicago, and Ms. Barbary was in San Francisco. He called her and left a message on her answering machine saying "I'll kill you." Ms. Barbary reported it to the police, and Mr. Martha was arrested.

In reality, however, Ms. Barbary never took Mr. Martha's threat literally. As she explains in her attached declaration (Exhibit B), at the time she had known Mr. Martha for 14 years, and never in that time had she ever known Mr. Martha to be violent or physically abusive. While she was upset at the phone call, she never actually feared for her life and never believed that Mr. Martha would actually carry out his threat.

In addition to the attached declaration, during Mr. Martha's immigration proceedings, described further below, Ms. Barbary testified in open court to these facts. She testified under oath that she does not fear Mr. Martha, that she does not consider him a violent person, and that she has no problem with him being released.

Mr. Martha pleaded guilty to the count under Penal Code § 422 on January 3, 1995. He was placed on three years' probation and ordered by the Court to stay away from Ms. Barbary. Mr. Martha was also later ordered to attend Walden House during the probationary period.

After Mr. Martha spent some time at Walden House, but was ejected after he was accused of having sexual intercourse while on the grounds, which is forbidden by the rules. He believed the charges were false, and refused to sign a confession, and on those grounds, he was ejected. Because he could not complete the program, he was in violation of his probation.

At the probation violation proceedings, he was represented by conflict counsel. He and his family asked the attorney whether or not the probation violation would result in his deportation. The attorney falsely told them that the proceedings would not result in deportation, and, relying on this advice, on April 21, 1997 Mr. Martha stipulated to the violation and was sentenced to 16 months' imprisonment.

### The immigration consequences of Mr. Martha's stipulation to the probation violation

Mr. Martha's counsel was, unfortunately, wrong. Under the federal Immigration and Nationality Act ("INA"), Mr. Martha's conviction and later sentence under Penal Code § 422 carried -- and still carries -- *mandatory* deportation consequences. Under INA § 237(a)(2)(A)(iii), any alien or permanent resident is deportable if he is convicted of a category of crimes labeled "aggravated felonies." 8 U.S.C. § 1227(a)(2)(A)(iii). Under INA section 101(a)(43)(F), any "crime of violence" -- which includes any crime that involves any use of force or threats of use of force -- is an

aggravated felony if the sentence imposed is one year or more. 8 U.S.C. § 1101(a)(43)(F). Penal Code § 422, while not requiring actual violence, constitutes a "crime of violence" within the meaning of the INA because it requires that a threat of use of force be made to the victim.

After his release from prison, Mr. Martha was placed in removal proceedings before the Immigration Court in San Francisco. Because he had been convicted of an "aggravated felony," Mr. Martha had only one potential form of relief available: restriction on removal. To be eligible for this relief, Mr. Martha must show that he would be persecuted on one of several grounds if he were removed to his country of citizenship.

While, as explained below, Mr. Martha would suffer severe discrimination and persecution in Jordan because of his mental condition, mental condition is not a recognized ground under immigration law. Mr. Martha's application for relief was therefore denied, and he was ordered removed from the United States on February 12, 1999 (Exhibit C). An appeal was taken from this decision, but was dismissed by the Board of Immigration Appeals on August 25, 1999.

Because Mr. Martha exhausted the limited avenues of relief he has under immigration law, his only hope at this stage is to either vacate the plea of guilty or modify the sentence such that it is less than one year, and then to reopen the immigration matter with the Board of Immigration Appeals. Under federal regulations, Mr. Martha must do so within 90 days of the order of dismissal or he will lose his right to do so. See 8 C.F.R. § 3.2(c)(2).

### The danger Mr. Martha will face if deported to Jordan

Unlike the United States, Jordan is not a democratic, progressive society. It is a tightly controlled monarchy where opposition to the government is a serious criminal offense, and discrimination is prevalent. Christians are severely discriminated against by the Moslem majority, and anyone who fails the follow the dictates of Islam can be placed in jail. Medical insurance is not available as in the United States, and those with mental conditions are considered outcasts who should be incarcerated. While the tightly-controlled government makes it very difficult to obtain documentation regarding these conditions, Mr. Martha's parents, who lived in Jordan for several decades before they fled government persecution, can attest to these ills.

If he is removed to Jordan, Mr. Martha will face impossible odds of survival. He will be severely discriminated against because he is a Christian and because he does not even speak the common language. He has no family or contacts to help him, and finding employment will be practically impossible. He will not have access to medications, and his bipolar medical condition will be left untreated, further exacerbating the situation. After a short time of being forced to live in Jordan, he is likely to either be placed in jail or permanently incarcerated because of his mental disorder.

DEAR. Ms. BReall

10-10-99.

THE reason I am writing you is to explain my Past behavior and Problem with THE law.

Two years Ago I was diagnosed with A bipolar disorder. I WAS NOT AWARE OF THIS mental Condition.

My bipolar condition Causes IRRATIONAL behavior Mood swings; Clouded Judgement And AN inAbility TO control my BehAVIOR And whAt I SAy At Time.

Since being diagnosed AS A Bipolar I AM TAKING MEDACATION which Allows me to lead NORMAl life And Control my behaviok.

I AM ASKing FoR youR help. with out it I will be deported. I HAVE been here Since I WAS Four months old, my hole liFE. IF IAm deported TO JORdan I Probably will be locked up FoR liFE, due To my Mental contidition. IF THis hAPPens I will Not be Able TO help My SoN ANTHONY iN ANY WAY.

I'll be VERY gRATEFul FoR ANY help you can Provide; So I HAVE A ChANCE to lead A betteR liFE; And help My Son. My ATTORNY will be Contacting you TO See what Can be Done. THANK you

```
LGAL STATUS SUMMARY  TYPE-   D     SQ-RC                    05/08/97 20:54
-------------------------------------------------------------------------
  CDC NUMBER  |  NAME                          |ETHNIC|     BIRTHDATE
   K49597     |  MARTHA,GEORGE,N               | OA   |    06/01/1967
-------------------------------------------------------------------------
  TERM STARTS | MAX REL DATE   MIN REL DATE  MAX ADJ REL DT | MIN ADJ REL DT
   04/24/1997 |  08/04/1997     07/01/1997    08/04/1997    |  07/01/1997
-------------------------------------------------------------------------
                                                         |  PAROLE PERIOD
BASE TERM  1/04 + ENHCMNTS   0/00 - TOT TERM   1/04      |  3 YRS
-------------------------------------------------------------------------
  PRE-PRISON + POST SENTENCE CREDITS
  CASE    P2900-5 P1203-3 P2900-1 CRC-CRED MH-CRED P4019  P2931 POST-SENT  TOT
  SC157784     256                                128                 1   385
-------------------------------------------------------------------------
  RECV DT/ COUNTY/    CASE    SENTENCE DATE              CREDIT    OFFENSE
    CNT      OFF-CODE DESCRIPTION                        CODE        DATE
-------------------------------------------------------------------------
 CONTROLLING PRINCIPAL & CONSECUTIVE   (INCLUDES ENHANCEMENTS/OFFENSES):

 --CONTROLLING CASE --
  4/24/1997  SF   SC157784    4/08/1997
    01 P422      TERRORIST THREAT                          1   08/16/1996
                 PR
-------------------------------------------------------------------------
 TRAN                               RULE    _____D A Y S_____
 TYPE   DATE   END DATE LOG NUMBER  NUMBER  ASSESS LOST REST DEAD
-------------------------------------------------------------------------
 BEG 04/24/1997            ******BEG BAL*******
    CURRENT PC BALANCE:   0            CURRENT BC BALANCE:    0
-------------------------------------------------------------------------
```

0266

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
San Francisco, California

File No.:    A 17 796 939                        February 12, 1999

In the Matter of                     )
                                     )
GEORGE NIMER MARTHA,                 )        IN REMOVAL PROCEEDINGS
                                     )
        Respondent                   )

CHARGES:      Section 237(a)(2)(A)(iii) of the Immigration and
              Nationality Act - Conviction involving a felony
              constituting an aggravated felony.

APPLICATION:  Withholding of removal.

ON BEHALF OF RESPONDENT:             ON BEHALF OF SERVICE:

Dana Mendelson                       James S. Stolley, Jr.
Mendelson Associates
211 Gulf Street, Ste. 112
San Francisco, CA  94102

                ORAL DECISION AND ORDER OF THE IMMIGRATION JUDGE

            The respondent is a 31-year-old, single male, native

and citizen of Jordan.  The United States Immigration and

Naturalization Service has brought these removal proceedings

pursuant to the authority contained in section 240 of the

Immigration and Nationality Act.  Proceedings were commenced with

the filing of a Notice to Appear with the Immigration Court on

July 25th 1997.  See, Exhibit 1.

            The respondent admitted that he was not a citizen and

national of the United States; that he's a native of Jordan.  He

entered the United States at or near New York, New York on or

about October 26th 1967 as an immigrant.  The Service introduced

jmh

as Exhibit 6 the immigration visa and alien registration as proof
that the respondent is a citizen of Jordan.  The Service also
introduced Exhibit 3, which is an Abstract of Judgement
evidencing the fact that the respondent, on January 3rd 1995, was
convicted in the Superior Court of California, County of San
Francisco for the offense of terrorist threats, in violation of
section 422 of the California Penal Code.  This exhibit also
evidences that the respondent was sentenced to a period of
incarceration of one year and four months.  Based upon the
admissions of the respondent and the exhibits introduced by the
Government, the Court finds that the respondent's removability
has been established by evidence which is clear and convincing,
and that the respondent is removable pursuant to section
237(a)(2)(A)(iii) of the Immigration and Nationality Act, as
amended, in that at any time after admission, the respondent had
been convicted of an aggravated felony as defined in section
101(a)(43) of the Act, to wit:  A crime of violence, as defined
in section 16A of Title 18 United States Code.

          The respondent declined to designate a country of
removal, and Jordan was directed.

          The respondent filed an application for withholding,
form I-589.  Prior to the admission of the form I-589, the
respondent swore before an officer that the contents of the
application, including attached document supplements and any
correction thereto were true and correct to the best of his

A 17 796 939                    2              February 12, 1999

jmh

knowledge.   See, Exhibit 2.   Since the respondent is statutorily
ineligible for asylum because of the conviction, the respondent
was not eligible for such relief.

### STATEMENT OF THE LAW

The burden of proof is on the respondent to establish
that he is eligible for withholding of removal.   8 C.F.R. section
208.16(b).

An alien who has been convicted of an aggravated felony
is presumed to have been convicted of a particularly serious
crime.   An alien convicted of a particularly serious crime shall
be considered to constitute a danger to the community and is
mandatorily and statutorily barred from the relief of withholding
of removal.   The respondent has the burden of proving that the
aggravated felony was not a particularly serious crime.   The
Court may, in its discretion, determine that an aggravated felony
or felonies with an aggregate sentence of less than five years is
not a particularly serious crime.   8 C.F.R. section 208.16(c)(2)
and (3); Matter of Q-T-M-T-, Int. Dec. 33300 (BIA December 23rd
1996).

To qualify for withholding of removal, if not
mandatorily barred pursuant to section 241(b)(3), the respondent
must show that his life or freedom would be threatened in the
proposed country of removal on account of race, religion,
nationality, membership in a particular social group or political
opinion.   The respondent must establish it is more likely than

A 17 796 939                    3                  February 12, 1999

jmh

not that he would be persecuted on the basis of one of the five enumerated grounds.   8 C.F.R. section 208.16(b)(1).

If the respondent establishes that he suffered persecution in the past such that his life or freedom was threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group or political opinion, it shall be presumed that his life would be threatened on return to that country unless a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it's no longer more likely than not that the respondent would be so persecuted in that country. 8 C.F.R. section 208.16(b)(2).

In evaluating claims of future persecution, the respondent need not provide evidence that he would be singled out individually for such persecution if he establishes that there was a pattern or practice in the country of proposed removal of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group or political opinion, and that the respondent establishes his own inclusion in and identification with such group of persons such that it's more likely than not that his life or freedom would be threatened upon return.   8 C.F.R. section 208.16(b)(3).

## ANALYSIS

The evidence at the hearing consisted of the following:

A 17 796 939                        4                February 12, 1999

jmh

Exhibit 1, Notice to Appear; Exhibit 2, the I-589 application for
withholding of removal; Exhibit 3, the Abstract of Conviction;
Exhibit 4-A through J, which constituted various documentations
regarding country conditions; Exhibit 5, which is a declaration
of Vivian Barbery; and Exhibit 6, which is the Immigration visa
and alien registration.  In addition, the respondent testified on
his own behalf, and the counsel for the respondent called one
witness on the respondent's behalf to describe country
conditions, and proffered the testimony of four other witnesses
who would similarly testify to country conditions.

          Based upon the fact the respondent was convicted of
terrorist threats and taking into account the supposedly
mitigating factors proffered by the respondent, the Court
concludes the respondent is mandatorily barred from relief from
removal by withholding of removal.

          Assuming argumento that the respondent is not
mandatorily and statutorily barred from withholding of removal,
the Court will, in consideration of judicial economy, analyze
respondent's claim for withholding of removal.  In respondent's
testimony and application, the respondent stated that he believes
that he would suffer future persecution on account of religion.
During the course of the respondent's testimony, the respondent
testified that he knew nothing of the country since he has stayed
his entire life in the United States; is not a Muslim and does
not know these people; and that he believes that based upon his

A 17 796 939                    5                   February 12, 1999

jmh

religion that Muslims would disagree with him.  As a consequence,
the respondent believes that he is scared to return to his
country for fear of being persecuted.  The evidence introduced at
the hearing indicates that the respondent's beliefs are
speculative at best, and that 4-D,  the Country Conditions
indicate that conditions are such that individuals are free to
practice their religion in Jordan.  In addition, the testimony of
other witnesses appear anecdotal at best, and that the incidences
to which they testify indicate incidences that have occurred
approximately 10 years ago, except for one individual who
testified as to a particular incident they had heard.  Based upon
the speculative nature of this evidence, and the inability of the
respondent to articulate specifically the fear to which he
believes that he would be subject as far as persecution, the
Court, after consideration of all the objective testimony and
documentary evidence, finds the respondent has not demonstrated
that it's more likely than not he would be persecuted on the
basis of one of the five enumerated grounds were he to return to
Jordan, and thus, does not meet the statutory requirements for
withholding of removal, even if not mandatorily barred for having
committed a particularly serious felony.

A 17 796 939                    6              February 12, 1999

jmh

## ORDER

IT IS HEREBY ORDERED, the respondent's application for withholding of removal is denied.

IT IS HEREBY FURTHER ORDERED, the respondent is ordered removed to Jordan.

IT IS FURTHER ORDERED that the respondent has until March 15th 1999 to file an appeal, and I am now providing the respondent with the requisite appeal forms.  Should the respondent ever illegally reenter the United States, the respondent will be in violation of Federal law and be fined and imprisoned for not more than 20 years pursuant to section 276 of the Act.

MICHAEL J. YAMAGUCHI
U.S. Immigration Judge

Received
Department of Justice

APR 6   1999

A 17 796 939

Executive Office for Immigration Review
Immigration Court
San Francisco, California

February 12, 1999

## CERTIFICATE PAGE

I hereby certify that the attached proceeding before

MICHAEL J. YAMAGUCHI in the matter of:

GEORGE NIMER MARTHA

A 17 796 939

San Francisco, CA

was held as herein appears, and that this is the original

transcript thereof for the file of the Executive Office for

Immigration Review.

Joyce M. Hughes, Transcriber

Deposition Services, Inc.
6245 Executive Boulevard
Rockville, Maryland 20852
(301) 881-3344

Received
March 31, 1999   Department of Justice
(Completion Date)
APR 6   1999

Executive Office for Immigration Review
Immigration Court
San Francisco, California

U.S. Department of Justice
Executive Office for Immigration Review
Immigration Court


Matter of                                    File A 17 796 939


                              )
                              )
GEORGE NIMER MARTHA           )        IN REMOVAL PROCEEDINGS
                              )
        Respondent            )
                              )        Transcript of Hearing


Before MICHAEL J. YAMAGUCHI, Immigration Judge


Date: February 12, 1999      Place: San Francisco, California


Transcribed by DEPOSITION SERVICES, INC. At Rockville, Maryland


Official Interpreter:


Language:


Appearances:

        For the Immigration and         For the Respondent:
        Naturalization Service:

James Stolley, Jr., Esq. Received Dana Mendelson, Esq.
                    Department of Justice

                    APR 6   1999

                Executive Office for Immigration Review
                        Immigration Court
                    San Francisco, California

jmh

1    JUDGE FOR THE RECORD

2              This is Immigration Judge Lamonte S. Freerks sitting in
3    a master calendar removal hearing in Florence, Arizona.  The date
4    is August 6th 1997.  We're in the matter of A 17 796 939, George
5    Martha.  He appears pro se.  The Trial Attorney is Monika Sud-
6    Devaraj, Esquire.  The hearing is in English.  Officer Perez and
7    Officer Starnes (phonetic sp.) are the court officers.  Rights in
8    this case are in file A 70 129 183.

9    JUDGE TO RESPONDENT

10             Q.   Mr. Martha, did you understand what I told you
11   earlier today about your rights?

12             A.   Yes, sir.

13             Q.   Would you like more time to consult with an
14   attorney before we go forward in your case?

15             A.   What I would like to do is ask the, the Court
16   today if, uh, I would like to fight my case in San Francisco and
17   try to get a bail and bail out and fight my case with private
18   counsel, sir, is what I want to do.  I have reference letters.  I
19   also had a fax come in yesterday to the Federal Courts here in
20   Florence.  I was wondering if you got that.

21             Q.   A fax letter from who?

22             A.   From a PhD, uh, in General Hospital in regards to
23   my fiance's conditions.

24             Q.   I don't have that in my file.  Who did they fax it
25   to?

A 17 796 939                    1                    August 6, 1997

jmh

1              A.    She faxed it, the doctor faxed it to the court

2    house here in Florence, and I've been asking, uh, the men in, the

3    officers in green.

4              Q.    Uh-huh.

5              A.    For this letter because it is important upon her,

6    uh, mental illness.

7              Q.    Well, maybe it got faxed to the INS office.   The

8    Court doesn't receive faxes, but maybe the INS has it.

9              A.    Okay.

10   JUDGE TO MS. SUD-DEVARAJ

11             Q.    Do you have any record of a fax?

12             A.    I don't, Your Honor.

13   RESPONDENT TO JUDGE

14             Q.    It's a real important letter.

15             A.    What's your fiance's name, Linda?

16             Q.    Uh, that's my sister, Linda.

17             A.    All right.

18             Q.    That's my sister, but I also have proof and, uh,

19   it's Gracie Luna is my fiance's name.  She's, uh, a 5150 right

20   now from her drug addiction, and, uh, she's basically real

21   disturbed over this.  She became a 5112.  She cut her wrist.

22             A.    What's 5150?

23             Q.    5150 is she, uh, we were supposed to get married

24   on, uh, July the 13th.  I paroled on July the 10th.  She freaked

25   out and cut her wrists.

A 17 796 939                  2                    August 6, 1997

jmh

1          A.   Oh.

2          Q.   Now, she's 5112.  She's trying to pull the

3    stitches out and stuff, so she's really, this American woman was

4    affected through all this and, uh, not only her, my family as

5    well.

6          A.   Well, I tell you what.  Let's back up before we

7    get into all that.  I've got your request for a bond hearing

8    right here.

9          Q.   Thank you, sir.

10         A.   Now, I can set you for a bond hearing because you

11   are an immigrant.  You have a right to ask for a bond hearing, so

12   if you want me to do that --

13         Q.   I don't --

14         A.   I'll set that for you.

15         Q.   Yeah, I would like that, sir.  Am I a permanent

16   resident?

17         A.   That's what the paperwork I've got says.

18         Q.   Okay.  Can I show you the paperwork here?

19         A.   Hand it to the officer, please.  When do you want

20   your bond hearing?  We can get you in tomorrow or Friday.

21         Q.   Tomorrow, sir.

22         A.   You sure you want it tomorrow because I won't have

23   that faxed letter yet.  You might want to investigate that, but

24   if you want it tomorrow, I'll set it tomorrow.  Just don't come

25   tomorrow and say you're not ready.

A 17 796 939                    3                    August 6, 1997

jmh

1           Q.    Let's do it on Friday, Your Honor.

2           A.    All right.

3           Q.    Because I also have letters coming in from, uh,

4    customers of mine that are law officers from San Francisco PD,

5    and I also have a couple more letters coming in from more, other

6    people that are respectable.

7           A.    Okay, I'm going to give these back to you.  You

8    bring them back to your next court hearing.  We'll have your bond

9    hearing Friday.

10          Q.    This Friday, sir?

11          A.    This Friday, the 8th.

12          Q.    Thank you, sir.

13          A.    Okay.  Now, let me tell you something else here.

14   You told me you're going to try to get a lawyer outside if you

15   can get a bond.  Just in case you're not able to get a bond or a

16   bond you can make, there are attorneys here who might be able to

17   help you.  You might want to talk to them to help you with your

18   bond hearing if you want to.  If you don't want to and you want

19   to represent yourself, then we'll see on Friday and do that then.

20          Q.    If, if I cannot get, uh, a bond on Friday, sir,

21   can I see them that day?

22          A.    Well, if you've got time to see them that day, you

23   can.  If you want to talk to them today, you can talk to them

24   today, too.

25          Q.    I really, uh, I'm an aggravated felon.

A 17 796 939                    4                   August 6, 1997

jmh

1          A.    Yes.

2          Q.    That's what they got me on and, uh, they say I got

3     one year, four months locked up in the state penitentiary, which

4     is perjury and fraud against the state of California.  I only did

5     81 days in San Quentin Prison.

6          A.    I tell you what.  Don't tell me too much before

7     you talk to a lawyer, okay?

8          Q.    All right, so I need, I need, I need to hire a

9     private, private counsel.  I don't want to talk to anybody who's

10    not going to represent me probably.

11         A.    Well, then it's your responsibility to find

12    private counsel.  Did you get the lawyer list?

13         Q.    Yes, sir, I got it.

14         A.    Okay.

15         Q.    Right over there.

16         A.    All right.  We'll come back Friday for your bond

17    hearing.

18         Q.    Thank you, sir.

19         A.    All right.

20    JUDGE FOR THE RECORD

21         The master calendar reset is August 20th.  This hearing

22    is adjourned.

23                         HEARING CONTINUED

24

25

A 17 796 939                    5                    August 6, 1997

jmh

1    JUDGE FOR THE RECORD

2          Today's date is February 12, 1999.  This is the U.S.

3    Immigration Court, San Francisco, California; Immigration Judge

4    Michael Yamaguchi.  This is in the matter of George Martha, case

5    number A 17 796 939.

6    JUDGE TO COUNSEL

7          Q.   Appearances, please.

8          A.   (Ms. Mendelson)  Dana Mendelson for Mr. Martha.

9          A.   (Mr. Stolley)  Jim Stolley for the Service.

10         Q.   Good morning to both of you.

11         A.   (Ms. Mendelson)  Good morning.

12         A.   (Mr. Stolley)  Good morning, Your Honor.

13   JUDGE FOR THE RECORD

14         We've had an off-the-record conversation regarding the

15   process with respect to this case.  What we are first going to do

16   is, it appears from the review of the record, the respondent has

17   not formally pled to the Notice to Appear, and we are going to

18   proceed on that basis first.  Second, the respondent has a motion

19   or is going to be arguing, and once we've made a decision

20   regarding the motions, then we will proceed, possibly proceed to

21   the merits of the respondent's application.

22   JUDGE TO MS. MENDELSON

23         Q.   At this time, Ms. Mendelson, have you had an

24   opportunity to review the Notice to Appear?

25         A.   Yes, Your Honor.

A 17 796 939                    6              February 12, 1999

jmh

1               Q.    And do you concede that the person named in the

2      Notice to Appear is the respondent, George Martha?

3               A.    Yes, Your Honor.

4               Q.    And obviously that he's been properly served.

5      According to the records here, it appears that he was served

6      while in custody.  He's in custody here.

7               A.    On 7-10?

8               Q.    Uh-huh.

9               A.    Is when they served him?

10              Q.    Uh-huh.

11     JUDGE TO MR. STOLLEY

12              Q.    Is that correct?  He was served while he was in

13     custody I believe.

14              A.    Yes, Your Honor.

15     JUDGE TO MS. MENDELSON

16              Q.    Yes, do you concede that?

17              A.    Okay, yes.

18              Q.    How does your client plead?

19              A.    Admit allegation number one.  I can't plead to

20     allegation number two.  I can't deny or, I just can't, I don't

21     know.  I guess that will be for the Court to determine.

22              Q.    Well, if you can either admit or deny.  We assume

23     that you deny that.

24              A.    Well, I'll deny that.  It's --

25              Q.    Number three?

A 17 796 939                      7              February 12, 1999

jmh

1          A.    Let me say that on two, I will admit the part

2     where you are a native of Jordan.

3          Q.    Okay.

4          A.    That part; the other part, no.  Number three, I

5     will admit; number four, deny; number five, deny.

6          Q.    All right.

7          A.    Deny all of it.

8          Q.    Right.  And I say, as a form of relief, assuming

9     the Government can prove the allegations, your client has filed

10    an application for withholding, since he's statutorily ineligible

11    for asylum.

12         A.    Yes.

13         Q.    Okay.  Now, what is your motion?

14         A.    Well, Your Honor, first of all, regarding the

15    aggravated felony, I have in my possession the transcript of the

16    Judgement of Sentence for Mr. Martha when he was sentenced.

17         Q.    Which has been marked in the record as Exhibit 3.

18         A.    And --

19    MR. STOLLEY TO JUDGE

20         Q.    Pardon me, Your Honor, I think was just the

21    Abstract of Judgement, was it not?

22         A.    Right.

23         Q.    Right.  Ms. Mendelson is referring to a different

24    document.

25         A.    Oh, what --

A 17 796 939                      8            February 12, 1999

jmh

1    MS. MENDELSON TO JUDGE

2              Q.    I'm referring to a different document.

3              A.    Oh, the actual transcript of the what, plea?

4              Q.    This is not the plea.  This is the Judgement and

5    Sentence.

6              A.    All right.

7              Q.    From January 17, 1995, and at that time, the

8    judge, as far as the sentence, told Mr. Martha as follows.  Okay,

9    Mr. Martha, your sentence is, imposition of sentence suspended,

10   three years probation, three years of enhanced probation to the

11   Adult Probation Department.  As condition of probation, you will

12   receive credit for time served of 159 days.  And then it goes to

13   other conditional particular probation that is not relevant.

14   This was the sentence in this case.  Mr. Martha was sentenced to

15   159 days, and there is no mention of any higher sentence

16   suspended.  It didn't say two years suspended or one year or

17   anything suspended.  It just says your sentence is imposition of

18   sentence suspended, meaning there is no sentence right now.  You

19   just (indiscernible) credit for time served.  What happened is

20   because of certain personal serious problems in Martha's life, he

21   felt that he needed to commit himself to a rehabilitation center,

22   and at some point, his probation officer approved it and said,

23   okay, yeah, that's a good idea, you should stay there.  And then

24   he left.  His probation was violated, and this is how that

25   sentence of one year and four months was imposed.  I don't

A 17 796 939                        9                    February 12, 1999

jmh

1    understand from where, since it never said 16 months sentence
2    suspended.  So, it's not really clear to me how it was imposed.
3    But, my argument is that the 16 months Mr. Martha received
4    because of something that is completely unrelated to any crime of
5    violence, for the 422, the PC422, what he actually received is
6    159 days credit for time served.  And the way it says it, I
7    understand that it's said like that because he already served
8    that time, so they say, okay, credit for time served will be 159.
9    And, I see nothing in the law of immigration that says that the
10   sentence given to a person because of violation of probation
11   should be counted as aggravated felony.  My argument is that the
12   sentence as far as aggravated felony should be the sentence at
13   time of sentencing for that felony.  If it were two years, three
14   years, 16 months sentence suspended, then I would have no
15   argument, and I would say the law says it's regardless of
16   suspension.  So, it would be aggravated felony.  But, in this
17   case, it doesn't say that.  And, therefore, my argument is that
18   Mr. Martha is not an aggravated felon.

19             A.    Because of the fact the nature of the sentence
20   determines whether or not the crime is an aggravated felony or
21   not, is that what you are arguing?

22             Q.    Yes, Your Honor.  Aggravated felony, there is a
23   long list of what constitutes aggravated felony, but in this
24   case, what's relevant to this case is a crime of violence for
25   which one year or more was imposed.  And my argument is that for

A 17 796 939                    10                    February 12, 1999

jmh

1    this crime what was imposed, a 150, oh, I'm sorry, and the law
2    says it's regardless of suspension.  The law says nothing about
3    violation of probation; regardless of suspension meaning if it
4    says in the sentencing a year or more suspended, that would count
5    as imposition of sentence.  In this case, there was no 16 months.
6    There is no year or more suspended.  So, my argument is it
7    doesn't fit under the aggravated felony.

8              A.    Do you have any cases that say that?

9              Q.    There are no cases that I could find one way or
10   the other.  It's just the plain law of immigration that says if a
11   sentence, crime of violence for which sentence imposed is a year
12   or more.  But, and it says regardless of suspension.  It doesn't
13   say, in the Act, it doesn't say, well, if it's imposed as
14   violation of probation, then it counts, too.  It looks like the
15   legislature knows exactly what they want to do because they say
16   let us make it very clear, regardless of suspension.  So, don't
17   you think that suspension is going to help you here.  But, it
18   don't say anything about violation of probation.  So, that means,
19   at least to me, that they did not mean to include violation of
20   probation, and what we should look at is actually the sentence.
21   He simply is not an aggravated felon.

22             A.    But, do you have any cases?  I mean, is there a
23   case?  According to the statute, whether or not, regardless of
24   how the sentence is imposed, whether it's suspended, whether it's
25   actually served, whether or not, it's irrelevant under the

A 17 796 939                    11              February 12, 1999

jmh

1    statute.

2                Q.    My argument, there are no cases that I could find

3    related one way or the other.

4                A.    Uh-huh.

5                Q.    Relating to what do we do if it were probation

6    violation.  So, all that means is nothing like that came, as far

7    as I know, before the BIA.

8                A.    May I see that transcript that you were reading.

9                Q.    Start with this paragraph relating to the sentence

10   (indiscernible).

11               A.    So, his sentence was an imposition of sentence

12   suspended, three years probation, three years of enhanced

13   probation to the Adult Probation Department.  As a condition of

14   probation, you will receive credit for time served of 159 days.

15               Q.    That was the sentence.

16               A.    Right.  He was sentenced.  Your sentence is an

17   imposition of sentence suspended, three years probation, three

18   years enhanced probation.  So, I'm still confused by your

19   argument.  Your argument is that because the sentence was

20   suspended that it doesn't constitute an aggravated felony because

21   no sentence was imposed, no actual sentence was imposed?

22               Q.    Because what was suspended is not one year or

23   more.  We don't know what was suspended.  Normally I see a lot of

24   plea agreements and a lot of sentencing.  Normally what it will

25   say, three year sentence suspended, two year sentence suspended,

A 17 796 939                    12                 February 12, 1999

jmh

1    like that.  But in this case, for reasons that I don't know, I
2    was not the attorney on the case, it says imposition is
3    suspended.

4              A.    All right.

5              Q.    That's it, so, that gives the doubt in here that
6    the sentence was less.  And this is further, in my opinion,
7    enhanced by the fact that it says and he's going to be sentenced
8    159 days credit for time served.  159 days is a strange number
9    for a sentence, so my interpretation of this is at that time, Mr.
10   Martha was in custody all ready a 159 days.

11             A.    That's right and he was given credit for that.

12             Q.    So, and I think, this is just an assumption, if he
13   were in custody, let's say a 130 days, it probably will say,
14   okay, 130 days because what they wanted to do was get him out,
15   and we have no number.  The law of immigration says it has to be
16   a year or more.  We have no number here for the imposition,
17   nothing here to indicate that any higher sentence could be
18   imposed at any time.

19             A.    Well, the abstract here says one year four months
20   imposed.

21             Q.    The abstract was, the date on the abstract is
22   about two years after the sentencing, so I think this is clearly
23   not imposed directly because of that crime.  We don't wait two
24   years.  Nobody waits two years to impose a sentence.  The way
25   they do it, this is just, technically the way they do these

A 17 796 939                      13              February 12, 1999

jmh

1    things, this is a commitment paper, a commitment to prison is

2    what it is.  They don't explain in this paper why the sentence

3    was imposed like that.  They don't say, well, you know, he was

4    supposed to finish a program.  He didn't finish a program and,

5    therefore, we impose it.  They just say imposed and what the

6    Court sees is that document, but the reality of it, the

7    transcript is the only true testimony of what happened in court,

8    and what happened in court is there was no year or more sentence

9    imposed for the crime.

10            A.    Well, I think, according to the Abstract, it

11   appears what happened was, correct me if I'm wrong, but Mr.

12   Stolley may be able to enlighten me, but I think was happened was

13   he violated his probation and they yanked him back and they

14   imposed the sentence of one year four month on April 1.  I may be

15   wrong.

16   JUDGE TO MR. STOLLEY

17            Q.    But, Mr. Stolley, maybe you can enlighten us as

18   to --

19   MS. MENDELSON TO JUDGE

20            Q.    That's what happened.

21            A.    Well, then that becomes a sentence.

22   MR. STOLLEY TO JUDGE

23            Q.    Your Honor, counsel's argument contains neither

24   common sense nor legal sense.  We refer you to Exhibit 3.

25            A.    Yes.

A 17 796 939                    14              February 12, 1999

jmh

1           Q.    He was sentenced to one year four months.

2      JUDGE TO MS. MENDELSON

3           Q.    Yeah, I think what happened here was that this

4      defendant, at the time of sentence, the sentence was suspended

5      and he was given three years of probation, and if he had been

6      good during his three year period, he would not have been, there

7      would have been no sentence imposed upon him.  But, he violated

8      probation.  He was brought back into court on April 11, 1997; the

9      one year and four months was imposed.  So, it constitutes a

10     sentence for purposes of the statute, the immigration laws.  Do

11     you have any cases?  I mean, you know, I'm willing to read cases.

12          A.    I understand.  There is no cases one way or the

13     other.

14          Q.    All right.  Well, then your motion is denied.  I'm

15     sorry, the one aspect is that you are arguing first of all that

16     no sentence was imposed.  I guess your second argument is that

17     the crime for which this respondent was convicted does not

18     constitute an aggravated felony within the definition of the

19     immigration.  Do you have any cases on that?

20          A.    No, Your Honor.

21          Q.    Okay.  What does the law say about this?  What's

22     an aggravated felony?

23          A.    Well, the aggravated felony as related to this

24     case would be a crime of violence for which a sentence of one

25     year or more imposed, because my argument, it wasn't imposed for

A 17 796 939                    15              February 12, 1999

jmh

1    that crime.

2              Q.   Well, on April 11th 1997, he was sentenced to one

3    year, a period greater than one year.  Terrorist threats, that's

4    obviously a crime of violence, and it is a crime, I mean, just by

5    the mere definition of terrorist threats, to me sort of connotes

6    it being a serious crime.  I mean if it were simply a threat, it

7    would have been simple assault.  It may have been a simple

8    battery, but terrorist threats, it sounds serious, doesn't it?

9              A.   Well, Your Honor, unfortunately, terrorist threats

10   has absolutely nothing to do with real terrorists.

11             Q.   Oh, I know that.  I know that.  I'm not saying

12   that Mr. Martha is a terrorist.  No, I'm not saying that.  What

13   I'm saying is that the mere fact that it's entitled terrorist

14   threats connotes that it is and sounds like a very serious crime.

15   I'm just using my common sense now here.

16             A.   It's actually a threat.

17             Q.   Yeah, all right.  Do you have any cases that say

18   that terrorist threats under Penal Code section 422 is not an

19   aggravated felony?

20             A.   No.

21             Q.   All right.

22   JUDGE TO MR. STOLLEY

23             Q.   Mr. Stolley, what's the Government argument?

24             A.   We have no argument.  It's just it comports with

25   the definition of crime of violence, 101(a)(43)(A).

A 17 796 939                    16               February 12, 1999

jmh

1          Q.    Yeah.

2    JUDGE TO MS. MENDELSON

3          Q.    Well, I'm going to deny your motion, and we will

4    go to the merits of the case.  Your client has denied certain

5    allegations.  Now, the Government has admitted into evidence the

6    fact that this respondent was convicted of a terrorist threat,

7    and that he was sentenced to a period of confinement of one year

8    and four months.  So, the only issue is that, frankly, that's it.

9    Based upon the fact that this respondent has been convicted of

10   this serious crime, and that the respondent has admitted to the

11   allegations that he is a native of Jordan --

12   JUDGE TO MR. STOLLEY

13         Q.    Mr. Stolley, what evidence does the Government

14   have regarding the citizenship of this particular respondent?

15         A.    Well, Your Honor, we have a visa.

16         Q.    All right.

17         A.    Which I can, I was not aware that the citizenship

18   would be an issue.

19         Q.    Yeah, I understand, but the respondent has denied

20   that.

21         A.    Sure.  I can make copies and submit it.

22         Q.    Would you please?

23         A.    Sure.

24         Q.    All right.

25         A.    Shall we go off the record?

A 17 796 939                    17              February 12, 1999

jmh

1           Q.    Sure.

2                         (OFF THE RECORD)

3                         (ON THE RECORD)

4    JUDGE FOR THE RECORD

5           The Government has provided to the Court a visa and

6    alien registration form for the respondent, form FS-511, which

7    has been marked and admitted as Exhibit 6.  So, it appears based

8    upon, or appears I should say, that the Court finds that first,

9    the respondent admits that he's not a citizen or a national of

10   the United States.  He admits that he's a native of Jordan, but

11   denied that he is a citizen of Jordan.  The Government has

12   introduced into evidence as Exhibit 6 the alien visa

13   registration, which evidences the citizenship of the respondent.

14   He admits that he was admitted to the United States at or near

15   New York, New York on October 26th 1967 as an immigrant.  The

16   respondent denies that he was convicted on January 3rd 1995 in

17   Superior Court for the County of San Francisco for the offense of

18   terrorist threats, in violation of 422 of the California Penal

19   Code.  The Government has introduced into evidence as Exhibit

20   3 --

21                        (OFF THE RECORD)

22                        (ON THE RECORD)

23   JUDGE FOR THE RECORD

24          I was saying that the Government has introduced into

25   evidence, certified copies of the conviction record for George N.

A 17 796 939                    18              February 12, 1999

jmh

1    Martha, evidencing the fact that the respondent, on or about

2    April 11th 1997, was convicted of violation of Penal Code section

3    422P, Terrorist Threats. The respondent has denied that for this

4    offense he was sentenced to a period of confinement of one year

5    and four months. Pursuant to Exhibit 3 in evidence, is the

6    respondent had, in fact, been sentenced to a period of

7    incarceration for one year and four months. Based upon the

8    evidence and the admissions of the respondent, the Court finds by

9    clear and convincing evidence that the charges have been proven,

10    and that the respondent is removable pursuant to section

11    237(a)(2)(A)(iii) of the Immigration and Nationality Act, as

12    amended, in that at any time after admission, the respondent had

13    been convicted of an aggravated felony as defined under section

14    101(a)(43) of the Act, to wit: A crime of violence, as defined

15    in section 16A of Title 18 U.S. Code. The respondent has filed

16    an application for withholding, and so, at this time, we will now

17    go to the merits of the respondent's application for withholding.

18    JUDGE TO MS. MENDELSON

19            Q.    And, as I understand the law, the burden is on

20    you, Ms. Mendelson, or the respondent.

21    MR. STOLLEY TO JUDGE

22            Q.    Your Honor, I'm sorry. I believe before that, the

23    Court should make a determination whether his conviction is a

24    particularly serious crime. If it is, then he is barred from

25    going to the merits of the withholding.

A 17 796 939            19            February 12, 1999

jmh

1           A.   I understand.

2           Q.   Matter of --

3           A.   I'm going to reserve that ruling until after I

4    hear from the respondent.

5           Q.   Oh, I see, okay.

6    JUDGE TO MS. MENDELSON

7           Q.   So, Ms. Mendelson, the Government has made a

8    motion for me to pretermit the withholding application.  I've

9    decided to reserve that motion until after you have presented

10   your case.

11          A.   Okay, so we're not going to talk about the

12   conviction right now?

13          Q.   We already have.  I'm sorry --

14          A.   We're not going to talk about the conviction right

15   now.

16          Q.   That's right.

17          A.   (Indiscernible).

18          Q.   I mean whether or not he's statutorily ineligible,

19   right, we'll do that after.  Let's hear the testimony and let's

20   get the evidence done with.  Let's make a record.

21   MR. STOLLEY TO JUDGE

22          Q.   On the withholding claim, you mean?

23          A.   That's right.

24          Q.   I see.

25          A.   Okay.

A 17 796 939                    20              February 12, 1999

jmh

1    JUDGE TO MS. MENDELSON

2              Q.   Okay, Ms. Mendelson.

3    MS. MENDELSON TO MR. STOLLEY

4              Q.   Do you want to do something with the witnesses?

5    Do you mind the witnesses being here?

6              A.   Are they testifying?

7              Q.   All of them.

8              A.   All of them?

9              Q.   All of them.

10             A.   They can wait outside.

11   MR. STOLLEY TO JUDGE

12             Q.   And there is no witness list as required.

13             Q.   I understand.  All right.

14   JUDGE TO MS. MENDELSON

15             Q.   Are you going to call all four of these ladies?

16             A.   Yes.

17             Q.   Okay.

18   JUDGE TO WITNESSES

19             Q.   Could you please stand outside?

20   MR. STOLLEY TO JUDGE

21             Q.   For the record, could we have their identities, so

22   that we know.

23   MS. MENDELSON TO JUDGE

24             Q.   I will --

25             A.   All right.  Why don't we do this; Ms. Mendelson,

A 17 796 939                    21              February 12, 1999

jmh

1    can you just identify for the record, who are the four witnesses

2    in addition to the respondent you intend to call?

3              Q.    Actually, there are five because there is Mr.

4    Martha's father who just stepped out of the court.

5              A.    All right.

6              Q.    And his name is Nemo Abu Martha (phonetic sp.).

7    The witnesses can identify --

8              A.    Themselves, all right.

9      FIRST WITNESS TO JUDGE

10             Q.    (indiscernible) Martha.

11             A.    And you are the sister?

12             Q.    Sister who?

13             A.    No, I'm sorry.  What's your relationship to the

14   respondent?

15             Q.    Nothing.

16             A.    Okay.

17   JUDGE TO SECOND WITNESS

18             Q.    Next, ma'am?

19             A.    Well, my husband and his father cousins, but we

20   have been long enough to know him.

21             Q.    Okay.

22   JUDGE TO THIRD WITNESS

23             Q.    You, ma'am?

24             A.    His aunt, his father's first cousin.

25             Q.    Okay, and your name please?

A 17 796 939                    22              February 12, 1999

jmh

1                A.    Selua (phonetic sp.)

2                Q.    Okay.

3        JUDGE TO RESPONDENT'S MOTHER

4                Q.    And you, ma'am?

5                A.    I'm his mother (indiscernible).

6                Q.    Okay.  Thank you very much.

7        JUDGE TO WITNESSES

8                Q.    Why don't you all have a, if you can find seats,

9        find a seat out there.

10       JUDGE TO MS. MENDELSON

11               Q.    All right, Ms. Mendelson, let me --

12       JUDGE TO RESPONDENT

13               Q.    Mr. Martha, do you want to stand?  You don't need

14       to raise your hand, I understand.  Do you solemnly swear or

15       affirm that the testimony you will render in this proceedings

16       will be the truth and nothing but the truth?

17               A.    Yes, sir.

18               Q.    Thank you very much.  Have a seat.

19       MR. STOLLEY TO MS. MENDELSON

20               Q.    This is a stranger.  Why is she testifying, the

21       woman who has no relationship testifying?

22               A.    Oh, to what's happening in Jordan.

23               Q.    Is she an expert?

24               A.    She is, she has personal knowledge.  I mean, these

25       people --

A 17 796 939                    23                February 12, 1999

jmh

1    JUDGE TO MS. MENDELSON

2           Q.    I was going to ask for a proffer, but why don't we

3    get through the testimony and then we'll get to the --

4           A.    The offer of proof is actually very simple.

5           Q.    I understand.  Instead of talking about it, let's

6    get to it.

7           A.    Okay.  All the witnesses, what they are going,

8    these witnesses are people who have personal knowledge of events

9    that are happening in Jordan.  They are not political experts as

10   far as political resume is concerned.  These are people who have

11   lived there and who have relatives living there, otherwise seen

12   or heard of events to substantiate --

13          Q.    That's good.  We'll get to that.  Let's get to Mr.

14   Martha.

15   MS. MENDELSON TO RESPONDENT

16          Q.    Mr. Martha, how long have you been in the United

17   States?

18          A.    Since I was, uh, four months, 26 days old, I

19   believe.  I ported in New York on 10-26-67.  I was born June 1st

20   1967.

21          Q.    Other than the few months before you came to the

22   United States, have you ever been to Jordan?

23          A.    No.

24          Q.    What languages do you speak?

25          A.    English.

A 17 796 939                    24                    February 12, 1999

jmh

1          Q.    Do you speak any --

2          A.    No.

3          Q.    What is your religion?

4          A.    I'm a protestant Christian.

5    JUDGE TO RESPONDENT

6          Q.    I'm sorry, a what?

7          A.    Christian.

8          Q.    What was --

9          A.    Protestant.

10          Q.    Protestant, okay.

11    MS. MENDELSON TO RESPONDENT

12          Q.    Are you a practicing Christian?

13          A.    I'm active.

14    JUDGE TO RESPONDENT

15          Q.    You are what?

16          A.    I'm an active Christian.

17          Q.    Active.

18          A.    I live by the laws of Jesus Christ.

19    MS. MENDELSON TO RESPONDENT

20          Q.    Can you tell the Court in more detail, and take

21    your time on that, how it is that you practice your religion?

22          A.    I, in the past three years, have basically been

23    the Holy Bible and, uh, throughout the times I've seen myself

24    grow and became very knowledgeable with the Bible and, uh, I like

25    to sometimes talk to people, preach to them if I see that they're

A 17 796 939                    25                    February 12, 1999

jmh

1    in need of preaching, like if they're in pain or something like

2    that because I believe that my preaching took my pain away, so it

3    could take someone else's.

4            Q.    What exactly do you preach to these people?

5            A.    I let them know that the things that I read are

6    true, that have happened, that is, in fact, are history and the

7    way I was raised throughout my life, all I remember is hearing

8    the name Jesus, and if out of all these years I've heard this

9    name, Jesus, then it's got to be true because He's, uh, in fact,

10   made me feel a lot of peace throughout the pain I've been in.

11           Q.    Why do you have to preach?

12           A.    It just, it takes me away from my everyday pain.

13           Q.    Well, what if --

14           A.    It's my belief.

15           Q.    What if you were told that you need not preach

16   your religion, just please don't do that?

17   MR. STOLLEY TO JUDGE

18           Q.    Objection, Your Honor.  What relevance does this

19   have to his withholding claim?

20           A.    Yeah, What's --

21           Q.    It calls for speculation.

22           A.    Yes, sustained.

23   MS. MENDELSON TO JUDGE

24           Q.    Can I ask him that (indiscernible)?

25           A.    No, he can't answer it.  Pose your next question.

A 17 796 939                 26                 February 12, 1999

jmh

1    MS. MENDELSON TO RESPONDENT

2              Q.    Do you have any opinion regarding the Moslem

3    religion?

4              A.    I'm against anything that is against Jesus Christ.

5    Anything against Jesus Christ is the Antichrist.

6              Q.    Do you like Arabs, Moslems?

7              A.    I really don't dislike anybody, but I don't

8    approve of the way they live, and I don't want to even think

9    about adapting to their lifestyle.

10             Q.    What is your opinion regarding roles of men and

11   women?

12             A.    Rules?

13             Q.    Roles, roles.

14             A.    Laws?

15             Q.    How should men and women should be.

16             A.    Equal.   The woman has a right to do what she

17   pleases.   She's a human being.  Uh, I don't believe a man should

18   hit a woman.  I believe that that's, I mean I've never hit nobody

19   in my life, so to hit somebody would be a brutal act.  As far as

20   the woman and man and the relationship, I really strongly believe

21   that even if you're not in a relationship, that a woman has a

22   right.   She's human.  It's human rights.  She has a right to buy

23   a car.   She has a right to live on her own.  She has a right to

24   have sex to whom she wants to have sex with.  It's her body, it's

25   her life, it's her destiny.

A 17 796 939                    27                February 12, 1999

jmh

1          Q.    What is your opinion about how people should get

2    together and form a relationship?

3    MR. STOLLEY TO JUDGE

4          Q.    Your Honor, objection.  Counsel is on a fishing

5    expedition.  She's attempting to bootstrap a withholding case by

6    trying to find whether there is a germ of any political opinion

7    in any of the questions that --

8          A.    That's argumentative.  I'll overrule that.  I'm

9    sorry, I will overrule the objection.

10   JUDGE TO RESPONDENT

11         Q.    You can answer the question.  Go ahead, answer the

12   question.

13   MS. MENDELSON TO RESPONDENT

14         Q.    How should --

15   RESPONDENT TO JUDGE

16         Q.    She needs to repeat it.

17   MS. MENDELSON TO RESPONDENT

18         Q.    Yeah, what is your opinion regarding how men and

19   women should get together to form a relationship?

20         A.    I personally would have to know somebody.  I've

21   known Vivian for many years before we got married.

22         Q.    Okay.  We're not, Vivian --

23         A.    Friendship, intimacy.

24         Q.    We're talking any place that you go, if you, how

25   do you in general believe that men and women should get together

A 17 796 939                    28                  February 12, 1999

jmh

1       in order to form a relationship?

2                A.      I don't believe that anyone should fix a marriage,

3       if that's -- I mean in a nightclub you meet somebody, go out and

4       have fun.

5                Q.      What kind of form of government do you like?

6                A.      I was raised in a democratic society and, uh --

7                Q.      What do you believe should be is the correct form

8       of government?

9                A.      The government that I'm living under right now is

10      the correct form of government.

11               Q.      Which is what?   What kind of government?   What

12      kind of government do you live under right now?

13               A.      Democratic.

14               Q.      Why do you like that form of government?

15               A.      Because freedom, you have the free, free to do

16      what you please.   It's, you can speak out what you feel and

17      it's --

18               Q.      Why --

19               A.      It's the way I was raised, I mean.

20               Q.      Why is it important for you to speak out?

21               A.      Because I'm human.   I have a right to live my

22      life.   Without expressing myself, how can I live?

23               Q.      What is your opinion about the form of, as far as

24      form of government about dictatorships?

25      MR. STOLLEY TO JUDGE

A 17 796 939                   29                   February 12, 1999

jmh

1             Q.    Objection, Your Honor.  What's the relevance?

2             A.    Yes.

3    JUDGE TO MS. MENDELSON

4             Q.    Counsel, what is the relevance?

5             A.    This is the form of government in Jordan.

6    MR. STOLLEY TO JUDGE

7             Q.    That's not correct, Your Honor.

8             A.    No.

9    JUDGE TO MS. MENDELSON

10            Q.    Ma'am, that's your -- maybe the question should be

11   posed this way.

12   JUDGE TO RESPONDENT

13            Q.    What is your opinion of the government of Jordan?

14            A.    I don't know, I know nothing about them and I

15   personally don't know anything about the Muslim law, and for me

16   to call somebody the king, to me that's a title just like a

17   president, and, uh, the only person that I can call that would my

18   President of the United States of America and that's Clinton.  I

19   could not bow down and say, Oh, King Hussein, or whatever his

20   name is, that you are my king.  He's an idol.  There's only one

21   king and that's Jesus Christ, and it's written in the Bible.  And

22   I have, I have that, that, that strong belief in me that I, I,

23   I'm not gonna take his position from him.  He's the king of the

24   people that want to call him the king, and my president is the

25   President of the United States who I call the President.

A 17 796 939                    30              February 12, 1999

jmh

1    MS. MENDELSON TO RESPONDENT

2         Q.    What do you normally do, do you ever think that

3    the Government, it does something that you disagree with; do you

4    ever disagree with something this Government does?

5         A.    No, no way.

6         Q.    What would you do if you did disagree with

7    something that this Government did?

8    MR. STOLLEY TO JUDGE

9         Q.    Speculation, Your Honor.  He's already testified

10   he's never disagreed with anything the Government has done.

11        A.    That's sustained.

12   MS. MENDELSON TO RESPONDENT

13        Q.    If you go, if there is, if you live in a place

14   where you disagree with the law or the government, would you do

15   something about it?

16        A.    I would like, if I disagree with something that's

17   going on, personally, yeah, I would talk to people about it, but

18   I don't have the power to do anything against a government.  If I

19   spoke against a government, I could be jailed.  I mean, look

20   where I'm at right now for threatening somebody.  I'm scared to

21   talk now.  I'm afraid to speak to anybody, but I still have

22   feelings that need to come out, and I still am human.

23        Q.    Do you think, assuming you wanted to speak about

24   something and you couldn't --

25   MR. STOLLEY TO JUDGE

A 17 796 939                    31              February 12, 1999

jmh

1              Q.   Objection, Your Honor.

2      JUDGE TO MS. MENDELSON

3              Q.   It's speculative.

4              A.   I believe.

5      MR. STOLLEY TO JUDGE

6              Q.   Could we just get to why he's afraid of returning

7      to Jordan, some objective fears?

8      JUDGE TO MS. MENDELSON

9              Q.   Well, Mr. Stolley has a point there.  Ms.

10     Mendelson --

11             A.   Let me explain something.

12             Q.   No, no.  I understand what you're trying to do.  I

13     understand you're trying to lay the foundation out, but I think

14     Mr. Stolley is saying here, he's not going to object to these

15     foundational questions.  Let's just ask the pertinent question,

16     why does he fear going back to Jordan?

17             A.   We can ask that question, but I would like the

18     opportunity to explain what I think is the special point about

19     this case.

20             Q.   Oh, Ms. Mendelson, I allow attorneys to argue

21     their case after the conclusion of evidence.  So, you don't have

22     to do it through the witness.

23     MS. MENDELSON TO RESPONDENT

24             Q.   Are you afraid to go back to Jordan?

25             A.   Yes, I am.

A 17 796 939                     32              February 12, 1999

jmh

1          Q.    Why?

2          A.    Uh, I don't know anything about the country.  I

3    came here when I was a baby.  I never, I successfully stayed in

4    America all my life.  I am not Muslim.  The people, they are true

5    animals to me.  They, uh, scare me.  I know that my big mouth

6    I'll probably say something wrong about their king and end up in

7    jail.  I, uh, know that by me preaching my religion, that I'll

8    continue on studying the Christianity law and I will not convert

9    to anything that I disagree.  This is my religion.  I disagree

10   with the Muslim law.  I was raised in the Christian law, and it's

11   just, it's scary, Your Honor, for me to, I mean, I, I may have

12   went to jail for, uh, threatening to hurt my wife, but in all

13   actuality, in all reality, I've never hurt nobody in my life,

14   and, and I would never participate in any wrongdoings to do such

15   a thing to anyone.  I'm against gang violence.  I'm against

16   anyone that wants to be an organization such as.  Uh, I'm against

17   people that sell drugs in the streets, although I am a recovering

18   addict.  I would not want nobody to harm my child, Anthony

19   Martha, who was born in San Francisco.

20   MS. MENDELSON TO JUDGE

21         Q.    Judge, how about if we concentrate on --

22   MS. MENDELSON TO RESPONDENT

23         Q.    The Court wants to know why you are afraid, not

24   exactly what you don't people to do to your child, but what

25   if --

A 17 796 939              33              February 12, 1999

jmh

1           A.    I'm afraid to die.  I don't want to die in, in, in

2    a foreign country.

3           Q.    Why do you think that you would die there?

4           A.    Because I am not accustomed to their laws.  I will

5    not and I refuse to be told how to live.  I was raised in

6    America, not in Jordan.

7           Q.    What if, I understand that you don't know the laws

8    there, but what if somebody taught you what the laws there were,

9    and then you knew that this what you need to do and not to do,

10   what then?

11          A.    I wouldn't do it.

12          Q.    And why wouldn't you do it?

13          A.    Because I won't change my religion for nobody

14   because I will not worship their laws.

15          Q.    What if you weren't really asked to change your

16   religion, but there were other, let's call a form of behavior

17   that you needed to follow in order to survive, and somebody told

18   you what they are, what would you do?

19   MR. STOLLEY TO JUDGE

20          Q.    Objection, Your Honor.  It calls for speculation.

21          A.    Yeah, sustained.

22   RESPONDENT TO MS. MENDELSON

23          Q.    I have a right to my political --

24   JUDGE TO RESPONDENT

25          Q.    I'm sorry, Mr. Martha, you can't answer the

A 17 796 939                    34              February 12, 1999

jmh

1    question.

2    MS. MENDELSON TO RESPONDENT

3          Q.   Do you see yourself as able, do you know if you

4    are able to not speak out?

5    JUDGE TO MS. MENDELSON

6          Q.   What?  I'm sorry, what was that question?

7          A.   Not speak out your opinion.

8          Q.   Could you repeat the question, please?

9    MS. MENDELSON TO RESPONDENT

10         Q.   Are you able to keep your opinions to yourself?

11   MR. STOLLEY TO JUDGE

12         Q.   Objection, Your Honor.  Asked and answered.  He

13   said a few minutes ago that, in fact, he was afraid of speaking

14   anymore because of the trouble that he'd got into.

15         A.   Well, there is also no foundation for that.

16   Sustained.

17   MS. MENDELSON TO RESPONDENT

18         Q.   Are there more reasons why you are afraid to go

19   back to Jordan?

20         A.   I'm afraid to go back to Jordan because I will

21   speak out in the way that they live because I don't want to live

22   the way they live.  I have a right to my political opinions.  I

23   have a right to my religion.  I have a right to live my life, and

24   they won't do it.  They'll jail me for, for speaking out the way

25   I feel and for preaching my Christianity.  I, I will be jailed

A 17 796 939                    35              February 12, 1999

jmh

1    for it.  I don't even think there's any Christians in Jordan at

2    all.  I think it's a Catholic little clique somewhere over there,

3    and I won't pray to the Virgin Mary and I don't, I refuse to

4    adapt to any other way.  This is the ways I was raised here.  I'm

5    afraid the jails over there, they'll kill me in there.  I can't,

6    I can't survive over there, Your Honor.

7              Q.   Do you --

8              A.   I don't even speak the language.

9              Q.   How is your health?

10             A.   Okay.

11             Q.   Mental health?  Do you have any mental --

12             A.   I, uh, I am bipolar.  I was diagnosed with the

13   bipolar disorder and --

14             Q.   Can you explain to the best of your ability what

15   happens to you or how, what that mental disorder does to you?

16             A.   I'm supposed to be on lithium, and the Lithium is

17   a salt that controls my mood swings which are highs and lows, my

18   peaks will, this is, uh, from my drug, drug abuse addiction.

19   Somehow it made me bipolar.  Uh, an INS psychiatrist in, in

20   Arizona is the one diagnosed me with it and medicated me with it,

21   and it's like I don't even have control over my mood swings

22   sometimes.  When I, I, I have a problem with verbal abuse when I

23   go through my peaks, and when I go to my lows, I, uh, I get real

24   depressed and lonely, and from this, I've had this for a long

25   time from my drug abuse.  And from this disorder, I became a

A 17 796 939                    36                February 12, 1999

jmh

1    verbal, I've had a problem with verbal abuse, but I, I'm a

2    graduate from, from (indiscernible) Life.  I did 40 weeks on

3    Valencia Street over here from, uh, domestic violence.  I'm a

4    verbal abuser and I went to seek treatment for it, and like, and

5    I'm on my medications for it.  When I'm on my medications, I

6    really don't have a problem with my peaks.  I don't if Jordan

7    will tolerate with that.

8    JUDGE TO MS. MENDELSON

9         Q.    Ms. Mendelson, do you have anything further?

10        A.    Well, what I want to present, I'm not allowed to.

11   MS. MENDELSON TO RESPONDENT

12        Q.    Do you have any family in Jordan?

13        A.    No.  I don't have nobody.

14        Q.    Do you know anybody in Jordan?

15        A.    No.

16        Q.    Do you speak the language?

17        A.    No.

18        Q.    Do you have any knowledge of the way of life in

19   Jordan?

20        A.    No, ma'am.  It's a foreign country to me.

21   MS. MENDELSON TO JUDGE

22        Q.    I have nothing further.

23        A.    Okay.

24   JUDGE TO MR. STOLLEY

25        Q.    Cross?

A 17 796 939                    37              February 12, 1999

jmh

1          A.    No questions.

2          Q.    All right.

3    JUDGE TO MS. MENDELSON

4          Q.    Ms. Mendelson, you indicated you have five

5    witnesses.  What is the proffer with respect to those witnesses?

6    Why do you want to call them?

7          A.    I want to call these witnesses because my

8    understanding is Mr. Martha doesn't know Jordan and cannot really

9    testify to what happens in Jordan.  The problem in this case,

10   what I tried to say, is that if one puts together what is

11   happening in Jordan and Mr. Martha's character, then it becomes

12   very clear that very shortly upon arriving there, he would be

13   jailed or worse.  These witnesses that I brought are people who

14   know, have knowledge from having lived there and having seen

15   what's going on, what happens to a person in Jordan who is one,

16   Christian, or two, speaks or says something against the

17   government and how severe these incidents are.  And they

18   actually, this is not, these are events that happened to them, to

19   their family, to people they saw.

20         Q.    Well, you indicate that you have five witnesses

21   that are all going to testify similarly, is that correct?

22         A.    To some degree, they testify similarly, but they

23   differ because each one, they sort of compliment each other, and

24   the events that they testify to, of course, different, because

25   each one of them had their own story to tell.

A 17 796 939              38              February 12, 1999

jmh

1           Q.   Well, Ms. Mendelson, your proffer is very vague.

2    I mean I understand.  I'll allow you to call one of the five.

3    Pick your best.  From what you proffered to the Court, they are

4    all appear to be redundant.  They all appear to have similar

5    information they can provide to the Court.  I'll allow you to

6    call one, so you can call one of them.  You haven't presented,

7    your proffer indicates to the Court that they are all going to

8    testify similarly, and as a result, under the rules of evidence,

9    redundant and cumulative can be excluded.  I mean, Mr. Stolley

10   here can object to all these witnesses just based upon the

11   proffer you provided.  So, I'm willing to listen to one.

12          A.   Okay, can I ask the Court to at least listen to

13   two of them and let me explain why; because the testimony is, in

14   fact, different.  I will pick one of the witnesses.

15          Q.   Let's hear the one and then we'll determine

16   whether or not we need the second, all right?

17          A.   Is it possible for me to have five minutes to talk

18   to them?  I believe that I cannot --

19          Q.   All right, five minutes.

20                         (OFF THE RECORD)

21                         (ON THE RECORD)

22   JUDGE FOR THE RECORD

23          The time now is, I have 15 to.  We'll reconvene in, I'm

24   sorry, we'll reconvene in five minutes.

25                         (OFF THE RECORD)

A 17 796 939                    39              February 12, 1999

jmh

```
 1                        (ON THE RECORD)

 2   JUDGE TO WITNESS

 3             Q.   Ma'am, just for the record, could you state your

 4   name?

 5             A.   My name?

 6             Q.   Yes.

 7             A.   Eseet Marta.

 8             Q.   All right.  And could you please raise your right

 9   hand?  Do you solemnly swear or affirm that the testimony you

10   will provide in this proceeding will be the truth and nothing but

11   the truth?

12             A.   It's truth and I have the picture and I was there.

13             Q.   All right.  Could you just please have a seat.

14             A.   Thank you.

15             Q.   State your name again and spell your name.

16             A.   E-S-E-E-T, M-A-R-T-A.

17             Q.   Okay.

18   JUDGE TO MS. MENDELSON

19             Q.   Counsel?

20   MS. MENDELSON TO WITNESS

21             Q.   Mrs. Marta, do you have any relationship with

22   George Marta?

23             A.   No.

24             Q.   Have you always lived in the United States?

25             A.   Living in the United States?
```

A 17 796 939                          40                    February 12, 1999

jmh

1          Q.    Have you always lived in the United States?

2          A.    Yes.

3          Q.    Always?

4          A.    No, I came 1974.  I can't hear too well.

5          Q.    Okay.  When was the last time you were in Jordan?

6          A.    Here, I have the visa, in October.

7     JUDGE TO WITNESS

8          Q.    October of when?

9          A.    October, last October.

10    MS. MENDELSON TO WITNESS

11         Q.    Would that be October of 1998?

12         A.    Yeah, it was '98, yes.

13         Q.    I want to ask you a few questions regarding I

14    would say things that happened in Jordan.  First of all, is it

15    easy in Jordan to distinguish a Christian from a Moslem?

16    JUDGE TO MS. MENDELSON

17         Q.    I'm sorry, counsel, but, what's the foundation?

18    WITNESS TO MS. MENDELSON

19         Q.    Oh, big one (indiscernible).

20    JUDGE TO WITNESS

21         Q.    No, no, no, ma'am.

22    JUDGE TO MS. MENDELSON

23         Q.    Counsel, you've got to lay a foundation before you

24    ask for an opinion.  So, could you please lay the foundation?

25         A.    George Martha testified that he's a Christian.

A 17 796 939                    41              February 12, 1999

jmh

1    What I'm trying to show is that there's discrimination against

2    the Christians in Jordan.

3              Q.    Ma'am, I know what you're trying to do, but in

4    order to elicit an opinion, you have to lay a foundation as to

5    the qualification of why a witness can render a specific opinion

6    or it's irrelevant.  I mean you might as well ask her the

7    difference between black and white.

8    MS. MENDELSON TO WITNESS

9              Q.    How long have you lived in Jordan, Ms. Marta?

10             A.    Well, I was one month there.

11             Q.    No, how long you lived in Jordan before?

12             A.    Oh, long time (indiscernible) from I'm born until

13   1968.  In '68, we left.

14             Q.    Do you consider yourself knowledgeable to testify

15   regarding customs in Jordan?

16             A.    You mean I have to be like them, their custom, no

17   way.

18             Q.    No.

19   JUDGE TO MS. MENDELSON

20             Q.    Well --

21   WITNESS TO MS. MENDELSON

22             Q.    I am Christian.  You know, it's different over

23   there.  You have to, when I was me and my son there, you know,

24   ever move my son I was with him.  I don't move, don't do any move

25   because we are different.  Christian is different.

A 17 796 939                    42              February 12, 1999

jmh

1    JUDGE TO WITNESS

2              Q.   I'm sorry, ma'am.  No.

3              A.   No.

4    JUDGE TO MS. MENDELSON

5              Q.   Counsel, pose your question again.

6    MS. MENDELSON TO WITNESS

7              Q.   Do you have any personal knowledge regarding

8    events that happened in Jordan relating to conflicts of religion?

9              A.   Yes.  You see here, I was over there.

10   JUDGE TO WITNESS

11             Q.   Ma'am, you've answered the question.

12             A.   Yeah.

13             Q.   Let the attorney.

14             A.   I was over there.

15             Q.   Excuse me.  Let the attorney conduct the

16   examination.

17   MS. MENDELSON TO WITNESS

18             Q.   What is your religion?

19             A.   Christian.

20             Q.   In Jordan, as far as you know, could you, in

21   Jordan, distinguish between, is there a way in Jordan to

22   distinguish right away between a Christian and a Moslem?

23             A.   Oh, yeah.

24   MR. STOLLEY TO JUDGE

25             Q.   Objection, Your Honor.  There is still no

A 17 796 939                    43              February 12, 1999

jmh

1    foundation laid.

2             A.   Yes, sustained.

3    WITNESS TO MS. MENDELSON

4             Q.   Very easy.

5             A.   Okay.

6    JUDGE TO MS. MENDELSON

7             Q.   Sustained.

8    WITNESS TO MS. MENDELSON

9             Q.   Very easy.

10            A.   Have you ever seen in Jordan, any military abuse

11   or government abuse against a person because he was a Christian?

12            Q.   I was in October there.  An army man, he came with

13   his truck, in Ovhey (phonetic sp.), is a small town, a Christian

14   town.  The man, he was open his door.  He know him because a

15   small town.  The army truck, boom, he push, he open, he had hit

16   his, his door and I said, my goodness, look at that what he did,

17   why?  Why you don't do something, for the Christian man.  He said

18   where I go, the police?  He's a Moslem.  I can do nothing.  I was

19   over there in front the building.  We was living there that

20   month.

21            Q.   Does the police in Jordan treat differently

22   Christians and Moslems?

23            A.   They can't go to the police.

24   MR. STOLLEY TO JUDGE

25            Q.   Objection, Your Honor, foundation.

A 17 796 939                    44              February 12, 1999

jmh

1           A.    Sustained.

2     JUDGE TO MS. MENDELSON

3           Q.    Ma'am, you have to lay the foundation.  You're

4     eliciting, as far as this is concerned, this is discussions,

5     rumors off the street.  You have to explain to the Court why this

6     person is qualified to express an opinion that you're attempting

7     to elicit.

8           A.    (indiscernible) the (indiscernible) qualification

9     we will cover.

10    MS. MENDELSON TO WITNESS

11          Q.    Do you have any knowledge regarding the way police

12    treats Christians and Moslems in Jordan?

13          A.    Sure, the Moslem, if Moslem he hit the Christian,

14    the Christian, he can't go the police station.  They gonna hit

15    him more.

16    MR. STOLLEY TO JUDGE

17          Q.    Your Honor, we have --

18    WITNESS TO MS. MENDELSON

19          Q.    They know from his name from --

20    JUDGE TO MR. STOLLEY

21          Q.    Yes, sustained, and the answer --

22    WITNESS TO MS. MENDELSON

23          Q.    He's a, he's a Christian.

24    JUDGE TO MS. MENDELSON

25          Q.    Yes --

A 17 796 939                    45              February 12, 1999

jmh

1    WITNESS TO MS. MENDELSON

2              Q.    Especially when his name John.

3              A.    Mrs. Marta --

4    JUDGE TO MS. MENDELSON

5              Q.    The objection is sustained.  The testimony will be

6    stricken.

7              A.    I'm sorry, I didn't hear the objection, Judge.

8    MR. STOLLEY TO JUDGE

9              Q.    There was still no foundation.  She simply said

10   that she did have knowledge, but she didn't tell us what that

11   knowledge was.

12             A.    Right, exactly.

13             Q.    She simply went into her testimony.

14   MS. MENDELSON TO WITNESS

15             Q.    Ms. Marta, have you ever, try to answer exactly

16   the question.

17             A.    Okay.

18             Q.    I understand that you said you have knowledge.

19   Now, my question is before in telling exactly what you saw, how

20   is it that you have knowledge of how the police treats Moslems

21   and Christians?  How do you know this?

22             A.    Because the Christian, she told me, I never can go

23   to the police station because --

24             Q.    No, no.  We'll go to this in a second.  I just

25   mean, let me explain.

A 17 796 939                    46                February 12, 1999

jmh

1          A.     They know by their, his name.  They treat him
2    different.

3          Q.     Ms. Marta, what my question is, the reason you
4    have the knowledge is because you saw it, you read about it, you
5    heard about it or you learned about it in university.  How is it,
6    before you tell the actual story, how is it that you have
7    knowledge about the way the police treat Christian and Moslem?

8          A.     Because I told her why you don't, why don't go to
9    the police?  She say, no way, it happen before.

10         Q.     Let me ask you a different way.  Have you ever
11   seen how the police treat Moslems, and have you ever seen how the
12   police treat Christians?

13         A.     I see it in the streets.

14         Q.     So, you saw that?

15         A.     Yeah.

16         Q.     Is that how, is that your testimony is the reason
17   you know it is because you saw it yourself?

18         A.     Yeah, I say why you doing like that?

19         Q.     (Indiscernible).

20         A.     Just because you are Christian, I said, why?  And
21   they can talk.  We are American citizen, we talk a little bit
22   more.  We are strong to talk, but poor lady, the one with me, she
23   can't talk.

24         Q.     Do you know, this is just a yes or no answer, do
25   you have any knowledge as to what happens in Jordan when a person

A 17 796 939                    47              February 12, 1999

jmh

1    speaks against the government, just yes or no.  Do you have any
2    knowledge?

3         A.    Yes.

4         Q.    And how it is that you have that knowledge?

5         A.    My brother was two years in the jail because he
6    say is not, is the government fault is no food.  There is no
7    tomato, there is, (indiscernible) in the jail.  You can't talk
8    anything for the policeman.

9         Q.    So, is it your testimony that you know what
10   happens to a person who speaks against the government because you
11   know somebody?

12        A.    No, I know my brother, my brother.

13        Q.    Is your brother ever, has your brother ever spoke
14   against the government?

15        A.    He was spoke, him in the jail.

16        Q.    What did he say?

17        A.    'Cause he say about the food, tomatoes, somebody
18   tape it and he put it in the court by tape.

19        Q.    How long was your brother in jail for saying that?

20        A.    Two years, two years.

21        Q.    And when did that happen?

22        A.    It was in, he left 1990, '90, he left, 9, yeah,
23   before (indiscernible), or '89 or '90, '90, I think it was '90,
24   so --

25        Q.    So, when was it that he was in jail?

A 17 796 939                     48                  February 12, 1999

jmh

1           A.   He was two years in the jail from '87, I think,

2    to, to '90.  It was two years.  The time was two years, and I

3    show you, also, I was going with a tailor doing alteration.

4    Here, the picture of her children, five daughters.  She's a

5    Christian.  And the Moslem lady, she came.  She kick her --

6    JUDGE TO WITNESS

7           Q.   Ma'am, I'm sorry.  There was no question, so.

8           A.   Oh, okay.  (Indiscernible).

9    MS. MENDELSON TO WITNESS

10          Q.   Did your brother have a trial?

11   MR. STOLLEY TO JUDGE

12          Q.   Your Honor, I don't know what the relevance of

13   this is.  This apparently happened 10 years ago to the witness'

14   brother.

15   JUDGE TO MS. MENDELSON

16          Q.   Ms. Mendelson, I'll allow the witness to answer

17   that question.

18   JUDGE TO WITNESS

19          Q.   Did he have a trial?  Did your brother have a

20   trial?

21          A.   Oh, yes.

22          Q.   All right.

23          A.   He was (indiscernible) for 15 years, but over

24   there, they say --

25          Q.   Well, no, ma'am, I think you answered the

A 17 796 939                    49                February 12, 1999

jmh

1    question.

2              A.    Oh.

3              Q.    Just please stick to the question.

4    JUDGE TO MS. MENDELSON

5              Q.    That's your answer.

6              A.    I understand that.  I would like to pursue that to

7    show the Court.  I understand that not every incident happen one

8    week ago.  I would like to pursue that incident and continue

9    asking her about her knowledge, did this continue to happen

10   because --

11   MR. STOLLEY TO JUDGE

12             Q.    Objection, Your Honor.

13   JUDGE TO MS. MENDELSON

14             Q.    It's irrelevant.

15             A.    The reason it's relevant is because if somebody

16   goes to Jordan and speaks against the government and doesn't get

17   what we call a fair trial, I think it is relevant as what gonna

18   happen to George Martha.

19             Q.    No, no, ma'am.  Ms. Mendelson, what's relevant is

20   not, let me say it the other way.  It's irrelevant regarding

21   these events that occurred 10 years ago.  What you are trying to

22   prove are what conditions are presently, for which the respondent

23   has fear.  So, I sustain the objection.

24   MS. MENDELSON TO WITNESS

25             Q.    Do you have any knowledge about recent events in

A 17 796 939                    50                    February 12, 1999

jmh

1    Jordan?

2           A.    The one I saw it, no, when I was October there,

3    Douglas, you know, he was going to ask for job. Here is picture,

4    because his cousin, we take a lot of picture when I was there.

5    And they beat him. I say why? He say because I'm Christian, I'm

6    asking for job from this Moslem.

7           Q.    And you --

8           A.    I say, how come?

9    JUDGE TO WITNESS

10          Q.    Ma'am, I'm sorry, just please respond to the

11   question.

12   JUDGE TO MS. MENDELSON

13          Q.    Ms. Mendelson?

14   MS. MENDELSON TO WITNESS

15          Q.    When you were in Jordan in October, did you have

16   occasion to walk in the streets?

17          A.    Walk in the --

18   MR. STOLLEY TO JUDGE

19          Q.    Could that be rephrased, Your Honor?

20   WITNESS TO MS. MENDELSON

21          Q.    I was walk in the street.

22   MR. STOLLEY TO JUDGE

23          Q.    I'm not sure what she means.

24          A.    Yeah.

25   WITNESS TO MS. MENDELSON

A 17 796 939                    51                 February 12, 1999

jmh

1              Q.    Cousin, not by myself.

2              A.    Can you --

3    JUDGE TO WITNESS

4              Q.    Ma'am, I'm sorry.

5    MS. MENDELSON TO WITNESS

6              Q.    Let's get to the point.

7    JUDGE TO MS. MENDELSON

8              Q.    Again, let's get some order here. There was an

9    objection.    The objection is sustained because this question was

10   vague.    Could you just rephrase the question, please?    Walking

11   around the street --

12   MS. MENDELSON TO WITNESS

13             Q.    How long were you in Jordan?

14             A.    One month, from, uh, what was it, from October

15   3rd, we left October 28th.

16             Q.    During that month that you were in Jordan, did you

17   have any occasion to see couples in the street, a couple, a man

18   and a woman walk in the street?    Did you have any occasion to see

19   that?

20             A.    Uh, usually, the Moslem, he, he walk only man by

21   himself sometime, but the Christian, they walk woman and man, and

22   some woman, they walk, too, by themself, but not much.

23             Q.    Did you have any occasion, at the time that you

24   saw a man a woman walking together, did you have any occasion to

25   see the man and the woman touching each other?

A 17 796 939                    52                    February 12, 1999

jmh

1           A.    Oh, no.  My, my, my son, because we have fiance
2    cousin, he, he told me can I touch her hand and I say, no, no.
3    This is, in not, I was all the time be careful with my son and he
4    was asking me how I do, how I walk, how I talk.
5    JUDGE TO WITNESS
6           Q.    That's fine, ma'am.  You've answered the question.
7           A.    Yeah.
8    MS. MENDELSON TO WITNESS
9           Q.    So, you have never seen anybody, man and woman
10   touch?
11          A.    No, no, hold each other, no.
12          Q.    And that was in October of '98?
13          A.    Yes.  No, they can't hold each other over there
14   walking the street.
15          Q.    Do you have any knowledge of incidents similar to
16   what had happened to your brother about 10 years ago?
17          A.    I hears many, many story, many, many story from
18   the cousin.  All of that, I said, please can you stop.  So many,
19   only they talk about those things.  I say, make, talk something
20   happy because (indiscernible) catch him.  And there was --
21   JUDGE TO WITNESS
22          Q.    Ma'am, you've answered the question.
23   MS. MENDELSON TO WITNESS
24          Q.    Do you know Sowah Shamir (phonetic sp.)?
25          A.    Yes, I know her.

A 17 796 939                    53                  February 12, 1999

jmh

1           Q.    Do you know anything about events that happened to

2    her cousin in Jordan?

3           A.    She told me about the story.  He was beating, I

4    think, she told me the story about her cousin there beaten.

5           Q.    Do you remember what happened to him?

6    MR. STOLLEY TO JUDGE

7           Q.    Your Honor, I'm not sure we know who we're

8    referring to.  Counsel has asked, do you know a Sowah, someone

9    who, and then a story about her brother.  So, we seem attenuated.

10   JUDGE TO MS. MENDELSON

11          Q.    I'm assuming we're going to get to the point here.

12          A.    Yeah, the point is that the (indiscernible) is

13   making a point that an incident, the Court is putting me in a

14   very difficult position, and the position is as follows, that I

15   cannot present to the Court incidents that happened to people in

16   Jordan and gave me five minutes to decide which to

17   (indiscernible).  Therefore, what I'm trying to do right now is

18   to bring to this witness an incident that happen one year ago in

19   Jordan, because I don't have any other possibility to present it

20   through somebody else, because I cannot testify to it, and I --

21          Q.    I think the objection is that you haven't laid any

22   foundation.  Your asking questions for people we have absolutely

23   no idea who they are.

24   MS. MENDELSON TO WITNESS

25          Q.    Who is Sowah Shamir?

A 17 796 939                  54                February 12, 1999

jmh

| 1  | A. | Oh, me, you ask me? |

| 2  | Q. | Yes. |

| 3  | A. | She's American citizen. |

4    JUDGE TO WITNESS

| 5  | Q. | Well, ma'am -- |

6    MS. MENDELSON TO WITNESS

| 7  | Q. | Do you know is she one of the women outside? |

| 8  | A. | Yes. |

| 9  | Q. | Do you know if she has any relatives in Jordan? |

| 10 | A. | No.  I think, yes, some relatives she has, yeah. |

| 11 | Q. | Do you know if she has a cousin in Jordan? |

| 12 | A. | I think, yeah, (indiscernible) in Jordan. |

| 13 | Q. | Do you know where he is in Jordan? |

| 14 | A. | Exactly, I don't know the address, you know, over |

15   there because there is no address, uh, everybody has mailbox.

| 16 | Q. | Do you -- |

| 17 | A. | The post office put my mail.  He don't come to the |

18   home.

| 19 | Q. | Do you know if he is free? |

20   MR. STOLLEY TO JUDGE

| 21 | Q. | Objection, Your Honor. |

| 22 | A. | Sustained. |

23   WITNESS TO MS. MENDELSON

| 24 | Q. | Uh -- |

25   JUDGE TO WITNESS

A 17 796 939                    55                    February 12, 1999

jmh

1              Q.    No, ma'am, ma'am.

2     MS. MENDELSON TO WITNESS

3              Q.    Do you know if her cousin was ever jailed?

4              A.    He was in jail.

5              Q.    Do you know when that was?

6              A.    Exactly, I have to ask her.  I don't know exactly.

7              Q.    Do you know approximately?

8              A.    I think she said seven years (indiscernible),

9     something like that about that incident.

10             Q.    Do you know of any incident, well, a cousin of

11    her, an incident more recent (indiscernible) cousin of her were

12    jailed?

13             A.    I think she told me the other cousin, the younger,

14    he was in the jail, also.

15             Q.    Do you know when that was?

16             A.    I don't know exactly.

17    JUDGE TO MS. MENDELSON

18             Q.    Ms. Mendelson, you really are fishing.

19             A.    Your Honor, I'm not fishing.  I'm just not allowed

20    to call the witness who can testify directly to it, and that was

21    a year ago.  I have nothing further.

22             Q.    All right.

23    JUDGE TO MR. STOLLEY

24             Q.    Do you have cross?

25             A.    No.

A 17 796 939                    56                   February 12, 1999

jmh

1    WITNESS TO MS. MENDELSON

2            Q.    You know, it was my son --

3    JUDGE TO WITNESS

4            Q.    Ma'am, you may be excused.

5            A.    Oh, okay.

6            Q.    Thank you very much, ma'am.  Would you just step

7    out.

8            A.    That's it?  Thank you.

9    MS. MENDELSON TO JUDGE

10            Q.    Your Honor, Mr. Martha's father --

11            A.    By the way, could you please have a seat.

12            Q.    Yeah, sure.

13            A.    You're wandering around the court room like Perry

14    Mason sort of gives me a little --

15            Q.    I have a habit of walking around the court room.

16            A.    I understand.  I understand.  Thank you.

17            Q.    I would like to be heard.  I have four more

18    witnesses waiting outside.  I'm not in the habit of bringing

19    witnesses to court for cumulative testimony.  The reason I pick

20    these witnesses from many others that I could have brought is

21    because each and every one of them has a specific example of, and

22    a specific story as an example of what happens to a person in

23    Jordan.  Each example is different from one other.  One is, in

24    this case, what happened to this witness brother happened

25    because, as she testified, because he spoke something against the

A 17 796 939                    57                February 12, 1999

jmh

1    government.  However, other examples are because of other

2    reasons.  I don't feel, I feel that I am trapped, or rather Mr.

3    Martha is trapped in the following way.  He cannot testify to

4    anything that goes on in Jordan because he simply doesn't know.

5    The only he can testify is the way he is.  He's practically

6    American.  The only way I can bring out what happening there and

7    giving what I would call a fair trial is to bring everything to

8    court so, not just his incident against the government.  I would

9    like to bring incidents about religion.  I would like to bring

10   incidents of jail because of political opinion.  And I believe

11   that if I'm not allowed to do that, I can't make my record and

12   I'm not giving Mr. Martha, he's not getting fair presentation of

13   his case.  I only had about five minutes.  This is the first

14   experience in my life where I'm not allowed to defend somebody

15   that way.  Therefore, and I had five minutes to think about what

16   to do about it, and I'm looking for a reason to either ask for

17   the Court to accept the rest of the witnesses saying that each

18   one of them is testifying, or the example of each one of them is

19   to a different aspect of the claim of withholding, or else I

20   cannot continue as Mr. Martha's attorney because I'm not --

21              Q.    Ms. -- I'm sorry, excuse me.  I'm sorry.  I didn't

22   mean to interrupt you.  You can continue.

23              A.    Or else I cannot continue as Mr. Martha's attorney

24   in this case because I'm not providing him with the

25   representation.

A 17 796 939                    58                February 12, 1999

jmh

```
 1            Q.   Well, Ms. Mendelson, I asked you for a proffer.  I
 2   asked you on several occasions to proffer to me what these
 3   witnesses said.  You told me that what they were going to say is
 4   that general conditions in the country, but through specific
 5   examples, you were going to demonstrate what the conditions are
 6   in the country.
 7            A.   But, what I didn't say is that each of them, there
 8   are several aspects of withholding of removal.
 9            Q.   But, I asked you to please give me the proffer.
10            A.   Okay.
11            Q.   John Doe is going to say X.
12            A.   I did not understand that it was to that specific.
13   I am willing to do it now.
14            Q.   Well, do it, please.
15            A.   I have a witness by the name of Sowah Shamir.  She
16   has a cousin who, he spoke out against Islam, and for that he was
17   taken to jail, and that was about a year ago, and to this day,
18   they don't know what happened to him.  He disappeared after he
19   was taken to jail.  This is as far as her example.  She also has
20   knowledge about what happened to people who don't strictly obey
21   the laws of the Moslem and more particularly the month of Ramadan
22   where people are not allowed to eat and smoke in the
23   (indiscernible) and what happens to people who actually do that.
24   Nema Martha is Mr. Martha's father, and he was a member of a
25   political organization by the name of BADA (phonetic sp.), and
```

A 17 796 939                    59                    February 12, 1999

jmh

1    this was a long time ago, however, this organization, an
2    organization that advocates the changing of the government, and,
3    of course, he was arrested, he was jailed, he was tortured, and
4    he is willing to testify to the details of his torture.   And
5    while he was there --

6              Q.   Excuse me.

7                        (OFF THE RECORD)

8                        (ON THE RECORD)

9    MS. MENDELSON TO JUDGE

10             Q.   He, Mr. Martha's father, is willing to testify not
11   just to the torture that he suffered, but rather the torture that
12   he saw, that other people suffered.  He's also willing to testify
13   that the way in Jordan is that he cannot ever go back.  His name
14   on what we would say a black list, and it's more than probable
15   that anybody related to him, especially his son, would be on the
16   same list in the sense that if George Martha sets foot in Jordan,
17   he will be persecuted for what, for events or for acts of his
18   father, what his father did.  I have a witness by the name of
19   Nada Martha.  She testified to some distant relationship to Mr.
20   Martha through marriage.  I cannot now remember exactly what it
21   is.  And she will testify to how she herself was mistreated in
22   Jordan because she was a Christian.  She will testify to how it
23   is next to impossible for a Christian to find a job in Jordan,
24   and what happens to a Christian apply for a job there.  Also, she
25   will testify that her cousin in 1995, which is relatively recent,

A 17 796 939                    60               February 12, 1999

jmh

1   he was put in jail for a month because he was smoking during the
2   Ramadan.  She will testify how a person in Mr. Martha's position
3   will not be able to find a place to live, mostly because he's
4   single, and something similar happened to her sister's son in
5   1990, which is not a year ago, but this is not that far ago
6   either, that he couldn't find a place to live because he was
7   single.  This will also testify to the impossibility of a person
8   in the situation of Mr. Martha to ever not be single because
9   marriages are arranged through families and he will have no
10  opportunity, no possibility to do that, even setting aside the
11  fact he doesn't speak the language.  And, they will testify to
12  the fact that there is no other way except arrangement between
13  families to get married or to get into, there is no relationship
14  to get married in Jordan any couple who would try to deviate from
15  that custom, chances are the woman will be killed and the man
16  will be either killed or beat up.  So, all this, and this is, the
17  highlight.  They, of course, will provide more details.  And, my
18  intention of bringing all of them is because each one of them,
19  their example is because of another aspect of withholding.  If we
20  putting all together, I believe that they will present well Mr.
21  Martha's case and the Court will understand what will happen to
22  him if he came back.  Therefore, and I believe that I represent
23  to the Court what they are going to testify to, but I cannot
24  testify for them as far as the details and I believe, based on my
25  conversations with them, that the details here are very

A 17 796 939                    61              February 12, 1999

jmh

1    important.

2    JUDGE TO MR. STOLLEY

3            Q.    Well, is the Government willing to accept those

4    proffers?

5            A.    The Government will accept the proffers.

6            Q.    All right.

7    JUDGE TO MS. MENDELSON

8            Q.    Well, the Court's willing to accept your proffer

9    as their testimony, so --

10           A.    I understand that.

11           Q.    Yes.

12           A.    But, let me repeat my last sentence, that was that

13   this is the offer of proof, except the offer of proof is just to

14   what they testify to, but not the details, and I believe in this

15   case, the details are more important, and the details I can't

16   testify to.  And, I don't think that Mr. Martha's case will be

17   complete if they cannot testify to the details.

18           Q.    Well, thank you, Ms. Mendelson.  The Court is

19   going to find that the Court will accept the offer of proof.  The

20   Court does not believe it is necessary to hear the testimony, and

21   so as a consequence, the Court will accept the proffer based upon

22   the stipulation of the Government.  So, at this point, I believe

23   the evidence is closed.  I just want to make sure in terms of the

24   record, you've introduced a substantial amount of evidence about

25   country conditions.  Exhibit 4-A through J is quite extensive,

A 17 796 939                    62                    February 12, 1999

jmh

1    and it indicates what are conditions in Jordan, and I think

2    you've done an admirable job of collecting the information

3    necessary for the Court to understand and appreciate the

4    conditions in Jordan at this time.  In addition, your proffer has

5    given the Court an appreciation and an understanding, and I think

6    your proffer was substantial and complete and sufficient for the

7    Court to understand the conditions.

8              A.    I would like to state on the record that I

9    strongly disagree that I presented a case until now.

10             Q.    All right.  Now, Ms. Mendelson, why don't you

11   explain to me your theory of why restrictions on removal are

12   appropriate in this case?

13   MR. STOLLEY TO JUDGE

14             Q.    Your Honor, the family, I mean they don't have to

15   stand in the hall.

16             A.    Oh, yeah, they can return.

17                        (OFF THE RECORD)

18                        (ON THE RECORD)

19   JUDGE TO MS. MENDELSON

20             Q.    Ms. Mendelson, could you please explain the theory

21   of your case?

22             A.    Your Honor, Mr. Martha came to the United States

23   when he was a few months old.  He's technically not an American

24   because he never applied for citizenship, but he is, in fact,

25   American.  I would like to say that the point of what he is is a

A 17 796 939                    63                  February 12, 1999

jmh

1     point that I would like to discuss later on.  He's American in
2     every way.  He's American in his beliefs as far all these
3     principles that we know as far as equality, as far as democracy,
4     as far as all the freedoms and liberties that this country offers
5     that I don't think I have to waste the Court's time in
6     expressing.  We all know what they are.  In addition to that, Mr.
7     Martha is outspoken.  He expresses his opinion, and he does not
8     really understand nor accept the meaning of I have to shut up and
9     I cannot express what I have to express.  Mr. Martha has no
10    knowledge, no experience of how life in Jordan is and what one
11    can or cannot say or do, even if he wanted to follow them.  He
12    doesn't want to and he doesn't think that he needs to compromise
13    his freedoms and beliefs such as freedom of speech and other
14    beliefs, in any way.  And, Mr. Martha doesn't have anybody in
15    Jordan to help him and to protect him and to tell him left and
16    right what you can or cannot say.  Mr. Martha's father is on a
17    black list for having belonged to an organization that tried to
18    speak and act against the government.  Mr. Martha's father, no
19    mother, no anybody can go there, stay with him and explain to
20    him, you cannot say this, you cannot say that.  Even if they did
21    that, he would have to live a life where he would have to
22    severely compromise his freedoms.  What is really going happen to
23    him there?  He will get off the plane.  He has no place to go.
24    He's a Christian.  He has a Christian name, and he will, the
25    first probability is that he will be arrested right away because

A 17 796 939                    64                    February 12, 1999

jmh

1    of his father.  He is going to be put in jail and probably killed
2    or tortured.  If he is forced to live there somehow, there is no
3    way that he can live without making "a mistake" and speaking to a
4    girl in the street or making a comment about something that
5    appeared in the newspaper, or saying what he thinks about
6    something that was done by the government.  People in Jordan tell
7    on each other.  Something like that, that we heard from the
8    testimony that somebody taped Eseet Marta's brother when he made
9    a simple comment as, it's the government's fault that we don't
10   have tomatoes, something like that.  And, he will within no time
11   end up in jail whether it's because he did something to a woman
12   or he spoke against the government or he spoke against religion,
13   all for the simple reason that he tried to preach his own
14   religion of Christianity to people.  He will be subject to --

15              Q.    Excuse me.

16              A.    As far as, he's going to be subject to physical
17   abuse or beating up by families of women if he ever dare to speak
18   to one, and there is no way that he would be able to survive.
19   Being Christian and noticeably being Christian, and not wanting
20   to hide that, chances are he will never be able to get any kind
21   of a job in Jordan to maintain himself because of his religion.
22   Because he is single and he has practically no opportunity under
23   the way of life in Jordan, because of him being single, he
24   probably will have to stay single, and he would not be able to
25   find a place to live.  It is extremely unlikely that Mr. Martha

jmh

1    will be able to get medical attention and continue to get his
2    medication for his bipolar disease that causes him to speak even
3    more or be more hyper, as we say, than what he normally is, which
4    will, of course, make him speak more, preach more, and endanger
5    the situation even more.  So, without any means of survival, and
6    without wanting to compromise his freedom, I don't think that Mr.
7    Martha will live outside of jail for any length of time, and if
8    he's put in jail, I don't think he's going to be able to survive
9    there either.  So, I think deporting him to Jordan will end in
10   his death most likely.

11            Q.    Thank you, Ms. Mendelson.

12   JUDGE TO MR. STOLLEY

13            Q.    Mr. Stolley?

14            A.    Briefly, Your Honor.  Restriction on removal
15   requires a showing that it is more likely than not that he will
16   be persecuted on account of one of the five protected grounds.  8
17   C.F.R. 208.16(b)(1).  He cannot do that.  By his own testimony
18   and application, his fears are entirely speculative.  In
19   addition, the background documentation, specifically 4-D, the
20   United States State Department Report on Asylum Claims and
21   Country Conditions, simply refutes all of his fears.  At this
22   point, I simply would like to point out that although Ms.
23   Mendelson did say that the father had, whatever had happened to
24   the father, it happened a long time ago.  Exhibit 6 shows that
25   the respondent actually came to the United States to join his

A 17 796 939                    66              February 12, 1999

jmh

1    father.

2    MR. STOLLEY TO MS. MENDELSON

3              Q.   If I'm not mistaken, Ms. Mendelson.

4    MR. STOLLEY TO JUDGE

5              Q.   So, that means that his father has been here for

6    at least 32 years.  In any event, the Service will withdraw it's

7    motion to pretermit.  It does not believe that we even need to

8    reach that issue.

9              A.   Okay.  Well, at this point, the Court is prepared

10   to render it's decision.  So --

11   MS. MENDELSON TO JUDGE

12             Q.   Can I respond to --

13             A.   Yes.  Oh, I'm sorry, yes, you do.  You always have

14   the last say, of course.

15             Q.   First of all, I would like to respond to the

16   Government claim that everything is speculative.  I doubt that

17   real examples, real life examples, these are not events that are

18   published in the newspapers.  These are real life events that

19   happened to family members or to relatives of friends of these

20   people who are here in court.  "Speculative."  If the Government

21   refer to the fact that Mr. Martha himself was not there to be

22   jailed, of course, that would be a ridiculous claim.  That is

23   what we are trying to prevent, but these events happened to

24   people who knew much more than Mr. Martha how to behave in

25   Jordan, nevertheless, they were jailed.  So, it is not

A 17 796 939                    67                February 12, 1999

jmh

1    speculative at all.  It is, the way I see it, beyond a reasonable
2    doubt.  As to the material attached, it is, in fact, numerous.
3    It proves also beyond a reasonable doubt what happens in Jordan.
4    And I also like to refute the Government's claim to this
5    particular exhibit that the U.S. Department of State, and that
6    the Government claim refutes.  I will not, of course, sit and
7    read all this report to here, but just phrases like, problems
8    remain including abuse and mistreatment that detainees arbitrary
9    arrest and detention, lack of accountability within secure
10   services, prolonged detention without charge, lack of due
11   process, infringement on citizens' privacy life, harassment of
12   opposition political party, restrictions on freedom of speech,
13   press, assembly and association, limits on freedom of religion,
14   and this is just the first and the second page of it.  I can't
15   see how all this, and this is that report, how all this refutes
16   all these claims.  I think all the materials and all the
17   testimony complete prove that Mr. Martha is not going to survive
18   in Jordan and he's going to be prosecuted by the government
19   because of his religious belief, because of his, he would like to
20   exercise his freedom of speech, and because he will be, his
21   political opinions that he supports, the form of government of
22   the United States, and because he is a member of the group of the
23   single people, that he will not be able to actually find a place
24   to live there, which is the lesser of our --

25            A.    Thank you very much.

A 17 796 939                    68              February 12, 1999

jmh

1    JUDGE FOR THE RECORD

2           Well, the Court is prepared to render its oral

3    decision, and I will do so right now.

4                    JUDGE RENDERS ORAL DECISION

5    JUDGE TO MS. MENDELSON

6           Q.   Ms. Mendelson, do you reserve appeal?

7           A.   I need to talk to my client about it.  I don't

8    know yet.

9    JUDGE TO MR. STOLLEY

10          Q.   I gather the Government waives.

11          A.   Waived appeal, Your Honor.

12          Q.   Okay.

13   JUDGE TO RESPONDENT

14          Q.   Now, Mr. Martha, I've ordered your removal from

15   this country.  You may appeal this decision on or before

16   March 15th 1999.  Your Notice of Appeal must be received by the

17   Board of Immigration Appeals in Falls Church, Virginia on or

18   before that date.  In addition, there is a fee of $110 that must

19   be paid with that Notice of Appeal.  You may file an application

20   to request the court to waive that fee, and the Court will

21   provide you with the forms in order to allow to you request that

22   waiver.  In addition, I've advised you as to penalties for

23   returning to this country, in the event that the order for

24   removal is finalized.

25   JUDGE TO COURT

A 17 796 939                    69                February 12, 1999

jmh

1               Q.    Is there anything further from either counsel?

2               A.    (Mr. Stoller)  No, Your Honor.

3               Q.    Okay.

4    JUDGE TO RESPONDENT

5               Q.    I'll indicate at this time on your behalf, Mr.

6    Martha, that you will reserve appeal, and obviously, if you

7    decide not to appeal, you need not perfect the appeal by filing

8    the notice and asking for the waiver.

9    JUDGE TO MS. MENDELSON

10              Q.    Is there anything further, Ms. Mendelson?

11   RESPONDENT TO JUDGE

12              Q.    Your Honor?

13   MS. MENDELSON TO RESPONDENT

14              Q.    (indiscernible) speak to him?

15              A.    Yeah, I would like to say something.

16   RESPONDENT TO JUDGE

17              Q.    I'm being deported for threatening to hurt

18   somebody over the telephone?

19              A.    Well, the law provides that because of the

20   conviction and the law determines that that conviction is a

21   serious crime.

22              Q.    It's not serious.

23              A.    Well --

24              Q.    I have a paper right here that says that I never

25   hit the woman.

A 17 796 939                    70                    February 12, 1999

jmh

1          A.    Well, I'll tell you what --

2          Q.    You're sending me, you're condemning me to die.

3    Why don't you just put me in San Quentin death row and let me die

4    here with my family?  Send me to prison here.  Wouldn't that be

5    more appropriate than to send me my, uh, to a country I know

6    nothing about?

7          A.    You can discuss that with your attorney.

8          Q.    You can't answer the question.

9          A.    Okay.

10                          <u>HEARING CLOSED</u>

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25